IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, 378 N. Main Avenue Tucson, AZ 85701;<br><br>             Plaintiff,<br>v.<br><br>DOUGLAS BURGUM, in his official capacity as Secretary of the Interior 1849 C Street, NW Washington, D.C. 20240,<br><br>             Defendant. | Civil Case No.: _____ |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1.      On Friday, March 13, 2026, at 6:15 p.m. EDT, the Office of the Secretary for the U.S. Department of the Interior issued a prepublication "Notice of Meeting," stating that, at the Department of the Interior's headquarters in Washington, D.C., "[t]he Endangered Species Committee will meet regarding an Endangered Species Act ["ESA" or "Act"] exemption for Gulf of America Oil and Gas Activities," including exploration, development, and production activities. The Committee is a cabinet-level panel colloquially referred to as the "God Squad" because it is vested with the extraordinary authority under the ESA to exempt federal actions that may cause a species' extinction from the standard safeguards of the ESA. Given the dire consequences of facilitating the demise of an entire species, the ESA provides for the Committee to intervene only under rare and extremely narrow circumstances as defined by the Act and its implementing regulations.

2.      According to the cursory one-page Federal Register notice, the Committee will meet on Tuesday, March 31, 2026, at 9:30 a.m. EDT at Department of the Interior Headquarters, with the public only able to view proceedings via a YouTube link. 91 Fed. Reg. 12672 (March 16, 2026).

3.      Because the Secretary proposes to summon the Committee without meeting the ESA's public notification and access requirements, and because convening the Committee flagrantly flouts substantive statutory requirements limiting the Committee's jurisdiction to the rarest of circumstances, which do not exist, and this unlawful meeting is evidently designed to greenlight an unlawful permanent exemption of ESA protections as applied to the many oceanic and terrestrial ESA-listed species that occur in the Gulf of Mexico, Plaintiff Center for Biological Diversity ("the Center") seeks declaratory as well as emergency and permanent injunctive relief prohibiting the meeting (or any other attempt by the Secretary to unlawfully convene the Committee) from occurring.

4.      The Interior Secretary's scheduled meeting of the Endangered Species Committee directly conflicts with the ESA. In 1978 amendments to the Act, Congress expressly created the Committee to function as an administrative tribunal of last resort involving irresolvable conflicts that cannot be addressed through the ESA's standard mechanisms. To that end, the ESA expressly limits the Committee's authority to instances where the expert agencies delegated with administering the law's requirements—National Marine Fisheries Service ("NMFS") for most ocean species and the U.S. Fish and Wildlife Service ("FWS") for terrestrial species, nesting sea turtles, seabirds, and some marine mammals, including manatees—have determined during the section 7 "consultation" process that a proposed federal action will jeopardize the continued existence of a species listed as threatened or endangered *and* that there

are no "reasonable and prudent alternatives" to the proposed action that would avoid such jeopardy. 16 U.S.C. § 1536(g)(1).

5.      The 1978 amendments define the Committee's process for considering and ruling on section 7 exemption applications in extraordinary detail. The plain text, statutory structure, and legislative history overwhelmingly demonstrate that the exemption process does not exist as a rubber stamp escape route for any federal project to sidestep the ESA requirements but is instead limited to those extraordinarily unusual cases that cannot be resolved using all of the processes embodied in the ESA.

6.      In practice, such circumstances are exceedingly rare. In the 48 years since its creation, the Committee has adjudicated only *three* exemption applications, with one exemption denied and the other two exemptions granted. Three additional exemption applications were filed but abandoned.

7.      The one-page, March 16 Federal Register notice states in vague and sweeping fashion that "[t]he Committee is meeting regarding an exemption under the Endangered Species Act with respect to oil and gas exploration, development, and production activities in the Gulf of [Mexico] associated with the Bureau of Ocean Energy Management ["BOEM"] and the Bureau of Safety and Environmental Enforcement ["BSEE"] Outer Continental Shelf Oil and Gas Program." BOEM and BSEE are agencies within the Department of the Interior. The Notice does not identify any specific agency action for which an exemption is sought; it does not identify who is seeking the exemption; and it does not specify how, if at all, any of the statutory prerequisites for seeking an exemption have been satisfied.

8.      The Committee's meeting announcement and information contained in the Federal Register notice are not remotely consistent with the ESA's requirements, including

numerous public notification and information access requirements under the Act and its implementing regulations. *See*, *e.g.*, 16 U.S.C. § 1536(g)(2)(B)(ii) (requiring Secretary to "publish notice of receipt of the application in the Federal Register, including a summary of the information contained in the application and a description of the agency action with respect to which the application for exemption has been filed."); 50 C.F.R. § 451.02(h)(1)-(3), (5)-(6) (requiring Secretarial action "announcing that an application has been filed," "stating the applicant's name," "briefly describing the proposed agency action and the result of the consultation process," "designating the place where copies of the application can be obtained," and "specifying the name of the person to contact for further information."). The March 16 notice makes no reference to any of these requirements, or indeed, to any exemption application at all.

