**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY,<br><br>     Plaintiff,<br><br>     v.<br><br>DOUGLAS BURGUM, Secretary of the Interior,<br><br>     Defendant. | Case No.: 1:26-cv-00940-RC<br><br>**PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER** |

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................................ iii

INTRODUCTION ....................................................................................................................... 1

LEGAL BACKGROUND ............................................................................................................. 3

    A.    The Endangered Species Act: Overview ............................................................... 3

    B.    Endangered Species Act: The 1978 "God Squad" Amendments ...................................... 4

FACTUAL BACKGROUND ......................................................................................................... 9

    A.    2025 NMFS Biological Opinion on "Gulf of America Oil and Gas Program" .................. 9

    B.    FWS 2018 Biological Opinion and Subsequent Consultation. ........................................ 11

ARGUMENT ............................................................................................................................. 12

    I.    The Center Is Likely to Succeed on the Merits ................................................. 12

        A.    The Secretary Failed to Meet the ESA's Public Notification and Information Requirements. ....................................................................... 13

        B.    The Secretary Is Unlawfully Convening the Endangered Species Committee..... 17

    II.    The Center Will be Irreparably Injured In the Absence of a Temporary Restraining Order ................................................................................................ 20

    III.    The Balance of the Equities and Public Interest Support Granting a Temporary Restraining Order. .............................................................................. 28

**TABLE OF AUTHORITIES**

**Cases**

*Aguilera v. FBI,*
 941 F. Supp. 144 (D.D.C. 1996) ............................................................................................ 22

*Am. Foreign Serv. Ass'n v. Trump,*
 766 F. Supp. 3d 25 (D.D.C. 2025) ............................................................................................ 1

*Am. Med. Ass'n v. Reno,*
 57 F.3d 1129 (D.C. Cir. 1995) .............................................................................................. 17

*Amoco Prod. Co. v. Vill. of Gambell,*
 480 U.S. 531 (1987) ............................................................................................................ 29

*\* Beatty v. Trump,*
 No. 25-cv-4480 (CRC), 2026 WL 712814 (D.D.C. Mar. 14, 2026) ...................................... 22

*Brennan Ctr. for Justice at NYU Sch. of Law v. DOC,*
 498 F. Supp. 3d 87 (D.D.C. 2020) ....................................................................................... 22

*\* Climate United Fund v. Citibank, N.A.,*
 775 F. Supp. 3d 335 (D.D.C. 2025) ................................................................ 14, 15, 20, 25, 29

*Ctr. for Biological Diversity v. Ross,*
 480 F. Supp. 3d 236 (D.D.C. 2020) ...................................................................................... 30

*Ctr. for Biological Diversity v. United States Fish & Wildlife Serv.,*
 146 F.4th 1144 (D.C. Cir. 2025) ........................................................................................... 27

*Ctr. for Pub. Integrity v. United States DOD,*
 411 F. Supp. 5 (D.D.C. 2019) .............................................................................................. 22

*Defs. of Wildlife v. Lujan,*
 504 U.S. 555 (1991) ............................................................................................................ 27

*FDA v. All. for Hippocratic Med.,*
 602 U.S. 367 (2024) ............................................................................................................ 24

*\* FEC v. Akins,*
 524 U.S. 11 (1998) .............................................................................................................. 24

*\* Gerber v. Norton,*
 294 F.3d 173 (D.C. Cir. 2002) ......................................................................... 14, 15, 17, 25

*League of United Latin Am. Citizens v. Executive Off. of President,*
 808 F. Supp. 3d 29 (D.D.C. 2025) ....................................................................................... 22

*League of Women Voters of the United States v. Newby,*
 838 F.3d 1 (D.C. Cir. 2016) ........................................................................................... 25, 29

*Loper Bright Enters. v. Raimondo,*
 603 U.S. 369 (2024) ............................................................................................................ 16

*Louisiana, et al. v. National Marine Fisheries Serv., et al.,*
 No. 2:25-cv-00691, 2026 WL 184236 (W.D. La.) .......................................................... 19, 20

\* *Portland Audubon Soc'y v. Endangered Species Comm.*,
   984 F.2d 1534 (9th Cir. 1993) ................................................................ 1, 9, 15, 16

*Pub. Citizen v. United States Dep't of Justice*,
   491 U.S. 440 (1989) .................................................................................... 24

*Ramirez v. U.S. Immigr. & Customs Enf't*,
   310 F. Supp. 3d 7 (D.D.C. 2018) ................................................................ 29

*Sierra Club v. EPA*,
   No. 25-1112 (RC), 2026 WL 686323 (D.D.C. Mar. 11, 2026) ................... 23

*Sierra Club, et al. v. Nat'l Marine Fisheries Serv., et al.*,
   No. DLB-25-1627 (D. Md.) .................................................................... 19, 20

\* *Tenn. Valley Auth. v. Hill*,
   437 U.S. 153 (1978) ............................................................................. 3, 4, 30

*TikTok Inc. v. Trump*,
   507 F. Supp. 3d 92 (D.D.C. 2020) .............................................................. 29

*Wertheimer v. FEC*,
   268 F.3d 1070 (D.C. Cir. 2001) .................................................................. 24

\* *WildEarth Guardians v. Salazar*,
   859 F. Supp. 2d 83 (D.D.C. 2012) .............................................................. 23

*Winter v. NRDC*,
   555 U.S. 7 (2008) ....................................................................................... 29

