# EXHIBIT 2:

**National Marine Fisheries Service's**

**2025 Biological Opinion**

## NATIONAL MARINE FISHERIES SERVICE
## ENDANGERED SPECIES ACT SECTION 7
## BIOLOGICAL AND CONFERENCE OPINION

**Title:**   Biological and Conference Opinion on Bureau of Ocean Energy Management and Bureau of Safety and Environmental Enforcement's Oil and Gas Program Activities in the Gulf of America

**Consultation Conducted By:**   Endangered Species Act Interagency Cooperation Division, Office of Protected Resources, National Marine Fisheries Service, National Oceanic and Atmospheric Administration, U.S. Department of Commerce

**Action Agencies:**   Bureau of Ocean Energy Management, Bureau of Safety and Environmental Enforcement, U.S. Environmental Protection Agency, and NMFS' Permits and Conservation Division

**Publisher:**   Office of Protected Resources, National Marine Fisheries Service, National Oceanic and Atmospheric Administration, U.S. Department of Commerce

**Approved:**

Eugenio Piñerio Soler
Assistant Administrator, National Marine Fisheries Service

**Date:**   5/20/2025

**ECO Number:**   OPR-2022-03526

**Digital Object Identifier:**

**Table of Contents**

**1    Introduction** ....................................................................................................................... **1**

    1.1    Consultation History ................................................................................................ 4

    1.2    Background ............................................................................................................... 6

**2    The Assessment Framework** ........................................................................................... **10**

    2.1    Programmatic Consultation Requirements and Procedures ........................................... 14

    2.2    Definition of Take .................................................................................................. 14

**3    Description of the Action** ................................................................................................ **16**

    3.1    Bureau of Ocean Energy Management and Bureau of Safety and Environmental Enforcement ....................................................................................................................... 22

        3.1.1    Responsibilities and Authorities under the Outer Continental Shelf Lands Act    22

        3.1.2    Overview of Oil and Gas Program Stages, Review Processes and Associated Plans and Permits Approved or Issued by the Action Agencies ........................ 23

        3.1.3    Implementation of Outer Continental Shelf Lands Act Stages .............................. 27

        3.1.4    Description of Activities Authorized under Plans and Permits ............................. 35

        3.1.5    Oil Spills ............................................................................................................ 78

        3.1.6    Project Design Criteria to Avoid and Minimize Adverse Effects.......................... 96

        3.1.7    Other Aspects of the Action Important to Effects Avoidance or Minimization ...................................................................................................... 100

    3.2    Environmental Protection Agency ......................................................................... 102

        3.2.1    Clean Water Act Responsibilities ...................................................................... 103

        3.2.2    Clean Air Act Responsibilities........................................................................... 105

    3.3    NMFS Permits and Conservation Division Responsibilities under the Marine Mammal Protection Act ...................................................................................................... 108

        3.3.1    Letters of Authorization .................................................................................... 109

        3.3.2    Adaptive Management ....................................................................................... 111

    3.4    Step-Down Review ............................................................................................... 112

        3.4.1    Step-Down Review Procedures: BOEM and BSEE ............................................ 115

        3.4.2    Project-Specific Review Procedures: NMFS Permits and Conservation Division 118

        3.4.3    Project-Specific Review Procedures: Environmental Protection Agency ............ 118

    3.5    Annual Activity Review......................................................................................... 119

        3.5.1    BOEM/BSEE Annual Review ........................................................................... 120

        3.5.2    USEPA Annual Reviews ................................................................................... 122

        3.5.3    NMFS Permits and Conservation Division......................................................... 122

**4    Action Area** ..................................................................................................................... **122**

**5    Stressors Created by the Action** ................................................................................... **124**

**6    Species and Critical Habitat in the Action Area ........................................................... 132**

6.1    May Affect, Not Likely to Adversely Affect .................................................... 132

6.1.1    Whales.................................................................................................. 132

6.1.2    ESA-listed Fish ................................................................................... 133

6.1.3    Designated Northwest Atlantic DPS Loggerhead Sea Turtle Critical Habitat ..... 137

6.1.4    ESA-Listed Corals and Designated Coral Critical Habitat................................. 142

6.1.5    Queen Conch ...................................................................................... 148

6.2    Status of Species and Critical Habitat in the Action Area Likely to be Adversely Affected ........................................................................................................ 149

6.2.1    Whales.................................................................................................. 151

6.2.2    Sperm Whale....................................................................................... 152

6.2.3    Rice's Whale ....................................................................................... 160

6.2.4    Proposed Critical Habitat for Rice's Whale....................................... 168

6.2.5    Sea Turtles .......................................................................................... 170

6.2.6    North Atlantic Distinct Population Segment Green Sea Turtle ............ 174

6.2.7    Proposed Critical Habitat Green Sea Turtle....................................... 183

6.2.8    Kemp's Ridley Sea Turtle.................................................................. 184

6.2.9    Hawksbill Sea Turtle.......................................................................... 192

6.2.10    Leatherback Sea Turtle ...................................................................... 197

6.2.11    Northwest Atlantic Ocean Distinct Population Segment Loggerhead Sea Turtle    204

6.2.12    Gulf Sturgeon..................................................................................... 215

6.2.13    Gulf Sturgeon Critical Habitat.......................................................... 223

**7    Environmental Baseline.................................................................................... 238**

7.1    Environmental Trends .................................................................................... 238

7.2    Sound............................................................................................................. 241

7.3    Fisheries Bycatch and Interactions................................................................ 245

7.3.1    Federal Fisheries ................................................................................ 246

7.3.2    State Fisheries .................................................................................... 252

7.4    Oil and Gas ................................................................................................... 252

7.4.1    Lease Sales and Drilling .................................................................... 253

7.4.2    Seismic Surveys ................................................................................. 254

7.4.3    Oil and Gas Platform Removals ........................................................ 254

7.4.4    Oil Spills ............................................................................................ 255

7.4.5    State Oil and Gas Activities .............................................................. 267

7.4.6    Oil and Gas Development in Mexican Waters ................................... 269

7.5    Vessel Operations.......................................................................................... 269

7.6    Dredging........................................................................................................ 270

7.7    Construction and Operation of Public Fishing Piers..................................... 271

7.8    Research Permits ........................................................................................... 272

7.9     Military Operations ........................................................................................ 272

7.10    Aquaculture .................................................................................................... 274

7.11    Marine Debris................................................................................................. 275

7.12    Nutrient Loading and Hypoxia....................................................................... 277

7.13    Other Marine Pollution................................................................................... 278

7.14    Cumulative Anthropogenic Impacts to the Environmental Baseline .............. 280

7.15    Conservation and Recovery Actions ............................................................... 281

    7.15.1    Rice's Whale and Sperm Whale ........................................................... 281

    7.15.2    Sea Turtles ........................................................................................... 282

    7.15.3    Gulf Sturgeon....................................................................................... 284

**8    Effects of the Action on ESA-Listed Species .................................................... 286**

8.1     Estimation of Effects, Including Best Available Data Sources, Analytical Tools
and Approaches, and Assumptions.............................................................................. 286

    8.1.1    Program Duration.................................................................................. 286

    8.1.2    Species' Densities and Abundance in the Action Area ......................... 287

    8.1.3    Effects Analysis Roadmaps .................................................................. 293

8.2     Stressors Not Likely to Adversely Affect ESA-Listed Species ..................... 297

    8.2.1    G&G Surveys using HRG...................................................................... 297

    8.2.2    Non-Acoustic G&G Survey Sources and Methods .............................. 301

    8.2.3    Construction Sound Sources other than Pile Driving ........................... 302

    8.2.4    Effects of Aircraft Operation and Sound .............................................. 304

    8.2.5    Effects of Air Emissions and NPDES Water Discharges ...................... 306

8.3     Effects of Conservation Measures.................................................................. 322

8.4     Effects of Vessel Strikes ............................................................................... 335

    8.4.1    Vessel Activity Associated with the Oil and Gas Program ................... 336

    8.4.2    Whales.................................................................................................. 345

    8.4.3    Sea Turtles ........................................................................................... 359

    8.4.4    Gulf Sturgeon ....................................................................................... 373

    8.4.5    Summary of the Effects of Vessel Strikes ............................................ 376

8.5     Effects of Sound ............................................................................................ 377

    8.5.1    Overview of Sound ............................................................................... 378

    8.5.2    Effects of Sound from Geological and Geophysical Surveys................ 389

    8.5.3    Effects of Sound from Decommissioning.............................................. 424

    8.5.4    Effects of Sound from Construction and Operations............................. 441

    8.5.5    Effects of Sound from Vessels.............................................................. 450

    8.5.6    Summary of the Effects of Sound......................................................... 454

8.6     Effects of Entanglement and Entrapment....................................................... 455

    8.6.1    Whales.................................................................................................. 456

    8.6.2    Sea Turtles ........................................................................................... 456

    8.6.3    Gulf Sturgeon....................................................................................... 465

8.6.4     Summary of the Effects of Entanglement and Entrapment ................................... 465
8.7     Effects of Marine Debris ................................................................................................. 466
    8.7.1     Whales.................................................................................................................. 468
    8.7.2     Sea Turtles .......................................................................................................... 470
    8.7.3     Gulf Sturgeon ...................................................................................................... 475
8.8     Effects of Oil Spills ......................................................................................................... 475
    8.8.1     Oil Spill Exposure and Response Analysis......................................................... 505

**9     Effects of the Action on Critical Habitat ......................................................... 526**
9.1     Gulf Sturgeon Critical Habitat ....................................................................................... 527
    9.1.1     Effects of Vessel Sound and Operation .............................................................. 527
    9.1.2     Effects of Seismic Surveys ................................................................................. 528
    9.1.3     Effects of Water Discharges ............................................................................... 528
    9.1.4     Effects of Marine Debris ..................................................................................... 529
    9.1.5     Effects of Oil Spills............................................................................................. 529
    9.1.6     Summary of Effects on Designated Critical Habitat for Gulf Sturgeon ............... 530
9.2     Proposed Rice's Whale Critical Habitat.......................................................................... 531
    9.2.1     Effects of Vessel Sound and Operation .............................................................. 531
    9.2.2     Effects of Sound from HRG Surveys................................................................... 532
    9.2.3     Effects of Seismic Surveys ................................................................................. 534
    9.2.4     Effects of Water Discharges ............................................................................... 536
    9.2.5     Effects of Marine Debris ..................................................................................... 536
    9.2.6     Effects of Oil Spills............................................................................................. 537
    9.2.7     Summary of Effects on Proposed Critical Habitat for Rice's Whale ................... 537
9.3     Proposed North Atlantic DPS Green Sea Turtle Critical Habitat ................................... 538
    9.3.1     Effects of Vessel Sound and Operation .............................................................. 538
    9.3.2     Effects of Sounds from HRG Surveys ................................................................ 539
    9.3.3     Effects of Seismic Surveys ................................................................................. 539
    9.3.4     Effects of Water Discharges ............................................................................... 540
    9.3.5     Effects of Marine Debris ..................................................................................... 540
    9.3.6     Effects of Oil Spills............................................................................................. 540
    9.3.7     Summary of Effects on Proposed Critical Habitat for North Atlantic DPS of
    Green Sea Turtle ............................................................................................................. 542

**10     Cumulative Effects................................................................................................. 542**

**11     Integration and Synthesis.................................................................................... 543**
11.1     Jeopardy Analysis ......................................................................................................... 544
    11.1.1     Rice's Whale ...................................................................................................... 545
    11.1.2     Sperm Whale ..................................................................................................... 548
    11.1.3     Green Sea Turtle North Atlantic DPS................................................................ 550
    11.1.4     Loggerhead Sea Turtle Northwest Atlantic DPS ............................................... 554

11.1.5    Kemp's Ridley Sea Turtle........................................................................ 557
11.1.6    Hawksbill Sea Turtle............................................................................... 560
11.1.7    Leatherback Sea Turtle ........................................................................... 561
11.1.8    Gulf Sturgeon ......................................................................................... 564
11.2    Critical Habitat Destruction/Adverse Modification Analysis ...................... 565
11.2.1    Gulf Sturgeon Critical Habitat............................................................... 566
11.2.2    Rice's Whale Proposed Critical Habitat ................................................ 568
11.2.3    North Atlantic DPS Green Sea Turtle Proposed Critical Habitat ......... 571

**12    Conclusion ........................................................................................... 573**

**13    Reasonable and Prudent Alternative ................................................ 574**
13.1    Proposed RPA ................................................................................................ 576
13.2    Compliance with RPA Criteria ...................................................................... 581
13.3    RPA Analysis of Effects ................................................................................ 582
13.4    RPA Conclusion ............................................................................................. 584

**14    Incidental Take Statement ................................................................ 584**
14.1    Amount or Extent of Take.............................................................................. 585
14.2    Reasonable and Prudent Measures ................................................................ 594
14.3    Terms and Conditions .................................................................................... 595

**15    Conservation Recommendations ....................................................... 596**

**16    Reinitiation Notice ............................................................................. 599**

**17    References ............................................................................................ 600**

marine mammals, whereas available data and models that provide estimates of MMPA Level A harassment are considered to be instances of harm and/or injury under the ESA, depending on the nature of the effects.

After the 2020 opinion was issued, an error was discovered in how BOEM's reduction in exposures for the removal of the "Gulf of Mexico Energy Security Act" (GOMESA) area (now the Presidential withdrawal[2] area) was calculated, and BOEM subsequently provided updated corrected numbers to NMFS on September 3, 2021.

The acoustic exposure modeling described in the 2020 opinion was redone in support of the 2024 final corrective revised seismic rule using the BOEM-provided activity levels from the 2021 letter noting an error in BOEM's calculation of the reduction in exposures for the removal of the GOMESA area, now the Presidential withdrawal area[3] (JASCO 2022). The MMPA seismic rule was revised to reflect the recalculated exposure amounts for marine mammals. The effects analysis in this opinion considered the revised MMPA Level B estimates to determine the extent of ESA take resulting from harassment, which is also reflected in the ITS.

The updated acoustic model determines exposures based on the revised, BOEM-provided activity levels for a specified geophysical survey type. The acoustic model considers behavioral characteristics of marine mammals and a smaller array size (5,110 cubic inch [$in^3$]) to account for the typical array size used in the Gulf of America. This smaller array size allows for a more realistic account of the potential nature of exposure in terms of magnitude, frequency, and duration, and provides a metric for the expected response to geophysical survey noise.

# 3  DESCRIPTION OF THE ACTION

*Action* means all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States or on the high seas. Examples include, but are not limited to: 1) actions intended to conserve listed species or their habitat; 2) the promulgation of regulations; 3) the granting of licenses, contracts, leases, easements, rights-of-way, permits, or grants in aid; or 4) actions directly or indirectly causing modifications to the land, water, or air (50 C.F.R. §402.02).

This consultation and opinion focus on the ongoing or future oil and gas-related program activity on the OCS in the Gulf of America authorized by either BOEM or BSEE. This opinion supersedes all previous section 7 consultations completed under the ESA for BOEM and BSEE (or their predecessor agencies). The scope of this consultation is DOI's management and regulation of OCS oil and gas-related activities under the OCSLA from 2025 through 2029

---

[2] https://trumpwhitehouse.archives.gov/presidential-actions/memorandum-withdrawal-certain-areas-united-states-outer-continental-shelf-leasing-disposition/

[3] On December 20, 2006, President Bush signed into law the GOMESA, which made available new areas for leasing in the EPA and placed a moratorium on other areas in the Gulf of America through June 30, 2032. This area was withdrawn from leasing on September 8, 2020, by the Trump Administration using authority under Section 12(a) of the OCSLA (43 U.S.C. § 1341(a)) through June 30, 2032.

analyzed in the 2020 opinion (because the timing of the program has not changed). For this consultation, the Bureaus' focused BA with appendices, several Programmatic EISs, and other supplemental information was used in this description of the action. The sections pertaining to USEPA and NMFS' Permits and Conservation Division actions rely on information provided for the 2020 opinion and we have updated some of the analyses related to these agencies, but the focus of this opinion is on BOEM and BSEE actions. For this consultation, as for the 2020 consultation, BOEM, BSEE, and NMFS determined a comprehensive, Gulf-wide, programmatic consultation approach is most efficient for analyzing the effects of the Oil and Gas Program activities.

For oil and gas leasing purposes, the Gulf of America is divided into three geographic leasing areas: the Western Planning Area (WPA), the Central Planning Area (CPA), and the Eastern Planning Area (EPA; Figure 1). This consultation considered all areas under federal jurisdiction that encompass all activities associated with the oil and gas program in the WPA, CPA and a small portion of the EPA that is not under moratorium. The five-year leasing schedules are projected by BOEM for each planning area (BOEM 2023a). BOEM has provided reasonably foreseeable projections for the likely leasing scenarios and activities related to such lease sales for five years from the date of issuance of the opinion (approximately 2029) for inclusion in this reinitiated consultation (BOEM and BSEE 2024). This opinion analyzes effects for the five-year leasing schedule, plus the 40-year projected life of a given lease, for a total of 45 years.



**Figure 1. Leases currently active in each planning area of the Gulf of America (Map available at https://www.boem.gov/Gulf-of-Mexico-Region-Lease-Map/)**

Projections of activities related to permitting and plan approvals for OCS oil and gas activities, including those resulting from all prior active leases and future lease sales (Table 2), as well as projections for G&G activities (Table 3) and bottom impacts (Table 4), are within the scope of this opinion. As noted, a lease life is typically up to 40 years from lease sales held in 2029, which is the end of the ten-year lease sale period considered in the 2020 opinion (five-year period remaining that is considered in this opinion). In addition, BOEM has the authority to extend the term of a lease if it continues to be actively producing. All plans and permits receive environmental review by the Bureaus, and some actions require further biological review by the Bureaus depending on their potential to result in effects to ESA-listed species or their habitats.

**Table 2. Summary of projected annual activity levels by depth zone for the Central Planning Area (CPS) and Western Planning Area (WPA) of the action area (Based on BSEE analysis of activity levels and trends from 2012 to 2022)**

| Activity | WPA | WPA | WPA | WPA | WPA | CPA | CPA | CPA | CPA | CPA | Total Action Area[1] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Depth (m) | 0-60 | 61-200 | 201-800 | 801-1,600 | >1,600 | 0-60 | 61-200 | 201-800 | 801-1,600 | >1,600 | All |
| Exploration and Delineation Wells | 0 | 0 | 0-1 | 0 | 0-3 | 0-1 | 0-2 | 0-1 | 0-2 | 12-27 | 12-36 |
| Development and Production Wells | 0-3 | 0-2 | 0-1 | 0 | 1-3 | 1-20 | 4-27 | 6-28 | 1-4 | 14-24 | 26-111 |
| Permanent Plug and Abandoned Wells | 6-23 | 16-69 | 2-44 | 0-3 | 4-11 | 68-181 | 70-215 | 29-99 | 0-24 | 34-57 | 230-725 |
| Installed Production Structures | 0-1 | 0-1 | 0-1 | 0-1 | 0-1 | 0-4 | 0-5 | 0-2 | 0-1 | 0-2 | 0-5 |
| Major modification of Production Structures | 0-2 | 0-1 | 0-1 | 0-1 | 0-1 | 0-16 | 0-19 | 0-23 | 0-2 | 0-7 | 0-25 |
| Total Production Structures Removed | 1-11 | 5-18 | 0-7 | 0-1 | 0-1 | 27-108 | 24-58 | 4-12 | 0-1 | 0-1 | 60-110 |
| Production Structures Removed Using Explosives | 0-3 | 0-5 | 0-1 | 0 | 0 | 4-26 | 3-15 | 0-3 | 0 | 0 | 5-25 |
| Subsea Structures Installed | 0-1 | 0-1 | 0-1 | 0-1 | 0-1 | 0-1 | 2-3 | 1-2 | 0-1 | 9-20 | 12-32 |
| Subsea Structures Removed | 0-1 | 0-1 | 0-1 | 0-1 | 0-1 | 0-2 | 0-3 | 0-2 | 0-1 | 2-15 | 2-21 |
| Method of Transportation % Piped[2] | 9S-100% | 9S-100% | 9S-100% | 100% | 100% | 9S-100% | 9S-100% | 9S-100% | 100% | 100°/4 | >99% |
| Method of Transportation % Barged | 0-2% | 0-2% | 0-2% | 0% | 0% | 0-2% | 0-2% | 0-2% | 0% | 0% | <1% |
| Method of Transportation %Tankered[3,4] | 0% | 0% | 0% | 0% | <1% | 0% | 0% | 0% | 0% | <1% | <1% |
| Length of Installed Pipelines (km)[5] | 0-7 | 0-6 | 0-2 | 0-1 | 0-2 | 0-38 | 0-92 | 0-68 | 0-27 | 0-758 | 0-1,001 |
| Subsea Pipeline Repairs or Modifications[6] | - | - | - | - | - | - | - | - | - | - | 340-447 |
| Length of Decommissioned Pipelines In-place (km) | 22--65 | 0-181 | 0-85 | 0-25 | 0-98 | 98-482 | 178-342 | 81-188 | 16-119 | 0-595 | 394-2,179 |
| Length of Decommissioned Pipelines Removed (km) | 0-4 | 0-8 | 0-2 | 0-1 | 0-1 | 5-42 | 0-13 | 0-8 | 0-1 | 0-4 | 5-83 |

19

Case 1:26-cv-00940-RC    Document 9-4    Filed 03/19/26    Page 11 of 82

| Activity | WPA | WPA | WPA | WPA | WPA | CPA | CPA | CPA | CPA | CPA | Total Action Area[1] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Service-Vessel Trios (1,000s)[7] | 1-15 | 1-8 | <1-2 | <1-3 | <1-2 | 21-77 | 13-35 | 3-6 | 5-8 | 4-8 | 47-163 |
| Helicopter-Operations (1,000s)[8] | <1-1 | <1-1 | <1 | <1-2 | <1-3 | <1-5 | <1-6 | <1-1 | 1-4 | 7-13 | 9-36 |

[1]Totals may not equal sum of all planning area and depth categories because maximum activity levels in each category are unlikely to occur across the Total Action Area. Totals based on historical leasing trends, drilling trends, oil and gas discovery volumes, production activity and other BOEM short-term forecasts as data and information used as input for the forecast models. Division among depth zones and planning area based on relative activity levels.

[2]100 percent of gas assumed to be piped.

[3]Tankers are forecasted to occur only in water depths >1,600m, otherwise pipelines are used.

