# EXHIBIT 3:

## U.S. Fish and Wildlife Service's
## 2018 Biological Opinion



# United States Department of the Interior

## FISH AND WILDLIFE SERVICE
646 Cajundome Blvd.
Suite 400
Lafayette, Louisiana 70506

April 20, 2018

Mr. Michael A. Celata
Regional Director, BOEM
Gulf of Mexico OCS Region
1201 Elmwood Park Boulevard
New Orleans, Louisiana  70123

Mr. Lars Herbst
Regional Director, Gulf of Mexico OCS Region
Bureau of Safety and Environmental Enforcement
1201 Elmwood Park Boulevard
New Orleans, Louisiana 70123

This document transmits the U.S. Fish and Wildlife Service's (Service) biological opinion (BO) on the effects of Bureau of Ocean Energy Management's (BOEM) and Bureau of Safety and Environmental Enforcement's (BSEE) proposed oil and gas leasing, exploration, development, production, decommissioning, and all related activities in the Gulf of Mexico (GOM) Outer Continental Shelf (OCS) within existing leased areas and those areas proposed for future leasing in the Western Planning Area (WPA), the Central Planning Area (CPA), and the Eastern Planning Area (EPA).  This BO will cover the following leases and activities for a ten-year period starting from the date this document is signed.

1. All oil and gas leases issued as a result of sales held during the ten-year period, including associated exploration, development, production, and decommissioning activities authorized by BOEM or BSEE under those leases;
2. Those associated exploration, development, production, and decommissioning activities authorized by BOEM or BSEE during this 10-year period under all other oil and gas leases, regardless of the date of issuance of the lease; and
3. Those geological and geophysical permits issued by BOEM during the ten-year period.

This biological opinion is submitted in accordance with section 7 of the Endangered Species Act (Act) of 1973, as amended (16 U.S.C. 1531 et seq.).

The following table contains a State-by-State listing of threatened (T) and endangered (E) species and their critical habitat (CH) included in this opinion that may potentially be affected by the proposed actions.

002755

| COMMON NAME | SCIENTIFIC NAME | FEDERAL STATUS | CRITICAL HABITAT | OCCURRENCE WITHIN ACTION AREA | HABITAT TYPE |
|---|---|---|---|---|---|
| **Reptiles** | | | | | |
| Green sea turtle | *Chelonia mydas* | T | N | FL | Coastal beaches |
| Hawksbill sea turtle | *Eretmochelys imbricata* | E | Y | TX to FL | Coastal beaches |
| Kemp's ridley sea turtle | *Lepidochelys kempii* | E | N | TX to FL | Coastal beaches |
| Leatherback sea turtle | *Dermochelys coriacea* | E | Y | TX to FL | Coastal beaches |
| Loggerhead sea turtle | *Caretta caretta* | T | Y | TX to FL | Coastal beaches |
| **Fish** | | | | | |
| Atlantic (Gulf subspecies) sturgeon | *Acipenser oxyrinchus desotoi* | T | Y | LA to FL | GOM waters and adjacent freshwater streams and rivers |
| **Birds** | | | | | |
| Cape Sable seaside sparrow | *Ammodramus maritimus mirabilis* | E | Y | S. FL | Inland and coastal terrestrial: short hydroperiod marl prairie |
| Mississippi sandhill crane | *Grus canadensis pulla* | E | Y | MS | Inland and coastal freshwater: wet pine savanna, pine plantations, swamps and wetlands edged by pine forests |
| Piping plover | *Charadrius melodus* | T | Y | TX to FL | Coastal beaches |
| Roseate tern | *Sterna dougallii dougallii* | T | N | FL | Coastal beaches |
| Rufa red knot | *Calidris canutus rufa* | T | N | TX to FL | Coastal beaches |
| Whooping crane | *Grus americana* | E, NEP | Y | E: TX; NEP: LA, FL | Inland freshwater and coastal estuarine: salt flats, grasslands, wetlands, ponds, and bays |
| Wood stork | *Mycteria americana* | T | N | MS, AL, FL | Freshwater and estuarine wetlands with periods of flooding followed by dry periods |
| **Mammals** | | | | | |
| Alabama beach mouse | *Peromyscus polionotus ammobates* | E | Y | AL | Coastal terrestrial: dune systems |
| Choctawhatchee beach mouse | *Peromyscus polionotus allophrys* | E | Y | FL | Coastal terrestrial: dune systems |