9.      The Secretary's notice also disregards the fundamental statutory prerequisite for convening the Committee: a determination by either NMFS or FWS that any "oil and gas exploration, development, and production activities" are jeopardizing the continuing existence of any listed species and that there are no reasonable or prudent alternatives that would avoid such jeopardy. 16 U.S.C. § 1536(g)(1).

10.     The Secretary's decision to undertake the exemption process without meeting any of the legal requirements in the ESA for doing so has potentially disastrous consequences. Numerous ESA-listed species are adversely affected by Gulf oil and gas operations, including the critically-imperiled Rice's whale (found solely in the Gulf, with only 50 individuals remaining), sperm whale, several species of sea turtle (green, hawksbill, Kemp's ridley, leatherback, and loggerhead sea turtles), Gulf sturgeon, West Indian manatee, numerous bird species, and several species of beach mice with highly limited ranges.

4

11.    On the same day that Secretary Burgum issued his notice of the Committee's meeting, the administration approved an ultradeep drilling project to 5,600 feet 250 miles off the Louisiana coast. Similar risky drilling led to the 2010 Deepwater Horizon explosion in 2010, the worst oil spill in U.S. history, which sent oil onto beaches throughout the Gulf, down to Tampa Bay, and even onto the Atlantic Coast, and caused a 22% decline in the Rice's whale population. In late 2025, the Trump administration proposed to open up vast new areas of the eastern Gulf to oil and gas drilling, including areas of southwest Florida coast long under a drilling moratorium, where a similar spill would threaten the coastal Everglades. This is on top of the more than 10 million acres of the Gulf already leased to oil and gas companies.

12.    The ESA provides that, with limited exceptions, any exemption granted by the Committee "shall constitute a *permanent* exemption *with respect to all endangered or threatened species* for the purposes of completing such agency action." 16 U.S.C. § 1536(h)(2)(A) (emphasis added). Consequently, the risks from oil spills as well as the multitude of other drilling impacts on ESA-listed species—such as harmful noise from geological and geophysical surveys, pollution from offshore fracking, collisions with vessels, and habitat destruction from platform and pipeline construction—would no longer be subject to the Act's section 7 requirements. The Secretary's patently unlawful convening of the Committee thus poses grave risks to the protection of all these species within the Gulf of Mexico.

13.    The Center accordingly brings this action seeking declaratory as well as emergency and permanent injunctive relief enjoining the Interior Secretary from convening the Committee unless and until the legal requirements for doing so have been satisfied

**JURISDICTION AND VENUE**

14.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and can grant declaratory relief pursuant to 28 U.S.C. §§ 2201-2202. The Court has jurisdiction under 28 U.S.C. § 1361 to issue mandamus relief against Defendant.

15.    Venue properly vests in this Court pursuant to 28 U.S.C. § 1391(b) and (e), because the violations are occurring in this district, Defendant resides in this district, and a substantial part of the events or omissions giving rise to the claims have occurred in this district due to decisions made by the Defendant.

**PARTIES**

16.    Plaintiff CENTER FOR BIOLOGICAL DIVERSITY ("the Center") is a national conservation organization that advocates for the protection of threatened and endangered species and their habitats through science, law, and policy. The Center's mission includes protecting air quality, water quality, and public health. The Center has been actively involved in protecting the Gulf of Mexico's oceanic and terrestrial habitats from oil and gas drilling for decades. The Center has more than 93,000 members and more than 1.8 million supporters globally. The Center brings this action on behalf of itself and its members.

17.    The Center has members who live near and regularly visit the Gulf of Mexico and its coastal communities, beaches, and offshore waters. Center members have demonstrated interests in the conservation of the many oceanic and terrestrial ESA-listed species that depend on the Gulf's waters and shores for their continued existence and ultimate recovery, including whales, sea turtles, manatees, birds, and beach mice. These members use and enjoy specific geographic areas directly and indirectly impacted by oil and gas exploration, development, and production activities in the Gulf. The Center's members have recreational, scientific,

educational, aesthetic, and professional interests in the Gulf's ESA-listed species and the broader Gulf environment upon which these species depend.

18.    Offshore oil and gas activities in the Gulf, including oil spills, geological and geophysical surveys, offshore fracking, high-pressure high-temperature projects, vessel and helicopter traffic, and the construction and operation of offshore platforms and pipelines, adversely affect many ESA-listed species and their habitats. These activities result in far-reaching impacts to wildlife aquatic and terrestrial habitat, air quality, and water quality. For example, oil spills have a wide array of lethal and sublethal impacts on wildlife, both immediate and long term. Chronic, constant noise from sources such as vessel traffic and construction impair some ESA-listed species' ability to communicate, navigate, reproduce, or feed, including the critically imperiled Rice's whale. Vessel traffic can also injure and kill ESA-listed species through vessel collisions. And offshore platforms and other infrastructure can injure and kill ESA-listed seabirds, such as the endangered black-capped petrel, through light pollution and collisions.

19.    The Secretary's March 16 notice was issued in disregard of numerous statutory and regulatory public notification and information access requirements of the ESA and its implementing regulations, directly impairing the Center's right to obtain information under the statute. This information is essential to the Center's ability to further its longstanding institutional interests in ensuring the survival and recovery of imperiled wildlife in the Gulf.