**Statutes**

5 U.S.C. § 554(c)(1) .......................................................................................... 17

16 U.S.C. § 1531(a)(1) ........................................................................................ 3

16 U.S.C. § 1531(a)(2) ........................................................................................ 3

16 U.S.C. § 1531(a)(3) ........................................................................................ 3

16 U.S.C. § 1531(b) ............................................................................................ 3

16 U.S.C. § 1531(c)(1) ........................................................................................ 3

16 U.S.C. § 1532(6) .......................................................................................... 10

16 U.S.C. § 1532(20) ........................................................................................ 10

16 U.S.C. § 1536(a)(2) ..................................................................................... 3, 4

16 U.S.C. § 1536(b)(3)(A) ................................................................................ 4, 6

16 U.S.C. § 1536(e)(5)(D) ........................................................................ 9, 15, 23

16 U.S.C. § 1536(e)(6) ...................................................................................... 17

16 U.S.C. § 1536(e)-(h) ...................................................................................... 7

16 U.S.C. § 1536(e)-(p) ...................................................................................... 7

16 U.S.C. § 1536(f)(2) ......................................................................................... 7

16 U.S.C. § 1536(g)(1) ........................................................................... 5, 7, 18, 20

16 U.S.C. § 1536(g)(2)(B) ................................................................................... 23

16 U.S.C. § 1536(g)(2)(B)(ii) .......................................................................... 9, 14

16 U.S.C. § 1536(g)(3) ......................................................................................... 8

16 U.S.C. § 1536(g)(4) ......................................................................................... 8

16 U.S.C. § 1536(g)(5) ......................................................................................... 8

16 U.S.C. § 1536(g)(8) ..................................................................................... 9, 15

16 U.S.C. § 1536(h)(2)(A) ............................................................................... 8, 27

16 U.S.C. § 1539(a) ............................................................................................ 15

16 U.S.C. § 1539(c) ............................................................................................ 15

16 U.S.C. § 1536(g) ............................................................................................. 8

16 U.S.C. § 1536(h) ............................................................................................. 8

**Regulations**

50 C.F.R. § 402.13 ............................................................................................... 4

50 C.F.R. § 402.14(b)(1) ...................................................................................... 4

50 C.F.R. § 402.14(c) ........................................................................................... 4

50 C.F.R. § 402.14(d) ........................................................................................... 4

50 C.F.R. § 402.14(g) ........................................................................................... 4

50 C.F.R. § 402.14(g)(8) ....................................................................................... 4

50 C.F.R. § 402.14(h) ........................................................................................... 4

50 C.F.R. § 402.14(h)(2) ............................................................................... 4, 6, 18

50 C.F.R. § 451.02 .............................................................................................. 18

50 C.F.R. § 451.02(h)(1) ................................................................................. 9, 14

50 C.F.R. § 451.02(h)(2) ................................................................................. 9, 14

50 C.F.R. § 451.02(h)(3) ................................................................................. 9, 14

50 C.F.R. § 451.02(h)(5) .................................................................................... 14

50 C.F.R. § 451.02(h)(6) .................................................................................... 14

50 C.F.R. § 451.03 .............................................................................................. 18

50 C.F.R. § 452.03(a) ........................................................................................... 8

50 C.F.R. § 452.04(a) ........................................................................................... 8

50 C.F.R. § 402.14(g)(5) ....................................................................................... 4

**Legislative Materials**

Pub. L. No. 95-632, § 1, 92 Stat. 3751 (1978)..................................................................... 5

S. Rep. No. 418, 97th Cong., 2d Sess. 17 (1982) ............................................................. 5


**Federal Register**

88 Fed. Reg. 47453 (July 24, 2023)..................................................................... 11

90 Fed. Reg. 8433 (Jan. 29, 2025) ..................................................................... 9

91 Fed. Reg. 12672 (Mar. 16, 2026).................................................... 1, 13, 14, 15, 26


**Other Authorities**

Congressional Research Service, *Endangered Species Act (ESA): The Exemption Process*
(Jan. 27, 2017) ..................................................................... 7

David B. Liner, *Environmental Law – The Endangered Species Act Amendments of 1978:*
*Congress Responds to Tennessee Valley Authority v. Hill.*, 25 Wayne L. Rev. 1327
(Sept. 1979)..................................................................... 5

Jacob W. Malcom & Ya-Wei Li, *Data Contradict Common Perceptions About a Controversial*
*Provision of the U.S. Endangered Species Act*, 112(52) PNAS 15844-15849 (2015) .............. 6

**INTRODUCTION**

Plaintiff Center for Biological Diversity ("Center") seeks a temporary restraining order ("TRO") prohibiting the Secretary of the Interior from unlawfully convening the cabinet-level Endangered Species Committee—known popularly as 'The God Squad' because it is authorized, only under extraordinary circumstances, to permit a federal action to cause the extinction of an entire species. *Portland Audubon Soc'y v. Endangered Species Comm.*, 984 F.2d 1534, 1537 (9th Cir. 1993). In a March 16, 2026, Federal Register notice, the Secretary announced a meeting of the Committee on March 31, 2026, "regarding an exemption under the Endangered Species Act ["ESA"], with respect to oil and gas exploration, development, and production activities in the Gulf of America" as authorized by the Bureau of Ocean Energy Management ("BOEM") and the Bureau of Safety and Environmental Enforcement ("BSEE"). 91 Fed. Reg. 12672 (Mar. 16, 2026) (Ex. 1 to the Declaration of Kristen Monsell ("Monsell Decl.")). As detailed in this brief, a TRO is warranted because the Center has a substantial likelihood of success on the merits and would suffer irreparable injury if a TRO is not granted, TRO issuance would not injure other interested parties, and the public interest would be furthered by issuance of a TRO. *Am. Foreign Serv. Ass'n v. Trump*, 766 F. Supp. 3d 25, 28 (D.D.C. 2025); *Climate United Fund v. Citibank, N.A.*, 775 F. Supp. 3d 335 (D.D.C. 2025).

Regarding the merits, the Secretary's notice fails to meet any of the ESA's essential public notification and access requirements, including such basic information as a summary of the exemption application prompting the meeting, the identity of the applicant, or even whether an exemption application has in fact been properly submitted to the Committee. In addition, although the ESA mandates that "all" records of the Endangered Species Committee "shall" be open to public scrutiny, to date, Defendant has not provided for public access to even a single

such record relating to the exemption that is the subject of the scheduled meeting. The March 16 notice provides no indication of how the public can access any records associated with the application or even if such records exist. And, although the Committee is meeting in person at the Department of the Interior Headquarters in Washington, D.C. and can therefore accommodate interested members of the public, it is not "open" to the public as required by the ESA; instead, it is a closed-door meeting that relegates the public to observing via a YouTube livestream.

The Secretary's notice also disregards the fundamental statutory prerequisite for convening the Committee: a determination by either the National Marine Fisheries Service ("NMFS") or the U.S. Fish and Wildlife Service ("FWS") (also known as "the Services") that oil and gas exploration, development, and production activities in the Gulf are jeopardizing the continued existence of any listed species and that there are no reasonable or prudent alternatives that would avoid such jeopardy. The Secretary's attempt to bypass the ESA's strict limitation of the Committee's jurisdiction to a tribunal of last resort would, if allowed to proceed, open the door to an unlawful permanent exemption of the ESA's protections for the many oceanic and terrestrial ESA-listed species adversely impacted by oil and gas operations in the Gulf, including whales, sea turtles, manatees, and birds.

These legal violations threaten to irreparably harm the Center's interests, including by depriving the Center of information to which it is legally entitled under the ESA and that is essential to the Center's efforts to safeguard imperiled species in the Gulf. In addition to the irreparable harm arising from the Secretary's wholesale failure to abide by the ESA's disclosure requirements, convening the Committee threatens direct, permanent, and irreversible environmental harm, including potential extinction of imperiled species, directly and irreparably

2

impacting the Center and its members' recreational, scientific, educational, aesthetic, and professional interests.

Finally, the balance of the equities favors issuance of a TRO, as its issuance would not adversely affect any other parties since the Center is only seeking to prevent the Endangered Species Committee from meeting until and unless the clear requirements of the ESA are met. A TRO would also serve the public's interest in affording endangered species the highest of priorities, as enshrined by the ESA.

## LEGAL BACKGROUND

**A.      The Endangered Species Act: Overview**

The ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978). Finding that "fish, wildlife, and plants are of esthetic, ecological, educational, historical, recreational, and scientific value to the Nation and its people," Congress ordered that all federal agencies shall "seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes" of the Act. 16 U.S.C. § 1531(a)(1)-(3), (b), (c)(1). To that end, the ESA establishes crucial substantive and procedural safeguards for species that are listed as endangered or threatened, as well as for the formally designated "critical habitats" of such species.

Section 7 of the ESA substantively prohibits federal agencies from taking any action which may jeopardize the continued existence of listed species or adversely modify a species' critical habitat. *Id.* § 1536(a)(2). To meet this substantive mandate, section 7 places a duty on all agencies to consult with either NMFS (for most ocean species) or FWS (for terrestrial species, nesting sea turtles, seabirds, and some marine mammals, including manatees) before engaging in

any discretionary action that may affect a listed species or critical habitat. *Id*. During the consultation process, the action agency and NMFS and FWS must "use the best scientific and commercial data available." *Id*.; 50 C.F.R. § 402.14(d), (g)(8). The section 7 consultation requirement reflects "a conscious decision by Congress to give endangered species priority over the 'primary missions' of federal agencies." *Tenn. Valley Auth.*, 437 U.S. at 185.

Once an action agency—in this case, BOEM and BSEE—determines that its action "may affect" a listed species or critical habitat, it must consult, either formally or informally, with one or both of Services. If the action agency determines that its action "is not likely to adversely affect any listed species or critical habitat," the process ends informally if the Services issue a written concurrence. 50 C.F.R. §§ 402.13, 402.14(b)(1).