[4]Tankers transport oil and gas; however, they are not regulated by BOEM or within the scope of the activities to be analyzed in the Bureaus' BA (i.e., not part of the action).

[5]Projected length of pipelines does not include length in State waters.

[6]A portion of pipeline repair and modification permits do not include offshore activities, such as pipeline cessation or notif ication of operations requests or flow direction changes.

[7]Trips include vessel activities associated with structure modification as maintenance and/or operations.

[8]Helicopter trips may include circuits. This means that each take-off and landing is counted as a trip and is not necessarily one trip offshore or one trip onshore. Trips may occur between platforms or across a water depth.

Case 1:26-cv-00940-RC    Document 9-4    Filed 03/19/26    Page 12 of 82

Biological Opinion on BOEM Gulf of America Oil and Gas Program                    Tracking No. FPR-2017-9234

**Table 3. Summary of projected levels of geological and geophysical activities over 10 years for the Gulf of America Oil and Gas Program (BOEM 2016; BOEM 2017e)**

| Geological or Geophysical Activity | Number | Miles |
|---|---|---|
| HRG Surveys (Airgun and Non-Airgun) | 716 | 103,025 |
| VSP Surveys | 561 | 16,992 |
| SWD Surveys | 100 | 0 |
| 2D Surveys | 23 | 149,800 |
| 3D Surveys | 69 | 649,420 |
| WAZ Surveys | 62 | 561,432 |
| 4D Surveys | 101 | 1,108,378 |
| Total 3D, WAZ, 4D Survey | 232 | 2,319,230 |
| CSEM | 12 | 8,120 |
| CPT | 100 | -- |
| Corings | 795 | -- |
| Grab Sample | 1 | -- |
| Vibracores | 0 | -- |
| Jet Probe | 0 | -- |
| Bottom Sampling Subtotal | 896 | -- |
| Shallow Drill Test Wells | 2 | -- |
| COST Wells | 1 | -- |
| Bottom-Founded Monitoring Buoy | 0 | -- |

2D = two-dimensional; 3D = three-dimensional; 4D = four-dimensional; COST = Continental Offshore Stratigraphic Test; CPT = cone penetrometer test; CSEM = controlled source electromagnetic; HRG = high-resolution geophysical; $m^2$ = square meters; SWD = seismic while drilling; VSP = vertical seismic profile; WAZ = wide azimuth (survey).

21

**Table 4. Spatial extent of bottom impacts for geological and geophysical activities over 10 years for the Gulf of America Oil and Gas Program (BOEM 2016; BOEM 2017e)**

| Geological or Geophysical Activity | Square Meters |
|---|---|
| Bottom Impacts (10 m$^2$/sample * 896 samples) | 8,960 |
| Bottom Impacts (20,000 m$^2$/COST well) | 60,000 |
| Bottom Impacts – Bottom Founded Monitoring Buoys (Footprint 0.56 m$^2$/buoy + Sweep 34,000 m$^2$/buoy) | 0 |
| Total Bottom Impacts | 68,960 |

## 3.1 Bureau of Ocean Energy Management and Bureau of Safety and Environmental Enforcement

This section describes (1) BOEM and BSEE's statutory responsibilities and regulatory authorities, (2) oil and gas program stages, review processes and associated plans and permits approved or issued, (3) implementation of OCSLA stages, and (4) activities authorized under oil and gas plans and permits. It also describes changes to and new information since the 2020 biological opinion for review processes, associated plans and permits issuance, and activities authorized under oil and gas plans and permits, as well as oil spill prevention, preparedness, containment, and response activities regulated by the Bureaus. In this section, we also discuss oil spill prevention, preparedness, containment, and response activities regulated by BOEM, BSEE and other federal agencies. Although not legally permitted discharges, oil spills do regularly result from oil and gas activities in the Gulf of America; therefore, their effects are analyzed in this opinion.

### 3.1.1　Responsibilities and Authorities under the Outer Continental Shelf Lands Act

Under the OCSLA, the Secretary of the DOI has the responsibility to "prepare and periodically revise, and maintain an oil and gas leasing program" in order to "best meet national energy needs" (43 USC §1344(a)). The Act further requires the Secretary to ensure that the U.S. government receives fair market value for acreage made available for leasing, and that offshore conventional (oil and gas) or renewable energy development activities conserve resources, operate safely, and take maximum steps to protect the environment. The Secretary of the DOI has delegated responsibility to implement OCSLA activities relevant to this opinion to BOEM and BSEE.

BOEM is responsible for leasing (including pre- and post-lease activities), exploration, and development plan approval and administration, environmental studies, NEPA analyses, resource evaluation, and economic analysis. BOEM reviews and approves plans for OCS oil and gas exploration and development. BOEM's Office of Strategic Resources, which is responsible for the development of the National Outer Continental Shelf Oil and Gas Leasing Program, oversees assessments of the oil, gas, and other mineral resource potential of the OCS, inventories oil and

BOEM regulations establish a systematic review process for air quality emissions during the plan approval to determine if the projected emissions from a facility result in onshore ambient air concentrations that may require appropriate emissions controls to mitigate potential onshore air quality degradation. Permit applicants must first conduct an initial screening analysis to determine whether emissions exceed established "exemption" levels as detailed in BOEM Notice to Lessees NTL-2020-N02 (https://www.boem.gov/sites/default/files/documents/about-boem/NTL-2020-N02.pdf). If these exemption levels are exceeded, the applicant must perform modeling to determine whether the BOEM "significance" levels will be exceeded onshore. When modeling demonstrates that BOEM's significance levels will be exceeded, best available control technologies (BACTs) must be applied. Conversely, when modeling demonstrates no impacts according to BOEM's significance levels, no BACT is required and a plan may be approved.

### 3.1.4   Description of Activities Authorized under Plans and Permits

The following sections describe in detail the activities implemented under the plans and permits discussed above, including inspection and enforcement activities by the action agencies, and measures required by all operators specifically to avoid or minimize harm to the environment and protected resources. This discussion will facilitate identification of the routes of potential adverse effects to ESA-listed species or designated critical habitats from the action that will be discussed in this opinion. We note that BOEM/BSEE did not project Oil and Gas Program activity in the EPA because of the Presidential withdrawal. Therefore, the annual activity level estimates in Table 2 and the activity subsections below do not include estimates for the EPA with the exception of G&G projections for the CPA that include those portions of the EPA not currently withdrawn, but only for geological coring and CSEM activities in those portions of the EPA.

According to discussions with BOEM, we understand that the annual levels provided in Table 2 of this opinion are substantially different from those in Table 2 in the 2020 opinion because: (1) the most current scenarios rely on data that include years of very low activity, such as 2020 (due to the COVID-19 pandemic); and (2) data collected and reported by the Bureaus during annual activity reviews led to changes in activity level estimates. Under any of these activities, technologies continue to evolve to meet the technical, environmental, and economic challenges of oil and gas development. New technologies as part of the Oil and Gas Program are discussed in Section 3.1.4.11, below.

### 3.1.4.1 Geological and Geophysical Surveys

G&G surveys routinely occur every day in the Gulf of America and, as relevant to the action, are conducted to: (1) obtain data for hydrocarbon and mineral exploration and production; (2) aid in siting of oil and gas structures, facilities, and pipelines; (3) identify possible seafloor or shallow-depth geologic hazards; and (4) locate potential archaeological resources and benthic habitats that should be avoided. Data needs and the target of interest drive the selection of a specific technique or suite of techniques.

Specific G&G surveys may span a single day, weeks, or months. G&G surveys are conducted in federal or state waters of the Gulf of America; however, BOEM and BSEE only have jurisdiction in federal waters. Extensive G&G exploration activity has occurred in the Gulf, mainly in the WPA and CPA. More advanced acquisition techniques such as multi-component, wide-azimuth (WAZ), full-azimuth (FAZ), multi-azimuth (MAZ), and coil surveys that use multiple sound sources, and high resolution geophysical (HRG) surveys, which include airgun and non-airgun equipment. BOEM defines two main categories of seismic surveys: (1) deep seismic (OBN), Vertical Seismic Profile (VSP), or borehole, 2D, 3D, 4D, and (2) HRG. Using recent permit application information, BOEM estimated future seismic equipment (Table 3, PEIS) will be used in the Gulf to enhance seismic imaging quality to levels not available in the past. It is reasonable to expect that G&G technologies will continue to change in the future. Permits for G&G require the following information to be submitted in a permit application: a description of drilling methods or sampling; equipment to be used; estimated bore holes or sample locations; navigation system; method of sampling; description of analyzed or processed data; estimated completion date; a map, plot, or chart showing latitude and longitude; specific block numbers; and total number of borings and samples. Further, before BOEM issues a permit, the applicant is required to notify BOEM of their receipt of a Letter of Authorization (LOA) under the MMPA or decision from NMFS that a LOA is not required.  BOEM will not issue a permit without this notification. Notice to Lessees (NTL) No. 2009-G34 provides guidance and clarification on the procedures for conducting ancillary activities (30 C.F.R. §550.208; https://www.bsee.gov/notices-to-lessees-ntl/notices-to-lessees/ntl-2009-g34-ancillary-activities-december-1-2009).

BOEM's draft PEIS address oil and gas (O&G), renewable energy (REN) and marine minerals program areas (Beckwith and Fuentes) However, this opinion only covers BOEM's Oil and Gas Program.

The O&G program area is the only one that conducts deep-penetration seismic surveys, non-acoustic marine geophysical surveys, and airborne remote surveys. Most, if not all deep-penetration seismic surveys require the use of airguns. Seismic surveys evaluate subsurface geological formations to assess potential hydrocarbon reservoirs and optimally site exploration and development wells. The two dimensional (2D) surveys provide a cross-sectional image of the Earth's structure while three dimensional (3D) surveys provide a volumetric image of underlying geological structures. Repeated 3D surveys result in time lapse, or four dimensional (4D), surveys that assess the depletion of a reservoir. The vertical seismic profile (VSP) surveys provide information about geologic structure, lithology, and fluids. Deep-penetration seismic surveys include:

- 2D Seismic Surveys ;

- 3D Seismic Surveys ;

- Ocean-Bottom 2D Seismic Surveys (Cable or Nodes) ;

- Ocean-Bottom 3D Seismic Surveys (Cable or Nodes) ;

- Wide-Azimuth and Related Multi-Vessel Surveys ;

- Borehole Seismic Surveys (2D and 3D VSP Surveys) ;

- Vertical Cable Surveys ; and

- 4D Time-Lapse Surveys ;

Non-acoustic marine geophysical surveys include marine gravity surveys, marine magnetic surveys, marine magnetotelluric surveys, or marine controlled source electromagnetic surveys. These efforts use electromagnetic signals to develop a conductivity/ resistivity profile of the seafloor, helping to identify economic hydrocarbon accumulations and aid with archaeological surveys. Airborne gravity surveys and airborne magnetic surveys are used to assess structure and sedimentary properties of subsurface horizons. Airborne magnetic surveys evaluate deep crustal structure, salt-related structure, and intra-sedimentary anomalies.

Airgun high-resolution geophysical surveys are high-resolution seismic surveys conducted under the O&G and REN program areas. These surveys employ a single airgun to assess shallow hazards, benthic habitats, renewable energy structure emplacement. The O&G and REN program areas also use acoustic pingers, transponders, transceivers, responders, remotely operated vehicles (ROVs), and autonomous vehicles (AUVs) to assist in the execution of surveys, either by providing location or facilitating underwater service tasks. Additionally, water guns are no longer used as a seismic source except in extremely rare instances.

Non-Airgun Acoustic High-Resolution Geophysical Surveys are conducted under the O&G, REN, and MMP program areas. These surveys include subbottom profiling surveys, side-scan sonars, and single beam and multibeam echosounders to assess shallow hazards, potential sand and gravel resources for coastal restoration, archaeological resources, and benthic habitats. Devices used in subbottom profiling surveys include, sparkers, boomers, and pingers.

Geological and Geotechnical Surveys conducted under the O&G, REN, and MMP program areas employ grab and box sampling and geologic coring to collect surface and near surface sediment samples to assess seafloor properties for siting structures such as platforms, pipelines, or cables. The O&G and REN program areas will also use shallow test drilling, continental offshore stratigraphic test (COST) wells, and cone penetrometer tests. The different types of geologic cores extracted include:

- gravity corers;

- multicorers;

- piston corers;

- rotary corers;

- ROV push cores; and

- vibracorers.

Cone penetrometer tests for geologic coring allow assessment of sediment characteristics for use in coastal restoration projects. Shallow test drilling is conducted to place test equipment into a borehole to evaluate gas hydrates or other properties. The COST wells evaluate stratigraphy and hydrocarbon potential without drilling directly into oil and gas bearing strata.

Seismic surveys are performed before lease sales to identify potential areas of hydrocarbons to inform future leasing decisions, including review of seismic data by BOEM to determine fair market value of a lease. Seismic surveys also occur after a lease is issued for a variety of reasons, such as further identifying drilling locations (and thus potentially reducing the number of dry holes); identifying archaeological sites, potential shallow geologic and manmade hazards for engineering; monitoring reservoir levels over time; and site planning for bottom-founded structures.

In general, seismic surveys are deep penetrating and are used to obtain data about geologic formations greater than 300 m below the sea floor. Typical seismic surveying operations tow a seismic sound source eight to 12 m below the sea surface. The seismic sound source is generally an airgun array, but it may also be a boomer, sparker, or other technology. One or more streamers (cable(s) with hydrophone signal receivers) are also towed behind the vessel. For towed equipment that has the potential to capture/entrap sea turtles, such as tail buoys, turtle guards are used. An alternative to streamers is the deployment of geophones either connected to ocean-bottom cables (OBC) or ocean-bottom nodes (OBN) placed individually on the sea floor. The airgun array produces underwater sound waves by releasing compressed air into the water column, creating an acoustical energy pulse. The intermittent release of compressed air creates a regular series of strong acoustic impulses separated by silent periods lasting up to 16 seconds (s), depending on survey type and depth to the target formations. The acoustic signals are reflected off subsurface structures and sediments and recorded back near the surface via the hydrophones in the streamer(s) or nodes/geophones. Streamers are often three to 12 km in length. The speed at which the vessels tow them varies depending on the type of survey, but it is typically between three and 4.5 knots (kt; about 5-8 km per hour) with gear deployed.

An airgun source can consist of a single device, but most often consists of an array or arrays of airguns configured in different ways to produce a desired signal to map certain areas for deep geologic features and oil and gas deposits. Airguns can be towed behind a vessel or suspended into the water from a drilling rig or workboat to survey the area around a well being drilled. The general principal of the airgun is that air is highly pressurized into a cylinder (the airgun); the airgun releases the pressure and discharges a sound pulse toward the sea floor. The pulse travels to the sea bottom and penetrates the subsurface, and the sound signals are reflected by subsurface geologic features (Figure 4 and Figure 5). Signals are recorded by hydrophones towed behind a vessel, geophones deployed down a well, or by receivers (cables or nodes) placed directly on the seafloor.



**Figure 4. Diagram of a seismic survey vessel towing both an airgun array and hydrophone cables**



**Figure 5. Example of a common high-resolution geophysical survey configuration in the Gulf of America**

The simultaneous discharge of highly pressurized air from the airguns results in a very loud "bang" several times each minute. The frequency of the bangs depends on the survey and number of source vessels used. Pathways for the transmission of seismic survey sound include direct paths through the water from the airguns, indirect paths that include reflection from the sea surface and bottom, and other pathways depending on the type of bottom sediments. For specific projects, seasonally and spatially variable environmental characteristics such as temperature and salinity can be modeled because they also play a role in determining the frequencies and sound level propagation.

Other G&G sound sources involve various types of sonars that map bottom and subsurface features in greater detail. These HRG surveys are conducted in a similar way, but they use sound sources other than airguns. HRG surveys typically use mid- and high-frequency sound sources attached to the vessel, a towfish (an instrument towed behind a vessel), or an AUV. The largest differences between airgun sound sources and HRG surveys include the frequency of the sound sources (HRG sources are higher frequencies), the source level of the sound sources (HRG source levels are a lower sound level than airguns), and the tow depth of the sound sources (HRG sources are deployed lower in the water column than airguns).

Pressure Inverted Echo Sounders (PIESs) are oceanographic instruments utilized for subsidence monitoring or to measure the speed of sound in the water column (USDOI BOEM 2023b). They transmit an acoustic pulse (typically once or twice an hour) that reflects off the sea surface and detect the pulse on the seabed to measure two-way travel time through the water column. They simultaneously measure pressure at the seabed (USDOI BOEM 2023b). Pressure measurements are converted to depth to find the acoustic distance traveled from the seabed to the surface and back again. By combining depth and travel time, the average sound speed in the water column can be calculated (USDOI BOEM 2023b). Some PIESs are designed to be free-fall deployed, but ROV deployments (e.g., tripod base configuration) were the preferred method in the past. When deployed using a free-fall descent, the PIES unit can be integrated into a flotation collar and attached via a biodegradable manila rope to a carbon (black) steel anchor weight, which will secure the unit on the seafloor until released. Seafloor spacing varies when placed by an ROV; examples include spacing at 400 m X 400 m or 1,200 m X 1,200 m. When used in conjunction with Ocean Bottom Nodes during ROV placement, PIESs may be deployed near the same time at node locations. The sampling interval of PIES can be configured serially before deployment and via its internal acoustic telemetry link. PIESs log data at programmable intervals for a time and can be deployed for months or even several years, depending on battery life (USDOI BOEM 2023b). They operate in water depths up to 6,000 m and are recovered via an ROV or acoustic release for retrieval at the sea surface. PIESs are narrowband, intermittent sources, with frequencies from 12–20 kilohertz (kHz; USDOI BOEM 2023b).

### 3.1.4.2 Deep Seismic Airgun Surveys

For 2D seismic surveys, a single streamer is towed behind the survey vessel, together with a single source or airgun array. Seismic vessels generally follow a systematic pattern during a survey, typically a simple grid pattern for 2D work, with lines typically no closer than half a kilometer. In simplified terms, 3D surveys collect a very large number of 2D slices, with minimum line separations of only 25-30 m. A 3D survey may take many months to complete (e.g., three to 18 months) and involves a precise definition of the survey area and transects, including multiple passes to cover a given survey area. For seismic surveys, 3D methods represent a substantial improvement in resolution and useful information relative to 2D methods. Consequently, most areas in the Gulf of America surveyed using 2D have been re-surveyed using 3D methods.

The 3D seismic surveying provides the opportunity to create higher resolution subsurface images and to resolve imaging challenges, thereby enabling a more accurate assessment of potential hydrocarbon reservoirs. As a result, the oil and gas industry is able to optimally locate and successfully develop wells, while minimizing the number of exploratory wells required. State-of-the-art interactive computer mapping systems can handle much denser data coverage than the older 2D seismic surveys. Multiple-source and multiple-streamer technologies are used for 3D seismic surveys. A typical 3D survey might employ a dual array of 18 air guns per array. At 10 m from the source, the resultant pressure is approximately ambient pressure plus one atmosphere. The streamer array might consist of six to eight parallel cables, each 3,000-12,000 m long, spaced 25-100 m apart. An 8-streamer array used for deepwater surveys is typically 700 m wide. A series of 3D surveys collected over time (commonly referred to as four-dimensional or 4D seismic surveying) is used for reservoir monitoring and management (the movement of oil, gas, and water in reservoirs can be observed over time). Increasingly, the data collected in a 3D seismic survey can be processed to provide near surface images adequate for many of the needs previously met by high-resolution surveys.

Wide-azimuth towed-streamer (WAZ) surveys have emerged in the last few years as a step change in marine surveying technology in the Gulf of America. This came about because the risky exploration and development of deepwater subsalt reservoirs required seismic data to have better illumination, higher signal-to-sound ratio, and improved resolution. Wide azimuth acquisition configurations involve multiple vessels operating concurrently in a variety of source vessel-to-acquisition vessel geometries. Several source vessels (usually two to four) are used in coordination with single or dual receiver vessels either in a parallel or rectangular arrangement with a typical 1200-m vessel spacing to maximize the azimuthal quality of data acquired. It is common to have sources also deployed from the receiver vessels in addition to source-only vessels. This improves the signal-to-sound ratio and helps to better define the salt and subsalt structures in the deep waters of the Gulf of America. Coiled (spiral) surveys are a further refinement of the wide azimuth acquisition of subsalt data. These surveys can consist of a single source/receiver arrangement or a multi-vessel operation with multiple sources where the vessels navigate in a coiled or spiral pattern over the area of acquisition.

Deep seismic surveys penetrate deeper into the crust layers than other survey types, high energy and low frequency (2D, 3D, 4D or WAZ) and may be done on leased blocks for more accurate identification of potential reservoirs, thereby aiding in the identification of additional reservoirs in "known" fields. Three-dimensional technology can be used in developed areas to identify bypassed hydrocarbon-bearing zones in currently producing formations and new productive horizons near or below currently producing formations. It can also be used in developed areas for reservoir monitoring and field management. Four-dimensional seismic surveying is predominantly used for on-lease reservoir monitoring and management. Through time-lapse surveys, the movement of oil, gas, and water in reservoirs can be observed over time, and that information is used to adjust production techniques and decisions, leading to more efficient production of the reservoir and the ultimate recovery of a greater portion of the original oil and

gas in place. Surveying may occur periodically throughout the productive life of a lease, as frequently as every six months.

### 3.1.4.3 Ocean-Bottom Airgun Surveys

Ocean-bottom surveys can use either cables or nodes. OBC surveys were originally designed to enable seismic surveys in congested areas (e.g., producing fields) with their many platforms and producing facilities. OBNs are deployed and retrieved by either cable or remotely operated vehicles (ROVs) that are now used as an alternative to cables. OBC surveys have been found to be useful for obtaining multi-component (i.e., seismic pressure, vertical, and the two horizontal motions of the water bottom, or sea floor) information. OBC surveys and nodal acquisition require the use of multiple ships (usually two ships for cable or node layout/pickup, one ship for recording, one ship for shooting, and two utility boats). These ships are generally smaller than those used in streamer operations. Operations are conducted "around the clock" and begin by dropping the cables off the back of the layout boat or by deployment of the nodal receivers by ROVs. Cable length or the number of nodes depend upon the survey demands; cable length is typically 4.2 km but can be up to 12 km. Depending on spacing and survey size, hundreds of nodes can be deployed and re-deployed over the span of the survey. Groups of seismic detectors, usually hydrophones and vertical motion geophones, are attached to the cable in intervals of 25-50 m. Multiple cables/nodes are laid parallel to each other using this layout method with a 50-m interval between cables/nodes. Typically, dual airgun arrays are used on a single-source vessel. When the cable/node is in place, a ship towing an airgun array (which is the same airgun array used for streamer work) passes between the cables/nodes, firing every 25 m. Sometimes a faster source ship speed of 6 kt, instead of the normal 4.5 kt speed, is used with a decrease in time between gun firings. After a source line is shot, the source ship takes about 10-15 minutes to turn around and pass down between the next two cables or line of nodes. When a cable/node is no longer needed to record seismic data, it is picked up by the cable pickup ship and is moved over to the next position where it is needed. The nodes are retrieved by an ROV. A particular cable/node can lay on the bottom anywhere from two hours to several days, depending upon operation conditions. Normally a cable will be left in place about seven to ten days. However, nodes may remain in place until the survey is completed or recovered and then re-deployed by an ROV.