2

002756

| Perdido Key beach mouse | *Peromyscus polionotus trissyllepsis* | E | Y | AL, FL | Coastal terrestrial: dune systems |
|---|---|---|---|---|---|
| St. Andrew beach mouse | *Peromyscus polionotus peninsularis* | E | Y | FL | Coastal terrestrial: dune systems |
| West Indian manatee | *Trichechus manatus* | T | Y | TX to FL | Inland freshwater; coastal estuarine: tidal rivers and streams, swamps, springs, salt marshes, lagoons, canals |

E = Endangered
T = Threatened
NEP = Nonessential Experimental Population

The National Marine Fisheries Service (NMFS) has jurisdiction for sea turtles in the marine environment.  When sea turtles leave the marine environment and come onshore to nest, the Service is responsible for those species. The Kemp's ridley, loggerhead, leatherback, green and hawksbill sea turtle are found in GOM coastal waters.

The leatherback sea turtle regularly nests in the U.S. Caribbean in Puerto Rico and the U.S. Virgin Islands.  Along the U.S. Atlantic coast, most nesting occurs in Florida (NMFS and Service 1992). Although uncommon, leatherback nesting has also been reported in Texas (Shaver 2008); on the northwest coast of Florida (LeBuff 1990, Florida Fish and Wildlife Conservation Commission [FWC] 2009a); and in southwest Florida a false crawl (nonnesting emergence) has been observed on Sanibel Island (LeBuff 1990).

Major green sea turtle nesting colonies in the Atlantic occur on Ascension Island, Aves Island, Costa Rica, and Surinam.  Within the U.S., green sea turtles nest in small numbers in the U.S. Virgin Islands and Puerto Rico, and in larger numbers along the east coast of Florida, particularly in Brevard, Indian River, St. Lucie, Martin, Palm Beach, and Broward Counties (NMFS and Service 1991).  Nests have been documented, in smaller numbers, north of these counties, from Volusia through Nassau Counties in Florida, as well as in Georgia, South Carolina, North Carolina, and as far north as Delaware in 2011.  Nesting has also been documented in smaller numbers along the Gulf coast of Florida from Escambia County through Franklin County in northwest Florida and from Pinellas County through Monroe County in southwest Florida (FWC 2016).

Within the continental U.S., hawksbill sea turtle nesting is rare and is restricted to the southeastern coast of Florida (Volusia through Miami-Dade Counties) and the Florida Keys (Monroe County) (Meylan 1992, Meylan 1995, FWC/Florida Fish and Wildlife Research Institute [FWRI] 2010b).  In the U.S. Caribbean, hawksbill nesting occurs on beaches throughout Puerto Rico and the U.S. Virgin Islands (NMFS and Service 1993).

The Service concurs that the proposed action is not likely to adversely affect nesting leatherback, green, and hawksbill sea turtles and their nests due to the low nesting numbers and the low probability of an oil spill occurring when those species and their nests could be present. Potential impacts to Kemp's ridley and loggerhead sea turtles are further discussed below.

002757

**Analysis of the species/critical habitat likely to be affected**

The Mississippi sandhill crane and its critical habitat may be affected by the proposed action. The effects of the proposed action on this species will be considered further in the remaining sections of this biological opinion. Potential sources of impacts to this species from existing and proposed oil and gas activities are loss of nesting and critical habitat, disturbance of nests, and trash and debris.

**ENVIRONMENTAL BASELINE**

**Status of the species within the action area**

The range of the Mississippi sandhill crane is limited to the action area, in Jackson County, Mississippi, as described above. In addition, the entire designated critical habitat for the Mississippi sandhill crane occurs within the action area.

**Factors affecting species environment within the action area**

Previously described development has historically affected the species and its habitat throughout the action area (cranes' range), and continues to do so (with the exception of lands on the refuge). This includes development or other use of lands within the cranes range that are not designated as critical habitat (approximately 83% of their range is not designated as critical habitat).