20.    The Secretary's decision to convene the March 31 meeting in a closed-door manner only accessible to the public through a YouTube stream violates the ESA's mandate that all Committee meetings be "open," further impairing the Center's interests. Even though the

Secretary's convening of the Committee is inherently unlawful, in the event that meeting is nonetheless held, Center staff intends to attend and participate in that meeting.

21.    In addition, the unlawful meeting of the Committee is designed to result in unlawful, permanent exemptions from ESA section 7 requirements as they otherwise pertain to the many ESA-listed species in the Gulf of Mexico that are adversely affected by oil and gas exploration, development, and production activities, injuring the Center's members' recreational, scientific, educational, aesthetic, and professional interests.

22.    For example, one Center member enjoys observing whales, and has worked on whale-watching boats off the U.S. East Coast, the Gulf Coast of Florida, and in the Caribbean. He now advocates on behalf of whales and educates the public about the need to protect imperiled whales from various threats, including oil and gas drilling activities. He has taken numerous trips to view large whales in various parts of the world and is planning a trip to look for Rice's whales in the Gulf this spring. Another Center member regularly uses the Gulf of Mexico, including the beaches, bays, and coastal waterways in Louisiana, Mississippi, Alabama, and Florida, to walk on the beach, go kayaking or paddleboarding, take out his boat, and observe and look for sea turtles, manatees, and other wildlife. He goes to the Gulf Island National Seashore at least once a month, where he has seen manatees and sea turtles. And another Center member is an avid bird watcher and has traveled to Texas, Louisiana, and Florida to see coastal and ocean birds, including whooping crane, eastern black rail, and black-capped petrel.

23.    Defendant DOUG BURGUM, Secretary of the Interior, is sued in his official capacity. Secretary Burgum is the chairman of the Endangered Species Committee and is the official who convened the meeting of the Committee at issue in this case.

8

**LEGAL BACKGROUND**

A.    **The Endangered Species Act: Overview**

24.    The ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978). Finding that "fish, wildlife, and plants are of esthetic, ecological, educational, historical, recreational, and scientific value to the Nation and its people," Congress ordered that all federal agencies shall "seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes" of the Act. 16 U.S.C. § 1531(a)(1)-(3), (b). To that end, the ESA establishes crucial substantive and procedural safeguards for species that are listed as endangered or threatened, as well as for the formally designated "critical habitats" of such species.

25.    Section 7 of the ESA substantively prohibits federal agencies from taking any action which may jeopardize the continued existence of listed species or that would destroy or adversely modify a species' critical habitat. *Id.* § 1536(a)(2).

26.    To meet this substantive mandate, section 7 places a duty on all agencies to consult with either NMFS or FWS, or both, depending on the species at issue, before engaging in any discretionary action that may affect a listed species or critical habitat. *Id.* The agency taking the action is known as the action agency, and NMFS and FWS are known as the expert consulting agencies or "Services."

27.    During the consultation process, both the action agency and the Services must "use the best scientific and commercial data available." *Id.* § 1536(a)(2); 50 C.F.R. § 402.14(d), (g)(8). The section 7 consultation requirement reflects "a conscious decision by Congress to give

9

endangered species priority over the 'primary missions' of federal agencies." *Tenn. Valley Auth.*, 437 U.S. at 185.

28.    Once an action agency determines that its action "may affect" a listed species or critical habitat, consultation, either formal or informal, is required. If the action agency determines that an action "is not likely to adversely affect any listed species or critical habitat," the process ends informally if the Service issues a written concurrence. 50 C.F.R. §§ 402.13; 402.14(b)(1).

29.    A relatively recent review of approximately 25,000 section 7 consultations conducted from 2000 to 2017 found that nearly 80% were resolved informally. Jacob W. Malcom & Ya-Wei Li, *Data Contradict Common Perceptions About a Controversial Provision of the U.S. Endangered Species Act*, 112(52) PNAS 15844-15849 (2015).

30.    For those relatively infrequent actions where the action agency or the Services instead determine that the action is likely to adversely affect a listed species or destroy or adversely modify a species' critical habitat, "formal consultation" is conducted. Formal consultation culminates in the Services issuing a "biological opinion" advising the action agency as to whether the proposed action, alone or taken together with cumulative effects, "is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat." 50 C.F.R. § 402.14(c), (g), (h)

31.    If the Services determine that jeopardy is likely, it must provide the action agency with "reasonable and prudent alternatives" to the proposed action that would avoid that result, if such alternatives exist. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(g)(5), (h)(2)

32.    The vast majority of biological opinions conclude that the action is not likely to jeopardize a listed species or adversely modify a species' critical habitat. For example, of the

4,934 formal consultations conducted between 2000 and 2017, only 72 (1.5% of formal and 0.3% of all consultations) resulted in jeopardy findings and only 55 (1.1% of formal and 0.2% of all consultations) resulted in findings of adverse modification of critical habitat. In a subset of FWS consultations conducted between 2008 to 2015, *none* of the 88,290 actions had been "stopped or extensively altered as a result of FWS finding jeopardy or destruction/adverse modification." Malcom & Li at 15846.