For those actions where the action agency or the Services instead determine that the action is likely to adversely affect a listed species or destroy or adversely modify a species' critical habitat, "formal consultation" is conducted. Formal consultation culminates in the Service's issuance of a biological opinion advising the action agency as to whether the proposed action, alone or "taken together with cumulative effects, is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat." *Id.* § 402.14(c), (g), (h).

If the Services determine that jeopardy is likely, they must provide the action agency with "reasonable and prudent alternatives" to the proposed action that would avoid such jeopardy, if any such alternatives exist. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(g)(5), (h)(2).

**B.** **Endangered Species Act: The 1978 "God Squad" Amendments**

In response to the Supreme Court's decision in *Tennessee Valley Authority*—which held that construction of a dam would violate the ESA by causing the extinction of a fish species—

Congress amended the ESA. President Carter signed the Endangered Species Act Amendments of 1978 into law on November 10, 1978. Pub. L. No. 95-632, § 1, 92 Stat. 3751 (1978). Although proposed amendments were introduced to dramatically weaken or eliminate section 7 requirements, Congress rejected this approach. It instead created a "comprehensive administrative scheme to promote interagency cooperation and to avoid conflict between the interests of particular projects and the protection of endangered species." David B. Liner, *Environmental Law – The Endangered Species Act Amendments of 1978: Congress Responds to Tennessee Valley Authority v. Hill.*, 25 Wayne L. Rev. 1327, 1335 (Sept. 1979).

To address the circumstances in which conflicts could not otherwise be resolved, the 1978 amendments created the Committee to oversee and implement an exemption process. The Committee "is designed to function as an *administrative court of last resort*." S. Rep. No. 418, 97th Cong., 2d Sess. 17 (1982) (emphasis added.). To that end, Congress expressly limited the Committee's authority to instances where the Service has determined that a specific action will jeopardize the continued existence of a species and/or destroy or adversely modify the species' critical habitat *and* there remains an "irresolvable conflict" concerning how to address that determination. 16 U.S.C. § 1536(g)(1).

In reality, such instances of irresolvable conflict are exceedingly rare. A relatively recent review of approximately 25,000 section 7 consultations conducted from 2000 to 2017 found that nearly 80 percent were resolved informally. Jacob W. Malcom & Ya-Wei Li, *Data Contradict Common Perceptions About a Controversial Provision of the U.S. Endangered Species Act*, 112(52) PNAS 15844-15849 (2015).

For those relatively few consultations that require formal consultation, the vast majority of biological opinions conclude that the action is not likely to jeopardize a listed species or

adversely modify a species' critical habitat. Of the 4,934 formal consultations conducted between 2000 and 2017, only 72 (constituting 1.5% of formal and 0.3% of all consultations) resulted in jeopardy findings and 55 (constituting 1.1% of formal and 0.2% of all consultations) resulted in findings of adverse modification of critical habitat.

For the miniscule percentage of ESA section 7 consultations that do result in a jeopardy determination, almost all of these determinations can be addressed through the development of "reasonable and prudent alternatives." 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h)(2). Thus, in a subset of FWS consultations conducted between 2008 to 2015, *none* of the 88,290 actions had been "stopped or extensively altered as a result of FWS finding jeopardy or destruction/adverse modification." Malcom & Li at 15846. This "low percentage of jeopardy and adverse modification" determinations led the review's authors to conclude that these "findings show[] that NMFS, like FWS, has worked with agencies and applicants to find solutions the vast majority of the time" and that "conventional wisdom about the ESA stopping projects is unfounded." *Id.*

The Committee's legal authority to hear exemption applications is limited to these rarest of rare circumstances—where the agency action will jeopardize a listed species or adversely modify a species' critical habitat *and* there are no "reasonable and prudent alternatives" that would avoid this result. 16 U.S.C. § 1536(g)(1); (f)(2) (information submitted in an exemption application must include "a statement describing why such action cannot be altered or modified to conform with the requirements of" of section 7(a)(2)).

Reflecting this rarity and the specific, limited role of the Committee under the ESA as an administrative court of last resort, the Committee has adjudicated only *three* exemption applications in the 47 years since its creation, with one exemption denied and the other two

exemptions granted. Three additional exemption applications were filed but abandoned. *See* Congressional Research Service, *Endangered Species Act (ESA): The Exemption Process* 14-21 (Jan. 27, 2017). The last time the Committee even met to consider an exemption application was in 1992. *Id*. at 19. In these last resort situations, the Committee has the weighty responsibility of permitting the likely extinction of a species from Earth and is thus commonly referred to as "the God Squad."

The 1978 amendments legislate the Committee's process for ruling on section 7 exemption applications in extraordinary detail, encompassing 12 new subsections—(e) through p)—within section 7. 16 U.S.C. § 1536(e)-(p). Among other elements, the amendments prescribe requirements for: 1) establishment of the Committee; 2) promulgation of regulations to govern the form of applications to the Committee; 3) processes and timelines governing the consideration of exemption applications; 4) findings required to grant an exemption application; and (5) public access and participation requirements. *Id.* § 1536(e)-(h).

When an exemption application has been properly submitted, the Committee is led by the Interior Secretary and composed of five other senior officials: the Secretaries of Agriculture and the Army, the head of the Council of Economic Advisers, and the administrators of the Environmental Protection Agency and the National Oceanic and Atmospheric Administration. Once an exemption application is received, the President appoints one individual from each affected State to be a member of the Committee in relation to the specific application. *Id*. § 1536(e)(3)(G), 1536(g)(2)(B); 50 C.F.R. § 451.03(b).

The ESA amendments established a rigorous framework of procedures and timelines governing the Committee's consideration of an exemption application. In addition to other duties, as Committee Chair, the Interior Secretary must make threshold determinations on an

application within 20 days. 16 U.S.C. § 1536(g)(3); 50 C.F.R. § 452.03(a). For an application that passes the threshold review, the Secretary must then prepare a report to present to the Committee within 140 days. 16 U.S.C. § 1536(g)(4)-(5).

To "develop the record for the report," Congress further directed that the Secretary "shall hold a hearing." *Id*. § 1536(g)(4); 50 C.F.R. § 452.04(a). The hearing is conducted by an administrative law judge, who is directed to then close and certify the record and transmit it to the Secretary. The Secretary then prepares a report for submission to the Committee. Among other requirements, the report must discuss the availability of alternatives, whether the action is in the public interest, and any reasonable mitigation measures. 16 U.S.C. § 1536(g)(5); 50 C.F.R. § 452.04(a).

Within 30 days of receiving the Secretary's report, the Committee may grant the application if "there are no reasonable and prudent alternatives to the agency action," the "benefits of such action clearly outweigh the benefits of alternative courses of action consistent with conserving the species or its critical habitat, and such action is in the public interest," and the "action is of regional or national significance." 16 U.S.C. § 1536(g), (h). In the event an exemption application is granted, the effects are sweeping. *Id*. § 1536(h)(2)(A) (with limited exception, exemption "shall constitute a permanent exemption with respect to all endangered or threatened species for the purposes of completing such agency action.").