Location of the cables/nodes on the bottom is done by acoustic pingers located at the detector groups and by using the time of first arrival of the seismic pulse at the detector group. Acoustic pingers use frequencies in the 9-13 kHz range. A detector group is a node or group of nodes that enable the seismic ship to accurately determine node location. To obtain more accurate first arrival times, the seismic data are recorded with less electronic filtering than is normally used. This detailed location is combined with normal navigational data collected on the source ship. In deep-water, the process of accurately locating bottom cables/nodes is more difficult because of the effects of irregular water bottoms and of the thermal layers, which affect travel times and travel paths, thus causing positioning errors.

### 3.1.4.4 High-Resolution Airgun Surveys

High-resolution airgun surveys collect data on surface and near-surface geology to identify archaeological sites, potential shallow geologic and manmade hazards for engineering, geohazards and soil conditions; assist with site planning for bottom-founded structures; and identify potential benthic biological communities (or habitats) and archaeological resources needing review and mitigation measures for OCS exploration and development plans. Information can also be recovered at much greater depths, so that some surveys are used for exploration purposes. A typical operation consists of a ship towing an airgun or array (about 25 m behind the ship) and a 600-m streamer cable with a tail buoy (about 700 m behind the ship). The ship travels at 3-3.5 kt (5.6-6.5 km per hour), and the airgun is fired every seven to eight seconds (or about every 12.5 m along a track line). Typical surveys cover one lease block, which is usually 4.8 km on a side. BOEM regulations require information be gathered on a 300- by 900-m grid, which amounts to about 129 km of trackline data per lease block. Including line turns, the time to survey one block is about 36 hours; however, streamer and airgun deployment and other operations add to the total survey time. For blocks identified by BOEM as having a high probability for the presence of historic archaeological resources (i.e., shipwrecks), grid points must be spaced 50-m apart (see NTL No. 2011-Joint-G01, http://www.boem.gov/Regulations/Notices-To-Lessees/2011/2011-JOINT-G01-pdf.aspx).

### 3.1.4.5 Non-Airgun, Sound-Producing High-Resolution Surveys

High-resolution surveys may use airguns but also use other sound sources, such as sub-bottom profilers (at 2.5-7 kHz), echosounders (single-beam at 12-240 kHz; multibeam at 50-400 kHz), boomers (at 300-3,000 hertz [Hz]), sparkers (at 50-4,000 Hz), compressed high intensity radar pulse (CHIRP) sub-bottom profiler (at 4-24 kHz), pingers (at 2 kHz), and side-scan sonars (16-1,500 kHz). These sound sources are typically powered either mechanically or electromagnetically.

*Deep-Tow, Sidescan Sonar, Single Beam Echosounder, or Multibeam Echosounder Surveys*

These surveys are conducted primarily for studies associated with the placement of production facilities and pipelines and typically use a towfish or an AUV to provide information on the presence of sand flows, hydrates, seeps, and bottom topography (e.g., hard bottom). Operations using towfish are conducted from ships towing cables up to 7 km long, which enable operations in water depths up to 3,000 m deep. Close to the end of the cable is a 30-45-m long section of chain to keep the sensor package tracking at approximately 25-30 m above the bottom. This requires the chain to be dragged along the sea floor, which cuts a trench in the sea floor approximately 10 centimeters (cm) wide by 15 cm deep (4 inches [in] wide by 6 in deep). In situations where the chain could entangle in shipwrecks, wellheads, or other obstructions or where reef colonies live, the chain is removed, and the sensor package is kept above the sea floor by adjusting the length of the tow cable. Maintaining a constant elevation above the sea floor by adjusting the cable length is very difficult, and the elevation above the sea floor is somewhat

greater in this case. These sources are often used simultaneously with airguns during deep-penetration seismic surveys.

*Subbottom Profiling Surveys*

Sparkers, boomers, pingers and CHIRPs each function differently but all provide similar data for shallower penetration of the subsurface (first few inches to feet). Sparkers use electricity to turn water into a vapor pulse that can penetrate several hundred feet into the subsurface and they are usually towed on one side of the ship opposite the hydrophone array on the other side of the ship. Boomers use electricity to cause two spring-loaded plates to push away from each other. They are usually towed behind the vessel on a towed sled. A pinger creates a weaker sound source that remains at one frequency and CHIRPs sweep through multiple frequencies and receive relatively clear echo returns.

*Non-Sound Producing Geophysical Surveys*

Marine gravity data can be collected with instruments on the sea floor, in boreholes, ships, helicopters or planes. Data were originally collected on the sea floor, but technology has moved the collection point to ships. Marine gravity meters have, in some cases, been housed in a ship while it is conducting a seismic survey. Another method of collection uses dedicated ships (about 50 m long) to collect an independent gravity dataset. Global positioning navigation systems and larger, more stable seismic ships make it possible to achieve the same order of accuracy with gravity meters placed in seismic ships as in dedicated ships. Data grids for gravity surveys typically range from 0.8 x 1.6 km or 1.6 x 1.6 km to higher altitude flying 6 x 19 km or 13 x 39 km.

Marine magnetic surveys measure Earth's magnetic field to determine structure and sedimentary properties of subsurface horizons. These surveys are usually conducted in conjunction with a seismic survey, allowing the navigation information to be used for both surveys. The development of low-power digital sensors has allowed the sensor package to be towed behind the seismic source array, which has greatly improved the operational efficiency of magnetic surveys.

Magnetotelluric surveys are passive measurements of Earth's electromagnetic fields. Electromagnetic surveys are used to help delineate potential oil and gas reservoirs. Many geological processes in the crust and upper mantle of the sea floor involve the interaction of fluid phases with surrounding rock. The conductivities of hydrothermal phases are different from those of host rock, and collectively they offer distinct profiles of electrical conductivity/resistivity depending on the specific geological process involved. Controlled source electromagnetic surveys (CSEM) induce very low frequency (typically less than 2 Hz) electromagnetic signals into the upper layers of the sea floor via a towed dipole. The signals propagate laterally to an array of receivers kilometers away. The variations in the electromagnetic field relative to the geometry of the receiver arrays and distance provide a conductivity/resistivity profile of the sea floor. From the profile, hydrocarbon reservoirs can be

differentiated from water reservoirs and surrounding rock. Table 5 shows the projected activity levels for non-sound producing G&G activities, including CSEM.

Aeromagnetic and Airborne Gravity Surveys are conducted to assess structure and sedimentary properties of the subsurface. Aeromagnetic surveys specifically look for deep crustal structure, salt-related structure, and intra-sedimentary anomalies. They are often flown by twin-engine, fixed-wing aircraft, typically Cessna 404s or 208s, Piper Aerostars, or Navajos. The flight lines are on the order of 400 km long at a height of 75-150 m above the surface and are flown at speeds of about 220 km per hour.

*Geological and Geochemical Sampling*

Geochemical sampling is conducted to obtain samples of the sea floor for physical and/or chemical analyses. Sampling results are used to site structures such as platforms and pipelines. Chemical analyses (surface geochemical prospecting) are based on the premise that upward migrated petroleum from deep source rocks and reservoirs can be detected in near-surface sediments and can be used to evaluate exploration potential. Bottom sampling uses devices that penetrate anywhere from a few centimeters to several meters below the sea floor. Samples of near-surface sediments are typically obtained by dropping a piston core or gravity core (dart-essentially a weighted tube) to the ocean floor and recovering it with an attached wire line. Table 5 through Table 7 shows the projected activity levels for non-sound producing G&G activities, including coring for each planning area. Samples can also be obtained using a grab (a device with a jaw-like mechanism) or with a dredge, which is a wire cage dragged along the sea floor. Shallow coring is done by conventional rotary drilling equipment from a drilling barge or boat. Penetration is usually limited to the recovery of several feet of consolidated rock. Usually a program of bottom sampling and shallow coring is conducted simultaneously using a small marine drilling vessel.

**Table 5. Projected levels of non-sound producing geological and geophysical activities in the Western Planning Area over a 10-year period in survey line distance (miles [mi]). Parenthetical numbers represent number of surveys (from (BOEM 2017e)**

| Year | Geologic Coring | CSEM | Drilling Test [A] |
|---|---|---|---|
| Year 1 | 0 | 0 | 0 |
| Year 2 | 0 | 660 mi (1) | 0 |
| Year 3 | 10 cores (1) | 0 | 0 |
| Year 4 | 0 | 0 | 0 |
| Year 5 | 40 cores (1) | 660 mi (1) | 0 |
| Year 6 | 0 | 660 mi (1) | 0 |
| Year 7 | 0 | 0 | 1 well (1) |
| Year 8 | 0 | 0 | 0 |
| Year 9 | 20 cores (2) | 660 mi (1) | 0 |

| Year | Geologic Coring | CSEM | Drilling Test [A] |
|---|---|---|---|
| Year 10 | 0 | 0 | 0 |
| Totals | 70 cores (4) | 2,640 mi (4) | 1 well (1) |

[A] Penetration <150 m (500 ft). CSEM = controlled-source electromagnetic. Typically, one OCS block is nine square miles (23.3 square kilometers [$km^2$], 2,331 hectares, or 5,760 acres).

**Table 6. Projected levels of non-sound producing geological and geophysical activities in the Central Planning Area over a 10-year period in survey line distance (miles [mi]). Parenthetical numbers represent number of surveys (from (BOEM 2017e)**

| Year | Geologic Coring | CSEM | Drilling Test [A] |
|---|---|---|---|
| Year 1 | 20 cores (2) | 760 mi (1) | 0 |
| Year 2 | 80 cores (3) | 1,520 mi (2) | 0 |
| Year 3 | 90 cores (4) | 0 | 0 |
| Year 4 | 20 cores (2) | 760 mi (1) | 0 |
| Year 5 | 60 cores (2) | 0 | 0 |
| Year 6 | 20 cores (2) | 760 mi (1) | 0 |
| Year 7 | 0 | 0 | 0 |
| Year 8 | 95 cores (5) | 0 | 0 |
| Year 9 | 0 | 760 mi (1) | 1 well (1) |
| Year 10 | 95 cores (5) | 0 | 0 |
| Totals | 480 cores (25) | 4,560 mi (6) | 1 well (1) |

[A] Penetration <150 m (500 ft). CSEM = controlled-source electromagnetic. Typically, one OCS block is nine square miles (23.3 square kilometers [$km^2$], 2,331 hectares, or 5,760 acres).

**Table 7. Projected levels of non-sound producing geological and geophysical activities in the Eastern Planning Area over a 10-year period in survey line distance (miles [mi]). Parenthetical numbers represent number of surveys (from (BOEM 2017e)**

| Year | Geologic Coring | CSEM | Drilling Test [A] |
|---|---|---|---|
| Year 1 | 15 cores (1) | 0 | 0 |
| Year 2 | 30 cores (2) | 0 | 0 |
| Year 3 | 30 cores (2) | 0 | 0 |
| Year 4 | 80 cores (2) | 0 | 0 |
| Year 5 | 0 | 460 mi (1) | 0 |
| Year 6 | 30 cores (2) | 0 | 0 |
| Year 7 | 0 | 0 | 0 |
| Year 8 | 30 cores (2) | 0 | 0 |
| Year 9 | 0 | 460 mi (1) | 0 |

| Year | Geologic Coring | CSEM | Drilling Test [A] |
|---|---|---|---|
| Year 10 | 30 cores (2) | 0 | 0 |
| Totals | 245 cores (13) | 920 mi (2) | 0 |

[A] Penetration <150 m (500 ft). CSEM = controlled-source electromagnetic. Typically, one OCS block is nine square miles (23.3 square kilometers [km$^2$], 2,331 hectares, or 5,760 acres).

### 3.1.4.6 Drilling

Oil and gas operators use different drilling terms to represent distinct stages in the discovery and exploitation of hydrocarbon resources. "Exploration well" generally refers to the first well drilled on a prospective geologic structure to confirm that a resource exists and to validate how much of the resource can be expected. If the quantities of the discovered resource appear to be economically viable, one or more follow-up "delineation wells" help define the amount of the resource or the extent of the reservoir. Following a discovery, an operator often temporarily plugs and abandons exploration and/or delineation wells to allow time for a development scenario to be generated and for equipment to be built or procured. For all new leases issued in the five-year period following issuance of this opinion (i.e., through about 2029), the Bureaus estimate the following annual activity levels for exploration and delineation wells that were revised for this consultation based on activity levels since the 2020 opinion was issued:

- WPA: 0-4 exploration and delineation wells annually

- CPA: 12-33 exploration and delineation wells annually

For all new leases issued in the five-year period following issuance of the opinion (i.e., through about 2029), BOEM and BSEE estimate the following activity levels for development and production wells that were revised for this consultation based on activity levels since the 2020 opinion was issued:

- WPA: 0-9 development and production wells annually

- CPA: 26-103 development and production wells annually

Exploration and delineation wells are typically drilled with MODUs; for example, jack-up rigs, semi-submersible rigs, submersibles, platform rigs, or drill ships. Non-MODU drilling units, such as inland barges, are also used. The type of rig chosen to drill a prospect depends primarily on water depth. The depth ranges for exploration rigs are in Table 8.

Table 8. Drilling rig types typically associated with each corresponding depth range (BOEM 2017b, pgs 3-18)

| MODU or Drilling Rig Type | Water Depth Range (meters) |
|---|---|
| Jack-up, submersible, and inland barges | ≤ 100 |
| Semi-submersible and platform rig | 100-3,000 |
| Drillship | ≥ 600 |

47

An average exploration well requires 30-120 days (mean of 60 days) to drill. The actual time for each well depends on many factors, including the depth of the prospect's potential target zone, the complexity of the well design, and the directional offset of the wellbore needed to reach a particular zone. A typical scenario assumes that the average exploration or delineation well depth will be approximately 12,055 ft (3,674 m) below mudline.

Figure 6 shows a generic well schematic for a relatively shallow exploration well in the deepwater Gulf of America. This well design was abstracted from actual well-casing programs from projects in the Mississippi Canyon and De Soto Canyon OCS areas and from internal BOEM data. A generic well configuration cannot capture all of the possible influences that can impact how a well is designed. These influences include (1) unique geologic conditions at a specific well location, (2) directional drilling requirements, (3) potential sidetrack(s), and (4) company preferences. For exploratory wells, contingencies (such as anticipated water-flow zones in the formation) must also be considered in the casing program.

Delineation and production wells are sometimes collectively termed "development wells." A development well is designed to extract resources from a known hydrocarbon reservoir. Sometimes an operator will decide to drill a series of development wells, move off location, and then return with a rig to complete all the wells at one time. If an exploration well is clearly a dry hole, the operator permanently abandons the well without delay. BOEM estimates that 89-90 percent of development wells will become "producing wells." Development wells may be drilled from movable structures, such as jack-up rigs, fixed bottom-supported structures, floating vertically moored structures, floating production facilities, and drill ships (either anchored or dynamically positioned drilling vessels). The range of these production systems are shown in Figure 7. The typical process includes setting and cementing the production casing, installing some down-hole production equipment, perforating the casing and surrounding cement, treating the formation, setting a gravel pack (if needed), and installing production tubing. One form of formation treatment is known as fracking, or hydraulic fracturing, which is pressurizing the well to force chemicals or mechanical agents into the formation. Mechanical agents, such as sand or small microspheres (tiny glass beads), can be used to prop open the created factures which then act as conduits to deliver hydrocarbons to the wellbore. Well treatment chemicals are commonly used to improve well productivity. Well completion techniques and chemicals vary depending on the rock properties of the reservoir. For example, acidizing a reservoir to dissolve cementing agents and improve fluid flow is the most common well treatment in the Gulf of America. BOEM (2017a) describes a typical process after the casing has been cemented, as to perforate the casing and cement, inject water, brine or gelled brine as carrier fluid for a "frac pack"/sand proppant pack and gravel pack; treating/acidizing the reservoir formation near the wellbore; installing production screens; running production tubing; and installing a production tree. More than 65 percent of the well completions may use frac-packs, or fracturing and gravel packing completion (BOEM 2017a). Well stimulation activities are BSEE-regulated by an "Application for Permit to Modify."

In contrast to onshore fracking in low-permeability shale reservoirs, the majority of fracking offshore are frac-packs, which are small scale by comparison and most commonly used for high-permeability formations to reduce the concentration of sand and silt in the produced fluids and maintain high flow rates. Frac-packs, which use similar chemicals as those onshore, also remain proximally close to the borehole (usually less than about 30 m) (BOEM 2017a).

The type of production structure (Figure 7) installed at a site depends mainly on water depth, but also on the total facility lifecycle, the type and quantity of hydrocarbon production expected, the number of wells to be drilled, and the number of anticipated tie-backs from other fields. All of these factors can influence an operator's procurement decision. The number of wells per structure varies according to the type of production structure used, the prospect size, and the drilling/production strategy deployed for the drilling program and for resource conservation.

Production systems can be fixed, floating, or subsea. BOEM has described and characterized production structures in its deepwater reference document (BOEM 2017a). In water depths of up to 1,312 ft (400 m), a typical scenario assumes that conventional, fixed platforms that are rigidly attached to the sea floor will be the type of structure preferred by operators. In water depths of less than 656 ft (200 m), 20 % of the platforms are expected to be manned (defined as having sleeping quarters on the structure). In depths between 656 and 1,312 ft (200 and 400 m), all structures are assumed to be manned. It is also assumed that helipads will be located on 66 % of the structures in water depths less 197 ft (60 m), on 94% of structures in water depths between 197 and 656 ft (60 and 200 m), and on 100 % of the structures in water depths greater 656 ft (200 m). At water depths greater than 1,312 ft (400 m), platform designs based on rigid attachment to the sea floor are not expected to be used. The 1,312-ft isobath appears to be the current economic limit for this type of structure.

Biological Opinion on BOEM Gulf of America Oil and Gas Program                                    Tracking No. FPR-2017-9234



**Figure 6. General well schematic (BOEM 2017b)**





**Figure 7. Deepwater development systems (BOEM 2017b)**

*High Pressure High Temperature Projects*

BSEE defines high pressure (HP) as an internal absolute pressure rating greater than 15,000 pounds per square inch absolute (psia) at the wellhead and high temperature (HT) as a temperature rating greater than 350° F. Due to these high pressures and/or temperatures, special equipment that complies with BSEE's HPHT regulations, including the *Oil and Gas and Sulfur Operations in the Outer Continental Shelf High Pressure High Temperature Updates* (89 FR 71076, effective October 29, 2024) and guidance is necessary for drilling, completing, and producing HPHT wells. BSEE considers HPHT equipment to be nonconventional technology, and production from HPHT wells requires a high level of scrutiny during the plan approval process.

HPHT wells have HPHT properties at the wellhead. Industry has successfully drilled HPHT wells both onshore and in shallow water offshore since the 1970s (OOC 2018). Conventional subsea oil and gas equipment can be used to discover reservoirs that have HPHT properties, but those wells cannot be produced using conventional subsea equipment because the conventional equipment cannot replace the drilling mud to complete the well and conventional subsea equipment cannot withstand the pressures or temperatures of the HPHT environment. Due to the HPHT conditions, special subsea equipment must be fabricated to withstand high pressures and/or temperatures to complete and produce HPHT wells. BSEE is collaborating with industry to develop subsea HPHT equipment as the technology is developed and proven successful. Future standards for subsea HPHT designs will be based on and updated with proven technology (OOC 2018).

HPHT wells have HPHT properties at the wellhead. Conventional subsea oil and gas equipment can be used to discover reservoirs that have HPHT properties, but those wells cannot be produced using conventional subsea equipment because such equipment cannot withstand the pressures or temperatures of the HPHT environment. Due to the HPHT conditions, special subsea equipment must be fabricated to withstand high pressures and/or temperatures to complete and produce HPHT wells. BSEE collaborates with industry to develop subsea HPHT equipment as the technology proves successful.

To implement the new technology before engineering standards for subsea oil-field equipment are fully developed and adopted, BSEE conducts stepwise, detailed evaluations of HPHT applications according to NTLs for HPHT development (NTL 2019-G02, "Guidance for Information Submissions Regarding Proposed High Pressure and/or High Temperature (HPHT) Well Design, Completion, and Intervention Operations"; NTL 2019-G03, "Guidance for Information Submissions Regarding Site Specific and Non-Site Specific HPHT Equipment Design Verification Analysis and Design Validation Testing "; and NTL 2019-G04, "Requesting Approval to Consider External Hydrostatic Pressure Effects When Calculating Internal Pressure Containment Capability for Pressure Containing and Pressure Controlling Subsea Equipment "). HPHT equipment must be qualified and reviewed by BSEE before it can be manufactured and used for a site-specific project. Operators must verify and validate HPHT components to ensure that they are fit-for-service. They must be able to show that potential failures are mitigated before any designs are verified. No equipment design can be used in the field until it has gone through design verification analysis and design validation testing for the prototype.

Risk assessments for new and emerging equipment provide a supplemental method for identifying and mitigating risks of accidents, to protect human safety and marine life. The development of standards for design, manufacture, and testing of HPHT equipment will help to minimize the risk of structural failure or the fatigue failure of equipment that could result in an oil spill due to loss of containment.

In addition to HPHT standards, other requirements must be met before an operator obtains a permit to drill, complete, and produce a subsea HPHT well. Both BOEM and BSEE conduct a

rigorous permit review process that includes technical, safety, and environmental reviews. BSEE procedures currently require that every technology review include an analysis of the mechanical barriers in place to keep oil and gas from escaping in the event of a failure. Comprehensive testing and approval processes for the deployment of non-conventional HPHT subsea technology substantially reduces the risk of potential accidents. To ensure safety, BSEE also inspects equipment before it is used.