Numerous enhancement/restoration projects designed to benefit Mississippi sandhill cranes and their habitat have occurred on the refuge. Specifically in 2015, the refuge: (1) conducted mechanical treatment on approximately 224 acres (via bush-hog, mulching machine, gyrotrack, chain saw) to enhance open savanna, (2) bush-hogged 450 acres, (3) conducted twenty-nine prescribed burns totaling 5,739 acres (4) chemically treated approximately 115 acres of cogongrass, and (5) released 10 captive-reared juveniles (of which 80% survived the first year). In addition, the contract trapper ran traps (foot-hold and snare) during January-June and October-December to protect nesting and released cranes. A total of 5,405 trap-nights were conducted removing 25 bobcats, 25 coyotes, 88 raccoons, one Canada goose, and 37 other.

**EFFECTS OF THE ACTION**

**Direct effects**

Potential sources of direct impact to the Mississippi sandhill crane from the proposed oil and gas activities are habitat loss and fragmentation, disturbance from aircraft and boat vessel traffic, effects from trash and debris, and OCS-related air emissions. Pipeline landfalls, terminals, and other onshore OCS-related infrastructure can destroy of fragment otherwise suitable Mississippi sandhill crane habitat. These activities should only have a minimal effect on Mississippi sandhill cranes and their critical habitat because the range of this species encompasses an area where new construction is not anticipated. In addition, new pipelines that go ashore require an environmental analysis before approval. Where pipeline landfall occurs, the permitting process

002796

encourages the development of measures to minimize and potentially eliminate impacts to federally listed species.

Low-altitude aircraft overflights related to OCS oil and gas operations could affect the Mississippi sandhill crane.  Mississippi sandhill cranes may be susceptible to disturbance by low-altitude aircraft during nesting, foraging and resting periods.  Those birds may leave and cease using their preferred nesting and feeding areas and possibly seek less desirable ones, resulting in decreased nest success, increased energy expenditure via flight and alertness, and reduced energy intake via lower feeding rates.  The Service, FAA, NPS, and BLM have an Interagency Agreement to reduce low-level flights over natural resource areas.  The recommended minimum flight altitude is 2,000 feet above ground level.  This limitation is included on aeronautical maps. The FAA (FAA Advisory Circular 91-36C) and corporate helicopter policy also states that helicopters must maintain a minimum altitude of 700 feet while in transit offshore and 500 feet while working between platforms.  When flying over land, the specified minimum altitude is 1,000 feet over unpopulated areas or across coastlines and 2,000 feet over populated areas and biologically sensitive areas such as wildlife refuges and national parks.  Within the CPA, BOEM/BSEE anticipates 594,500-1,112,500 helicopter trips annually.  Service vessels, in support of OCS-related activities, are expected to use selected nearshore waters and existing coastal navigation waterways.  Those activities are not anticipated to significantly increase the amount of existing routine helicopter and vessel traffic within the CPA.  Impacts to the Mississippi sandhill crane from helicopter and vessel traffic should, therefore, be minimal.

There are numerous existing laws, regulations, and enforcement guidelines that prohibit and discourage the disposal of solid debris in Gulf waters that can impact listed species and their critical habitats.  For example, BSEE prohibits the disposal of equipment, containers, and other materials into offshore waters by lessees (30 CFR 250.300).  Also, BSEE NTL No. 2015-G03 requires annual awareness training and the posting of placards to minimize the unintentional loss of debris from industry structures or vessels.  BSEE inspectors routinely conduct site visits and issue citations for noncompliance. In addition, MARPOL, Annex V. Public Law 100-220 (101 Statute 1458), which prohibits the disposal of any plastics, garbage, and other solid wastes at sea or in coastal waters, went into effect January 1, 1989, and is enforced by the USCG.  The MDRPR (P .L 109-449) was enacted in December 2006.  The purposes of the MDRPR are to help identify, determine sources of, assess, reduce and prevent marine debris and its adverse impacts on the marine environment and navigation safety; to reactivate the Interagency Marine Debris Coordinating Committee; and to develop a Federal marine debris information clearinghouse.  The MDRPR established, within the NOAA, a Marine Debris Prevention and Removal Program to reduce and prevent the occurrence and adverse impacts of marine debris on the marine environment and navigation safety.  Greatly improved handling of waste and trash by industry, along with the annual awareness training required by the marine debris mitigations, is decreasing OCS-related debris in the ocean and impacts to the Mississippi sandhill crane are, therefore, expected to be negligible.