33.    This "low percentage of jeopardy and adverse modification" determinations "shows that [NMFS and FWS] . . . ha[ve] worked with agencies and applicants to find solutions the vast majority of the time" and that "conventional wisdom about the ESA stopping projects is unfounded." *Id.*

**B.    The Endangered Species Act: 1978 Amendments Creating the "Endangered Species Committee"**

34.    In response to the Supreme Court's decision in *Tenn. Valley Auth.*—which held that construction of a dam would violate the ESA by causing the extinction of a fish species—Congress amended the ESA. President Carter signed the Endangered Species Act Amendments of 1978 into law on November 10, 1978. Pub. L. No. 95-632, § 1, 92 Stat. 3751 (1978).

35.    Although proposed amendments were introduced to dramatically weaken or eliminate section 7 requirements, Congress rejected this approach. Congress instead created a "comprehensive administrative scheme to promote interagency cooperation and to avoid conflict between the interests of particular projects and the protection of endangered species." David B. Liner, *Environmental Law – The Endangered Species Act Amendments of 1978: Congress Responds to Tennessee Valley Authority v. Hill*, 25 Wayne L. Rev. 1327, 1335 (1979). To address the extraordinary circumstances in which such conflicts cannot otherwise be resolved, Congress created the Committee to oversee and implement this exemption process.

11

36.     The Committee "is designed to function as an *administrative court of last resort*." S. Rep. No. 418, 97th Cong., 2d Sess. 17 (1982) (emphasis added). To that end, Congress expressly limited the Committee's authority to instances where NMFS or FWS has determined that a specific action will jeopardize the continued exist of a species and/or destroy or adversely modify the species' critical habitat and there remains an "irresolvable conflict" concerning how to address that determination.

37.     Almost all jeopardy determinations—which, as previously explained, are themselves very rare—can be addressed through the development of "reasonable and prudent alternatives." 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h)(2). The Committee's authority to hear exemption applications is limited to an even smaller subset of these already uncommon circumstances—where the agency action will jeopardize a listed species or impair a species' critical habitat *and* there are no reasonable and prudent alternatives that would avoid this result. 16 U.S.C. § 1536(g)(1).

38.     The 1978 amendments specify the Committee's process for ruling on section 7 exemption applications in extraordinary detail, encompassing 12 new subsections ((e) through o)) within section 7.

39.     Among other elements, the amendments prescribe requirements for: (1) establishment of the Committee; (2) promulgation of regulations to govern the form of applications to the Committee; 93) processes and timelines governing the consideration of exemption applications; (4) findings required to grant an exemption application; and (5) public access and participation requirements. 16 U.S.C § 1536(e)-(h).

40.     Where an exemption application has been properly submitted, the Committee is led by the Interior Secretary and composed of five other senior officials: the Secretaries of

Agriculture and the Army, the Chairman of the Council of Economic Advisers, and the Administrators of the Environmental Protection Agency and the National Oceanic and Atmospheric Administration. Once an exemption application is received, the President appoints one individual from each affected State to be a member of the Committee in relation to the specific application. 16 U.S.C. § 1536(e)(3)(G), (g)(2)(B); 50 C.F.R. § 451.03(b).

41.     The amendments establish a rigorous framework of specific procedures and timelines governing the Committee's consideration of an exemption application. In addition to other duties, the Interior Secretary as Committee Chair must make threshold determinations on an application within 20 days. 16 U.S.C. § 1536(g)(3); 50 C.F.R. § 452.03(a). For an application that passes the threshold review, the Secretary must then prepare a report to present to the Committee within 140 days. 16 U.S.C. § 1536(g)(4)-(5). In order to "develop the record for the report," Congress further directed that the Secretary "shall hold a hearing." 16 U.S.C. § 1536(g)(4); 50 C.F.R. § 452.04(a). The hearing is conducted by an administrative law judge, who is directed to then close and certify the record and transmit it to the Secretary. The Secretary then prepares a report for submission to the Committee. Among other requirements, the report must discuss the availability of alternatives, whether the action is in the public interest, and any reasonable mitigation measures. 16 U.S.C. § 1536(g)(5); 50 C.F.R. § 452.05(a)

42.     Within 30 days of receiving the Secretary's report, the Committee may grant the application if "there are no reasonable and prudent alternatives to the agency action," the "benefits of such action clearly outweigh the benefits of alternative courses of action consistent with conserving the species or its critical habitat, and such action is in the public interest," and the "action is of regional or national significance." 16 U.S.C. § 1536(g), (h).

43.     The Secretary is required to meet public notification and information access requirements throughout all stages of the Committee's process for considering exemption applications. *See* 16 U.S.C. § 1536(g)(2)(B)(ii) (requiring the Secretary to "publish notice of receipt of the application in the Federal Register, including a summary of the information contained in the application and a description of the agency action with respect to which the application for exemption has been filed."); *id*. § 1536(e)(5)(D) ("All meeting and records of the Committee shall be open to the public."); *id*. § 1536(g)(8) ("All meetings and records resulting from activities pursuant to this subsection shall be open to the public."); 50 C.F.R. § 451.02(h).