The Secretary is required to meet extensive public notification and information access requirements throughout all stages of the Committee's process for meeting and considering exemption applications. *See id*. § 1536(g)(2)(B)(ii) (requiring the Secretary to "publish notice of receipt of the application in the Federal Register, including a summary of the information contained in the application and a description of the agency action with respect to which the

application for exemption has been filed."); *id*. § 1536(e)(5)(D) ("All meetings and records of the Committee shall be open to the public."); *id*. § 1536(g)(8) ("All meetings and records resulting from activities pursuant to this subsection shall be open to the public."); 50 C.F.R. § 451.02(h)(1)-(3), (5)-(6); *see also Portland Audubon*, 984 F.2d at 1537 ("The Secretary must initially consider any exemption application, *publish a notice and summary of the application in the Federal Register*, and determine whether certain threshold requirements have been met."). (emphasis added)).[1]

## FACTUAL BACKGROUND

**A.    2025 NMFS Biological Opinion on "Gulf of America Oil and Gas Program"**

Although the Secretary's March 16 notice does not directly reference it, NMFS finalized the latest ESA section 7 consultation with BOEM and BSEE regarding federally-authorized oil and gas exploration, development, and production activities in the Gulf on May 20, 2025.

This 2025 consultation is a programmatic biological opinion ("NMFS BiOp") that covers all such activities in three main areas—the western planning area, central planning area, and eastern planning area—encompassing approximately 95 million areas. NMFS BiOp at 123 (Monsell Decl., Ex. 2).

---

[1] On January 29, 2025, President Trump issued executive order 14156, entitled "Declaring a National Energy Emergency." 90 Fed. Reg. 8433, 8435-36 (Jan. 29, 2025). Among other provisions, E.O. 14156 seeks to expand the role of the Committee far beyond the narrow function that the ESA itself prescribes. Specifically, Section 6 of the E.O.: (1) directs the Interior Secretary to convene the Committee "not less than quarterly"; (2) opens the Committee's doors to any applicant "who submits for exemption from obligations imposed by Section 7"; and (3) directs the Committee "to identify obstacles to domestic energy infrastructure specifically deriving from implementation of the ESA or the Marine Mammal Protection Act." The Secretary's notice does not reference E.O. 14156, or address whether an exemption application (assuming one was received) was submitted pursuant to the E.O.'s terms, and thus the Center's initiating Complaint does not include any claims directed at the legality of the E.O.

The consultation's scope includes Interior's management and regulation of oil and gas-related activities under the Outer Continental Shelf Lands Act from 2025 through 2029, including projections of activities relating to permitting and plan approval and impacts from all prior active leases and future lease sales. *Id.* at 16-18. These activities include seismic surveys; drilling (including offshore fracking and high pressure high temperature projects); vessel and helicopter traffic; offshore infrastructure and construction; pipelines; and decommissioning and structure removal operations. *Id.* at 35-78. There are currently 1,366 active platforms in the Gulf. *Id.* at 71.

In the 2025 BiOp, NMFS concluded that these activities were likely to adversely affect several ESA-listed species—including Rice's and sperm whales, green, hawksbill, Kemp's ridley, leatherback, and loggerhead sea turtles, and Gulf sturgeon—and designated or proposed critical habitat for Rice's whale, green sea turtle, and Gulf sturgeon. *Id.* at 150-51.

ESA-listed species are by definition either in danger of extinction or will become so in the foreseeable future. *See* 16 U.S.C. § 1532(6), (20) (defining "endangered" and "threatened" species, respectively). The status of Rice's whale, however, is particularly urgent. The only known baleen species to occur in the Gulf year-round, Rice's whales' core habitat is located in the northeastern Gulf in the De Soto Canyon area at relatively shallow depths of 100 to 400 meters. NMFS BiOp at 160. Recent science has determined that the species is also persistently found in the western and central Gulf at the same depths. *See* 88 Fed. Reg. 47453, 47461 (July 24, 2023). The species is critically endangered, with the latest abundance estimates at only 51 animals. NMFS BiOp at 165-66. Scientists estimate that as much as 22% of the Rice's whale population died as a result of the Deepwater Horizon spill in 2010. *Id.* at 259.

Adverse effects to Rice's and sperm whales from Gulf oil and gas activities include vessel strikes; entanglements in marine debris; and pollution from noise and oil spills, including sounds from chronic, constant sources such as vessel traffic and construction that impair the whale's ability to communicate, navigate, reproduce, or feed. *Id.* at 150-52. Sea turtles are also harmed by vessel strikes, oil spills, noise pollution, and other stressors. *Id.*

In the 2025 BiOp, NMFS concluded that oil and gas activities in the Gulf were likely to jeopardize the continued existence of Rice's whale due to the risk of vessel strikes. *Id.* at 574. In an effort to ameliorate this predicted impact, NMFS proposed a reasonable and prudent alternative comprised of the following actions to be implemented in step-wise fashion: immediately begin to use technology to enable Rice's whale vessel strike avoidance and monitoring and presence of Rice's whale; establish an expert working group to support development and implementation of a Rice's whale vessel strike avoidance technology plan; improve understanding of Rice's whale vessel strike risk associated with the proposed action; develop a Rice's whale vessel strike avoidance technology plan; undertake independent peer review; implement Rice's whale vessel strike technology plan; and monitor Rice's whales to ensure no likelihood of jeopardy during implementation of the reasonable and prudent alternative. *Id.* at 577-81.

**B.**    **<u>FWS 2018 Biological Opinion and Subsequent Consultation.</u>**

On April 20, 2018, FWS issued a biological opinion ("FWS BiOp") regarding oil and gas exploration, development, and production activities in the Gulf for the species under FWS's jurisdiction. FWS BiOp at 1-3 (Monsell Decl., Ex. 3). That BiOp found that various listed species in the Gulf (such as the manatee and sandhill crane) would either not be affected at all or were not likely to be adversely affected by certain impacts (such as vessel operations and air

pollution), *id.* at 42-44, 111-15, but were likely to be adversely affected by oil spills, *id.* at 114-15. The FWS BiOp concluded that none of the species would be jeopardized. *Id.* at 117. After reinitiating consultation in view of new information regarding impacts to certain species and their habitats, and a newly listed species, in 2025, FWS reaffirmed its conclusion that no species would be jeopardized and no designated critical habitat would be destroyed or adversely modified. 2025 Consultation at 1-10 (Monsell Decl., Ex. 4).[2]

In short, although NMFS and FWS have come to varying conclusions regarding the effects of oil and gas operations on endangered and threatened species in the Gulf, neither Service has reached the legal conclusion that is necessary under the ESA to trigger a meeting of the Endangered Species Committee, *i.e.*, that such operations will cause jeopardy or destruction/adverse modification of critical habitat *and* that there are no reasonable and prudent alternatives that would avoid those impacts. Nonetheless, the Secretary decided to convene a meeting of the Committee regarding oil and gas operations in the Gulf without even complying with the ESA's unequivocal requirements for public access and transparency. *See* 91 Fed. Reg. at 12672.[3]

## ARGUMENT

**I.      The Center Is Likely to Succeed on the Merits**

The Center has a substantial likelihood of success on the merits because the Interior Secretary is convening the Committee unlawfully in two fundamental respects: (1) the Secretary

---

[2] As discussed in more detail *infra*, Argument I.B, the 2025 BiOp is being challenged in two cases.

[3] Before filing this lawsuit, the Center wrote to the Secretary requesting compliance with the ESA's requirements for disclosure of records and open meetings. *See* Hartl Decl. ¶¶ 20-22; Exs. A, B, and C to Hartl Decl. That request did not yield any commitment to comply, thus necessitating this litigation.

has failed to meet the ESA's public notification and information access requirements; and (2) the Secretary is unlawfully calling the meeting in the absence of a determination by NMFS or FWS that Gulf oil and gas exploration, development, and production activities are in violation of section 7(a)(2).[4]

> ### A. The Secretary Failed to Meet the ESA's Public Notification and Information Requirements.