Industry has been working on subsea HPHT technology for many years. However, engineering standards take time to create following the development of new technology. Therefore, the implementation of new HPHT technology, or non-conventional technology, has preceded the development of an engineering standard (Pallanich 2017). Numerous HPHT engineering standards for subsea oil-field equipment are currently being developed to address these advancements in technology. The challenge has been to understand how to adapt existing engineering design methods to the design of subsea oil-field equipment using materials that can withstand the HPHT environment. To implement the new technology before development of engineering standards for subsea oil-field equipment, BSEE evaluates HPHT applications according to recently published guidelines.

HPHT equipment must be qualified and reviewed by BSEE before it can be manufactured and used for a site-specific project. Operators must verify and validate HPHT components to ensure that they are fit-for-service for a site-specific project. They must be able to show that potential failures are mitigated before any designs are verified and validated to be fit -for-service. No equipment design can be used in the field until it has gone through design verification analysis and design validation testing for the prototype.

For HPHT equipment to be verified, it must pass a design verification analysis, which determines if the equipment is able to withstand potential modes of failure. During design verification analysis, several verification analytical checks occur, including plastic collapse (burst/rupture checks), local failure (strains exceed certain limits), ratcheting (deformation), bolting, and fatigue analysis using fracture mechanics or nominal stress (S/N) methods. Seal testing cannot be done analytically and must be done with a physical test.

After verification, HPHT equipment must pass validation testing defined by engineering standards. A prototype is physically tested to ensure that it performs in the HPHT environment in order to demonstrate compliance with specification requirements. Validation testing may include pressure testing, bending testing, compression testing, tension testing, and other tests as defined based on the potential modes of failure.

BSEE uses independent third parties (I3P) to review the design verification analysis and design validation testing during the approval process. After the equipment is qualified through design verification analysis and validation testing, the I3P must review, analyze, and summarize their findings. The I3P and operator review the original equipment manufacturer (OEM) qualification documents and submit comments to the OEM separately. The OEM resolves all comments and

then releases the documents to the I3P to prepare summary reports for submittal to BSEE during the permit application process. These reports become part of the permanent BSEE record and are an integral part of the approval process (OOC 2018).

An operator must submit an associated EP, DPP, or DOCD to BOEM and several applications to BSEE for HPHT projects, Application for Permit to Drill (APD), Application for Permit to Modify (APM), and DWOP. Many of the applications also include I3P verification for new technology. Though standards are still being developed for HPHT equipment, BSEE has published guidance on requirements for HPHT projects based on research and collaboration with industry over the past decade. To provide operators with guidance on BSEE requirements for HPHT projects, BSEE published a series of NTLs.

### 3.1.4.7 Vessel Operations

The Gulf of America Oil and Gas Program involves the operation of a variety of vessels. These include service vessels, barges, tankers, and G&G survey vessels. Vessel characteristics are determined by activity. For example, there may be vessels specific to anchor handling or pipe laying. Following are descriptions of the types of vessels used in the Gulf of America oil and gas program.

*Service Vessels*

Service vessels transport personnel and supplies between service bases (Figure 8) and offshore platforms, drilling rigs, derrick barges, and pipeline construction barges. Service vessels carry fresh water, fuel, cement, barite, liquid drilling fluids, tubulars, equipment, food, and other supplies to offshore sites. These vessels are usually fast moving and smaller relative to the larger drilling and production vessels associated with the program. A trip is considered the transportation from a service base to an offshore site and back; in other words, a round-trip. BOEM anticipates the following levels of vessel trips over a 5-year period for leases sold between 2025 and 2029:

- WPA: 1,000-30,000 service vessel trips annually.

- CPA: 46,000-134,000 service vessel trips annually.

For cumulative scenarios over the next 70 years, BOEM estimates between 55,842 and 169,614 service vessel trips annually  BOEM (2017a), which based on a comparison to an estimate of the total vessel traffic in the Gulf of America in 2022, represents between six and 19% of all vessel traffic. All trips are assumed to originate from the designated service base to an offshore site and back.



**Figure 8. OCS-related service bases in the Gulf of America (BOEM 2017b)**

Service vessels primarily used in deep water are offshore supply vessels (OSVs), fast supply vessels, and anchor-handling towing supply/vessels (AHTSs). The USCG defines an offshore service vessel (OSV) as a vessel propelled by machinery other than steam that is of more than 15 gross tons and less than 500 gross tons and that regularly carries goods, supplies, individuals in addition to the crew, or equipment in support of exploration, exploitation, or production of offshore mineral or energy resources (46 CFR 90.10-40). Other deepwater specialty service vessels are well stimulation vessels. The OSVs and AHTSs carry the same type of cargo (i.e., fresh water, fuel, cement, barite, liquid drilling fluids, tubulars, equipment, food, and miscellaneous supplies) but have different functions. The AHTSs also differ from the supply vessels by their deepwater mooring deployment and towing capabilities.

*Barges*

Barges may be used to transport oil and gas, supplies such as chemicals or drilling mud, or wastes between shore bases and offshore platforms. Barges are non-self-propelled vessels that must be accompanied by one or more tugboats. Because of this, barge transport is usually constrained to shallow waters, close to the shoreline. Barging of OCS oil from platforms to shore terminals is an option used by the oil industry in lieu of transporting their product to shore via pipeline. A platform operator generally decides at the beginning of a development project whether the production will be barged or piped. Barging is used infrequently as an interim transport system before the installation of a pipeline system. About one percent of the oil produced in less than 60 meters in both the WPA and the CPA during the action is expected to be

barged to shore. Over the 40-year life of the leases, less than one percent of the total oil produced is expected to be barged.

Other types of barging operations may be carried out in connection with OCS operations. Besides barging from platform to shore terminal, some platform operators choose to barge their oil to other platforms where it is then off-loaded to storage tanks and later piped to shore. Barges may be used to transport oil from deepwater sites during extended well testing, an activity that is likely to increase in the future. Storage and barging of the well stream from extended well tests is an alternative to flaring the gas and burning the liquids produced during well testing. No information is currently available on the number of barge trips associated with these other types of offshore oil barging operations.

*Tankers*

Tankers are used to transport oil from floating production and storage and off-loading units (FPSOs). FPSOs are floating production systems that store crude oil in tanks located in the hull of the vessel and that periodically off-load the crude to shuttle tankers for transport to shore. FPSOs may be used to develop marginal oil fields or to access areas too distant from the existing OCS pipeline infrastructure. Shuttle tankers vary in size, but they are primarily limited by the 34- to 47-ft water depths of U.S. Gulf Coast refinery ports. Because of these depth limitations, shuttle tankers are likely to have a cargo capacity of between 500,000-550,000 barrels (bbl). All shuttle tankers are required to be double hulled.

In the Gulf of America, two FPSO systems – one associated with the Cascade Chinook Project, and another associated with the Shell Stones Project – have shuttle tankers currently in operation. These tankers make seven-day round trips to refineries along the Gulf Coast, serving an area from Corpus Christi, Texas, to Pascagoula, Mississippi. As new wells and FPSOs enter into operation, additional shuttle tankers will be put into service and will visit FPSOs every three to five days. BOEM projects that, in the next 70 years, at a maximum one new FPSO system would be put in place. For this FPSO, as well as the two currently in operation, BOEM estimates that when operating at maximum capacity, maximum offloading would occur once every 3.3 days, which would equate to 110 shuttle tanker transits across the Gulf of America annually per FPSO (BOEM 2017c).

*Vessels Associated with Geological and Geophysical Activities*

G&G activities are also expected to produce vessel traffic. BOEM estimated those levels, which are displayed in Table 9.

**Table 9. Annual vessel traffic associated with G&G activities**

| Survey Type | Projected Vessel-Months[A] | Estimated Transits to Shore Base for Survey Vessels | Estimated Transits to Shore Base for Service Vessels |
|---|---|---|---|
| Vessel Based (2D, 3D, 4D, WAZ) | 345 | 32.8 | 1,936.8 |
| Platform Based (VSP, SWD) | 6.6 | 16.5 | 1.9 |
| Vessel Based (Non-Airgun HRG) | 7.2 | 28.8 | 0 |
| Other | 1.7 | 2.4 | 10.7 |
| Oil and Gas G&G Activities | Subtotal | 80.5 | 1,949.4 |

*A - Vessel months are used as a measure of vessel utilization, or vessel activity, necessary to complete the data acquisition. Vessel months were calculated by multiplying the projected number of survey events times the mean number of vessels used in that survey type times the mean duration of that survey type. 2D = two-dimensional; 3D = three-dimensional; 4D = four-dimensional; G&G = geological and geophysical; HRG = high-resolution geophysical; SWD = seismic while drilling; VSP = vertical seismic profile; WAZ = wide azimuth (survey).*

## Vessel Operation Conservation Measures

To minimize the potential for vessel strikes to marine animals, the Bureaus programmatically apply a protocol, "*Vessel Strike Avoidance and Injured and/or Dead Aquatic Protected Species Reporting,*" which clarifies 30 C.F.R. §550.282 and 30 C.F.R. §250.282 and incorporates the vessel strike avoidance measures recently updated through consultation with NMFS. The Bureaus monitor for any takes that occur because of vessel strikes and require that any operator immediately report the striking of any marine animal (30 C.F.R. §550.282, 30 C.F.R. §250.282, and vessel strike protocol). These measures will continue being applied under the program into the foreseeable future.

### 3.1.4.8 Helicopter Operations

For all new leases issued in the 5-year period following issuance of this opinion (i.e, through about 2029), the Bureaus estimate the following annual helicopter activity levels (see also Table 10 below for G&G activity level estimations), which have been updated for the reinitiation:

- WPA: 0-3,000 helicopter trips annually.

- CPA: 0-29,000 helicopter trips annually.

Helicopters are a primary mode of transporting personnel between service bases and offshore platforms, drilling rigs, derrick barges, and pipeline construction barges. Helicopters are routinely used for normal crew changes and at other times to transport management and special service personnel to offshore exploration and production sites. Equipment and supplies are sometimes transported via helicopter as well. Protected species surveys during decommissioning activities also utilize helicopters. Helicopter trips are considered a flight segment; that is, from a take-off to a landing, regardless of other stops offshore. In areas of heavy industry activity, helicopter segments can be a matter of minutes, hopping from one structure to the next. To meet

the demands of deepwater activities, the offshore helicopter industry is purchasing new helicopters that travel farther and faster, carry more personnel, are all weather capable, and have lower operating costs. The number of helicopters operating in the Gulf of America is expected to decrease in the future as helicopters that operate are expected to be larger and faster.

**Table 10. Helicopter traffic associated with G&G activities over 10 years (BOEM 2017e)**

| Survey Type | Estimated Helicopter Transits Needed to Support Surveys |
|---|---|
| Vessel Based (2D, 3D, 4D, WAZ) | 7,329 |
| Platform Based (VSP, SWD) | 168 |
| Vessel Based (Non-Airgun HRG) | 0 |
| Other | 0 |
| Oil and Gas G&G Activities Total | 7,497 |

*2D = two-dimensional; 3D = three-dimensional; 4D = four-dimensional; G&G = geological and geophysical; HRG = high-resolution geophysical; SWD = seismic while drilling; VSP = vertical seismic profile; WAZ = wide azimuth (survey).*

### 3.1.4.9 Offshore Infrastructure/Construction

Following 30 C.F.R. §250.900 lessees need to obtain approval before installing or modifying a platform. For all new leases issued in the 5-year period following issuance of the opinion (i.e., through about 2029) for this consultation, the Bureaus estimate the following activity levels for installation of OCS structures:

- WPA: 0-1 installation of OCS structures annually.

- CPA:  0-5 installations of OCS structures annually.

BSEE does a technical review of all proposed OCS oil and gas structure designs and installation procedures. All proposed facilities are reviewed for structural integrity. The lessee must design, fabricate, install, use, inspect, and maintain all platforms and structures on the OCS to assure their structural integrity for the safe conduct of operations at specific locations. Applications for platform and structure approval are filed in accordance with 30 C.F.R. §250.901. Design requirements are presented in detail at 30 C.F.R. §§250.904-250.909. The lessee evaluates characteristic environmental conditions associated with operational functions to be performed. Factors such as waves, wind, currents, tides, temperature, and the potential for marine growth on the structure are considered. In addition, pursuant to 30 C.F.R. §§250.902 and 250.903, BSEE has established a program to assure that new structures meeting the conditions listed under 30 C.F.R. §250.900(c) are designed, fabricated, and installed using standardized procedures to prevent structural failures. After installation, platforms and structures are required to be periodically inspected and maintained under 30 C.F.R. §250.912.

*Types of Offshore Structures*

Bottom-founded or floating structures may be placed over development wells to support production from a prospect. These structures provide the means to access and control the wells.

They are a staging area for processing and treating produced hydrocarbons from the wells, initiating export of the produced hydrocarbons, conducting additional drilling or reservoir stimulation, conducting workover activities, and carrying out eventual abandonment and decommissioning procedures. The variety of offshore infrastructure installed for hydrocarbon production includes fixed and floating platforms, caissons, well protectors, casing, wellheads, and conductors, and pipelines. Subsea wells may also be completed to produce hydrocarbons from the shelf and in the deepwater portions of the Gulf of America. The subsea completions require a host structure to control their flow and to process their well stream. The subsea well is controlled via an umbilical cable from the host.

Fixed, jacketed platforms are the most common surface structures in the Gulf of America and account for about 60% of all bottom-founded surface structures on the shallow continental shelf. Fixed platforms are brought on location as complete units or in sections on an installation barge towed by powerful tugboats. If the structure is fabricated in sections, it is generally composed of two segments called the *jacket* (the lower portion) and the *deck* (the portion above the water line). The platform's tubular-steel jacket is then launched from a barge, upended, and lowered into position by a derrick barge with a large crane. The jacket is anchored to the sea floor by piles driven through the legs. The deck section with one or more levels is then lifted atop the jacket and welded to the foundation. The platform may have a helipad installed on its deck section. Platforms may or may not be manned continuously.

Caissons, the second most numerous structures, account for about 30% of bottom-founded, surface structures in the Gulf of America. Caissons are located primarily on the shallow continental shelf. Simpler in design and fabrication than traditional jacketed platforms, most caissons consist of a steel pipe that generally ranges from 36-96 in (91-244 cm) in diameter. The caisson pipe is driven over existing well(s) to a depth that allows for shoring against varying sea states. Though primarily installed for well protection, some caissons may also be used as foundations for equipment and termination or relay points for pipeline operations.

Well protectors account for about ten percent of all bottom-founded surface structures in the Gulf of America. Well protectors are used primarily to safeguard producing wells and their production trees from boat damage and from battering by storms and floating debris. Similar to fixed platforms, well protectors consist of small piled jackets with three or four legs generally less than 36 in (91 cm) in diameter, which may or may not support a deck section.

*Installation of Structures*

Structure installation and commissioning activities may take place over a period of a week to a month, typically at the beginning of a platform's potential 40-year production life. Commissioning activities involve the emplacement, connecting, and testing of the structure's modular components that are assembled on site. The time required to complete the operations to start production at a structure depends on the complexity of its facilities. To keep floating structures on station, a mooring system must be designed and installed. Lines to anchors or piling

arrays attach the floating components of the structure. With a tension leg platform (TLP), tendons stem from a base plate on the sea bottom to the floating portion of the structure. Most exploration drilling, platform, and pipeline emplacement operations on the OCS require anchors to hold the rig, topside structures, or support vessels in place. Anchors disturb the sea floor and sediments in the area where dropped or emplaced. Dynamically positioned rigs, production structures, and vessels are held in position by four or more propeller jets and do not cause anchoring impacts. Mooring buoys may be placed near drilling rigs or platforms so that service vessels need not anchor or for when they cannot anchor (in deeper water). The temporarily installed anchors for these buoys are usually smaller and lighter than those used for vessel anchoring and, thus, will have less impact on the sea bottom. Moreover, installing one buoy will preclude the need for numerous individual vessel-anchoring occasions. Service vessel anchoring is assumed not to occur in water depths greater than 150 m (492 ft) and only occasionally in shallower waters (vessels would always tie up to a platform or buoy in water depths greater than 150 m). Barges generally tie up to a production system rather than anchor. Barges and other vessels are also used for both installing and removing structures. Barge vessels use anchors placed away from their location of work.

*Modification of Structures*

Modification of platform structures may be required to repair damage to or materially alter the platform for new operations. These modifications can be major, where structural components of the platform are modified or the loading on the platform is increased by 10% or more. They can also be minor, where smaller components of the platform are modified, added, or removed. The majority of structure modification work occurs above the water. Structure modification operations that include in water work are carried out the same as structure installation operations.

*Pile Driving of Structures*

In addition to various pieces of support equipment used in construction, such as vessels and cranes, pile driving is the primary method by which fixed structures are attached to the sea floor and provide stability for other support structures. Classified as either impact hammers or vibratory hammers, the design of the pile driving hammer assembly varies depending upon the medium powering the system; however, most assemblies contain a specialized control unit, piston, ram, and anvil. The impact hammer systems used for OCS-related work predominantly utilize steam, pneumatic, or hydraulic assemblies. Most of the steam and pneumatic systems used in the Gulf of America are limited to surface operations and have energy outputs (torque) ranging from 15,000-60,000 ft/pound (lb; 20-82 kilonewton meters [kNm]). Hydraulic impact hammer systems can be used in both surface and subsea operations and most generally range from 11,000-370,000 ft/lb (15-500 kNm). Almost all vibratory hammer systems use hydraulic power and, due to their configuration, they can be used for both surface and subsea operations. All activities proposing use of vibratory hammers will be sent to NMFS for project-specific review before receiving approval. Plan and permit proposals sent to NMFS for project-specific review will include detailed descriptions of proposed vibratory hammer activities.

Operators determine the type and size of pile driving equipment they require based upon the dimensions and design of the object being driven, water depths, equipment configuration (surface vs. subsea), sediment/substrate types, and the nature of the operations being conducted. Sediment types are varied in the Gulf of America, but for shallow sea bed activities such as these they are generally classified as consisting of muds (directly off river deltas/outlets), clays (mostly from the Louisiana-Texas border westward), and unconsolidated sands or silt (most of the shelf of the Northern Gulf of America). Each sediment type offers differing levels of friction that must be overcome to allow the pile to penetrate to a sufficient depth. There are two primary pile-driving operations on the OCS: (1) the setting of casing conductors (also known as drive pipe) for drilling operations, and (2) pile emplacement for securing oil and gas structures and facilities to the seafloor. Table 11 summarizes pile-driving activity in the Gulf of America between 2020 and 2023.

**Table 11. Bureau-reported pile-driving data from 2020-2023**

| Impact Hammer Size | Number of Pile Drivings | Object Driven | Avg Object Diameter (in) | Objects Driven per Activity | Avg Total Strikes | Avg Water Depth (ft) | Avg Strikes per ft | Avg Highest Hammer Energy (kJ) | Avg Drive Depth BML (ft) | Avg Pile Driving Hours per Day |
|---|---|---|---|---|---|---|---|---|---|---|
| S-90 | 27 | Well conductor/ Drive pipe | 24 | 1 | 6827.7 | 191.2 | 29.2 | 61.4 | 264.3 | 4.4 |
| S-150 | 3 | Well conductor/ Drive pipe | 27.3 | 1 | 8437.5 | 941 | 48.5 | 129.1 | 575.3 | 6.2 |
| S-280 | 1 | Caisson/ pile | 36 | 3 | 5234.7 | 285 | 29.5 | 252.5 | 174.7 | 2.2 |

From (BOEM and BSEE 2024).

## Casing Conductor (Drive Pipe) Installation

Due to the frequency of exploratory and development drilling operations on the OCS, the greatest number of pile-driving operations involve the setting or installation of casing conductors. Most casing conductors range in diameter from 12-36 in (30-92 cm) and have wall thicknesses that run from 0.25-0.75 in. These are generally driven into the substrate until the conductor "meets refusal" or cannot be driven further without damage. Conductor casings can also be jetted into the sea bed; however, the ease of mobilization of hammer drivers coupled with their speed of penetration, minimizes the use of jetting equipment, which requires more time to deploy and is often unviable due to water depth and sediment type. Most casing conductor driving operations occur in water depths less than 200 m. Based on the number of activities since 2020, BOEM estimates three to twelve well drive pipe installations per year using impact pile driving (including new wells and side tracking with slot recovery) total for exploratory and development drilling operations. This estimate should be caveated due to limitations of oil and gas exploration and production during the COVID-19 pandemic and oil and gas pricing from 2020-2022.

*Structure/Facility Pile Installation*

Pile-driving operations are also conducted during oil and gas structure/facility installations on the Gulf of America OCS. Structure piles are generally forged or rolled-sheet constructed steel pipes that range in diameter from 24-96 in (61-244 cm) and have wall thicknesses that run from 0.5-2 in. The piles are inserted into the legs of the platform jackets, along the inner wall of a caisson, or into sleeves configured into skirt bracings or sea floor templates for structures in certain deepwater/unstable environments. As with conductor casings, piles are generally driven into the substrate until it "meets refusal" or reaches a sufficient depth to ensure stability. Once set to the proper depth/refusal, the pile is then welded or grouted to the jacket leg, caisson, or sleeve to affix the facility to the seafloor. Installing structure piles requires the use of larger hydraulic impact hammers such as an IHC S-280 (280 kNm maximum energy capacity). Once set to the proper depth and/or refusal, the pile is then welded or grouted to the jacket leg, caisson, or sleeve to affix the facility to the seabed. Most structure installation pile driving operations occur in water depths less than 200 meters. Impact pile driving is anticipated to occur in some, but not all, structure installation and modifications in depths below 200 m. Based on the number of activities since 2020, BOEM estimates zero to two structure installations or major modifications (three-four piles per structure) per year using impact pile driving throughout the Gulf. This estimate should be caveated due to limitations of oil and gas exploration and production during the COVID-19 pandemic and oil and gas pricing from 2020-2022.

Deepwater and subsea installations primarily use suction embedding (anchor piles), but some vibratory-hammer pile installation work is still conducted on the shelf to 'pin' the jacket assembly to the seabed prior to deck installation (Scaggs 2010). Based on the number of shelf facilities installed over the last five years, BOEM/BSEE estimate about 20 structures annually (with an average of approximately four-piles per structure), all of which are projected to be in less than 150-meters water depth. Because BOEM does not require pile-installation reporting under OCSLA regulations, a projection of 80 instances of vibra-hammer use per year is estimated.