BOEM/BSEE anticipates minimal effects to air quality associated with OCS oil and gas emissions due to prevailing atmospheric conditions, emission heights and rates, and pollutant concentrations.  Because emissions from OCS-related activities are not likely to impact ambient

43

002797

air quality, effects to the Mississippi sandhill crane from decreased air quality are expected to be negligible.

**Indirect effects**

While oil spills represent the greatest potential impact to coastal and marine bird populations, the Mississippi sandhill cranes preferred habitat is savannahs predominated by wiregrass, with scattered longleaf pine, slash pine, and cypress trees. Because Mississippi sandhill cranes are an interior species and are not know to nest, forage, or rest within coastal habitats, contact with oil is unlikely. In addition, there is a 0.5-1 percent probability that an oil spill > 1,000 barrels originating in the WPA or CPA would occur and contact Mississippi sandhill crane habitat (including critical habitat) within 10 days. There is < 0.5 percent probability that an oil spill >1,000 barrels originating in the EPA would occur and contact Mississippi sandhill cranes and their habitat (including critical habitat). Note again that those probabilities do not include clean-up activities and natural weathering of the spill. The BOEM/BSEE, USEPA, and USCG have regulations, requirements, and recommendations that should prevent or reduce the likelihood of a spill occurring and prevent or reduce impacts to Mississippi sandhill cranes if a spill occurs. This, and the weathering of oil in the environment, should further minimize potential impacts on Mississippi sandhill cranes if a spill occurs.

**Effects summary**

Activities occurring as a result of the proposed action may affect the Mississippi sandhill crane and its critical habitat; however, no direct loss of habitat is anticipated. It is expected that the majority of the effects from the major-impact producing factors (i.e., habitat loss and fragmentation, aircraft and vessel noise and operation, marine debris, and air emissions) are sublethal and infrequent within Mississippi sandhill crane habitat, causing discountable or insignificant effects. The greatest concern is the threat of an oil spill reaching Mississippi sandhill crane nesting habitat during the nesting season. As stated above, however, Mississippi sandhill crane habitat is buffered from coastal habitats and the probabilities, developed by BOEM/BSEE, of an oil spill occurring and contacting habitat where nesting Mississippi sandhill cranes occur are low. Furthermore, contact with habitat does not necessarily mean contact with individuals, therefore, the likelihood of adverse impacts are further reduced. They also overestimate contact probability because they do not account for naturally occurring events such as weathering and activities included in the proposed action (e.g., clean up, and containment). Although the reduction in those probabilities could not be quantified, it is the Service's belief that those reductions make the likelihood of contact extremely low, but not zero.

As discussed earlier, BOEM and BSEE continue to maintain that a low-probability catastrophic spill is not reasonably certain to occur and, therefore, is neither a direct nor an indirect effect of the proposed action. Accordingly, potential impacts to Mississippi sandhill cranes associated with a spill of this magnitude are not addressed in this BO.

44

002798

Manatee distribution and dispersal patterns, and numbers of individuals within an area, can vary considerably from year-to-year and season-to-season.  This variability in dispersal patterns is dependent on a variety of biotic and abiotic factors, such as warm-water discharges, freshwater supplies, high quality feeding areas, and mating season.  During January 2003, there were three aerial surveys covering Florida.  A total of 1,695; 1,814; and 1,705 manatees were observed along the east coast of Florida.

**Factors affecting the species' environment within the action area**

Manatee habitat is being fragmented due to development and ensuing seawalls and boat docks.  Development reduces water quality and increases turbidity.  Seawalls increase lateral scouring of the sea bottom where seagrasses grow.  Boats often scar seagrass beds in shallow water also.

A significant factor affecting manatees within the action area is sublethal injuries due to boat interactions.  On a continued basis, this type of injury could have an impact on maintaining a healthy and viable population.  In that regard, most manatee carcasses examined bear scars from previous strikes with watercraft (Wright et al. 1995), and a significant number of living, but scarred, manatees exist.