**C.     The Administrative Procedure Act**

44.     The Administrative Procedure Act ("APA") governs judicial review of federal agency actions. 5 U.S.C. §§ 701-706.

45.     The APA specifies that courts "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law." *Id*. § 706(2)(A), (D). The APA also provides a right of action to "compel agency action unlawfully withheld or unreasonably delayed[.]" *Id*. § 706(1).

**FACTUAL ALLEGATIONS**

**A.     2025 NMFS Biological Opinion on "Gulf of America Oil and Gas Program".**

46.     Although the Secretary's March 16 notice does not directly reference it, NMFS finalized the latest ESA section 7 consultation with BOEM and BSEE regarding oil and gas exploration, development, and production activities in the Gulf in a biological opinion issued on May 20, 2025.

14

47.     The 2025 Biological Opinion ("2025 BiOp") is a programmatic document that analyzes effects of oil and gas activities within the federal Outer Continental Shelf ("OCS"), referring to the offshore waters beginning 10 miles offshore of Florida; 3.5 miles offshore of Louisiana, Mississippi, and Alabama; and 10.3 miles offshore of Texas, extending seaward to the limits of United States jurisdiction, the Exclusive Economic Zone ("EEZ"), to a water depth of 10,978 feet. 2025 BiOp at 123. Divided into three main areas—the western planning area ("WPA"), central planning area ("CPA"), and eastern planning area ("EPA")—the total area encompassed by the BiOp is approximately 95 million acres. *Id.*

48.     The consultation's scope includes Interior's management and regulation of OCS oil and gas-related activities under the Outer Continental Shelf Lands Act ("OSCLA") from 2025 through 2029, including projections of activities relating to permitting and plan approval and impacts from all prior active leases and future lease sales. *Id.* at 16-18. As such, the BiOp covers 45 years of federally authorized oil and gas activities in the Gulf.

49.     These activities include geological and geophysical surveys; airgun surveys (deep seismic, ocean-bottom, high-resolution, non-airgun, sound-producing high-resolution); drilling (including offshore fracking and high pressure high temperature projects) and production (fixed, floating, or subsea); vessel operations (barges and tankers); helicopter operations; offshore infrastructure and construction (including pile driving, casing conductor installation, and structure and facility pile installation); pipelines; decommissioning and structure removal; and severance operations. *Id.* at 35-78. There are currently 1,366 active platforms in the Gulf. *Id.* at 71.

50.     In the 2025 BiOp, NMFS concluded that these activities were likely to adversely affect ESA-listed species including Rice's and sperm whale, green, hawksbill, Kemp's ridley,

15

leatherback, and loggerhead sea turtles, and Gulf sturgeon, and designated or proposed critical habitat for Rice's whale, green sea turtle, and Gulf sturgeon. *Id.* at 150-151.

51.    ESA-listed species are by definition either in danger of extinction or will become so in the foreseeable future. The status of Rice's whale, however, is a particularly urgent situation. The only known baleen species to occur in the Gulf year-round, Rice's whales are concentrated in the northeastern Gulf in the De Soto Canyon area at relatively shallow depths of 100 to 400 meters. *Id.* at 160. Recent science has determined that the species is also persistently found in the western and central Gulf at the same depths. The species is critically endangered, with the latest abundance estimates at only 51 animals. *Id.* at 165-166.

52.    Adverse effects to Rice's and sperm whales include vessel strikes; entanglements; and pollution from noise and oil spills, including sounds from chronic, constant sources such as vessel traffic and construction that impair the whale's ability to communicate, navigate, reproduce, or feed. *Id.* at 151-152.

53.    In the 2025 BiOp, NMFS concluded that oil and gas activities in the Gulf were likely to jeopardize the continued existence of Rice's whale due to the risk of vessel strikes *Id.* at 574. In an effort to ameliorate this predicted impact, NMFS proposed a reasonable and prudent alternative comprised of the following actions to be implemented in step-wise fashion: immediately begin to use technology to enable Rice's whale vessel strike avoidance and monitoring and presence of Rice's whale; establish an expert working group to support development and implementation of a Rice's whale vessel strike avoidance technology plan; improve understanding of Rice's whale vessel strike risk associated with the proposed action; develop a Rice's whale vessel strike avoidance technology plan; undertake independent peer

review; implement Rice's whale vessel strike technology plan; and monitor Rice's whales to ensure no likelihood of jeopardy during RPA implementation. *Id.* at 577-581.

54.    In an earlier 2020 BiOp, NMFS found that federally authorized Gulf oil and gas activities are likely to jeopardize the Rice's whale because of the "wide-ranging, combined multiple effects to the small and likely declining population" from five "combined stressors": vessel strikes, vessel noise, marine debris, oil spills and dispersants, and sound from seismic survey." NMFS included an RPA to address only two of those threats: vessel strikes and vessel noise. Specifically, the RPA restricted vessel activity in Rice's whale habitat in the eastern Gulf, including a requirement that oil and gas vessels travel at no more than 10 knots through the area year-round and a prohibition on oil and gas vessels traveling through the area at night or at times of low visibility, except in emergencies for the safety of the vessel or crew. NMFS included the 2020 RPA as part of the baseline in its 2025 BiOp.