The ESA provides detailed public notification and information access requirements in conjunction with the section 7 exemption application process that have not been met.[5] These requirements begin with receipt of an exemption application, requiring the Secretary to "publish notice of receipt of the application in the Federal Register, including a summary of the information contained in the application and a description of the agency action with respect to which the application for exemption has been filed." 16 U.S.C. § 1536(g)(2)(B)(ii). The ESA's implementing regulations further require "announcing that the application has been filed," "stating the applicant's name," "briefly describing the proposed agency action and the result of the consultation process," "designating the place where copies of the application can be obtained," and "specifying the name of the person to contact for further information." 50 C.F.R. § 451.02(h)(1)-(3), (5)-(6).

---

[4] As explained in the Center's discussion of irreparable injury, *infra* Argument II, the Center is likely to establish that it has standing, both because of the deprivation of information and access to which it is legally entitled under the plain language of the relevant provisions of the ESA, and because its members have concrete reactional and other interests in the imperiled wildlife that is the subject of the "exemption" that is the focus of the Committee's impending meeting.

[5] As discussed in more detail in Argument I.B, *infra*, there can be no valid exemption application because neither NMFS nor FWS has determined that oil and gas activities in the Gulf would violate section 7(a)(2) of the ESA.

The Secretary's Federal Register Notice provides *none* of this mandated information. *See* 91 Fed. Reg. at 12672. It does not provide a summary of the information contained in the exemption application; it does not identify who is even seeking the exemption; and it does not specify how, if at all, any of the statutory prerequisites for seeking an exemption have been satisfied. The notice does not, in fact, address whether an application has even been received. The Center is thus likely to prevail on the merits of its argument that by convening a meeting on an exemption without providing the interested public with such information, the Secretary is in violation of the ESA's public information and access requirements. *See Climate United Fund v. Citibank, N.A.*, 775 F. Supp. 3d 335, 347 (D.D.C. 2025) (finding that plaintiffs seeking TRO had likelihood of success on merits where "EPA Defendants [had] provided written notice" of grant, "but did not comply with [regulatory requirements]" that would "allow Plaintiffs 'an opportunity to object and provide information challenging the action'").

These violations bear close resemblance to the D.C. Circuit's decision in *Gerber v. Norton*, 294 F.3d 173 (D.C. Cir. 2002), involving section 10(c) of the ESA, which requires that "information received by [FWS] as part of any [incidental take permit] application shall be available to the public record at every stage of the proceeding." *Gerber*, 294 F.3d at 179 (citing 16 U.S.C. § 1539(a), (c)). In that case, the panel concluded that FWS's failure to include a key portion of the application (a map of a proposed mitigation site) "violated the requirement . . . that it make the complete permit application 'available to the public.'" *Gerber*, 294 F.3d at 181 (citation omitted).

The Secretary is also in violation of ESA requirements that both the Committee's records and meetings be "open to the public." 16 U.S.C. § 1536(e)(5)(D) ("All meetings and records of the Committee *shall be open to the public*.") (emphasis added); *id*. § 1536(g)(8) ("All meetings

14

and records *resulting* from activities pursuant to this subsection *shall be open to the public*.")
(emphasis added)); *see also Portland Audubon*, 984 F.2d at 1542 ("The Endangered Species Act
as well as the applicable part of its regulations are intended to ensure that *all Committee
meetings, hearings, and records are open to the public*.") (emphasis added).

Regarding the open records requirement, the Secretary has made *none*, let alone "all," of
the Committee's documents available to the public. The Secretary's Federal Register notice
provides no indication as to how the public can access any records pertaining to the exemption
application (if such application has been filed) or any other records "resulting from activities" of
the Committee. *See* 91 Fed. Reg. at 12672. The absence of this required information leaves the
Center and other members of the interested public totally in the dark as to the purported factual
and legal underpinnings of the Secretary's extraordinary decision to convene the Committee. Not
only does that flout Congress's clear intent in mandating an entirely open exemption process, but
it is a hallmark of arbitrary action. *See Climate United Fund*, 775 F. Supp. 3d at 348 (rejecting
EPA's rationale that "the [challenged grant] termination is based on the information contained in
the termination letter" as "circular and unhelpful," and "of no assistance to the court in
discerning whether EPA Defendants followed the necessary steps," or "had offered a reasoned
explanation for the termination.").

The March 31, 2026, meeting format also fails to meet the ESA's requirement that
Committee proceedings be "open to the public." Although the Committee will physically
convene at Department of the Interior Headquarters, the Center and public at large cannot attend.
Instead, the public will be provided only with a livestreamed view of the closed-door meeting via
YouTube. While livestreaming is an appropriate *supplement* to a meeting that is "open to the
public," the "best meaning" of that phrase is that interested members of the public may attend in

person. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024). That is especially so given that statutory language was added to the ESA in 1978—when Congress would not have even contemplated livestreaming as a substitute for actual attendance. That is also how the Ninth Circuit read the language in holding that Committee proceedings must be equally open to all interested parties. *See Portland Audubon*, 984 F.2d at 1542 (describing "[t]he *public's right to attend all Committee meetings*, participate in all Committee hearings, and have access to all Committee records") (emphasis added).

There is also no discernable reason why the public cannot be accommodated at the Interior Department's headquarters in Washington, D.C. Put bluntly, whatever discomfort the Secretary or other committee members may experience in having to discuss an exemption to the ESA in front of an actual audience of concerned citizens cannot negate Congress's determination that such a public proceeding will further the purposes of the ESA. *See id.*, 984 F.2d at 1542-43.

Given the unlawful paucity of information that the Secretary has shared with the public to date, the Center does not know what the specific agenda for the meeting is, including, *e.g.*, whether there will be any actual deliberations regarding the granting of an exemption or whether interested industry observers will be permitted to provide comment and otherwise participate. If so (and undue secrecy unavoidably breeds justifiable suspicion), relegating the Center and the public concerned with the well-being of Gulf wildlife to mere internet observers of the Committee's closed-door proceedings not only fails to abide by the ESA's "open to the public" requirements but runs directly afoul of ESA section 7(e)(6). Section 7(e)(6) incorporates Administrative Procedure Act requirements pertaining to agency hearings, requiring that "the consideration of any application for an exemption under this section and the conduct of any

hearing under this subsection shall be in accordance with sections 554, 555, and 556 (other than subsection (b)(3) of section 556)." 16 U.S.C. § 1536(e)(6).

Section 554(c)(1) of the Administrative Procedure Act, in turn, requires that "all interested persons" "shall" be "give[n]" the opportunity for . . . the submission and consideration of facts [and] arguments . . . when time, the nature of the proceeding, and public interest permit." 5 U.S.C. § 554(c)(1). An opportunity for public comment must be a "meaningful opportunity." *Gerber*, 294 F.3d at 179 (citing *Am. Med. Ass'n v. Reno*, 57 F.3d 1129, 1132-33 (D.C. Cir. 1995)). Merely allowing the interested public to view a livestreamed, closed-door Committee meeting obviously and directly conflicts with this mandate. In any event, even if the public is provided an opportunity to comment via the livestream, that opportunity will still not be "meaningful" given the Secretary's failure to provide the basic, statutorily-required information regarding the exemption application (if any application has in fact been submitted), precluding the Center and public from effectively providing "facts and arguments" pertaining to that application, as required by ESA section 7(e)(6), 16 U.S.C. § 1536(e)(6), and the expressly incorporated Administrative Procedure Act provisions, *see Gerber*, 294 F.3d at 179 ("[G]iven [FWS's] conclusion that the off-site mitigation area was necessary for approval of the permit, there could not have been a meaningful opportunity to comment on the application without a meaningful opportunity to comment on the site.").