*Pipelines*

Pipelines are the primary means of transporting produced hydrocarbons from offshore oil and gas fields to distribution centers or onshore processing points. Pipelines on the OCS are designated as either gathering lines or trunklines. Gathering lines are typically shorter segments of small-diameter pipelines (generally 4-12 inches [10-30 centimeters]) that transport the well stream from one or more wells to a production facility or from a production facility to a central facility serving one or several leases (e.g., a trunkline or central storage or processing terminal). Trunklines are typically large-diameter pipelines (as large as 36 in [91 cm]) that receive and mix similar production products and transport them from the production fields to shore (Table 12). A trunkline may contain production from many discovery wells drilled on several hydrocarbon fields. The OCS-related pipelines near shore and onshore may merge with pipelines carrying materials produced in state territories for transport to processing facilities or to connections with pipelines located farther inland.

Pipelines are installed by lay barges that are either anchored or dynamically-positioned while the pipeline is laid. Conventional pipe-laying barges use an array of eight anchors that each weigh 9,000 kilograms (kg; 19,842 lb) to position the barge and to move it forward along the pipeline route. These anchors are continually moved as the pipe-laying operation proceeds. The area actually affected by these anchors depends on water depth, wind, currents, chain length, and the size of the anchor and chain. Pipeline sections may be welded together on a conventional lay barge as it moves forward on its route or they may be welded together at a fabrication site onshore and wound onto a large-diameter spool or reel. Once the reel barge is on location, the pipeline is straightened and lowered to the sea floor on its intended route. Both types of lay barge use a stinger to support the pipeline as it enters the water. The stinger helps to prevent undesirable bending or kinking of the pipeline as it is installed. In some cases, pipelines or segments of pipelines are welded together onshore or along a beach front area and then towed offshore to their location for installation.

BSEE is responsible for regulatory oversight of the design, installation, maintenance, and removal of OCS producer-operated oil and gas pipelines. The BSEE's operating regulations for pipelines, at 30 C.F.R. §250 Subpart J, are intended to provide safe and pollution-free transportation of fluids in a manner that does not unduly interfere with other OCS users.

The coastline marks the boundary that determines which agency is responsible for a facility. The BOEM/BSEE of the DOI is responsible for offshore facilities, including pipelines but not deepwater ports, located seaward of the coastline. The USEPA is responsible for non-transportation-related offshore facilities located landward of the coastline. The U.S. Coast Guard (USCG) and the Research and Special Programs Administration of the DOT will handle transportation-related offshore facilities, including pipelines, located landward of the coastline.

For all new leases issued in the 5-year period following issuance of the opinion (i.e., through about 2029) for this consultation, the Bureaus estimate the following activity levels:

- WPA: 0-18 km of pipelines annually

- CPA/EPA: 0-1,000 km of pipelines annually

For the OCS Program, which includes proposed lease sales in the WPA, CPA, and EPA, 0-12 new pipeline landfalls are projected from 2020 through 2070 (over the 40-year lease life for leases awarded during the first ten years after this opinion is issued). Most, if not all, of the OCS pipeline installed is expected to tie into the existing infrastructure.

Table 12. Outer continental shelf pipeline landfalls installed between 1996 and 2009

| Segment Number | Year Installed | Product Type | Size (inches) | Company | State |
|---|---|---|---|---|---|
| 10631 | 1996 | Oil | 24 | Equilon Pipeline Company LLC | Louisiana |
| 12470 | 1996 | Oil | 24 | Manta Ray Gathering Company LLC | Louisiana |
| 11217 | 1997 | Gas | 30 | Enbridge Offshore | Louisiana |

63

| Segment Number | Year Installed | Product Type | Size (inches) | Company | State |
|---|---|---|---|---|---|
| 11496 | 1997 | Oil | 12 | ExxonMobil Pipeline Company | Louisiana |
| 11952 | 2000 | Oil | 18-20 | ExxonMobil Pipeline Company | Texas |
| 14470 | 2004 | Oil | 10 | Chevron USA Inc. | Louisiana |
| 13972 | 2004 | Oil | 24 | Manta Ray Gathering Company LLC | Texas |
| 13987 | 2004 | Oil | 24 | Manta Ray Gathering Company LLC | Texas |
| 13534 | 2005 | Oil | 30 | BP Pipelines (North America) | Louisiana |
| 13534 | 2005 | Oil | 30 | Mardi Gras Endymion Oil Pipeline Co. | Louisiana |
| 17108 | 2007 | Gas/ Condensate | 16 | Stone Energy Corporation | Louisiana |
| 17691 | 2009 | Gas/Oil | 08 | Stone Energy Corporation | Louisiana |

BSEE evaluates the design, fabrication, installation, and maintenance of all OCS pipelines. BSEE evaluates proposed pipelines for an appropriate cathodic protection system that is required to protect the pipeline from leaks resulting from external corrosion of the pipe, an external pipeline coating system to prolong the service life of the pipeline, measures to protect the inside of the pipeline, proposed operating pressure of the line, and protection of other pipelines crossing the proposed route. BSEE also evaluates protective safety devices such as pressure sensors and remotely-operated valves, the physical arrangement of those devices proposed to be installed by the applicant for the purposes of protecting the pipeline from possible overpressure conditions and for detecting and initiating a response to abnormally low-pressure conditions. Proposed pipeline routes are evaluated for potential impacts on biological communities. Operators are required to periodically inspect pipeline routes and conduct monthly overflights to inspect pipeline routes for leakage.

### 3.1.4.10    Air Emissions

Air emissions are a component of offshore oil and gas operations. Various activities associated with offshore oil and gas development can release air pollutants to the atmosphere. Emissions are generated during exploration and production activities when fuels are combusted to power drilling rigs, engines and generators. Additional emissions come from helicopter and vessel traffic that support offshore operations, including seismic surveys, resupply missions, and personnel transport. Air pollutants are also released during venting and flaring events, to dispose of excess hydrocarbon vapors or natural gas. Flaring and venting may also be necessary to remove potentially damaging completion fluids from a wellbore and to provide sufficient reservoir data for the operator to evaluate reservoir development options during unloading/testing operations and/or in emergency situations. Current regulatory guidance for air

emissions can be found on BOEM's website at https://www.boem.gov/overview-air-quality-regulations.

The OCSLA (43 USC §1334(a)(8)) requires the Secretary of the DOI to promulgate and administer regulations for compliance with the NAAQS, pursuant to the CAA (42 USC §7401 et seq.), to the extent that authorized activities significantly affect the air quality of any state. Under provisions of the CAA Amendments of 1990, the USEPA Administrator has jurisdiction in OCS areas in the Gulf of America eastward of 87.5°W longitude (see Section 3.2.2for USEPA's air permitting action).Figure 9 displays the jurisdictional boundaries between BOEM and USEPA. BOEM implementing regulations in 30 C.F.R. § 550 Subpart C apply to those air emission sources in the Gulf of America westward of 87.5ºW longitude. BOEM issued NTL 2014-G01 that discusses collecting and reporting information through their online system to provide additional information on its oversight of air emissions on the OCS (https://www.boem.gov/BOEM-NTL-No-2014-G01/). USEPA's OCS Air Regulations at 40 C.F.R. Part 55 implement section 328 of the CAA and establish the air pollution control requirements for OCS sources and the procedures for implementation and enforcement of these requirements.



**Figure 9. USEPA and BOEM air quality jurisdictional boundaries. Lease blocks that were active in 2012 are shown in red and dark green areas depict platforms (Ramseur 2012)**

*BOEM Air Quality Review Requirements*

All new or supplemental EPs and DOCDs must include air emissions information sufficient to determine whether an air quality review is required (30 C.F.R. §§550.218 and 550.249). The BOEM regulations require a review of air quality emissions to determine if the projected emissions from a facility would be expected to result in onshore ambient air concentrations above BOEM significance levels. The regulated pollutants include carbon monoxide (CO),

particulate matter ($PM_{10}$ and $PM_{2.5}$), sulphur oxides ($SO_x$), nitrogen oxides ($NO_x$), volatile organic compounds (VOCs), lead (Pb), ammonia ($NH_3$), and total suspended particulates (TSP).

The BOEM uses a two-level hierarchy of evaluation criteria to evaluate potential impacts of offshore emission sources to onshore areas. The evaluation criteria are the exemption level and the significance level. If the proposed activities exceed the criteria at the first (exemption) level, the evaluation moves to the significance level criteria. The initial evaluation compares the worst-case emissions to the BOEM exemption criteria. If the proposed activity emissions are below the exemption levels, the action is exempt from further air quality review. If exemption levels are exceeded, a second step of refined modeling is required using the American Meteorological Society/Environmental Protection Agency Regulatory (AERMOD) model or the California Puff (CALPUFF) model as outlined in NTL-2020-N02 (https://www.boem.gov/sites/default/files/documents/about-boem/NTL-2020-N02.pdf). The NTL identifies the approved air quality models for use in assessments within BOEM jurisdiction and provides background on BOEM's regulatory authority, the rationale for model selection, and the transition from previously used models. The NTL outlines the use of AERMOD for short-range transport (within 50 kilometers of the shoreline) and CALPUFF for long-range transport (beyond 50 kilometers). Additionally, the NTL allows for the consideration of alternative models on a case-by-case basis, following the guidelines in Appendix W of 40 CFR part 51 and approval from the BOEM Regional Director and/or Chief Environmental Officer.

The modeled potential onshore impacts are compared with BOEM significance levels. If these significance levels are exceeded in an attainment area (an area that meets applicable NAAQS), the operator would be required to apply best available control technology to the emissions source. If the affected area is classified as nonattainment, further emission reductions or offsets may be required.

According to BSEE, field compliance verification is conducted for air quality inspections on OCS facilities (BSEE presentation to NMFS, May 19, 2019). These efforts monitor active operations and determine compliance with environmental standards.

### 3.1.4.11        New or Unusual Technologies

Emergent technologies continue to evolve to meet the technical, environmental, and economic challenges of deepwater development. New or unusual technologies (NUTs) must be identified by the operator in its EP, DPP, DWOP, and DOCD or through BOEM's plan review processes.

Some new technologies differ from established technologies in how they function or interface with the environment. These include equipment or procedures that have not been installed or used in Gulf of America OCS waters. Having no operational history, they have not been assessed by BOEM (or NMFS) through technical and environmental reviews. New technologies may be outside the framework established by BOEM or BSEE regulations and, thus, their performance (e.g., safety, environmental protection, efficiency) has not been addressed by BOEM or BSEE. The degree to which these new technologies interface with the environment and the potential

66

impacts that may result are considered in determining the level of NEPA review that would be initiated.

Under any of the oil and gas program proposed activities, NUTs may be identified through the Bureaus' permitting process, by the operator in OCS plans and permit applications, or through the Bureaus' plan review and authorization processes. If BOEM's review of a permit or plan determines that a NUT is part of the proposed work, the permit or plan cannot be approved until an environmental assessment (EA) is prepared and a review of the plan is completed. BOEM does not designate specific technologies as NUT until industry identifies and brings them to BOEM for approval. Some of the technologies proposed for use by operators are often extended applications of existing technologies and interface with the environment in essentially the same way as well-known or conventional technologies. These technologies and any associated equipment or operations are reviewed by BOEM to determine if mitigation measures are required to reduce or negate unnecessary impacts to OCS resources. Some examples of new technologies that do not affect the environment differently and that are deployed in the Oil and Gas Program are synthetic mooring lines, subsurface safety devices, and multiplex subsea controls. Those that do not have an environmental effect that varies from what is considered in this opinion would not require further review or consultation with NMFS.

The degree to which these new technologies interface with the environment and the potential impacts that may result are considered in determining the level of NEPA review that would be initiated and whether project-specific review would be triggered as defined in this opinion.

BOEM has developed a NUT review checklist to help facilitate decisions on the appropriate level of engineering and environmental review needed for a proposed technology. The questions operators must address for a NUT review include:

1. Has the technology or hardware been used previously or extensively in the Gulf of America OCS Region under operating conditions similar to those anticipated for the activities proposed in this plan (therefore technically not considered NUT)?

2. Does the technology function in a manner that potentially causes different impacts to the environment than similar equipment or procedures did in the past?

3. Does the technology have a significantly different interface with the environment than similar equipment or procedures did in the past?

4. Does the technology include operating characteristics that are outside the performance parameters established by 30 C.F.R. §550?

A senior NEPA coordinator conducts the NUT Review with the assistance of the engineers in the BSEE Technical Assessment Section and the senior plan coordinator. Any proposed NUT that is determined to function in a manner that potentially causes different impacts to the environment than similar equipment or procedures did in the past or has a significantly different interface with

67

the environment than similar equipment or procedures did in the past will meet the extraordinary condition at 43 C.F.R. §46.215(d) and will be evaluated in an EA.

The BOEM has developed a NUT matrix to help facilitate decisions on the appropriate level of engineering and environmental review needed for a proposed technology. Technologies will be added to the NUT matrix as they emerge, and technologies will be removed from the matrix as sufficient experience is gained in their implementation. From an environmental perspective, the matrix characterizes new technologies into three categories: technologies that may affect the environment; technologies that do not interact with the environment any differently than "conventional" technologies; and technologies about which the Bureaus do not have sufficient information to determine their potential impacts to the environment. In this latter case, the Bureaus will seek to gain the necessary information from operators or manufacturers regarding the technologies to make an appropriate determination on potential effects on the environment.

The BSEE project-specific engineering safety review ensures that equipment proposed for use is designed to withstand the operational and environmental conditions in which it would operate.

### 3.1.4.12    Decommissioning and Structure Removal

Decommissioning requirements are described in 30 C.F.R. § 250.1700 (Subpart Q – Decommissioning Activities). On April 18, 2023, BSEE published a new rule to amend its regulations to clarify decommissioning responsibilities of right-of-use and easement (RUE) grant holders and to formalize BSEE's policies regarding performance by predecessors ordered to decommission OCS facilities (88 FR 23569).

The BSEE NTL 2018-G03, "Idle Iron Decommissioning Guidance for Wells and Platforms," clarifies existing regulations that wells that are not useful (i.e., no longer producing) are required to be plugged by set times implemented by BSEE, or one year after lease termination/expiration. Any well that became "idle" or not useful for lease operations subsequent to the NTL's publication is expected to be plugged no later than three years after the well became "idle." The NTL also clarifies that BSEE will enforce the decommissioning of platforms considered "idle" or no longer useful at the time the NTL was published. Any platform that became "idle" or not useful for lease operations subsequent to the NTL's publication is expected to be decommissioned no later than five years after the platform became "idle." BSEE regulations require the operator to sever bottom-founded objects and their related components at least 4.6 meters (15 feet) below the mudline. All oil and gas facilities and obstructions that would be severed for removal, referred to as target structures, include the following:

- Wellheads and conductors

- Subsea wellheads and conductors

- Subsea production devices (valve assemblies to produce the well, test the system, or shut-in operations)

- Jacketed platforms

- Caissons

- Well protectors (small piled jackets with or without a support deck)

- Cables, chains, and mooring lines

- Suction pile anchors

- Pipelines

- Cement structures and foundations

These are usually completely removed, with components being refurbished and reused, sold for scrap, or sent as waste to a landfill. In some cases, structures or equipment are decommissioned in place. These include pipelines in blocks without significant sediment resources; jacketed platforms, rarely including stripped topside/decks and/or conductors, caissons/well protectors integrated into larger jacket assembly, for artificial reefing (approximately 15-20/year); Subsea wellheads and casings in depths greater than 305 m (approximately 20-28/year); Suction pile anchors in depths greater than 800 m (approximately 1-3/ten-years); and short sections of cables, chains, and mooring lines attached to decommissioned in place suction pile anchors.  Operators schedule most of their removal projects from June-December when seas are generally calm (Figure 10).



**Figure 10. Seasonal trends of removal operations from 1994-2003 (Source: MMS data)**

For each structure-removal operation, a project management team develops a decommissioning plan and schedule. The team could be within the company, an independent third party, or a specialized unit within a decommissioning contractor group. Decommissioning operations may employ a single "turn-key" salvage contractor (offers a complete removal package) or up to three

levels of subcontractors. Currently, there are six removal project management companies, seven derrick/lift vessel companies, about 12 non-explosive-severance companies, and two explosive-severance companies. Up to five companies provide turnkey contracts, for either explosive or non-explosive-severance work. Decommissioning options are presented in Figure 11.



**Figure 11. Decommissioning options for an obsolete structure (Fam et al. 2018)**

To accomplish these removals, a host of activities are required to (1) mobilize necessary equipment and service vessels, (2) prepare the decommissioning targets (e.g., piles, jackets, conductors, bracings, wells, pipelines), (3) sever the target from the sea bed and/or into manageable components, (4) salvage the severed portion(s), and (5) conduct final site-clearance verification work. Preparatory work could include pipeline flushing and securing, equipment removal, tank/deck cleaning, and survey work. The topside equipment such as living quarters, generators, and processing equipment are removed and taken to shore. The deck section is then detached, lifted from the platform, and transported by barge. Conductors and piles are severed 15 ft below the mudline. The jacket is then disconnected from the seafloor and lifted onto a cargo barge. Depending on the target, a complete removal decommissioning operation may span several days or weeks, and in some cases, even months.

Operators have the option to use explosives for the severance of jacket piles and well conductors. Although mechanical severance techniques are available, such methods can be less reliable and be more costly, particularly as water depth increases. Despite costs and effectiveness, the majority of severance activities in the last decade used mechanical or nonexplosive tools. Explosives are generally placed below the mudline, inside or outside of the target members. Occasionally, specialized explosive devices are required to sever targets that are in open water, above the mudline, such as chains, cables, and pipelines (DEMEX Division of TEI Construction Services 2003). In the sections below, we describe decommissioning as four stages: pre-severance, severance, post-severance, and site clearance.

Platform removals are usually completely removed and those that occurred from 2013 through 2022 are displayed in Table 13. During decommissioning, pipelines are typically pigged (i.e., flushed, cleaned) and then cut to sever them from the structures (e.g., platform riser) to which they are attached. The severed pipeline segment is then abandoned in place or partially or completely removed. If removed, pipeline segments are transported to shore for disposal or recycling  (Shams et al. 2023).

**Table 13. Platform removals between 2013 and 2022 (BSEE 2023)**

| Final Disposition | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|---|---|---|---|
| Reused | 8 | 10 | 10 | 1 | 0 | 1 | 2 | 0 | 0 | 0 |
| Reefed | 17 | 18 | 22 | 25 | 14 | 26 | 8 | 4 | 11 | 20 |
| Scrapped | 199 | 175 | 98 | 178 | 98 | 112 | 80 | 32 | 57 | 66 |
| Annual Totals | 224 | 203 | 130 | 204 | 112 | 139 | 90 | 36 | 68 | 86 |
| Percentage Reefed | 8% | 9% | 17% | 12% | 13% | 19% | 9% | 11% | 16% | 23% |

There are currently 1,366 active platforms in the Gulf of America, most of which are located in water depths of 200 m (656 ft) or less. As of June 21, 2023, the BSEE OCS Facility Infrastructure dashboard indicates In addition, as of January 15, 2025 BSEE data indicate 273 of these structures have applied for decommissioning (BSEE 2025).

*Pre-Severance Operations*

The first step in a structure-removal operation is the development of a decommissioning plan and schedule. It is the responsibility of a project management team to assess the nature of the operation, taking into consideration, among other things, the target structure(s), marine conditions, available services (e.g., lift vessels, severing subcontractors), and initial operator preferences.

The first set of these activities to occur on the Gulf of America OCS involve the onsite mobilization of lift and support vessels, specialized equipment, and load barges necessary to receive the salvaged structure. The primary mobilization bases would be Fourchon, Cameron, Morgan City, New Iberia, and Intracoastal City in Louisiana and Galveston, Port Aransas, and Port Arthur in Texas. The primary salvage yards for the scrapping or refurbishment of structures are Morgan City (Amelia) and New Iberia in Louisiana and Port Arthur in Texas.

Any requisite preparatory work commences on and near the structure, which could include pipeline flushing and securing, equipment removal, tank/deck cleaning, and survey work. When set, all of the necessary personnel (e.g., welders, equipment operators, severing technicians), vessels (e.g., derrick/jack-up barge, tugs, load barges), and support equipment (e.g., severing tools, ROVs) are mobilized on station at the structure site. Once the lift vessel is on location and positioned, personnel and equipment are staged to begin preliminary work on the structure. For

71

subsea targets such as casing stubs, divers or ROVs are used to assess the target, conduct any necessary surveys, and assist in either deploying or conducting the below mudline severing methodology.

For surface structures such as caissons and jacketed platforms, a temporary gangway is secured to allow the cutting crews and riggers access to the structure. Depending on the size and design of the platform, modules such as generator shacks and berthing compartments, as well as other large components (e.g., flaring booms, crane assemblies), may need to be cut/disconnected from the topsides and removed. The remaining topsides assembly is then cut from the piles/jacket, lifted, and secured on the load barge. When required, welders connect scaffolds and bracing around the open piles to allow for personnel and equipment access. If internal pile severing will be conducted, crews then install and operate jetting equipment down the pile to washout the existing mud plug (most often sequentially). Once all piles are jetted and gauged (i.e., internal clearance verification) to the proper cut depth, all unneeded equipment is removed from the structure and the severing operations can commence.

To mitigate any potential impacts to biological resources BSEE will require operators to conduct surveys and reporting prior to mobilizing on site and conducting any sea floor disturbing activities. For the biological surveys, operators are to follow NTL No. 2009-G39 (https://www.bsee.gov/notices-to-lessees-ntl/notices-to-lessees/ntl-2009-g39-biologically-sensitive-underwater-features), which requires lessees to avoid or mitigate impacts to topographic features, live bottoms (pinnacle trend features and low relief features such as sea grass communities), and potentially significant biological features. BSEE will also require operators to conduct surveys and report to avoid impacts to potential archaeological resources. The guidelines for these surveys and reporting are detailed in NTL No. 2005-G07.

*Severance Operations*

As previously mentioned, there are two primary methodologies used in the Gulf of America for cutting decommissioning targets; non-explosive and explosive severance. The choice of severing tool used depends on the target size and type, water depth, economics, environmental concerns, tool availability, and weather conditions. Despite advancements in non-explosive-severance methods and the requisite marine protected species mitigation measures, BSEE expects explosive-severance activities to continue to be used for the foreseeable future (Table 14).