**EFFECTS OF THE ACTION**

**Direct effects**

Potential sources of direct impact to the West Indian manatee from the proposed oil and gas activities are the degradation of water quality from operational discharges, noise disturbance from aircraft, collisions with vessel traffic, and effects from trash and debris.

The primary operational waste discharges generated during offshore oil and gas exploration and development are drilling fluids, drill cuttings, produced water, deck drainage, sanitary wastes, and domestic wastes.  During production activities, additional waste streams include produced sand and well treatment, workover, and completion fluids.  Minor additional discharges occur from numerous sources; these discharges may include desalination unit discharges, blowout preventer fluids, boiler blowdown discharges, excess cement slurry, and uncontaminated freshwater and saltwater.  Discharges are regulated by the USEPA's NPDES permits.  Pollutants discharged into navigable waters of the U.S. are regulated by USEPA under the Clean Water Act of 1972 and subsequent provisions (33 U.S.C. §1251 *et seq.*).  Specifically, an NPDES permit must be obtained from USEPA under Sections 301(h) and 403 (45 FR 65953, October 3, 1980) of the Clean Water Act.  Most operational discharges are diluted and dispersed when released in offshore areas, and they are not expected to significantly impact West Indian manatees.

Low-altitude aircraft overflights related to OCS oil and gas operations could affect the West Indian manatee.  Aircraft overflights (either helicopter or fixed-wing) in close proximity to marine mammals may elicit a startle response due to either the increasing noise as the aircraft approaches or due to the physical presence of the aircraft in the air.  Marine mammals often react to aircraft overflights by hasty dives, turns, or other abrupt changes in behavior.  Responsiveness varies widely depending on factors such as species, the activity the animals are engaged in, and

111

002865

water depth (Richardson et al. 1995).  Marine mammals engaged in feeding or social behavior are often insensitive to overflights, while those in confined waters or those with calves may be more responsive.  The effects appear to be transient, and there is no indication that long-term displacement of marine mammals occurs.  However, the absence of conspicuous response does not show that the animals are unaffected; it is not known whether these subtle effects are biologically significant (Richardson and Würsig, 1997).  Aircraft noise is generally short in duration and transient in nature.  Aircraft operations will continue to be numerous in the western and central planning areas, with much more limited activity in the EPA.  FAA Advisory Circular AC 91-36D at 2000 feet encourages pilots to maintain higher than minimum altitudes (noted below) over noise-sensitive areas.  FAA corporate helicopter policy states that helicopters should maintain a minimum altitude of 700 feet while in transit offshore and 500 feet while working between platforms.  In addition, guidelines and regulations issued by NMFS under the authority of the MMPA do include provisions specifying helicopter pilots to maintain an altitude of 1,000 feet within 100 yards of marine mammals.  It is unlikely that manatees would be affected by routine OCS helicopter traffic operating at these altitudes.  Occasional overflights likely will have no significant impact on manatees.

Vessel strikes are the most common cause of human-induced mortality for manatees (FWC 2015b).  While manatees are less common in the western Gulf, they are being seen more frequently and increased sightings indicate that there is a potential for risks to this species from OCS vessel traffic.  The BOEM NTL 2016-G01, "Vessel Strike Avoidance and Injured/Dead Protected Species Reporting," provides minimization measures for vessel strike avoidance and reporting.  Those measures include, but are not limited to:  (1) maintain a vigilant watch for marine mammals and sea turtles and slow down or stop vessel to avoid striking protected species, (2) when sea turtles, small cetaceans, or manatees are sighted, attempt to maintain a distance of 50 yards or greater whenever possible, and (3) reduce vessel speed to 10 knots or less when mother/calf pairs, pods, or large assemblages of cetaceans and manatees are observed near an underway vessel when safety permits.  An individual at the surface may indicate the presence of submerged animals in the vicinity of the vessel; therefore, precautionary measures should always be exercised.  Adherence to the NTL protocols should significantly reduce the potential for impacts to that species from vessel strikes.  In addition, manatees are rare within the CPA and WPA which is the area where most vessel traffic associated with the proposed action occurs, thereby further limiting the potential for adverse impacts to that species.