55.    The 2025 BiOp also contained what it labeled as an Incidental Take Statement ("ITS") for ESA-listed species likely to be adversely affected including whales (Rice's and sperm) and sea turtles (Kemp's ridley, North Atlantic DPS green, Northwest Atlantic loggerhead, leatherback, and hawksbill). 2025 BiOp at 584-598.

56.    The ITS includes quantified estimates of incidental take for each sea turtle species resulting from geological and geophysical surveys (impairment from seismic survey sound, harassment from seismic survey sound, lethal entanglement in equipment, and entrapment in moon pools) and vessel strikes. The ITS also includes a quantified estimate from geological and geophysical surveys of annual levels of incidental take of Rice's and sperm whales due to sound, and a quantified level of lethal and non-lethal take of Rice's and sperm whales from vessel strikes. *Id.* at 588-591. It does not quantify the extent of take from oil spills or marine debris

17

expected to occur from Gulf oil and gas drilling activities, nor does it authorize several types of take of Rice's whales and sperm whales that the BiOp acknowledges will likely occur or contain measures to ensure such take complies with the ESA and Marine Mammal Protection Act.

**B.      FWS Biological Opinion**

57.      FWS issued a Biological Opinion regarding BOEM and BSEE authorized oil and gas exploration, development, and production activities in the Gulf on April 20, 2018, responding to BOEM and BSEE's Biological Assessment determining that ESA-listed bird species (Cape Sable seaside sparrow, Mississippi sandhill crane, piping plover, roseate tern, rufa red knot, whooping crane, and wood stork); nesting sea turtles (Kemp's ridley, loggerhead, and loggerhead critical habitat); beach mice (Alabama, Choctawhatchee, St. Andrew, and Perdido Key); and West Indian manatees were either not affected or not likely to be adversely affected by discharges, aircraft noise and operation, vessel noise and operation, drilling and production noise, marine debris, and brightly lit platforms, but were likely to be adversely affected by oil spills. The 2018 FWS BiOp concluded that none of the species would be taken by Gulf oil and gas drilling activities and that none of the species are jeopardized by such activities.

58.      On March 6, 2024, BOEM and BSEE wrote to FWS requesting reinitiation of consultation due to new information, including the listing of black-capped petrel on January 29, 2024; the proposed rules to designate critical habitat for the rufa red knot and North Atlantic distinct population segment of the green sea turtle (for nesting); and an analysis of new information regarding the recent use of the Chandeleur Islands by nesting loggerhead and Kemp's ridley sea turtles. In March 2025, FWS concluded that the proposed actions may affect, but are not likely to adversely affect these listed species. It also re-affirmed its earlier conclusions in the 2018 Biological Opinion.

**C.      The Secretary's March 16, 2026, Notice of Meeting**

59.      On Friday, March 13, 2026, at 6:15 p.m. EDT, the Office of the Secretary for the U.S. Department of the Interior issued a prepublication "Notice of Meeting," stating that "[t]he Endangered Species Committee will meet regarding an Endangered Species Act exemption for Gulf of America Oil and Gas Activities." According to the Notice, published in the Federal Register on Monday, March 16, 2026, the Committee will meet on Tuesday, March 31, 2026, at 9:30 a.m. EDT at Department of the Interior Headquarters. 91 Fed. Reg. at 12672. The Notice does not state that members of the public will be able to attend the hearing in person but, rather, only that the meeting will be "livestream[ed]" on YouTube.

60.      The March 16, 2026, notice does not indicate whether an exemption application was filed, identify who the applicant was if such an application was filed, or provide any other required information regarding the application or where the public can view the application materials, as required by the ESA and its implementing regulations. The notice provides no explanation as to the basis for convening the Committee in the absence of a determination by NMFS or FWS that oil and gas activities in the Gulf violate section 7(a)(2).

**D.      The Center's March 16, 2026, Letter to the Secretary Seeking Public Notification and Information Access Required by the ESA.**

61.      On March 16, 2026, the Center wrote to the Interior Secretary, invoking the information access obligations imposed by the ESA, citing the pertinent statutory and regulatory provisions, and demanding by the close of business on March 17, 2026, (1) all documents presently in the possession of the Interior Department relating in any manner to the "exemption" to be discussed at the upcoming meeting; and (2) an assurance that the meeting will in fact be open to interested members of the public, as required by the ESA, and details of how and when the public may gain physical access to the meeting.

19

62.     By letter to the Center dated March 17, 2026, the Interior Department's Deputy Solicitor for Energy and Mineral Resources responded to the Center's March 16 demand letter. The response did not commit to providing any of the records or other information sought in the Center's letter. Nor did it commit to making the March 31 meeting open to the public. Rather, the response asked the Center to "explain why you believe the Act requires the Committee to provide the records you have requested before the Committee's March 31 meeting," and "why you believe the Act requires in-person attendance" at the meeting.