**B.      The Secretary Is Unlawfully Convening the Endangered Species Committee.**

The Secretary's failure to meet the public access and notification requirements of the ESA and its regulations is compounded by the fact that the predicate requirements for convening the Committee have not been met in relation to oil and gas exploration, development, and production in the Gulf. Again, the Committee may only consider an exemption application after

17

NMFS or FWS has determined that a proposed federal action is likely to jeopardize the continued existence of a species listed under the ESA, and that there are no "reasonable and prudent alternatives" that would avoid this jeopardy. 16 U.S.C. § 1536(g)(1); *see also* 50 C.F.R. § 402.14(h)(2) (a 'jeopardy' biological opinion shall include reasonable and prudent alternatives, if any. If [NMFS] is unable to develop such alternatives, [it] will indicate that to the best of its knowledge there are no reasonable and prudent alternatives."); 50 C.F.R. § 451.02 (describing the procedures for applying for an exemption from section 7(a)(2) of the ESA), *id.* § 451.03 (describing process for appointing a member from an affected state to the Committee once the Secretary receives an exemption application).

This fundamental threshold requirement for convening the Committee is absent here. Although NMFS's 2025 BiOp did involve a jeopardy determination with respect to Rice's whale, such determination alone does not trigger the Committee's jurisdiction. Like nearly every other ESA consultation, the 2025 BiOp did not culminate in a finding by NMFS that oil and gas exploration, development, and production activities in the Gulf would violate section 7(a)(2), but instead included reasonable and prudent alternatives intended to avoid jeopardy to Rice's whale.[6]

The legality of this 2025 BiOp is being contested in two actions: *Sierra Club, et al. v. Nat'l Marine Fisheries Serv., et al.*, No. DLB-25-1627 (D. Md.), and *Louisiana, et al. v.*

---

[6] In an earlier 2020 BiOp, NMFS also found that federally authorized Gulf oil and gas activities are likely to jeopardize the Rice's whale because of the "wide-ranging, combined multiple effects to the small and likely declining population" from five "combined stressors": vessel strikes, vessel noise, marine debris, oil spills and dispersants, and sound from seismic survey. NMFS included a reasonable and prudent alternative to address only two of those threats: vessel strikes and vessel noise. Specifically, the measure restricted vessel activity in Rice's whale habitat in the eastern Gulf, including a requirement that oil and gas vessels travel at no more than 10 knots through the area year-round and a prohibition on oil and gas vessels traveling through the area at night or at times of low visibility, except in emergencies for the safety of the vessel or crew.

*National Marine Fisheries Serv., et al.*, No. 2:25-cv-00691, 2026 WL 184236 (W.D. La.). In *Sierra Club*, the plaintiffs (including the Center) allege, *inter alia*, claims that the proposed alternatives are not sufficiently protective to mitigate the jeopardy determination. In *Louisiana*, the plaintiffs allege that NMFS's jeopardy conclusion was arbitrary and capricious, and that the proposed reasonable and prudent alternatives are overly restrictive.

On January 23, 2026, the court in *Louisiana* granted summary judgment to the plaintiffs, finding NMFS's jeopardy determination and associated reasonable and prudent alternative was arbitrary and capricious. 2026 WL 184236, at \*7-9. Subsequent to that ruling, the plaintiffs and federal defendants on February 19, 2026, submitted a joint response regarding remedy proposing that NMFS reopen the ESA section 7 process and "prepare an updated analysis and new jeopardy determination for the Rice's whale, along with an update to or deletion" of the reasonable and prudent alternative within a 185-day period. *Louisiana,* No. 2:25-cv-00691, Joint Response [ECF 58] at 2. The parties additionally proposed that the remand occur without vacatur, so as to "minimize disruptions to regulated oil and gas operations during the remand." *Id.* at 3. The court issued an order adopting the proposed remedy on February 20, 2026. *Louisiana,* No. 2:25-cv-00691, Order [ECF 59].

Summary judgment briefing is largely completed in the *Sierra Club* case and scheduled to conclude on April 3, 2026. *Sierra Club,* No. DLB-25-1627, Summary Judgment Reply [ECF 68]. On March 6, 2026, the defendant-intervenors, comprised of several oil and gas companies and trade organizations, moved to stay proceedings in *Sierra Club* for six months in light of the remand in *Louisiana. Sierra Club,* No. DLB-25-1627, Motion to Stay [ECF 87]. Plaintiffs oppose this motion, with their response brief due this Friday, March 20.

As noted above, the court's decision in *Louisiana* declared that the 2025 BiOp was

unlawful and has remanded that BiOp to NMFS for further consideration consistent with the court's opinion while allowing current oil and gas activities to continue. And while the Center and other plaintiffs seek to continue their litigation and oppose Intervenors' motion to stay their case pending that remand, the mere fact of such litigation is not grounds to invoke the Committee's jurisdiction under the ESA or its regulations. Instead, the ongoing litigation regarding ESA section 7 compliance as it pertains to Gulf oil and gas operations should be (and under the ESA's Committee provisions, *must* be) allowed to unfold and provides no basis for invoking the Committee's limited jurisdiction.

Because NMFS has not concluded that the Gulf oil and gas activities violate section 7(a)(2), there can be no lawful application for an exemption to the Committee, and accordingly, there is no lawful basis for the Secretary to convene the Committee as announced in the March 16, 2026, Federal Register notice. 16 U.S.C. § 1536(g)(1); see *Climate United Fund*, 775 F. Supp. 3d at 348 (finding likelihood of success in TRO proceeding because agency "decisions must be made lawfully and in accordance with established procedures and relevant rules and regulations.").

## II.     The Center Will be Irreparably Injured In the Absence of a Temporary Restraining Order

In the absence of a TRO, the Center will suffer irreparable harm arising from deprivation of the Center's statutory and regulatory rights to public notification and information access, as well as significant harm to the Center's recreational, scientific, educational, aesthetic, and professional interests in the Gulf's ESA-listed species and the broader Gulf environment upon which these species depend.

The threatened irreparable harm to the Center's statutory right to obtain information essential to the organization's advocacy for imperiled wildlife in the Gulf, Declaration of Brett

Hartl ¶ 16 ("Hartl Decl."), is actual and imminent. The Secretary's fast-tracked notice that the Committee will meet in two weeks' time regarding an exemption from the ESA—the first such meeting in decades—released on a Friday evening well outside the normal pre-publication Federal Register timeline, cries out for scrupulous compliance with the ESA's public access and accountability mechanisms. The very opposite is occurring with no credible justification. It is therefore difficult to draw any conclusion but that Secretary's action is designed to deprive the public of information and access to which it is legally required.

The Secretary's failure to meet the ESA's public notification and information access requirements in relation to the March 31, 2026, meeting irreparably harms the Center, particularly since the information that has not been provided is needed, and statutorily required, for an imminent, specific legal proceeding of the Committee. For example, this past weekend Judge Cooper found irreparable harm and issued a TRO where a Kennedy Center Board Trustee was deprived of information pertaining to an upcoming meeting where the fate of the Kennedy Center will be decided, holding that "[i]n light of the foregoing, the Court has little trouble concluding that Beatty's lack of access to core information about the Kennedy Center's closure and reconstruction plans will cause her irreparable harm, and that her harm outweighs any conceivable prejudice to the government." *Beatty v. Trump*, No. 25-cv-4480 (CRC), 2026 WL 712814, at *10 (D.D.C. Mar. 14, 2026). The Court reasoned that where "the Board is slated to make a decision about the near-term future of the Kennedy Center in a few days," and "after that meeting passes, 'there can be no do over and no redress' as to the lost opportunity to exercise her fiduciary duty in that pivotal moment . . . Beatty has faced, and will continue to face, irreparable harm without the information she needs to make an informed decision about the Kennedy

Center's future." *Id.* at *11 (quoting *League of United Latin Am. Citizens v. Executive Off. of President*, 808 F. Supp. 3d 29, 81 (D.D.C. 2025)).