Modeling on structure removal processes done by Kaiser et al. (2005) is presented below, though these data do not reflect the increase in removals since 2010. Since previous studies and environmental reports distinguish explosive severing activities as having the greatest potential to harm marine protected species, the report concentrates on the estimated number of platform removals that may employ explosive cutting. Because an operator's appraisal of when and how to decommission a specific structure involves several complex factors, the main components of the report consist of "optimistic" and "pessimistic" model sets (platform life expectancy,

probabilistic removal, and binary-choice severance selection models) and a section that provides a statistical description of decommissioning operations based upon historical data.

**Table 14. Structures Removed and Severance Type in the Gulf of America between 2015 and 2022**

| Year | Total Structures Removed | Explosive Severance Used (Percentage) | Nonexplosive Severance Used (Percentage) |
|---|---|---|---|
| 2015 | 129 | 41 (32%) | 88 (68%) |
| 2016 | 199 | 34 (17%) | 165 (83%) |
| 2017 | 108 | 22 (20%) | 86 (80%) |
| 2018 | 137 | 33 (24%) | 104 (76%) |
| 2019 | 88 | 17(19%) | 71 (81%) |
| 2020 | 36 | 4(11%) | 32 (89%) |
| 2021 | 68 | 11(16%) | 57 (84%) |
| 2022 | 84 | 13 (15%) | 71 (85%) |

Kaiser et al. (2005) provided projections of removals by modeling structure removal processes until the year 2021 for removals using explosive-severance. For all activities issued in the 5-year period following issuance of the opinion (i.e., through about 2029), the Bureaus' estimate the following structures to be removed with explosives:

- WPA/CPA: 5-25 structure removals annually using explosives. BSEE expects that this annual number will not remain constant and will decline over time.

- No foreseeable structure removals are expected to occur in the EPA.

- No foreseeable structure removals via explosives in waters greater than 200 meters.

Non-explosive methods include abrasive cutters (sand and abrasive-water jets), mechanical cutters (e.g., carbide or rotary), diamond wire cutting devices, and cutting facilitated by commercial divers using arc/gas torches. These methods are relatively slow and potentially harmful to human health and safety (primarily for diver severances) but have little to no impact on the marine environment. For a detailed discussion of these methods, refer to the Minerals Management Service's programmatic environmental assessment for structure removal operations on the OCS in the Gulf  (DOI-MMS 2005).

There is a wide range of explosive materials available for use in severing charges in Gulf of America decommissioning activities. Severing contractors are responsible for assessing the type of material needed based upon its characteristics in relation to the target size and design, specific marine conditions, and potential methods of charge deployment. Explosive-severance activities use specialized charges to achieve target severance. Unlike most non-explosive methods, severance charges can be deployed on multiple targets and detonate nearly-simultaneously (i.e.,

staggered at an interval of 0.9 seconds), effecting rapid severances. These devices can be deployed and operated by divers, ROV, or from the surface.

Explosive-severance activity or "detonation event" for most removal targets lasts for only several seconds. For complex targets or in instances where the initial explosive-severance attempts are unsuccessful, more than one detonation event may be necessary per decommissioning operation. Hours or days would be needed to implement mitigation measures and redeploy new charges.

There are three types of charges used in severing structures in the Gulf of America: bulk charges, shaped charges, and fracturing charges. Bulk charges are used most often. Bulk charges are designed to sever targets using the mechanical distortion and subsequent ripping resulting from the shock wave and expanding gas bubble released during the detonation. The charge may be placed in a section of polyvinylchloride pipe or in layers of steel and/or concrete to confine and focus the detonation. The charges are placed either inside or outside of the target.

Shaped charges are placed in special housings designed to create a void between the explosive material and target wall. Employing a phenomenon known as the Monroe Effect, the shock wave deforms the shaped housing into a high-velocity plasma jet within the void. The formed jet cuts through steel targets. Shaped charges are much more efficient in cutting targets, thereby greatly reducing the net explosive weight needed to sever similar-sized targets. Shaped charges can be deployed internal or external to the target structure.

Fracturing charges are currently the least used explosives cutting tools in the Gulf. Generally available as "plaster" or shock-refraction cutters, fracturing charges sever targets by taking advantage of the reflected shock wave resulting from the initial force developed during detonation (Board and Structures 1996). The focus of the shock wave direction results in fracturing of the target wall opposite of the charge, with the ensuing gas bubble expanding and causing the completion of the cut. Not very effective on wells or grouted piles, fracturing charges are primarily available in the form of an adhesive-backed tape, which has always required divers for deployment (Continental Shelf Associates Inc. 2004). Severing contractors are currently working on improvements to the charges, including charge delivery systems that could negate the need for divers.

*Post-Severance Operations*

Once the operator completes their severance activities, the structure must be removed from the seabed and transported to its final destination (e.g., salvage yard, alternative location, reef site). Similar to its pre-severance duties, the on-station lift vessel is responsible for the post-severance hoisting of the cut material out of the water and onto a load barge or comparable vessel. If the lift vessel cannot pull the structure free from the sediment, on-station supervisors will decide whether or not to reattempt the severing method or to revert to a backup cutter.

All of the lifted components are ultimately arranged on the load barge and sea-fastened (i.e., welded and braced) to the deck to facilitate transport to the final destination (e.g., new location, salvage, recycling, or reefing). Though rarely used in the Gulf, a company may also need to

74

employ a process called "progressive transport" or "hopping," which allows for the controlled, surface-accessible dividing of oversized jackets. Following the severance of a structure from its foundation, welders install closure plates atop of all exposed jacket legs or piles. Valve assemblies built into each of the closure plates allow compressed air to evacuate water from the tubulars, deballasting the jacket and making it buoyant (Snyder 2000). After being hoisted by and secured to the stern of a lift vessel, the jacket is then towed to a previously surveyed location in shallower water. The set-down locations are expected to be far enough offshore to allow for backloading onto a barge. At the new site, the jacket is ballasted and set back onto the sea floor, exposing several additional feet of the structure above the water. From this position, welders can return to the jacket and set up scaffolding, which allows them to remove the closure plates and begin cutting all of the necessary legs, piles, and diagonal/vertical bracing. Once complete, the severed jacket section is rigged, lifted, and secured to a load barge. If the lift vessel is still not capable of lifting the remaining jacket assembly, welders reattach the closure plates, and the procedure is repeated until successful.

The use of jacket hopping is expected to be extremely rare. However, in instances when proposed, BSEE will require surveys of the route from the initial structure location to each site that the structure would be set down.

*Rigs to Reefs Program*

It is the policy of BSEE to support and encourage the reuse of appropriate, structural material from obsolete oil and gas platforms as artificial reefs. To start the process, the operator contacts the associated, coastal state agency that manages their approved artificial reef plan and outlines the proposed platform material and preferred location. All five Gulf of America coastal states have approved artificial reef plans and have identified offshore areas suitable for reefing that would not lead to unnecessary impacts to navigation and commercial fisheries.  The state agency works with the operator to develop a reefing proposal and secures the required permit from the USACE. The state and operator negotiate the terms of an agreement for a donation from the operator to the state that would allow them to take liability for the material.

Concurrently, the operator submits an application for platform removal to BSEE, which includes the reefing proposal and other decommissioning activities and timelines. The permit application is reviewed by BOEM under a site-specific EA (SEA) and assessed by BSEE to ensure that the proposed reef material and operations will not lead to potential impacts to critical OCS infrastructure, other users of the OCS, and the environment. Over 625 platforms had been converted to permanent artificial reefs in the Gulf of America.

*Site Clearance*

After all decommissioning work is completed and the structure is salvaged, operators are required to perform site-clearance work to ensure that the sea floor of their lease(s) have been restored to prelease conditions. Based upon requirements found in Subpart Q of the OCSLA regulations (30 C.F.R. §§250.1740 to 250.1743), operators have the option of either trawling

(with commercial nets, Table 15) or conducting diver, high-resolution sonar, or ROV surveys over specific areas for the structure type.

**Table 15. Site clearance requirements with trawl nets**

| Structure | Clearance Requirement |
|---|---|
| Well site | 300-foot-radius circle centered on the well location |
| Subsea well site | 600-foot-radius circle centered on the well location |
| Platform site | 1,320-foot-radius circle centered on the location of the platform |
| Single-well caisson, well protector jacket, template of manifold | 600-foot-radius circle centered on the structure location |
| If trawling near buried active pipelines | You must contact the pipelines owner to determine the condition of the pipeline before trawling |
| If trawling near unburied active pipelines 8 inches in diameter or larger | You must trawl parallel to the pipeline, and no closer than 100 feet to either side |
| If trawling near unburied smaller diameter active pipelines in the area that have obstructions present | You must remove the pipeline |
| If trawling near unburied active pipelines in the trawl area that are smaller than 8 inches in diameter and have no obstructions present. | You must trawl parallel to the pipeline |

NTL 2019-G05 specifies that trawling operations need to be completed in compliance with the following: that trawl nets must have a minimum stretched mesh size of 4 inches at the cod end and 2 inches elsewhere, and a maximum stretched mesh size of 6 inches, any shrimp caught in the net will be released, trawl times will be limited to no more than 30 minutes to allow for the removal of any captured sea turtles, and any turtles caught will be photographed and reported to BSEE and NMFS and resuscitated following NMFS guidelines. The NTL also specifies that platforms and single-well caissons and/or well protectors located in water depths less than 300 ft must be trawled in two directions. The regulations contain specific trawling requirements that are designed to facilitate the removal of any small objects or obstructions (e.g., tools, containers, batteries) that may have been lost or discarded during the operational life of the structure.

NTL 2019-G05 additionally clarifies that:

- An Application for Permit to Modify (APM) or site clearance verification report must include a list of all debris collected as a result of any of the retrieval methods, including material collected in both the heavy-duty and verification nets, items recovered by divers during snag investigations and retrievals, and any lost or recovered trawling gear.

- For Site Clearance Reporting to the Bureaus, operators should provide digital photographs of the items recovered during the use of the heavy-duty trawl nets, site

clearance verification trawl nets, diver recovery, and any other vessels used. Each photograph should be of appropriate scale and size so that individual items can be identified. All photographs of recovered items must also correspond with the items recovered and listed on individual lines within the logs.

Under 30 C.F.R. §250.1741(f), there must be a 300-ft and 500-ft buffer from a shipwreck or sensitive biological feature, respectively. Then the area may be cleared using divers, sonar and/or ROV surveys of the grid area to protect important cultural and biological resources. A high-frequency sonar system is used to determine geodetic positions for each seafloor obstruction, and a dispatched diver(s) or ROV recovers or investigates the object. Unlike trawling, survey-led recovery activities only disturb the seafloor in a limited area around the obstruction, reducing the potential for additional impacts to the benthic environment.

BOEM currently applies the following conditions of approval to permits for site clearance:

Site-clearance Trawling Reporting: If trawling is used to comply with the site clearance verification requirements under 30 C.F.R. §§250.1740-1743, which mandates that turtle excluder devices (TEDs) be removed from the trawl nets to facilitate the collection of seabed debris, you must abide by maximum trawl times of 30 minutes, allowing for the removal of any captured sea turtles. If during your trawling activities, you capture a sea turtle in your nets, you must:

- Contact BSEE's Office of Environmental Compliance at protectedspecies@bsee.gov and NMFS' Southeast Regional Office (NMFS-SERO) at takereport.miifsser@noaa.gov immediately;

- Resuscitate and release any captured sea turtles as per NMFS' guidelines found online at https://www.sefsc.noaa.gov/turtles/TM NMFS SEFSC 580 2010.pdf (see page 3-6; Plate 3-1) or Attachment 10 of this opinion; and

- Photograph the turtle, and complete a sea turtle stranding form for each sea turtle caught in your nets. The form can be found at: https://www.sefsc.noaa.gov/species/turtles/strandings.htm and submit to NMFS and BSEE (to the email addresses noted above).

Post Approval Notification (Structure Removal): Per 30 C.F.R. §250.194(c) and clarified in NTL No. 2005-G07, if during site clearance operations you discover any object of potential archaeological significance you are required to immediately halt operations. In addition, you must immediately report this discovery to BSEE Office of Environmental Compliance (Env-Compliance-Arc@bsee.gov) and contact Dr. Christopher Horrell at (504) 736-2796. Additional guidance will be provided to the operator as to what steps will be needed to protect any potential submerged archaeological resources. Additionally, as specified under 30 C.F.R. §250.1743:

- You are required to provide the trawling logs for both heavy-duty nets and verification nets with descriptions of each item recovered. Should you only pull site clearance verification nets, please clearly state this within the body of the Site Clearance Report. In

addition, provide ALL vessel logs related to vessels that were used to recover items during site clearance operations (e.g. anchor handling vessels, lift boats, dive support vessels, tug boats, etc.). If you did not use any vessels to recover items, please clearly state this within the body of the Site Clearance Report.

- With your Site Clearance Report, you are also required to provide a CD or DVD of all digital photographs of the items recovered during the use of the heavy-duty trawl nets, site clearance verification trawl nets, diver recovery, and any other vessels used. Each photograph must be of appropriate scale and size so that individual items can be identified. All photographs of recovered items must also correspond with the items recovered and listed on individual lines within the logs. In addition, when you submit your photographs, you should label each photograph file name so that it represents the individual trawl line from which the items were recovered.

Progressive-Transport Notification: In accordance with OCSLA requirements (30 C.F.R. §250.1727(g)), if at any point in your decommissioning schedule progressive transport/"hopping" activities are required to section your jacket assembly or support material barge loading, a prior written request must be submitted and approval must be obtained from the Regional Supervisor/Field Operations. Your request to use progressive transport must include a detailed procedural narrative and separate location plat for each "set-down" site, showing pipelines, anchor patterns for the derrick barge, and any known archaeological and/or potentially sensitive biological features. The diagram/map of the route to be taken from the initial structure location along the transport path to each site must also be submitted with your request. If the block(s) that you intend to use as "setdown" sites have not been surveyed as per NTL No. 2009-G39 and NTL No. 2005-G07, you may be required to conduct the necessary surveys/reporting prior to mobilizing on site and conducting any seafloor-disturbing activities.

### 3.1.5   Oil Spills

Oil spills are not legally permitted because the Oil Pollution Act prohibits any release of oil to the environment, including accidental discharges. Within BSEE, the Oil Spill Preparedness Division addresses all aspects of offshore oil-spill prevention, planning, preparedness, and response (Section 3.1.3.6). BSEE implements regulations found at 30 CFR 250 and 30 CFR 254. Based on requirements for OSRPs established in section 311 of the Federal Water Pollution Control Act (FWPCA), 33 U.S.C. 1321, BSEE reviews, and approves all OSRPs.  All spills ≥ 1 bbl must be reported to BSEE and the United States Coast Guard (USCG) via the National Response Center (NRC). BSEE conducts investigations into spills, may assess civil and criminal penalties, oversees spill source control and abatement operations, and conducts research into spill response in the marine environment The United States Coast Guard (USCG) serves as the pre-designated Federal On-Scene Coordinator (FOSC) for oil and hazardous substance pollutions incidents that threaten the coastal zone. The FOSC directs responses and coordinates all efforts at the scene of a release.  BSEE and the USCG have signed four Memoranda of Agreement (https://www.bsee.gov/newsroom/latest-news/statements-and-releases/press-releases/bsee-and-

action, such as drilling multiple wells, that should be included but tallied separately from the total number of plans/permits);

    iii.   the number of permitted actions in the Mississippi and DeSoto Canyon Protraction areas; and

    iv.   the number and volume of program-related hydrocarbon spills occurring annually in each planning area in water depths less than 200 meters and greater than 200 m.

### 3.5.2 USEPA Annual Reviews

- Actions regulated under the NPDES General Permit and potential NPDES Individual Permits will be summarized.

- Region 6 will annually summarize number of activities reported under their electronic data submission system (https://echo.epa.gov/resources/echo-site-map).

- Region 6 will annually provide a summary report of all non-compliance events under the NPDES General Permit by lease holder or operator, as well as any penalties for violations of permit conditions. Data collection would begin at the time of the release of this opinion.

- Region 4 NPDES division will annually provide a summary report of all water quality permitting associated with oil and gas activities and make a determination whether or not they complied with the applicable general or individual permit.

- Region 4 will provide an annual summary of all site-specific air permits.

- There may be increased or reduced reporting requirements as the annual review process proceeds.

### 3.5.3 NMFS Permits and Conservation Division

NMFS Permits and Conservation Division provides shared documents for regular tracking of their activities and alignment with ESA section 7 reporting requirements. The annual review will cover all projects that occur within a given calendar year (January 1 through December 31), and the review will occur no later than the end of second quarter of the following year (i.e., by March 31). Reporting requirements may change over the program lifetime as the annual review process proceeds.

If the results of the annual review show that the anticipated impacts to listed species or critical habitat identified in this programmatic opinion have been exceeded or different/new impacts are expected, reinitiation of consultation may be required.

## 4 ACTION AREA

Action area means all areas affected directly, or indirectly, by the federal action, and not just the immediate area involved in the action (50 C.F.R. § 402.02).

The action area for this consultation includes the federal OCS waters in the Gulf of America, as well as coastal areas, ports, airspaces, and waterways used by transport vessels related to coastal infrastructure, fabrication sites, and pipelines connecting to the offshore pipeline system, and other estuarine and marine areas affected directly and indirectly by the action.

In the Gulf of America, the OCS refers to the offshore waters beginning 10 mi (16 km) offshore of Florida; 3.5 mi (5.6 km) offshore of Louisiana, Mississippi, and Alabama; and 10.3 mi (16.5 km) offshore of Texas; and extending seaward to the limits of the United States jurisdiction, the Exclusive Economic Zone (EEZ), to water depth of approximately 10,978 ft (3,346 m). Figure 16 displays the extent of BOEM's jurisdiction on the OCS divided into three planning areas.

The WPA covers approximately 28.58 million acres and is located 10.4 mi (16.7 km) offshore of Texas and extends seaward to the limits of the EEZ. It is bounded on the west and north by the federal-state boundary offshore of Texas. The eastern boundary begins at the offshore boundary between Texas and Louisiana and proceeds south-southeasterly. The WPA is bounded on the south by the maritime boundary with Mexico, as established by the "Treaty Between The Government Of The United States Of America And The Government Of The United Mexican States On The Delimitation Of The Continental Shelf In The Western Gulf Of Mexico Beyond 200 Nautical Miles," effective January 2001[7].

The CPA covers approximately 66.45 million acres and is located 3.5 miles (5.6 kilometers) offshore of Louisiana, Mississippi, and Alabama and extends seaward to the limits of the Federal jurisdiction. The eastern boundary begins at the Florida-Alabama border and proceeds southsoutheasterly.

---

[7] See https://www.boem.gov/sites/default/files/regulations/Treaties/US-Mexico-Delimitation-Treaty-9-June-2000.pdf



**Figure 16. The action area for this consultation includes BOEM Gulf of America planning areas that extend into state coastal waters to shore and 55 km offshore beyond federal waters. The yellow area is under Presidential withdrawal until 2032 (BOEM 2017b).**

The EPA, a large part of which is not included as part of BOEM's action, covers approximately 64.56 million acres and is located 10.4 mi (16.7 km) offshore of Florida extending westward to the boundary of the CPA. The portion of the EPA included as part of the action covers approximately 657,905 acres, bordered by the CPA boundary on the west. The area is located south of the Florida-Alabama border. The EPA withdrawal covers approximately 1.942 million acres. All areas under consideration for leasing are more than 125 mi (200 km) from Florida and the withdrawal area. Note that the area under Presidential withdrawal shown in Figure 16 (hatch-marked) is not included in BOEM's action for planning purposes because BOEM is not planning exploration or development activities within the area; however, there is vessel traffic associated with the oil and gas program that may transit across that area from Florida ports. Therefore, the area under withdrawal is part of the action area considered in this consultation.

The Presidential withdrawal of much of the EPA does not restrict geophysical surveys in the withdrawn area, but BOEM is not planning any geophysical survey activity in those areas for the period covered under this opinion, thus, G&G survey activities in the withdrawn area were not included in the consultation. Therefore, any BOEM- or BSEE-permitted oil and gas-related activities planned in the withdrawn portion of the EPA would need to undergo a separate consultation to be covered under the ESA.

## 5   STRESSORS CREATED BY THE ACTION

124

marine environments that make up the designated area), and discusses the condition and current function of designated critical habitat, including the PBFs that contribute to that conservation value of the critical habitat. More detailed information on the status and trends of these ESA-listed species, and their biology and ecology can be found in the listing regulations and critical habitat designations published in the Federal Register, status reviews, recovery plans, and on NMFS' Web site: http://www.nmfs.noaa.gov/pr/species/esa/listed.htm.

Rice's whales, sperm whales, green sea turtles (North Atlantic DPS), Kemp's ridley sea turtles, hawksbill sea turtles, leatherback sea turtles, loggerhead sea turtles (Northwest Atlantic Ocean DPS), and Gulf sturgeon are all likely to be adversely affected by the action (Table 19). The sea turtle species and sperm whales use Gulf waters extensively, while Rice's whales mainly inhabit the northeastern Gulf, although it is possible that they were historically more widespread and there are confirmed sightings of Rice's whales outside of this area. These species will be exposed to a variety of stressors from oil and gas program operations. While many specific oil and gas activities are not likely to adversely affect these species, several activities present stressors that may lead to harassment, injury, or death. These stressors include vessel strikes, ingestion of or entanglement in marine debris, impacts from sound and explosives, and oil spills. Gulf sturgeon use nearshore coastal waters in the Gulf of America and could be affected by oil spills stemming from the action. In addition, designated critical habitat for Gulf sturgeon and proposed critical habitat for Rice's whale and green sea turtle North Atlantic DPS may be adversely affected by the action (Table 20).