There are numerous existing laws, regulations, and enforcement guidelines that prohibit and discourage the disposal of solid debris in Gulf waters that can impact listed species and their critical habitats.  For example, BSEE prohibits the disposal of equipment, containers, and other materials into offshore waters by lessees (30 CFR 250.300).  Also, BSEE NTL No. 2015-G03 requires annual awareness training and the posting of placards to minimize the unintentional loss of debris from industry structures or vessels.  BOEM/BSEE inspectors routinely conduct site visits and issue citations for noncompliance.  In addition, MARPOL, Annex V. Public Law 100-220 (101 Statute 1458), which prohibits the disposal of any plastics, garbage, and other solid wastes at sea or in coastal waters, went into effect January 1, 1989, and is enforced by the USCG.  The MDRPR (P .L 109-449) was enacted in December 2006.  The purposes of the MDRPR are to help identify, determine sources of, assess, reduce and prevent marine debris and its adverse impacts on the marine environment and navigation safety; to reactivate the

112

002866

Interagency Marine Debris Coordinating Committee; and to develop a Federal marine debris information clearinghouse.  The MDRPR established, within the NOAA, a Marine Debris Prevention and Removal Program to reduce and prevent the occurrence and adverse impacts of marine debris on the marine environment and navigation safety.  Greatly improved handling of waste and trash by industry, along with the annual awareness training required by the marine debris mitigations, is decreasing. OCS-related debris in the ocean and impacts to the West Indian manatee are, therefore, expected to be negligible.

**Indirect effects**

A potential source of indirect effects to the West Indian manatee would be caused by oil spills.  Those species may be among the more vulnerable species because they forage in intertidal areas.  Ingestion of oil could occur during the feeding process.  Some oiling may occur through direct contact with oiled sediments or waves in the splash zone.

Manatees concentrate their activities in coastal waters often resulting at or just below the surface, which may bring them in contact with spilled oil (St. Aubin and Lounsbury 1990).  Types of impacts to manatees from contact with oil include: asphyxiation due to inhalation of hydrocarbons; acute poisoning due to contact with fresh oil; lowering of tolerance to other stressors due to the incorporation of sublethal amounts of petroleum components into body tissue; nutritional stress through damage to food sources; and inflammation or infection and difficulty eating due to oil sticking to the sensory hairs around their mouths (Preen 1989, Sadiq and McCain 1993, Australian Maritime Safety Authority 2003).  Direct contact with oil likely does not impact adult manatees' thermoregulation abilities because they use blubber for insulation.  Also, they exhibit no grooming behavior that would contribute to ingestion (Service 2006b).  Manatees are nonselective, generalized feeders that might consume tarballs along with their normal food, although such occurrences have been rarely reported (review of St. Aubin and Lounsbury 1990).  A manatee might also ingest fresh petroleum, which some researchers have suggested might interfere with the manatee's secretory activity of their unique gastric glands or harm intestinal flora vital to digestion (Geraci and St. Aubin 1980; Reynolds 1980).  Spilled oil may also affect the quality or availability of aquatic vegetation, including seagrasses, upon which manatees feed.

There have been no experimental studies and only a handful of observations suggesting that oil has harmed any manatees (St. Aubin and Lounsbury 1990), although for a population under pressure from other mortality factors (e.g., vessel strikes), even a localized incident could be significant (St. Aubin and Lounsbury 1990).  Oil spills that may occur from OCS energy activities that reach the coast or the confines of preferred river systems and canals, particularly during winter (when the animals are most vulnerable physiologically), could further endanger local populations.  The physiological costs of animals moving to colder waters to escape oiled areas may result in thermal stress that would exacerbate the effects of even brief exposure to oil (St. Aubin and Lounsbury 1990).

Spill-response activities that may impact manatees include increased vessel traffic, use of dispersants, and other remediation activities (e.g., controlled burns, skimmers, booms, etc.).  The increased human presence after an oil spill (e.g., vessels) would likely cause changes in behavior

113

002867

and/or distribution, thereby potentially stressing manatees further and perhaps making them more vulnerable to various physiologic and toxic effects of spilled oil.  In addition, the large number of response vessels could place manatees at a greater risk of vessel collisions, which could cause fatal injuries.  Vessel noise would also increase as a result of increased vessel activity and could result in behavioral changes in some individuals.