63.     By response letter transmitted on the morning of March 18, 2026, the Center again set forth the legal basis for its requests, explained that there is no practical reason why the Interior Department cannot accommodate access by those who desire to attend the meeting in person, and urged the Secretary to reconsider the Committee's denial of the legally required access. As of the filing of this Complaint, no such reconsideration has been forthcoming.

**CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**
**APA Violation Against the Secretary:**
**Violation of, and/or Unlawful Withholding of,**
**Public Notification and Information Access Requirements**

64.     Plaintiff incorporates by reference the allegations in all preceding paragraphs.

65.     The ESA and its implementing regulations contain several public notification and information access requirements in relation to the Committee's consideration of exemption applications.

66.     Under section 7(g)(2)(B)(i), the Secretary must "publish notice of receipt of the application in the Federal Register, including a summary of the information contained in the application and a description of the agency action with respect to which the application for exemption has been filed." 16 U.S.C. § 1536(g)(2)(B)(ii). The Act's implementing regulations

mandate additional specific requirements upon the Secretary's receipt of the application. *See* 50 C.F.R. § 451.02(h) (requiring Secretarial action "announcing that the application has been filed," "stating the applicant's name," "briefly describing the proposed agency action and the result of the consultation process," "designating the place where copies of the application can be obtained," and "specifying the name of the person to contact for further information.").

67.     Following receipt, the ESA prescribes further public notification and information access requirements throughout all stages of the Committee's process for considering exemption applications. 16 U.S.C. § 1536(e)(5)(D) ("[a]ll meetings and records of the Committee shall be open to the public."); *id*. § 1536(g)(8) ("All meetings and records resulting from activities pursuant to this subsection shall be open to the public.").

68.     Because neither NMFS nor FWS has determined that Gulf oil and gas activities violate section 7(a)(2), the Secretary cannot have received a lawful exemption application and thus could not have lawfully called a meeting to consider such an application.

69.     If the Secretary has nonetheless received an exemption application despite the absence of a determination by NMFS and FWS that section 7(a)(2) has been violated, he has failed to provide the public with the information regarding that unlawful application as required by law. The notice is bereft of any information regarding whether an exemption application has even been received, who submitted the application, or any other category of basic information required by the ESA and its regulations.

70.     The Secretary's notice provides no indication as to how the public can access any records of the Committee, including any records pertaining to any exemption application that has been submitted, as required by the ESA. Moreover, the meeting itself is not "open" to the public as required by the ESA but is instead only being livestreamed via YouTube.

21

71.    Section 7(e)(6) of the ESA further requires that "to the extent practicable within the time required for action under subsection (g) . . . the consideration of any application for an exemption under this section and the conduct of any hearing under this subsection shall be in accordance with sections 554, 555, and 556 (other than subsection(b)(3) of section 556)." 16 U.S.C. § 1536(e)(6). These statutory requirements have also been disregarded. APA section 554(c)(1), for example, requires that the agency "shall give all interested parties opportunity for . . . the submission and consideration of facts [and] arguments . . . when time, the nature of the proceeding, and public interest permit." 5 U.S.C. § 554(c)(1). The Secretary's March 16 notice precludes meeting this requirement, as no information has been provided regarding the exemption application (if any has indeed been submitted).

72.    The Secretary's decision to convene the Committee on March 31, 2026, is a final agency action. Because the Secretary's decision to call a meeting without satisfying the ESA's public notification and information access requirements is arbitrary, capricious, made without procedure required by law, and is otherwise not in accordance with law, and/or such public notification and information access has been unreasonably delayed and unlawfully withheld, the Secretary's decision and failure to comply with the ESA's public access obligations violates the APA. 5 U.S.C. § 706(1); (2)(A), (D).

**SECOND CLAIM FOR RELIEF**
**APA Violation Against the Secretary:**
**Unlawful Convening of the Endangered Species Committee**

73.    Plaintiff incorporates by reference the allegations in all preceding paragraphs.

74.    The Committee may only consider an exemption after NMFS or FWS has determined that a proposed federal action is likely to jeopardize the continued existence of a species listed under the ESA, and that there are no "reasonable and prudent alternatives" that

22

would avoid this jeopardy. 16 U.S.C. § 1536(g); 50 C.F.R. §§ 451.02, 451.03. This fundamental threshold requirement for convening the Committee is absent here.

75.    NMFS's 2025 BiOp determined that the proposed oil and gas exploration, development, and production activities would jeopardize the continued existence of Rice's whale, a critically imperiled species endemic to the Gulf. In order to address this jeopardy determination, NMFS recommended reasonable and prudent alternatives that it determined would avoid jeopardy, including the development and use of technology on oil and gas related vessels to monitor for the species' presence.