Irreparable harm stemming from the failure to timely provide required information is also recognized by numerous Freedom of Information Act ("FOIA") cases, particularly where, as here, that information pertains to significant matter of national importance. *See, e.g.*, *Ctr. for Pub. Integrity v. United States DOD*, 411 F. Supp. 5, 12-13 (D.D.C. 2019) (finding irreparable harm where "the primary value of the information lies in its ability to inform the public of ongoing proceedings of national importance; and, in these circumstances, stale information is of little value.") (internal citation and quotations omitted); *Brennan Ctr. for Justice at NYU Sch. of Law v. DOC*, 498 F. Supp. 3d 87, 103 (D.D.C. 2020) (finding irreparable harm where plaintiff "seeks records relating to an important public debate and discussion about a process that will come to an end relatively soon."); *Aguilera v. FBI*, 941 F. Supp. 144, 151-152 (D.D.C. 1996) (finding irreparable harm where requested documents under FOIA were to be used as evidence in upcoming hearing).

The irreparable harm is even more evident in this context of meeting of a Committee whose sole legal mandate is, literally, to decide whether a species should be consigned to extinction, and where the Secretary has failed to provide even basic categories of information regarding the exemption application required as part of the Committee's meeting announcement in the Federal Register. As a result, the Center and everyone else in the general public (with the presumed exception of those whose economic and other interests would benefit from an ESA exemption) are left clueless as to what exactly is on the agenda for the meeting and what disastrous consequences for Gulf wildlife (and those with interests in conserving it) may result from the meeting.

The Secretary's failure to comply with the ESA's information and public access requirements plainly confers informational standing on the Center. As this Court recently explained, "[i]nformational standing 'arises only in very specific statutory contexts where a statutory provision has explicitly created a right to information.'" *Sierra Club v. EPA*, No. 25-1112 (RC), 2026 WL 686323, at *5 (D.D.C. Mar. 11, 2026) (citation omitted). That is precisely the situation here with regard to ESA provisions unequivocally mandating that "[a]ll meetings and records of the Committee shall be open to the public," 16 U.S.C. § 1536(e)(5)(D), and further delineating precise kinds of information that must be made available to the public "promptly" "upon receipt," *id*. § 1536(g)(2)(B).

To establish informational standing, a plaintiff must "(1) identify a statute that, on plaintiff's reading, directly requires the defendant to disclose information that the plaintiff has a right to obtain, (2) show that it has been denied the information to which it is entitled, and (3) provide a credible claim that the information would be helpful to it." *WildEarth Guardians v. Salazar*, 859 F. Supp. 2d 83, 92-93 (D.D.C. 2012) (citing *FEC v. Akins*, 524 U.S. 11, 21 (1998)); *see also Pub. Citizen v. United States Dep't of Justice*, 491 U.S. 440, 449 (1989) ("[W]hen an agency denies requests for information under the Freedom of Information Act, refusal to permit appellants to scrutinize the ABA Committee's activities to the extent [the Federal Advisory Committee Act] allows constitutes a sufficiently distinct injury to provide standing to sue.");

Here, as detailed *supra*, the ESA's Committee provisions "entitle[] all members of the public to certain information." *Cf FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395-96 (2024) (finding no informational injury where plaintiffs did not assert that "federal law requires FDA to disseminate such information upon request by members of the public."). This is also not a circumstance where the information is already available "from a different source," disclosure of

which would only result in "duplicative reporting." *Wertheimer v. FEC*, 268 F.3d 1070, 1075 (D.C. Cir. 2001). The categories of information required by the ESA and its regulations related to the Committee's consideration of an exemption for oil and gas activities in the Gulf exist solely within the possession of the Secretary (and perhaps other members of the Committee) and the Center has no recourse but to obtain them from Secretary, as the ESA requires.[7]

The Secretary's violations of the ESA's informational access requirements are impairing and will continue to impair the Center's longstanding organizational interests in the protection of Gulf ESA-listed species that would lose protection under the exemption that is the subject of the Committee meeting. The Center and its Oceans Program and Endangered Species Program "have worked towards better environmental protections and better protections for wildlife in the Gulf of Mexico for over 20 years," including securing ESA protections for Gulf marine species, and extensive litigation against the Department of the Interior, FWS, and NMFS challenging failures to adequately protect ESA-listed species through the ESA section 7 consultation process. Hartl Decl. ¶¶ 9-12.

Having timely and full access to the information required by the ESA in relation to the Committee's consideration of exemption applications is essential to the Center's ability to engage in effective advocacy regarding the proposed exemption, including adequately preparing for the March 31, 2026, hearing. Hartl Decl. ¶¶ 14-16. In *Gerber*, the D.C. Circuit rejected FWS's claim that a similar deprivation of the ESA's informational requirements constituted harmless error, noting that appellants "have presented enough to show that on remand they can mount a credible challenge" to the permit issuance and "were thus prejudiced by the absence of

---

[7] As noted earlier, the Center's pre-litigation efforts to obtain the information have been unavailing. *See* Hartl Decl. ¶¶ 20-22, Exs. A-C.

an opportunity to do so before the agency issued the permit." 294 F.3d at 184 (internal quotations and citations omitted); *see also League of Women Voters of the United States v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) (where "obstacles unquestionably make it more difficult for the Leagues to accomplish their primary mission of registering voters, they provide injury for purposes both of standing and irreparable harm."); *Climate United Fund*, 775 F. Supp. 3d at 347 (finding "EPA Defendants [had] provided written notice" of grant, "but did not comply with [regulatory requirements" that would "allow Plaintiffs 'an opportunity to object and provide information challenging the action' when it unilaterally terminated their grants."). Similarly, here, allowing the Secretary's unlawful convening of the Committee to move forward in the absence of such information irreparably harms the Center's interests by prejudicing its ability to effectively participate in Committee proceedings.

The Secretary's failure to lawfully provide open access to all the Committee's records regarding the proposed exemption, or to conduct an "open meeting," further harms the Center's interests. Hartl Decl. ¶¶ 17-19. Even though the Secretary's convening of the Committee is inherently unlawful, in the event that meeting is nonetheless held, Center staff fully intends to attend and participate in that meeting. Hartl Decl. ¶ 23. Based on Center staff's extensive experience in attending and participating in public hearings held by federal agencies, watching a meeting being streamed via YouTube is no substitute for live attendance. Hartl Decl. ¶¶ 18-19. The Secretary's notice is in fact vague as to whether there will be opportunity for participation and public comment (typically, the only way to participate in such livestream would be via "Live Chat") or whether the interested public will be relegated to mere observation, stating only that "the meeting will be open to the public through livestreaming." 91 Fed. Reg. at 12672. But in any event, "a live-stream is not remotely equivalent to a public meeting that affords an

opportunity to have a much better appreciation for how the meeting participants are interacting, what documents and other materials are being reviewed, who else may be in attendance that may be relevant to the discussion and other matters that cannot be captured fully through only live-streaming of a meeting." Hartl Decl. ¶ 18.

In addition to the irreparable harm arising from the Secretary's systematic failure to abide by public access and notification requirements, the unprecedented convening of the Committee outside of the specific and detailed strictures established under the ESA and its regulations also risks serious irreparable harm to the interests of the Center's members in Gulf species. The Secretary's notice, as bereft of information as it is, states that the Committee is meeting "regarding" an ESA exemption for Gulf oil and gas activities. 91 Fed. Reg. at 12672. The ESA provides that, with limited exception, any such exemption granted by the Committee "shall constitute a permanent exemption *with respect to all endangered or threatened species* for the purposes of completing such agency action." 16 U.S.C. § 1536(h)(2)(A) (emphasis added).