**Table 19. ESA-listed species that may be adversely affected by the action**

| Species | ESA Status | Recovery Plan |
|---|---|---|
| Gulf Bryde's Whale (Balaenoptera edeni; re-classified as the Rice's Whale, Balaenoptera ricei in 2021) | E – 84 FR 15446 | Recovery Outline |
| Sperm Whale (*Physeter macrocephalus*) | E – 35 FR 18319 | 75 FR 81584 |
| Green Sea Turtle (*Chelonia mydas*) – North Atlantic DPS | T – 81 FR 20057 | 10/1991 |
| Hawksbill Sea Turtle (*Eretmochelys imbricata*) | E – 35 FR 8491 | 63 FR 28359 and 57 FR 38818 |
| Kemp's Ridley Sea Turtle (*Lepidochelys kempii*) | E – 35 FR 18319 | 9/2011 |
| Leatherback Sea Turtle (*Dermochelys coriacea*) | E – 35 FR 8491 | 63 FR 28359 and 10/1991 |
| Loggerhead Sea Turtle (*Caretta caretta*) – Northwest Atlantic Ocean DPS | T – 76 FR 58868 | 74 FR 2995 |
| Gulf Sturgeon (*Acipenser oxyrinchus desotoi*) | T – 56 FR 49653 | 09/1995 |

**Table 20. Designated and Proposed Critical Habitat that may be adversely affected by the action**

| Designated and Proposed Critical Habitat | Federal Register Notice | Unit |
|---|---|---|
| Gulf Sturgeon (*Acipenser oxyrinchus desotoi*) | 68 FR 13370 | Units 8-14 |
| Rice's Whale (Balaenoptera ricei) | 88 FR 47453 | -- |
| Green Turtle (*Chelonia mydas*) – North Atlantic DPS | 88 FR 46572 | FL01, TX01, NA01 (Sargassum) |

### 6.2.1   Whales

### 6.2.1.1 Threats to Sperm and Rice's Whales

Large whales considered in this opinion include sperm whale and Rice's whale. Both species are threatened by vessel strikes, entanglement, oil spills, pollution, loss of prey and habitat, and sound. In this section, we discuss general threats and, in Sections 6.2.2 and 6.2.3, we discuss species-specific threats.

*Vessel Strike*

Various types and sizes of vessels have been involved in ship strikes with large whales, including container/cargo ships/freighters, tankers, military vessels, cruise ships, ferries, recreational vessels, research vessels, fishing vessels, whale-watching vessels, and other vessels (Jensen and Silber 2004). The majority of vessel strikes of large whales occur when vessels are traveling at speeds greater than approximately ten knots, with faster vessels, especially large vessels (80 m or greater), being more likely to cause serious injury or death (Conn and Silber 2013; Jensen and Silber 2004; Laist et al. 2001; Vanderlaan and Taggart 2007a). Injury is generally caused by the rotating propeller blades, but blunt injury from direct impact with the hull also occurs. Injuries to whales killed by vessel strikes include huge slashes, cuts, broken vertebrae, decapitation, and animals cut in half (Carillo and Ritter 2010).

*Entanglement*

Entanglement in fishing gear or other marine debris represents an important source of injury and mortality in marine mammals. Fisheries interactions are likely to have significant demographic effects on many populations of marine mammals (Read et al. 2006). Bycatch mortality is estimated globally to exceed hundreds of thousands of marine mammals each year (Read et al. 2006). Many marine mammals that die from entanglement in commercial fishing gear tend to sink rather than strand ashore, thus making it difficult to fully assess the magnitude of this threat. When not immediately fatal, entanglement or ingestion of fishing gear can impede the ability of marine mammals to feed and can cause injuries that eventually lead to infection and death (Cassoff et al. 2011; Moore and Van der Hoop 2012; Wells et al. 2008). Other sublethal effects of entanglement include increased vulnerability to additional threats, such as predation and ship strikes, by restricting agility and swimming speed. There are also costs likely to be associated

151

with nonlethal entanglements in terms of energy and stress (Moore and Van der Hoop 2012). There is a strong spatial component to bycatch of marine mammals, with 'hotspots' influenced by marine mammal density and fishing intensity (Lewison et al. 2014).

*Pollution*

Pollution from noise and oil spills are threats to whales. Sound from constant, chronic sources such as vessel traffic and other construction noises can mask sound of whales trying to communicate, navigate, reproduce, or feed. These topics are also discussed in Sections 7 and 8.

## 6.2.2    Sperm Whale

Sperm whales were first listed under the precursor to the ESA, the Endangered Species Conservation Act of 1969, and remained on the list of threatened and endangered species after the passage of the ESA in 1973. The sperm whale is endangered as a result of past commercial whaling. The IWC estimates that nearly 250,000 sperm whales were killed worldwide in whaling activities between 1800 and 1900. From 1910 to 1982, nearly 700,000 sperm whales were killed worldwide by whaling activities  (Whitehead and Shin 2022). A compilation of all whaling catches in the North Atlantic north of 20ºN from 1905 onward gave totals of 28,728 males and 9,507 females (NMFS 2010a). Sperm whales are protected under the MMPA and listed in Appendix I of the Convention on International Trade in Endangered Species of Wild Fauna and Flora (CITES), meaning that commercial trade in products of sperm whales is prohibited.

### 6.2.2.1 Species Description and Distribution

The sperm whale occurs in all oceans of the world. Sperm whales are perhaps the most widely distributed mammal on earth. It is the largest of the toothed whales, reaching a length of 60 ft (18.3 m) in males and 40 ft (12.2 m) in females (Odell 1992). Sperm whales are distributed throughout most oceanic areas, but are found in deeper waters seaward of the continental shelf. Deep water is required so they can make prolonged, deep dives to locate prey, breed, and nurse their young. In general, females and immature sperm whales appear to be restricted in range, whereas males are found over a wider range and do make occasional movements across and between ocean basins (Dufault et al. 1999). Stable, long-term associations among related and unrelated females form the core units of sperm whale societies (Christal and Whitehead 1998). Females and juveniles form groups that are generally distributed within tropical and temperate latitudes between 50°N and 50°S, while the solitary adult males can be found at higher latitudes between 75ºN and 75ºS (Reeves and Whitehead 1997). The home ranges of individual females seem to span distances of approximately 1,000 km (Best 1979; Dufault and Whitehead 1995). Although there is strong evidence for geographic, matrilineal structuring in sperm whales, there is no evidence the management stocks presented in the following paragraph represent distinct populations of whales.

The Recovery Plan  (NMFS 2010a) identifies recovery criteria geographically across three ocean basins: the Atlantic Ocean/Mediterranean Sea, the Pacific Ocean, and the Indian Ocean. This geographic division by basin is due to the wide distribution of sperm whales and presumably

152

baseline data on sperm whale occurrence existed prior to the Deepwater Horizon spill to compare with the post-spill data. Therefore, inferring spill-related sperm whale occurrence was difficult.

However, Marques et al. (2023b) looked at cetacean density surface models from Roberts et al. (2016b) and data on surface oil coverage and thickness from Macdonald et al. (2015) to determine impacts from the Deepwater Horizon oil spill on cetacean populations. The authors estimated that the sperm whale population trajectory in the Gulf of America required approximately 11 years to return to 95% of the baseline population trajectory.

Li et al. (2021b) analyzed passive acoustic datasets in the northern Gulf of America from approximately 16, 40, and 80 kilometers away from the DWH oil spill site. Data were collected in 2007, 2010, 2015, 2016, and 2017. A comparison between the abundances of sperm whales before and after the oil spill was completed. The results show that sperm whales were present in the region throughout the entire monitoring period. The results also indicated that the density of sperm whales at the site closest to the spill showed recovery from 2010 to 2015, thus, animals increased the site occupancy, probably due to prey field recovery.

There have been no updates to the sperm whale recovery plan since 2010. A five-year review was conducted in 2015 and concluded that no changes to the status of the species were warranted.

### 6.2.3 Rice's Whale

At the time of issuance of the 2020 biological opinion, Rice's whales in the Gulf of America were classified as a Gulf subspecies of the Bryde's whales (*Balaenoptera edeni)* because of their genetic distinctiveness from other Bryde's whales worldwide (including the subspecies of *B. e. edeni* and *B. e. brydei*). Gulf Bryde's whales were listed as endangered under the ESA on April 15, 2019. On August 23, 2021, the common and scientific name of the former Gulf of Mexico Bryde's whale was revised via rulemaking to Rice's whale (*Balaenoptera ricei)* to reflect the scientifically accepted taxonomy and nomenclature of the whale as a separate species (86 FR 47022).

### 6.2.3.1 Species Description and Distribution

The Rice's whale is the only known baleen whale to inhabit the Gulf of America year-round. These whales are consistently found in the northeastern Gulf of America in the De Soto Canyon area between the 100 m and 400 m depth contours. Whaling records indicate the historical distribution of Rice's whales in the Gulf was likely much broader, and included the north-central and southern Gulf.

Rice's whales are baleen whales that typically grow to lengths of 40 to 55 ft (13 to 16.5 m). To date, the largest verified Rice's whale to strand was a lactating female about 1,265 cm long; the largest male was 1,126 cm (Rosel et al. 2021). The species has a large, falcate dorsal fin, a streamlined body shape, and a pointed, flat rostrum. There are three ridges on the dorsal surface of the rostrum that distinguish it from other similar-looking species, such as the sei whale (Rosel

2016). Rice's whales have a counter-shaded color that is fairly uniformly-dark dorsally and light to pinkish ventrally.

Historically, there has been less survey effort in known Rice's whale habitat than in other areas of the Gulf of America. The area where Rice's whales are expected to be found and their density based on best available information is shown in Figure 22, Figure 23, and Figure 24. Most sightings have occurred off the northwest coast of Florida in waters near the continental shelf break (bottom depths ranging between 100-400m, (Garrison et al. 2024). Sightings in this area have been observed year-round, and the same individual animals, identified by dorsal fin and body markings, have been seen in this region over many years. However, in recent years, there have been visually and genetically confirmed observations of Rice's whales off the coast of Texas and south of Louisiana. There have been historical sightings of unidentified baleen whales outside the eastern Gulf, and there have also been six confirmed visual sightings of Rice's whales outside of the eastern Gulf  (Garrison et al. 2024). Notably, there was a confirmed Rice's whale sighting in the western Gulf of America off the central Texas coast in waters 225 m deep during the 2017 GoMAPPS survey effort (NMFS 2018b).

Rosel et al. (2021) reported that, based on a compilation of sighting and stranding data from 1992 to 2019, the primary habitat of the Rice's whale is the northeastern Gulf of America, particularly the De Soto Canyon area (Figure 22). Rice's whale habitat is considered to be within the depth range of 100 to 400 m in this part of the Gulf (NMFS 2020; Rosel 2016; Rosel et al. 2021). Two Bryde's-like whales were sighted during a NMFS survey in the western Gulf in the early 1990s (Rosel et al. 2021) and there was a confirmed Rice's whale sighting in the western Gulf of America off the central Texas coast in waters 225 m deep (NMFS 2018a). Data from passive acoustic monitoring revealed long-moan whale calls along the northwestern Gulf of America shelf break that were determined to share distinctive and similar features with Rice's whale calls in the eastern Gulf of America, which provides evidence for the occurrence of Rice's whales over a broader distribution in the Gulf of America than previously understood (Debich et al. 2025a; Debich et al. 2025b; Debich et al. 2025c; Soldevila et al. 2022a; Soldevila et al. 2024; Soldevila et al. 2022b).

Updated spatial density models based on line-transect and aerial surveys conducted in U.S. waters of the Gulf during the GoMMAPPS project show highest Rice's whales occurring throughout their northeastern Gulf habitat and the 100 to 400-m isobaths throughout the entire year (Figure 23 and Figure 24; (Rappucci et al. 2023)). Rice's whale habitat is characterized by bottom depths between 100-400m, cool near-bottom water temperatures, and surface waters rich with algae (Garrison et al. 2024). These features support the concentration of schooling fish near the bottom, which make up their primary prey (Kiszka et al. 2023). Rice's whales feed near the bottom, diving consistently during daylight hours to feed on fish. They spend more time near the surface at night with less active foraging (Kok et al. 2023; Soldevila et al. 2017).



**Figure 22. Distribution of sightings and strandings of Bryde's-like whales in the Gulf and Atlantic U.S. EEZ from 1992 to 2019. Green area: Rice's whale primary habitat area. Blue circles: visual survey sightings, yellow circles: sightings recorded by protected species observers (PSOs), red triangles: strandings recorded as "Bryde's whales", black circles: strandings recorded as unconfirmed Bryde's-like whale, green squares: strandings confirmed as Gulf Bryde's-like whale (Rosel et al. 2021).**



**Figure 23. Density map of relative Rice's whale abundance in the Gulf in January (Rappucci et al. 2023).**



**Figure 24. Density map of relative Rice's whale abundance in the Gulf in July (Rappucci et al. 2023)**

Vessel and aerial surveys during 2023 and 2024 have added to the available sightings of Rice's whales in the Gulf of America in addition to the data summarized in Garrison et al. 2024. During April 2024, an aerial survey was conducted off the coast of Texas over water depths between 100-400m. Two whales identified visually as Rice's whales were observed and photographed. The locations of the sightings were close to where a Rice's whale had been observed in the summer of 2017 and the locations where Rice's whales have been detected acoustically (Debich et al. 2025a; Debich et al. 2025b; Debich et al. 2025c; Soldevilla et al. 2024). Large vessel surveys were conducted in the summers of 2023 and 2024 to assess marine mammal abundance and spatial distribution. These surveys included sightings of Rice's whales in the northeastern Gulf habitat along with a sighting of a probable Rice's whale (Summer 2023), three visually identified individuals south of Louisiana (Summer 2024), and an individual off the coast of Texas. The locations of these sightings are shown in Figure 25. The locations where these sightings occurred are consistent with both the predicted habitat and previous passive acoustic detections.

Passive acoustic data has been used to improve our understanding of where Rice's whales may occur throughout the Gulf. Studies conducted in 2018 and 2019 verified that Rice's whales have unique calls (Soldevilla et al. 2022a; Soldevilla et al. 2022b) that can be used to determine when they are present using PAM. Data from PAM units in the central and western Gulf of America have demonstrated regular presence of Rice's whales year-round (Debich et al. 2025a; Debich et al. 2025b; Debich et al. 2025c; Soldevilla et al. 2022a; Soldevilla et al. 2024), consistent with the recent visual observations in these areas (Figure 24). These detections are within the described habitat between the 100-400m water depths, and PAM units deployed in deeper waters have not detected Rice's whales. A PAM unit moored in waters off the northeastern coast of Mexico also detected Rice's whale vocalizations (Soldevilla et al. 2024), indicating for the first time that their range includes Mexican waters and validated habitat predictions from Garrison et al. (2024).

Ongoing PAM studies include the deployment of units in potential Rice's whale habitats more broadly in Mexican waters to determine the extent of Rice's whale habitat.



**Figure 25. Passive Acoustic Monitoring Sites where Rice's whale calls were detected (Soldevilla et al. 2022)**

Information available from the status review (Rosel 2016), the proposed listing, and available literature was used to summarize the life history, population dynamics, and status of the species as follows.

### 6.2.3.2 Life History Information

Little is known about the Rice's whale's life history compared to Bryde's whales more generally and worldwide. For the purposes of this opinion, we use relevant information gathered about Bryde's whales more generally and worldwide because they are a close relative to Rice's whale (reference). The life expectancy of Rice's whales is unknown. Bryde's whale have a gestation period of 11 to 12 months, and give birth to a single calf, which is nursed for six to 12 months. Age of sexual maturity is not known for Rice's whales specifically, but Rice's whales are thought to be sexually mature at eight to 13 years. Peak breeding and calving probably occurs in the fall. Females breed every second year. Rice's whales exhibit a typical diel dive pattern, with deep dives in the daytime, and shallow dives at night. Rice's whales generally feed on schooling fishes (e.g., anchovy, sardine, mackerel, and herring) and small crustaceans (Rosel 2016).

Rice's whales are year-round residents in the Gulf of America. Bryde's whales are known to dive to over 200 m depth to feed on small fish or crustaceans and their occurrence is thought to be determined by prey abundance (Kerosky et al. 2012). Bryde's whales are observed in small groups, pairs or solitary and reportedly seem curious about ships (Lodi et al. 2015; Rosel 2016; Tershy 1992).

According to Rice (1998), adult *B. e. edeni* rarely exceed 37 ft (11.5 m) total length and adult *B. e. brydei* reach approximately 46 to 49 ft (14 to15 m).  Rosel and Wilcox (2014) summarized body length information in the Gulf of America from strandings and concluded that they may have a size range intermediate to the currently recognized subspecies. This is similar to Bryde's whales off the coast of South Africa where inshore males are estimated to attain maturity at 40 to 41 ft (12.2 to 12.5 m) compared to 42 to 45 ft (12.8 to 13.7 m) for offshore males, while inshore females reach sexual maturity at 39 to 41 ft (11.9 to 12.5 m) compared to 42 to 43 ft (12.8 to 13.1 m) for offshore females (Best 2001).

Like other balaenopterids, Rice's whales have distinctive calls depending on geographic regions that may be useful for delineating subspecies or populations (Figueiredo 2014; Rosel 2016; Širović et al. 2014). Based on data presented in  Širović et al. (2014) and Rice et al. (2014), the calls by the Rice's whale are consistent with, but different from those previously reported for Bryde's whales worldwide. These unique acoustic signatures support the genetic analyses identifying the Rice's whale as an evolutionary distinct species from Bryde's whales (Rosel and Wilcox 2014). While no data exist on the hearing abilities of Rice's whale, as with other marine mammals we assume they hear best in the frequency range in which they produce calls.

Based on trawl surveys, Kiszka et al. (2023) inferred that prey items most readily available included Atlantic pearlside (*Maurolicus weitzmani*), silver-rag driftfish (*Ariomma bondi*), Dumeril's lanternfish (*Diaphus dumerilii*), and longfin inshore squid (*Doryteuthis pealeii*). However, stable isotope analysis from biopsy samples indicated that silver-rag driftfish were the primary prey item for Rice's whales, despite the lower relative abundance of this prey species compared to others. Silver-rag driftfish were found to have a higher energy content than the other prey species analyzed. These results suggest that prey energy content rather than prey abundance may be the primary driver behind prey selection by Rice's whales.

A study by (Soldevilla et al. 2022a) used sonobuoys and passive acoustic tagging to validate the source of potential call types and to characterize Rice's whale calls. During concurrent visual and acoustic surveys, acoustic-directed approaches were conducted to obtain visual verifications of sources of localized sounds. Of 28 acoustic-directed approaches, 79% led to sightings of balaenopterid whales, of which 10 could be positively identified to species as Rice's whales. Long-moan calls, downsweep sequences, and tonal-sequences are attributed to Rice's whales based on these matches. A potential new call type, the low-frequency downsweep sequence, is characterized from tagged Rice's whale recordings.

### 6.2.3.3 Status and Population Dynamics

The Rice's whale population is very small; data from aerial and vessel-based line-transect surveys conducted in the northern Gulf of America have been used to estimate their abundance. Abundance estimates made between 1991 and 2009 range between zero and 44 individuals (Rosel 2016). A second habitat-based density estimate by  Roberts et al. (2016a) that incorporated visual survey data from 1992 to 2009 estimated 44 individuals (Rosel 2016), was used in the 2020 biological opinion. The current best abundance estimate for the Rice's whale is

51 animals (Hayes et al. 2023; NMFS 2021). This estimate incorporates the most recent data available on the species, including the best data available on post-DWH abundance, and was derived from vessel survey data from 2017 and 2018 in the eastern Gulf. However, given increasing evidence that Rice's whales regularly occur outside the eastern Gulf and have been confirmed in Mexican waters, this may be an under estimate.  Rappucci et al. (2023) estimate the population may be larger, with an abundance estimate of 121 animals derived from a species distribution model that covers a broader area, including Mexican waters (Figure 23 and Figure 24). There is insufficient information available to properly examine population trends for the Rice's whale.

Genetic diversity within the Rice's whale population is very low. Genetic analysis of Rice's whale samples from the Gulf of America found only two mitochondrial DNA control region haplotypes in the first 375 base pairs of the control region (compared to five haplotypes for North Atlantic right whales and 51 in fin whales across the same control region sequence) (Rosel and Wilcox 2014). Examination of 42 nuclear microsatellite loci found that 25 (60%) were monomorphic, meaning no genetic variability was seen for the 21 Rice's whales sampled (Rosel 2016).

Phylogenetic reconstruction using the control region and all published Bryde's whale sequences reveal that the Rice's whale's haplotypes are evolutionarily distinct from the other two recognized subspecies of Bryde's whale as the two subspecies are from each other. In addition, the Rice's whale is more genetically differentiated from the two recognized subspecies than is the sei whale, which is an entirely different species (Rosel and Wilcox 2014; Rosel et al. 2021).

**6.2.3.4 Threats**

Historically, some commercial whaling targeting sperm whales occurred in the Gulf of America and, while Rice's whales were not specifically targeted by whalers, "finback whales" caught between the mid-1700s and late 1800s were likely Rice's whales (Reeves et al. 2011). Since then, there has not been whaling in the Gulf of America. Sound from shipping traffic and seismic surveys in the region can affect Rice's whales' ability to communicate. Vessel traffic, such as from commercial shipping and the oil and gas industry, poses a risk of vessel strike for Rice's whales. Of the six reported Rice's whale strandings on the Gulf Coasts of Louisiana and Florida since 2005, at least one was attributed to blunt force trauma by ship strike (NOAA National Marine Mammal Health and Stranding Response Database unpublished data). Further, carcass-recovery rates are low for cetaceans in the Gulf of America (Williams et al. 2011). Entanglement from fishing gear is also a threat, and several fisheries operate within the range of the species. The DWH oil spill and response heavily affected the Rice's whale population (Trustees 2016). Oil spills and response to spills continue to be a serious threat, though there has been regulatory reform and drilling safety improvements (see Section 8.8). Because the Rice's whale population is small and has low levels of genetic diversity, it is highly susceptible to further perturbations.



**Figure 60. Diagram showing offshore distribution of oil and gas during DWH (Joye 2015)**

While post-spill restoration continues, there is uncertainty regarding overall effectiveness of restoration efforts (Wallace et al. 2019). It is also uncertain how these restoration efforts have altered the baseline relative to what it would have been if the efforts had not occurred.

*Rice's Whale*

The Rice's whale population was likely affected by the DWH spill and response. Population models suggest that nearly half of the population was potentially impacted by DWH oil (Figure 61, resulting in an estimated 22% maximum decline in population size that will require 69 years to recover to the pre-spill population size (Trustees 2016). Note that these results should be interpreted with great caution, both due to model uncertainty and because small populations like the Rice's whales are highly susceptible to stochastic, or unpredictable, processes and genetic

effects. The population models used by the  Trustees (2016) did not account for these effects; therefore, the capability of the Rice's whale population to recover from this injury is unknown.