Remediation activities that could impact manatees include the use of skimmers, booms, and controlled burns.  Impacts from skimmers could be through capture and/or entrainment.  Booming operations could potentially impact marine mammals, particularly manatees, as they are known to explore and interact with objects in their environment (Hartman 1979).  Lines used to anchor booms are more likely that the boom itself to impact manatees if the booms are deployed in manatee habitat.  Controlled burns could impact manatees if they were in the burning oil; however, it is expected that animals would avoid the area once it is ignited.  In both skimming and controlled burning activities, the use of trained observers is common and reduces the likelihood of impacts to marine life.

Spill-response activities may include the application of dispersant chemicals to the affected area.  Dispersant chemicals are designed to break oil on the water's surface into droplets, which breakdown in seawater.  Virtually nothing is known directly about the effects of oil dispersants on manatees, except that presumably removing oil from the surface would reduce the risk of contact and render it less likely to adhere to the skin, baleen plates, or other body surfaces (Neff 1990).  Impacts from dispersants are unknown but may be irritants to manatees.

According to the OSRA, there is a less than a 0.5 percent probability that an oil spill >1,000 barrels would occur and contact manatees and their habitat within 10 days in the EPA (note again that those probabilities do not include clean-up activities and natural weathering of the spill).  The occurrence of manatees in the coastal central and western Gulf of Mexico waters is rare, therefore, significant impacts to that species in the CPA and WPA are not anticipated.  The BOEM/BSEE, USEPA, and USCG have regulations, requirements, and recommendations to prevent or reduce the likelihood of a spill occurring and prevent or reduce impacts to West Indian manatees if a spill occurs.  Those measures, and the weathering of oil in the environment, should significantly minimize potential impacts on West Indian manatees if a spill occurs.  Indirect impacts to critical habitat could result from contact by spilled oil if a spill were to occur.  As discussed above, there is a low probability of oil, spilled as a result of the proposed action, contacting areas where critical habitat has been designated.

**Effects summary**

For reasons discussed above, it is expected that the majority of the effects from the major-impact producing factors (i.e., degradation of water quality from operational discharges, noise disturbance, collisions with vessel traffic, and effects from trash and debris) would be sublethal (causing discountable or insignificant effects) or would be unlikely to occur.  The greatest threat to manatees associated with OCS oil and gas development is oil spills.  This species may be among the more vulnerable species because they forage in intertidal areas.  Although the probability of an oil spill reaching manatee habitat is very small, it is a concern. The probabilities, developed by BOEM/BSEE, of an oil spill occurring and contacting habitat

114

002868

(including critical habitat) where manatees occur overestimate contact probability because they do not account for naturally occurring events such as weathering and activities included in the proposed action (e.g., clean up, containment, etc.). Although the reduction in those probabilities could not be quantified, it is the Service's belief that those reductions make the likelihood of contact extremely low. In addition, because contact with habitat does not necessarily mean contact with the individual, the likelihood of incidental take is not reasonably certain to occur. If a spill were to occur, the adverse effects that might occur to that critical habitat would be temporary in nature and are of low probability.

As discussed earlier, BOEM and BSEE continue to maintain that a low-probability catastrophic spill is not reasonably certain to occur and, therefore, is neither a direct nor an indirect effect of the proposed action. Accordingly, potential impacts to manatees associated with a spill of this magnitude are not addressed in this BO.

**CUMULATIVE EFFECTS**

Cumulative effects include the effects of future state, tribal, local or private actions that are reasonably certain to occur in the action area considered in this biological opinion. Future federal actions that are unrelated to the proposed action are not considered in this section because they require separate consultation pursuant to section 7 of the Act. Four major activities are reasonably certain to occur within the action area: 1) commercial and recreational fishing, 2) release of marine debris and trash from commercial and recreational vessels related/unrelated to the offshore oil and gas industry, 3) transportation of imported oil and other petroleum products, and 4) coastal development for human communities and recreation.