76.    While the 2025 NMFS BiOp did involve a jeopardy determination, such determination standing alone falls far short of the statutory and regulatory prerequisites for invoking the Committee's jurisdiction. The most important of these prerequisites is that "after consultation," NMFS or FWS has issued a Biological Opinion concluding "that the agency action would violate [Section 7(a)(2)]." 16 U.S.C. § 1536(g)(1). Such conclusion can only occur if the Biological Opinion concludes jeopardy *and* that there are no reasonable and prudent alternatives.50 C.F.R. § 402.14(h)(2) ("A 'jeopardy' biological opinion shall include reasonable and prudent alternatives, if any. If [NMFS or FWS] is unable to develop such alternatives, [it] will indicate that to the best of its knowledge there are no reasonable and prudent alternatives.").

77.    By making a decision to convene the Committee in the absence of a determination by NMFS or FWS that Gulf oil and gas exploration, development, and production activities violate section 7(a)(2) (based on a jeopardy finding for which no reasonable and prudent alternatives exist), the Secretary's action is arbitrary, capricious, made without procedure required by law, and otherwise not in accordance with law, in violation of the ESA and its implementing regulations and the APA. 5 U.S.C. § 706(2)(A), (D).

**THIRD CLAIM FOR RELIEF**
**Mandamus Relief Against the Secretary:**
**Failure to Comply With the ESA's Mandatory Disclosure Obligations**

78.     Plaintiff incorporates by reference the allegations in all preceding paragraphs.

79.     The ESA requires, in relevant part, that "[u]pon receipt of an application for exemption of agency action . . . the Secretary shall promptly . . . publish notice of receipt of the application in the Federal Register, including a summary of the information contained in the application and a description of the agency action with respect to which the application for exemption has been filed." 16 U.S.C. § 1536(g)(2)(B). No such notice has been published.

80.     The ESA's implementing regulations impose additional disclosure obligations on the Secretary when an exemption application has been submitted, including "announcing that the application has been filed," "stating the applicant's name," "describing the proposed agency action and the result of the consultation process," "designating the place where copies of the application can be obtained," and "specifying the name of the persons to contact for further information" in connection with the exemption application. 50 C.F.R. § 451.02(h). No such information has been disclosed to the public.

81.     The ESA requires that "[a]ll meetings and records resulting from activities pursuant to this subsection shall be open to the public." 16 U.S.C. § 1536(e)(5)(D). The Secretary has not made any of the records of the Committee, let alone all of them, open to the public. The Interior Department's March 16, 2026 Federal Register Notice makes clear that the Secretary is not allowing the interested public to attend the March 31 meeting.

82.     A writ of mandamus is therefore warranted to compel Defendant to provide the Center with the access to information, documents, and meetings that the ESA mandates. 28 U.S.C. § 1361.

24

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court:

1.     Declare the Secretary's March 16, 2026, notice of convening the Endangered Species Act Committee as arbitrary, capricious, and otherwise not in accordance with law due to the Secretary's failure to meet the ESA's public notification and information access requirements, and for unlawfully convening the Committee without meeting the requirements of the ESA.

2.     Enjoin the Secretary from convening the March 31, 2026, Endangered Species Committee meeting and all other Committee meetings that are proposed without meeting the ESA's public notification and information access requirements, and the substantive requirements under the ESA for invoking the Committee's jurisdiction to hear exemption applications, and vacate the decision to hold the meeting as announced in the March 16, 2026, Federal Register notice;

3.     Enjoin the Committee from issuing any ESA exemptions without full observance of the requirements of the ESA and its implementing regulations;

4.     Issue a writ of mandamus compelling the Secretary to comply with the public access requirements of the ESA;

5.     Retain jurisdiction to ensure compliance with the Court's Orders;

6.     Award Plaintiffs their reasonable costs of litigation, including reasonable attorneys' fees, expert fees, and costs; and

7.     Grant such other and further relief as the Court may deem just and proper.

25

DATED: March 18, 2026                  Respectfully submitted,

                                       /s/ Eric R. Glitzenstein
                                       Eric R. Glitzenstein (D.C. Bar No. 358287)
                                       Center for Biological Diversity
                                       1411 K Street NW, Suite 1300
                                       Washington, DC 20005
                                       Phone: (202) 849-8401
                                       Email: eglitzenstein@biologicaldiversity.org

                                       /s/ *Brian Segee*
                                       Brian Segee (CA Bar No. 200795)*
                                       Center for Biological Diversity
                                       226 W. Ojai Ave., Ste. 101-442
                                       Ojai, CA 93023-3278
                                       Phone: 805-750-8852
                                       Email: bsegee@biologicaldiversity.org

                                       /s/ *Kristen Monsell*
                                       Kristen Monsell (D.C. Bar No. CA00060)
                                       Center for Biological Diversity
                                       2100 Franklin St., Suite 375
                                       Oakland, CA 94612
                                       Phone: (510) 844-7137
                                       Email: kmonsell@biologicaldiversity.org

                                       /s/ *Lindsay E. Reeves*
                                       Lindsay E. Reeves (La. Bar No. 32703)*
                                       Center for Biological Diversity
                                       3436 Magazine Street, FRNT PMB
                                       539 New Orleans, LA 70115
                                       Phone: (504) 342-4337
                                       Email: lreeves@biologicaldiversity.org

                                       *Seeking admission *pro hac vice*

                                       *Attorneys for Plaintiff*