In addition to informational rights standing, the Center's members have recreational, scientific, educational, aesthetic, and professional interests in specific ESA-listed species, and the particular areas within the Gulf and its shores those species inhabit. *See e.g.*, *Ctr. for Biological Diversity v. United States Fish & Wildlife Serv.*, 146 F.4th 1144, 115 (D.C. Cir. 2025) (the "'desire to . . . observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing'") (quoting *Defs. of Wildlife v. Lujan*, 504 U.S. 555, 562-63 (1991)). Those interests are threatened by the sweeping exemption from the ESA that is the declared focus of the Committee's unlawfully secretive meeting. *See* Declaration of James Reeves ¶¶ 10-11 ("Reeves Decl.") (describing "special, life-long memories" from viewing ESA-listed species including manatees and sea turtles in the Gulf Islands National Seashore, Fort

Pickens area, Key West, Fleming Key, Stock Island, and rivers in Florida, including a surfing manatee); Hartl Decl. ¶ 24 (describing extensive travel for wildlife observation, including diving with sperm whales) ("Seeing these magnificent animals in the water and feeling their sonar pules coarse through one's body is truly one of the most amazing experiences of my life, and I am distressed and injured when these whales are killed by the impacts of the oil and gas industry in the Gulf of Mexico"); Hartl Decl. ¶ 25 (describing extensive travel to Gulf of Mexico to observe ESA-listed species subject to the exemption under consideration, including whooping cranes on their wintering grounds in and around Aransas National Wildlife Refuge on the Texas coast, and the risks oil spills pose to that interest); Hartl Decl. ¶ 26 (describing trips to view black-capped petrel, and noting that "[w]ith a population of fewer than 500 pairs, any major impacts to these seabirds in the Gulf of Mexico could easily drive the species extinct everywhere.").

The Center's members also have concrete interests in the Rice's whale that will be irreparably harmed by the Secretary's unlawful convening of the Committee regarding ESA exemptions for Gulf oil and gas activities. Reeves Decl. ¶ 16 (describing attendance of the Gulf Whale Festival on March 7, 2026, in Pensacola Beach, Florida, and plans to do a deep-sea charter to De Soto Canyon or nearby waters in May 2026).

The Secretary's unlawful convening of the Committee regarding a broad ESA exemption as to oil and gas exploration, development, and production activities in the Gulf—in the absence of any public exemption application and without even the most basic public access requirements being satisfied—circumvents ESA requirements that protect ESA-listed species in which the Center's members have concrete interests, including Rice's whales, as well as leatherback sea turtles, Kemp's ridley sea turtles, and Gulf sturgeon. Unlawfully leapfrogging over the ESA's standard safeguards—including the establishment of reasonable and prudent alternatives for

27

addressing any acknowledged jeopardy situation—removes a central procedural and substantive protection under the Act. The risks from oil spills as well as the multitude of other drilling impacts on ESA-listed species—such as harmful noise from geological and geophysical surveys, pollution from offshore fracking, collisions with vessels, and habitat destruction from platform and pipeline construction—will now apparently be addressed by the Committee charged with considering ESA exemptions rather than resolved through the standard, species-protective consultation process. Although the prospect of extinction caused by short-circuiting the legally mandated process is particularly pronounced with respect to Rice's whale, reduced to only 51 individuals remaining in the wild, the threat posed by the Committee's unlawful action exists with respect to all of the ESA-listed species in the Gulf.

**III.    The Balance of the Equities and Public Interest Support Granting a Temporary Restraining Order.**

The remaining two factors also favor issuance of a TRO. The Center has shown a likelihood of success on the merits, and "the balance of harms will usually favor the issuance of an injunction to protect the environment." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987). When assessing the public interest, "courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Ramirez v. U.S. Immigr. & Customs Enf't*, 310 F. Supp. 3d 7, 32 (D.D.C. 2018) (quoting *Winter v. NRDC*, 555 U.S. 7, 24 (2008)). In the event "a movant seeks to enjoin the government, these final two factors merge." *Climate United Fund*, 775 F. Supp. 3d at 351.

The Secretary cannot demonstrate any injury, let alone a substantial injury, which would weigh against granting a TRO. To begin with, the order sought would only prevent the Committee from meeting during the time that it takes for the Court to further assess the Center's claims. In addition to being devoid of other information, the Secretary's notice convening the

meeting does not in any way intimate that there is urgency in holding the meeting imminently. And since no exemption application is even referenced in the notice, there is no basis for finding that the Secretary could conduct any lawful business, let alone that it must do so before the Court has an opportunity to more fully assess the parties' respective positions.

Indeed, the government "cannot suffer harm from an injunction that merely ends an unlawful practice." *TikTok Inc. v. Trump*, 507 F. Supp. 3d 92, 115 (D.D.C. 2020) (internal citation and quotations omitted). This is because "[t]here is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters*, 838 F.3d at 12. "To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *Id*. (internal citation and quotations omitted); *Ramirez*, 310 F. Supp. 3d at 33 ("The public interest surely does not cut in favor of permitting an agency to fail to comply with a statutory mandate."). Nor can any other parties claim such injury, particularly because there can be no valid exemption application before the Secretary and thus no lawfully impacted applicant.

As first recognized by the Supreme Court in *Tennessee Valley Authority*, the ESA embodies Congress's "plain intent" to "halt and reverse the trend toward species extinction, whatever the cost." 437 U.S. at 184. While the Court is not "mechanically obligated to grant an injunction," the Act "nonetheless makes clear that 'the balance [of equities] has been struck in favor of affording endangered species the highest of priorities." *Ctr. for Biological Diversity v. Ross*, 480 F. Supp. 3d 236, 250 (D.D.C. 2020) (quoting *Tenn. Valley Auth*., 437 U.S. at 193-94)). Congress consciously and purposefully left this priority intact in the 1978 amendments, while allowing exemptions from section 7 requirements in very rare and very specifically defined

circumstances, subject to numerous procedural safeguards, including the public access that the Secretary is disregarding.

The Center thus respectfully requests this Court to grant a temporary restraining order barring the proposed March 31, 2026, meeting from occurring (and any other proposed meeting of the Committee at odds with the ESA's requirements) so that it may hear the merits of this litigation prior to any such convening.

Respectfully submitted this 19th day of March, 2026.

*/s/ Eric Robert Glitzenstein*
Eric Robert Glitzenstein (D.C. Bar No. 358287)
Center for Biological Diversity
1411 K Street NW, Suite 1300
Washington, DC 20005
Phone: (202) 849-8401
Email: eglitzenstein@biologicaldiversity.org

/s/ *Brian Segee*
Brian Segee (CA Bar No. 200795)
Admitted *pro hac vice*
Center for Biological Diversity
226 W. Ojai Ave., Ste. 101-442
Ojai, CA 93023-3278
Phone: 805-750-8852
Email: bsegee@biologicaldiversity.org

/s/ *Kristen Monsell*
Kristen Monsell (D.C. Bar No. CA00060)
Center for Biological Diversity
2100 Franklin St., Suite 375
Oakland, CA 94612
Phone: (510) 844-7137
Email: kmonsell@biologicaldiversity.org

/s/ *Lindsay E. Reeves*
Lindsay E. Reeves (La. Bar No. 32703)
Admitted *pro hac vice*
Center for Biological Diversity
3436 Magazine Street, FRNT PMB 539
New Orleans, LA 70115

Phone: (504) 342-4337
Email: lreeves@biologicaldiversity.org

*Attorneys for Plaintiff*