**Figure 61. Line transects and sightings of Rice's whales with the red area representing the overlap of DWH oil exposure and the area where Rice's whales are typically found. Figure from MMIQT (2015)**

*Sperm Whale*

Sperm whales could have been exposed to toxic oil components through inhalation, aspiration, ingestion, and dermal exposure.  Marques et al. (2023a) found that sperm whales were amongst the cetaceans most heavily impacted by DWH, with an estimated 5% population decline compared to pre-DWH abundances. According to the modeling effort, the sperm whale population is estimated to take over 11 years to recover to pre-DWH numbers. There were 19 observations of 33 sperm whales swimming in DWH surface oil or that had oil on their bodies (Diaz 2015 as cited in Trustees 2016). The effects of oil exposure include physical and toxicological damage to organ systems and tissues, reproductive failure, and death. Sperm whales suffered from multiple routes of exposure at the same time, over intermittent timeframes and at varying rates, doses, and chemical compositions of oil. The estimation of effects to sperm whales is largely based on observed impacts to bottlenose dolphins resulting from exposure to DWH oil. The DWH oil spill occurred in deep water sperm whale habitat. The same routes of internal oil exposure (ingestion, inhalation, and aspiration) would have occurred in sperm whales that have been shown to adversely affect coastal bottlenose dolphins. The surface oil and vapors at the surface were more concentrated offshore near the leaking wellhead that could have exposed sperm whales to high levels of contaminants between dives that were known to have occurred with dolphins.

information following the DWH event. A large oil spill will have detrimental effects on the PBFs related to the availability of prey and the support of demographic functions in the portion of the critical habitat unit or units reached by oil, although the quantity of oil is expected to be small by the time it reaches coastal areas. The DWH event led to oil being observed on more than 2,113 km of shoreline from Texas to Florida  (Trustees 2016). Because the 100,000 bbl spill we evaluated as reasonably certain to occur once over the 45-year period of the Oil and Gas Program considered in this opinion is approximately 3% of the size of the DWH event, we calculate up to 64 km of shoreline could be impacted, which would be a very small portion of the proposed nearshore green sea turtle critical habitat units along the coasts of Texas and Florida.

Impacts to proposed North Atlantic DPS green sea turtle critical habitat from a large oil spill are expected to be localized and not are not expected to result in the loss or degradation of large areas containing the PBFs of prey availability and refugia for juvenile, subadult and adult green sea turtles supporting survival, development, growth and/or reproduction. The PBFs of the critical habitat will not likely be altered or destroyed by the Oil and Gas Program activities to the extent that the survival and recovery of North Atlantic DPS green sea turtle would be appreciably reduced. We base this on current presence of green sea turtles in areas containing the PBFs for nearshore critical habitat in the action area that are largely outside the Oil and Gas Program Planning Areas. Therefore, we do not expect the effects of the action, in particular the stressor of a large oil spill discussed here that was found to adversely affect proposed North Atlantic DPS green sea turtle critical habitat, to appreciably diminish the overall value of the critical habitat for the conservation of green sea turtle in the action area. We conclude the action will not result in the destruction or adverse modification of proposed critical habitat for North Atlantic DPS green sea turtle.

## 12 CONCLUSION

After reviewing the current status of the ESA-listed species, the environmental baseline within the action area, the effects of the proposed action, and cumulative effects, it is NMFS' biological opinion that the proposed action is likely to jeopardize the continued existence of the Rice's whale.

We note here that only the stressor of vessel strike to Rice's whale violates section 7(a)(2) by causing a likelihood of jeopardy to a listed species, and a RPA has been recommended (Section 13). In Section 13, we describe the other stressors determined to adversely affect Rice's whale, noting existing regulatory systems or other factors that reduce their impacts to Rice's whale relevant to our jeopardy analysis. Normally, we would not include further discussion of stressors that are not likely to jeopardize the continued existence of a species in our opinion. However, because these stressors were discussed in the context of the RPA in the *Sierra Club v. NMFS* litigation that precipitated this opinion, we discuss further why an RPA is not appropriate for effects to Rice's whale other than vessel strike.

It is NMFS' biological opinion that the proposed action is not likely to jeopardize the continued existence of sperm whale, Northwest Atlantic loggerhead sea turtle, Kemp's ridley sea turtle, North Atlantic DPS green sea turtle, leatherback sea turtle, hawksbill sea turtle, or Gulf sturgeon. Additionally, it is NMFS' biological opinion that the proposed action is not likely to destroy or adversely modify loggerhead or Gulf sturgeon designated critical habitat, or proposed critical habitat for green sea turtle North Atlantic DPS or Rice's whale.

# 13 REASONABLE AND PRUDENT ALTERNATIVE

When NMFS concludes that an action is likely to jeopardize an ESA-listed species or is likely to destroy or adversely modify designated and proposed critical habitat, NMFS suggests a reasonable and prudent alternative (RPA) (section 7(b)(3)(A) of the ESA) that would allow the action to proceed in compliance with section 7(a)(2) and implementing regulations at 50 CFR §402.10(c). To this end, NMFS recommends the following RPA to BOEM and BSEE to ensure the Gulf of America oil and gas program operates in accordance with the ESA.

Through this consultation, NMFS finds that the operation of oil and gas vessels in the Gulf of America, in an area where the endangered Rice's whale occurs, is likely to jeopardize the continued existence of the whale due to the risk of vessel strike. The RPA described below reduces or avoids the primary threat to Rice's whales in our analysis, the risk of injurious and lethal vessel strike interaction. The impacts of other stressors that are part of the proposed action are more limited in space and time, diffuse, or not likely to result in adverse effects to Rice's whale. Below, we summarize again the stressors generated by the proposed action and how they are addressed by the RPA. Regarding marine debris, under current regulation, operators are prohibited from deliberately discharging containers and other similar materials (i.e., trash and debris) into the marine environment (30 CFR §250.300(a) and (b)(6)) and are required to make durable identification markings on equipment, tools, containers (especially drums), and other material (30 CFR §250.300(c)) so that they are traceable to the source. In addition, BSEE NTL 2015-G03 "Marine Trash and Debris Awareness and Elimination" provides guidance to prevent intentional and/or accidental introduction of debris into the marine environment. These mitigations include the posting of informational placards and making Marine Trash and Debris Awareness training available to employees working offshore. Marine debris effects are therefore minimized from the program and our analysis of the effects of marine debris resulting in one sublethal take of Rice's whale did not contribute to the likelihood of jeopardy conclusion on the proposed action; therefore, no measures addressing marine debris are included in the RPA.

In terms of chronic sound, vessel noise is not expected to have lethal or injurious effects, but, rather, it may cause chronic behavioral effects. We expect the restrictions in the RWA included in the 2020 BiOp and in the proposed action for this BiOp to reduce the potential for exposure to vessel sound to the degree that behavioral harassment is minimal, or even discountable, where the species is most likely to occur. In addition, the greatest density of Rice's whales is not within the busiest vessel traffic regions of the action area. We believe vessel noise is adequately mitigated by the vessel speed restrictions in the 2020 Rice's Whale Area and also expect

574

implementation of the Rice's whale vessel strike avoidance technology plan (RW tech plan) described below will result in reduced vessel noise elsewhere in the action area given the ability vessels will have to avoid transiting near Rice's whales; therefore, no measures to address vessel noise are included in the RPA. This additional benefit of the RW tech plan further reduces the impacts of vessel noise to Rice's whales.

Regarding seismic noise, the MMPA regulation governing the authorization of incidental marine mammal take from seismic activity associated with the Oil and Gas Program contains mitigation, monitoring, and reporting requirements relevant to all marine mammals, with particular attention to Rice's whale (86 FR 5322). For example, as reflected in the Letter of Authorization, the scope of BOEM's action excluded the Presidential moratorium area (and thus the RWA in the Eastern Planning Area).  We consider these existing requirements and elements of the action, taken together, to be sufficient to reduce impacts that may contribute to adverse effects. We believe Rice's whales would avoid exposure to injurious sound levels based on information from other baleen whales and the lack of G&G activities within the Rice's whale area mean exposure of individuals to injurious sound levels from seismic surveys is less likely. Any exposures that do occur would be at sound levels that would not impede the animal's ability to find prey, avoid predators, or locate conspecifics to socialize and reproduce. Therefore, no measures to address seismic activities are included in the RPA.

Regarding oil spills, BSEE has regulations in place, some of which have been implemented since the 2020 BiOp was issued, to strengthen oil spill prevention and oil spill response measures, improving the overall safety of oil and gas activities. Depending on the location of an oil spill, Rice's whales could be exposed and that exposure could contribute to a reduction in fitness of individual whales. The Bureaus are mandated under OCSLA and OPA to ensure protection of the environment while facilitating the federal government's leasing of its offshore mineral resources and energy resources, and have conducted rulemakings to that effect. For example, BSEE amended their Drilling Safety Rule in 2016 to strengthen oil spill prevention requirements. In 2019, BSEE revised their Well Control Rule, which was revised again in 2023 to clarify blowout preventer (BOP) system requirements and to modify certain specific BOP equipment capability requirements. These rules, along with others detailed in Section 3.1.5.1 are in place to increase safety and to reduce the likelihood of spill occurrence. NMFS acknowledges that the Bureaus are the entities tasked by statute with determining the best measures to implement for oil spill prevention, and, after independently reviewing such measures, NMFS finds that the existing regulatory regime for oil spill prevention substantially reduces the risk of exposure for Rice's whale to oil spills. While our analysis showed that multiple small oil spills may occur over the course of the program, we determined only a single large spill (100,000 bbl) is reasonably certain to occur over the 45-year period considered in this opinion that could lead to exposure of up to one Rice's whale. Thus, no measures addressing oil spills are included in the RPA.

Finally, our analysis of all stressors, considered together, does not lead to a different conclusion from that described for each individual stressor. The impact of threats to the species was

presented in the range-wide status of the species, and the impact of stressors not associated with the action that affect the status of the species in the action area was presented in the environmental baseline. Our effects analysis considered all stressors caused by the Oil and Gas Program, and our jeopardy analysis considered all stressors in the context of the range-wide status of the species, environmental baseline, and effects of the action. We do not foresee a multiplicative impact from combining stressors, but rather, an aggregate one, which we have fully considered by addressing each stressor in turn, while incorporating the range-wide status of the species and environmental baseline, including all existing impacts of the ongoing oil and gas program, in our understanding of the species' current status and trajectory. We do not believe, for instance, that individual exposure to sound from various sound sources contributes to the likelihood of jeopardy from vessel strike for the proposed action. Therefore, associated measures are not included in the RPA.

NMFS's implementing regulations define reasonable and prudent alternatives as alternative actions, identified during formal consultation, that: (1) can be implemented in a manner consistent with the intended purpose of the action; (2) can be implemented consistent with the scope of the action agency's legal authority and jurisdiction; (3) are economically and technologically feasible; and (4) NMFS believes would avoid the likelihood of jeopardizing the continued existence of ESA-listed species or resulting in the destruction or adverse modification of critical habitat (50 CFR §402.02). The overarching requirement is that an RPA be capable of avoiding the likelihood of jeopardizing ESA-listed species and adversely modifying designated and proposed critical habitat – all other elements of the definition must be evaluated within this context. The other three factors are intended to implement the statutory phrase "can be taken by the Federal agency or applicant in implementing the agency action." 16 U.S.C. §1536(b)(3)(A).

## 13.1    Proposed RPA

We have developed the following RPA to avoid the likelihood of jeopardizing the continued existence of the endangered Rice's whale, which has low population numbers (estimated at less than 100) and is highly vulnerable to vessel strike mortality, effects of sound, and the combination of other stressors from the proposed action. Because vessel strike is the stressor that underlies the conclusion that the proposed action is likely to jeopardize the continued existence of the species, the RPA is focused on this stressor.

If BOEM and BSEE choose to implement the RPA for the programmatic opinion, the RPA will be in effect for the timeframe of the opinion (45 years). BOEM and BSEE would coordinate with NMFS on implementation of the RPA in the first five years and then review the RPA at least every five years to evaluate progress and determine whether and how the RPA may need to be modified to ensure the oil and gas program is not likely to jeopardize the continued existence of the Rice's whale and is consistent with any future MMPA rule. This review would be in addition to or in conjunction with any other review of the RPA or the opinion by the agencies that is appropriate under the reinitiation triggers defined in Section 16 of the opinion.

The RPA requires the following as it relates to vessel activity in the action area, which is identified and defined in Figure 14.

1. **Immediately begin to use technology to enable Rice's whale vessel strike avoidance and monitoring of presence of Rice's whale.**

   o Upon adoption of the RPA, BOEM and BSEE will identify a near real-time platform to help oil and gas related vessels avoid strikes of Rice's whale while the Rice's whale vessel strike avoidance technology plan is under development (see RPA #4). The platform should allow for near real-time reporting of all sightings of large whales (live or dead) that could be Rice's whales within the RWA and the 100 - 400 m isobath outside the RWA (see Figure 27). The platform should be accessible to BOEM, BSEE, and all oil and gas vessel operators (e.g., WhaleAlert, a readily available system) and be structured so that data can be used reliably for Rice's whale avoidance in real time.[43]

   o In addition, BOEM and BSEE, in collaboration with NMFS, must identify and incorporate data from any existing near real-time Rice's whale detection systems (e.g., existing near real-time PAM equipped to detect Rice's whales, visual observations from PSOs) into the identified platform. As additional devices and near real-time Rice's whale detection data systems come online, BOEM and BSEE, in collaboration with NMFS, must work to ensure they are integrated into the near real-time sightings platform to establish an integrated platform for all Rice's whale detections in the Gulf of America (e.g., see WhaleMap for North Atlantic right whales).

   o All oil and gas operators in the specified area must monitor the Rice's whale near real-time detections platform, as crew and vessel safety allows, and take any necessary action to avoid or reduce the likelihood of vessel strike (e.g., by changing trajectory or speed, see Attachment 3, Vessel strike avoidance protocol, for specifics). This includes taking appropriate action in response to detections by the vessel itself as well as in response to any other detections (e.g., from the near real-time platform) that indicate the potential presence of a Rice's whale in the vicinity of the operating vessel. BOEM and BSEE, in collaboration with NMFS, must also monitor this platform for all detections of Rice's whales and ensure oil and gas vessel operators are aware of any detections as soon as practicable but no later than 24 hrs of becoming aware of the detection.

---

[43] Data in this platform are intended for mariner safety and awareness and should not be used in another context without further validation.

577

2. **Establish an expert working group to support development and implementation of a Rice's whale vessel strike avoidance technology plan (RW Tech Plan)**

    o   Within one month of issuance of the BiOp and adoption of the RPA, BOEM and BSEE must form and chair an expert working group, in collaboration with NMFS, the applicants, and other relevant experts to inform BOEM and BSEE as they develop, test, and implement a RW tech plan The expert working group must include individuals with expertise in oil and gas development activities, marine mammal biology and behavior, vessel types and traffic patterns, and other relevant expertise. The expert working group must be convened at least once every three months, or at some other more frequent cadence, prior to initial implementation of the RW tech plan.

3. **Improve understanding of Rice's whale vessel strike risk associated with the proposed action**

    o   Within one year of the issuance of this opinion, BOEM and BSEE, in coordination with NMFS and the expert working group, must complete an advanced assessment of vessel strike risk of Rice's whale in the Gulf of America. This assessment should aim to further our understanding of the uncertainties associated with estimating injurious and lethal vessel strikes from oil and gas program-associated vessel operations, including the potential effects of vessel size, vessel speed, employment of detection technologies, and crew training to avoid vessel strikes. The assessment must rely on the best available scientific and commercial information and methodology.

    o   The assessment should make use of recent and future scientific methods to assess vessel strike risk for large whales and consider existing data gaps and recommended improvements for assessing vessel strike risk to Rice's whales (e.g., Blondin et al. 2025, Garrison et al., 2025, Stevens et al. 2024, among  others).

    o   As new information becomes available, the vessel strike risk assessment must be updated as appropriate to ensure this RPA is still meeting its intended objectives.

4. **Develop a Rice's whale vessel strike avoidance technology plan (RW Tech Plan)**

    o   Within 18 months of issuance of this opinion BOEM and BSEE, in coordination with NMFS and the expert working group shall develop a Rice's whale vessel strike avoidance technology plan (i.e., within 6 months of completing an updated vessel strike risk assessment). Such a plan should consider other technology transition plans developed by the U.S. Government (e.g., https://orta.research.noaa.gov/plans/).

o   The RW Tech Plan must: be informed by the advanced vessel strike risk assessment (RPA #3); consider information from the near-real time platform and detection systems noted above (RPA #1); lay out clear steps to develop, evaluate, and implement technology to reduce the likelihood of injurious and lethal vessel strikes from oil and gas vessel operations of Rice's whale; and outline how the agencies will engage industry and the private sector to develop, test, and implement the plan. The plan may modify or replace the near real-time platform and detection systems noted above (RPA #1). The plan should harness existing, ongoing, and future technology (e.g., vessel avoidance technology used to prevent vessel interactions with North Atlantic right whales or other large whales), to reduce the likelihood of vessel strikes of Rice's whales. It should also consider pairing technology with real-time/near real-time spatio-temporal protective measures, modifications to vessel operations such as speed and trajectory (in real time) to prevent strikes of oncoming whales, and avoiding areas where Rice's whales are known to be present, etc.

o   While the RW Tech Plan must prioritize use of technology where Rice's whales are at heightened vessel strike risk outside of areas where existing speed restrictions are included as part of the proposed action (i.e., the RWA), it should consider application of technologies throughout the full action area, including in the RWA, to further minimize the likelihood of jeopardizing the continued existence of Rice's whales.

o   The RW Tech Plan should directly integrate with ongoing efforts by NMFS and other federal agencies to promote the recovery of Rice's whale (e.g., recovery plan) in order to avoid duplication and ensure a cost effective, streamlined approach for meeting the requirements of the MMPA and ESA while reducing the potential for regulatory burden on marine industries.

o   In accordance with 50 C.F.R. § 402.02, the RW Tech Plan should be economically and technologically feasible.

5. **Undertake independent peer review**

•   To ensure that the vessel strike risk assessment (RPA# 3) and the RW tech plan (RPA #4) are based on the best available scientific and commercial data available, both must undergo a scientific peer review process involving independent experts in large whale biology, vessel strike risk modeling, Gulf of America vessel traffic patterns, and other relevant disciplines, and resulting documents must be made publicly available. The vessel strike risk assessment and RW tech plan must be implemented as appropriate on the timelines outlined below (RPA #6) so as not to cause unreasonable delays and BOEM and BSEE must revise the Tech Plan as needed as a result of the peer review.

6. **Implement Rice's whale vessel strike technology plan**

   o Within 24 months of issuance of this opinion, BOEM and BSEE, in coordination with NMFS and the expert working group must begin implementation of the technology plan, which may consist of whale detection and avoidance technology that is available within this period of time. Implementation must continue to ensure that oil and gas program-associated vessel operation is not likely to jeopardize the continued existence of endangered Rice's whales (see RPA #4).

   o As noted above, at least every 5 years following initial implementation of the RW Tech Plan, BOEM and BSEE, in coordination with NMFS and the expert working group must review the effectiveness of the RW tech plan implementation and modify the Plan as needed such that the application of technologies to reduce vessel strikes, which may evolve over time, continues to ensure that the continued existence of Rice's whale is not likely jeopardized. Such modifications should be documented as amendments to this opinion and made publicly available

7. **Monitor Rice's whales to ensure no likelihood of jeopardy during RPA implementation**

   o Upon acceptance of this RPA and issuance of this opinion, and to ensure the action is not likely to jeopardize the continued existence of endangered Rice's whales while components of this RPA are further developed and implemented, BOEM and BSEE, in coordination with NMFS, must develop and implement plans to monitor each of the following within the action area:

      ▪ Rice's whale population abundance, distribution, and health. Such monitoring serves as a means to ensure the status of the species remains unchanged from its status as evaluated in this opinion and to assess undetected (cryptic) vessel strikes of Rice's whales and the potential population level impacts. This monitoring may make use of various methodologies including vessel surveys, aerial surveys, PAM, biological sampling, telemetry, among others, and may involve external research entities as well as agency activities. A plan for this monitoring must be developed and implementation must begin within 1 year of the finalization of this opinion.

      ▪ All vessel traffic associated with the action. Such monitoring must provide data, to be shared and reported to NMFS, for regular re-assessment of vessel strike risk over the course of implementation of the 45-year timeframe of this opinion utilizing the risk assessment from RPA #1. Vessel monitoring may make use of existing vessel tracking/monitoring technologies and programs such as Automatic Identification System (AIS) vessel traffic monitoring, but must allow for complete monitoring of all

vessel traffic associated with the action. Vessel traffic monitoring and reporting must begin within 6 months of acceptance of this RPA and finalization of this opinion and should be modified as needed to ensure comprehensive monitoring of vessel traffic associated with the proposed action through the timeframe of this opinion.

- All potential vessel strikes of Rice's whales. This should include strikes of any large object that could be a Rice's whale involving any vessel operating in association with the action, as well as any observations of live or dead possible Rice's whales that may have been struck by a vessel. If, through this monitoring, it is determined that a Rice's whale has likely been struck and killed or injured, BOEM and BSEE must immediately coordinate with NMFS to determine if consultation needs to be reinitiated and if modifications to this RPA are necessary. Vessel strike monitoring must begin within 6 months of acceptance of this RPA and finalization of this opinion and should be modified as needed to ensure comprehensive monitoring of vessel strikes through the timeframe of this opinion.

The implementation of this RPA is expected to reduce the risk of vessel strikes from oil and gas program-related vessel operation such that injurious or lethal strikes of Rice's whale are discountable over the full implementation of the RPA and continued operation of the Gulf of America oil and gas program for the full timeframe of the opinion (45 years). Thus, implementation of this RPA is expected to avoid the likelihood of this oil and gas program jeopardizing the continued existence of endangered Rice's whales.

## 13.2    Compliance with RPA Criteria

Under ESA section 7(a)(2), the proposed action must avoid the likelihood of "jeopardiz[ing] the continued existence of a species in the wild, by appreciably reducing the likelihood of a species' survival and recovery." A RPA to the proposed action is one that avoids the likelihood of jeopardy to the species by ensuring that the action's effects do not appreciably increase the risks to the species' potential for survival or recovery. The RPA must also be: (1) consistent with the intended purpose of the action; (2) within the scope of the federal agency's legal authority and jurisdiction; and (3) economically and technologically feasible.

To evaluate if the RPA is consistent with the intended purpose of the action, we considered the purpose of the program. This RPA is consistent with the purpose of the programmatic action, as it will allow for continuance of the oil and gas program in the Gulf of America while ensuring the program is not likely to jeopardize the continued existence of the Rice's whale. BOEM and BSEE would implement and enforce this RW Tech Plan through whichever means are most efficient, practicable, and reliable, including agreements with industry, programmatic lease stipulations, conditions of approvals on permits and authorizations, NTLs (or comparable guidance), best management practices, and/or other appropriate authorities.