The GOM provides nearly 21 percent (in weight and value) of the commercial fish landings in the continental U.S. Most commercial species harvested from federal waters of the GOM are considered to be at or near overfished conditions. Continued fishing at the present levels may result in rapid declines in commercial landings and eventual failure of certain fisheries. Recreational fishing is a major recreational activity occurring in Federal waters and associated with oil and gas platforms. The northern GOM coastal zone is one of the major recreational regions of the U.S. for marine fishing. Nearly all species significant to the GOM's commercial and recreational catches are estuarine-dependent. Impacts to the estuarine ecosystem include inshore water quality degradation, loss of wetlands, and natural catastrophes (hurricanes). Fishery Management Plans are developed by the GOM Fishery Management Council to assess and manage commercial and recreational species of fish harvested from federal waters and in need of conservation (MMS 1997). NMFS is the Federal agency responsible for regulating the commercial fishing industry and recreational fishing within these waters, and uses the management plans to implement those regulations.

Over the last several years, companies have employed waste reduction and improved waste-handling practices to reduce the amount of trash offshore that could potentially be lost into the marine environment. Improved waste management practices have resulted in a marked decline in accidental loss of trash and debris (MMS 2002). In accordance with MARPOL Annex V, all ships and watercraft (including all commercial and recreational vessels) are limited in the type

115

002869

Inshore spill events have the greatest likelihood of impacting coastal estuary and bay shoreline habitats used by plovers or nesting brown pelicans.  Large inshore spills would occur primarily from tankers and barges while at dock or during intracoastal transport of crude oil and petroleum products in barges and pipelines.

Extensive refinery capacity, easy port access, and a well-developed transportation system have contributed to the development of the Gulf Coast region as an important center for handling oil to meet the world's energy needs.  Both petroleum products and crude oil are imported and exported.  To handle the large quantities of crude and petroleum products that enter and exit the GOM and to meet the Gulf States' energy needs, a tremendous amount of coastwide transport of oil occurs.  The greater chance and larger spill volumes of spills occurring from imports, and intracoastal transportation of crude and refined petroleum products, present a concern for impacts to listed species.

**CONCLUSION**

For spill sizes ranging from 900,000 to 7.2 million barrels (estimated by BOEM/BSEE to qualify as a catastrophic spill for analytical purposes) the frequency range is between 1 in every 10,000 wells drilled to 1 in every 100,000 wells drilled.  The Deepwater Horizon spill of 4.9 million barrels is closer in order of magnitude to the 1 in 100,000 wells drilled frequency.  Ji et al. (2014) estimates the return period of a catastrophic oil spill in the OCS area to be approximately 165 years, with a 95% confidence interval between 41 and more than 500 years.  Accordingly, BOEM/BSEE continue to maintain that a catastrophic spill is neither a direct nor indirect effect of the proposed action because a spill of that magnitude is not reasonably certain to occur over the project life.  BOEM/BSEE anticipate that the most frequent spills associated with OCS oil and gas activities are generally less than 1 barrel in size.  These spills are so small and of short duration that impacts to federally listed species are expected to be insignificant.  As the more reasonably expected spill size increases (to the largest category of greater than 10,000 barrels in size), BOEM/BSEE has determined that up to one spill of this size is likely to occur over the 40-year period analyzed.

After reviewing the current status of the above species and critical habitat, the environmental baseline for the action area, the effects of the proposed oil and gas lease sale, and the cumulative effects, it is the Service's BO that the proposed leasing, exploration, development, production, and abandonment activities for existing and proposed WPA, CPA, and EPA Gulf of Mexico Planning Areas under the leasing and regulatory authorities of BOEM/BSEE are not likely to jeopardize the continued existence of the listed species under the Service's jurisdiction and are not likely to destroy or adversely modify their designated critical habitat, if any.  In evaluating the potential that this action constitutes destruction or adverse modification of critical habitat, the Service has evaluated whether the action will appreciably diminish the value of the designated critical habitat for the recovery of the listed species.  For each species with designated critical habitat, the adverse effects that may occur to that critical habitat would be temporary in nature and are of low probability.

002871