# EXHIBIT 4:

## U.S. Fish and Wildlife Service's
## 2025 Consultation




# United States Department of the Interior

FISH AND WILDLIFE SERVICE
200 Dulles Drive
Lafayette, Louisiana 70506

March 28, 2025

Dr. Agatha-Marie Kaller
Regional Supervisor for Environment
Bureau of Ocean Energy Management
New Orleans Office
1201 Elmwood Park Boulevard
New Orleans, Louisiana 70123

Mr. Tommy Broussard
Regional Environmental Officer
Office of Environmental Compliance
Gulf of Mexico OCS Region
Bureau of Safety & Environmental Enforcement
1201 Elmwood Park Boulevard
New Orleans, Louisiana 70123

SUBJECT:    Reinitiation of Endangered Species Act consultation for proposed oil and gas leasing, exploration, development, production, decommissioning, and all related activities in the Gulf of America

Dear Dr. Kaller and Mr. Broussard:

Please reference the Bureau of Ocean Energy Management's (BOEM) and Bureau of Safety and Environmental Enforcement's (BSEE) (collectively, the Bureaus) March 6, 2024, request to reinitiate informal consultation under Section 7 of the Endangered Species Act (ESA), as amended (87 Stat. 884, as amended; 16 U.S.C. §§ 1531 et seq.). The Bureaus reviewed new information related to the Fish and Wildlife Service's (Service) April 20, 2018, programmatic biological opinion (2018 BiOp) on proposed oil and gas leasing, exploration, development, production, decommissioning, and all related activities in the Gulf of America (Gulf) Outer Continental Shelf (OCS) within existing leased areas and those areas proposed for future leasing in the Eastern Planning Area (EPA), the Central Planning Area (CPA), and the Western Planning Area (WPA). On December 20, 2024, the Service requested additional clarification and information regarding this consultation which was provided by the Bureaus on February 5, 2025.

The 2018 BiOp consultation considered all activities associated with the oil and gas program occurring in areas under Federal jurisdiction in the EPA, CPA, and WPA. The geographic scope includes all areas under Federal jurisdiction in the WPA, and the areas of the CPA and small portions of the EPA that are not currently withdrawn from leasing. The action area for this consultation includes the Federal OCS waters in the Gulf, as well as coastal areas, ports, airspaces, and waterways used by transport vessels related to coastal infrastructure, fabrication sites, and pipelines connecting to the offshore pipeline system, and other estuarine and marine areas affected directly and indirectly by the proposed action.

While the Bureaus identified new information that "may affect listed species or critical habitat in a manner or to an extent not previously considered," and that became available following the issuance of the 2018 BiOp, it was determined this new information does not change the

037281

conclusions in the 2018 BiOp. Assessment of the new information found that it supports the previous conclusions or was largely already considered in the previous analysis; thus, concurrences in the 2018 BiOp remain valid.

New information available since the 2018 BiOp includes the listing of the black-capped petrel (*Pterodroma hasitata*) and proposed critical habitat designations for the rufa red knot (*Calidris canutus rufa*) and green sea turtle (*Chelonia mydas*). The Bureaus are now requesting concurrence with their determination that the proposed action is not likely to adversely affect the endangered black-capped petrel and proposed critical habitat for the threatened rufa red knot, and the proposed action will have no effect on the proposed critical habitat for the threatened green sea turtle North Atlantic distinct population segment (DPS). New information regarding threatened green, threatened loggerhead (*Caretta caretta*), and endangered Kemp's ridley (*Lepidochelys kempii*) sea turtles nesting on the Chandeleur Islands (2022-2025) is also analyzed in this consultation.

**Additional Clarification and Information**

*Greenhouse Gas Emissions*

In our December 20, 2024, request for additional clarification and information, the Service asked if the Bureaus could clarify whether and how the effects of any potential greenhouse gas emissions (GHG), including emissions resulting from the subsequent use of OCS oil and gas produced by activities covered in this consultation, were considered. Pursuant to the definition of "effects of the action" in 50 C.F.R § 402.02, "a consequence is caused by the proposed action if it would not occur *but for* the proposed action *and it is reasonably certain to occur*" (emphasis added). In the Bureaus' February 5, 2025, letter, they stated that they are unable to determine that GHG emissions from the proposed action are reasonably certain to cause consequences to listed species because existing global climate models cannot attribute local or regional effects to an area from GHG emitted from particular areas (such as the Gulf) or specific oil and gas wells. Furthermore, accumulated and persisting GHG emissions already in the atmosphere and the annual volume of GHG emissions will occur globally regardless of whether a particular Bureau lease sale is held, or plan or permit is approved.

The economics of oil markets are multifaceted, especially considering that oil and gas are a worldwide commodity affected by complex forces, such as but not limited to geopolitical events, severe weather, and OPEC pricing (U.S. Energy Information Administration (USEIA) 2023). Supply sources of oil and production capacity are fixed in the near term, as it takes some time to develop new ones (USEIA 2023). Demand in petroleum does not necessarily decrease following price changes, in part because the world's transportation systems heavily rely on petroleum products (USEIA 2023). Moreover, because markets will eventually adjust to changes in supply, reduction in petroleum production from sources in the Gulf would eventually be replaced by other sources, especially as worldwide demand for oil grows as a result of economic development (USEIA 2023). Impacts to listed species from global warming caused by GHG emissions are expected to occur, but they will occur with or without the proposed action.

Furthermore, there are numerous other influences on total GHG emissions, certainly in the U.S., beyond petroleum production, which will likewise influence future emissions, making them difficult to predict. At the global level, predictions would be even more challenging. In addition, sources other than petroleum-related ones emit GHGs, such as agriculture and industry, and changes in these sources' emissions also need to be factored in (Environmental Protection Agency 2025). Moreover, in the U.S., land use, land-use change, and forestry are a net sink, absorbing carbon dioxide from the atmosphere and offsetting 13 percent of total gross GHG emissions (Environmental Protection Agency 2025). "Since 1990, gross U.S. greenhouse gas emissions have decreased by just over 3 percent" (Environmental Protection Agency 2025). While GHG emissions in the U.S. are trending downward, past results do not necessarily dictate future ones. This discussion demonstrates the complexity and multifaceted nature of oil economics, its influence on U.S. GHG emissions, and therefore the attenuated causal chain between emissions from Gulf sources (the proposed action) and effects of any resulting GHGs on species in the action area. As a result, the Service concurs that potential effects of GHG emissions are not consequences that occur "*but for* the proposed action." 50 C.F.R § 402.02 (emphasis added).

*Sea Level Rise*

The Service also asked the Bureaus to clarify whether or to what extent the proposed action could lead to sea level rise that results in potential effects to nesting sea turtles, beach mice, or other threatened or endangered species. The Bureaus responded that sea level rise is a consequence of global warming, mostly driven by the thermal expansion of warming ocean waters and the influx of water from melting glaciers and ice sheets, as well as other regional processes (Sweet et al. 2022). Sea level rise in the Gulf is influenced by both global and regional processes, such as subsidence. Therefore, it is difficult to isolate the contribution of oil- and gas-related activities in the Gulf to sea level rise due to the interconnectedness of these activities in both a global and regional context. While the Gulf Coast is vulnerable to rising sea levels, these effects are driven more by climate patterns and regional processes, than by oil- and gas-related activities (Sweet et al. 2022). Oil- and gas-related activities in the Gulf represent a small fraction of global GHG emissions, and as noted above, those global emissions will continue to exacerbate global warming. This will result in sea level rise regardless of the proposed action, so impacts to listed species will occur independently of the proposed action. Therefore, the Bureaus concluded that sea level rise and resulting impacts from the proposed action do not meet the "*but for*" requirement outlined in 50 C.F.R § 402.02 (emphasis added).

In addition, the Service considered potential global warming effects to coastal habitats for listed species within the Gulf. Over the past 100 years, the globally averaged sea level has risen approximately 3.9 to 9.8 inches (Rahmstorf et al. 2007), a rate that is an order of magnitude greater than that seen in the past several thousand years (Douglas et al. 2001 as cited in Hopkinson et al. 2008). Potential effects of sea level rise on coastal beaches may vary regionally due to subsidence or uplift as well as the geological character of the coast and near-shore habitats (Galbraith et al. 2002). In the last century, for example, sea level rise along the U.S. Gulf Coast exceeded the global average by 5.1 to 5.9 inches because coastal lands west of Florida are subsiding (Environmental Protection Agency 2015), and sediment compaction and oil and gas extraction compound tectonic subsidence (Penland and Ramsey 1990; Morton et al. 2003;

Hopkinson et al. 2008). Low elevations and proximity to the coast make all coastal habitats vulnerable to the effects of rising sea level. Furthermore, areas with small astronomical tidal ranges (e.g., portions of the Gulf Coast where intertidal range is less than 1 meter) are the most vulnerable to loss of intertidal wetlands and flats induced by sea-level rise (Environmental Protection Agency 2015). Mapping by Titus and Richman (2001) showed that more than 80 percent of the lowest land along the Atlantic and Gulf coasts was in Louisiana, Florida, Texas, and North Carolina.

However, as noted above, it is difficult to isolate the contribution of oil- and gas-related activities in the Gulf to sea level rise due to global warming and subsidence on both a global and regional scale. Accordingly, the Service concurs with the Bureaus' determination that the impacts of sea level rise are occurring beyond the activities of the proposed action and do not meet the "*but for*" requirement outlined in 50 C.F.R § 402.02 (emphasis added).

*Artificial Lighting*

In the Service's December 20, 2024, letter, the Bureaus were also asked to clarify whether or to what extent lighting on offshore oil and gas platforms and applicable infrastructure affects listed species. The following paraphrases the information in their February 5, 2025, letter:

> For safety and operations, artificial lighting is required on offshore oil and gas platforms and other infrastructure. This artificial lighting could cause potential effects such as species attraction, avoidance, changes in migration patterns, or changes in predator/prey interactions (Marangoni et al. 2002). However, due to the distance from shore, artificial lighting on OCS platforms and infrastructure is not expected to impact federally listed species under the Service's jurisdiction whose habitat includes inland and/or coastal waters, beaches, barrier islands, and/or marsh (i.e., piping plovers, sea turtle hatchlings, etc.). While there is evidence that the rufa red knot cross Gulf waters while migrating, their response to artificial lighting is not known (Russell 2005; Perkins 2023; USFWS 2014). Based on documented Gulf crossing locations for the rufa red knot, there is minimal overlap with BOEM regulated oil- and gas-related activity on the OCS.

Based on that information, the previous conclusions for the rufa red knot from the 2018 BiOp does not change. The only listed species under the Service's jurisdiction that could be impacted by OCS lighting is the black-capped petrel and will be further discussed in the Effects Analysis section below.

*Updated Oil Spill Risk Assessment*

The Service also considered the risks of oil spills to listed species. In the March 6, 2024, reinitiation letter, the Bureaus provided a discussion titled Updated Oil Spill Risk Assessment and the 2023 Oil Spill Risk Assessment (OSRA). The 2018 BiOp assessed the potential risk of an oil spill based on results from a previous OSRA for the Gulf (Ji et al. 2017). The reinitiation letter explains that the Bureaus reviewed the updated OSRA and found no information that would alter the previously reached conclusions for federally listed species under the Service's jurisdiction in the Gulf. The updated OSRA shows that while oil spill rates from OCS platforms remained the same between 1996-2010 and 2000-2015, rates of spills from OCS pipelines and OCS tankers decreased (Anderson et al. 2012; ABS 2016). While coastal waters of the action

area are expected to be impacted by frequent small spills, according to the updated OSRA, the probability that an oil spill greater than or equal to 1,000 barrels is less than 0.5 to 4 percent (Ji and Schiff 2023). According to Ji et al. (2014), the probability of a catastrophic oil spill (over 1 million bbl) is low, and the Bureaus determined that it is not reasonably certain to occur.

In reviewing the Bureaus' updated OSRA, the Service analyzed National Response Center (NRC) spill reports for this fiscal year (beginning October 1, 2024) up to March 20, 2025, that were forwarded to the Louisiana Ecological Services Office by the Office of Environmental Policy and Compliance (OEPC) to determine whether the results of the OSRA are reasonable. Approximately 110 NRC reports were reviewed for spills in Louisiana (86 percent), Mississippi (10 percent), and Arkansas (3 percent). Of the 110 reports reviewed, 45 reports were for incidents within the Gulf, with two in Mississippi, five in federal waters, and the rest in Louisiana state waters. Approximately 60 percent of the 110 reports required further coordination with various partners to determine the extent of potential impacts to federally listed species and critical habitat, regardless of spill amounts. Of those 60 percent, a subset of 25 percent required some level of technical assistance to or informal consultation with the U.S. Coast Guard (USCG) regarding potential effects to federally listed species and critical habitat as a result of the USCG's response actions to the spills. Due to partner cooperation, technical assistance, implementation of conservation measures, relatively small spill amounts, and most incidents not occurring in suitable habitat for federally listed species within the Service's purview, the USCG's response actions to those incidents did not require formal consultation for Arkansas, Louisiana, and Mississippi. Furthermore, the Service has not had to conduct formal consultation with the USCG for spill response actions this fiscal year within other Gulf states. (Note: the Service consults with the USCG on their response actions to clean up spills, but not on the illegal releases themselves.) None of those releases have resulted in high risks of impacts to federally listed species or their critical habitat within the Service's purview. Accordingly, based on the Service's experience with reviewing NRC spill reports, the revised OSRA oil spill probabilities are reasonable.

Based on our review of the Bureaus' information, as well as our knowledge of and experience with reviewing NRC reports for spills occurring along the Gulf coast, the Service finds that the previously reached conclusions for federally listed species in the 2018 BiOp are still valid. Impacts of the proposed action to the species covered under the reinitiation will be further discussed in the Effects Analysis section below.

**Effects Analysis**

*Black-capped Petrel*

The black-capped petrel, listed as endangered under the ESA as of January 29, 2024, nests on the island of Hispaniola and spends the rest of its life at sea (USFWS 2023a). The occurrence of the species in the northern Gulf has been confirmed by recent studies, extending the known range of the species to include the northern Gulf (Jodice et al. 2021). A portion of the black-capped petrel's range extension overlaps with the action area; the majority of the species' range is in the eastern Gulf and concentrated in the EPA with only a small number of observations west of the Mississippi River. OCS oil- and gas-related activity in the eastern Gulf is generally low, reducing the overall potential for interaction with the species.

Artificial lighting and infrastructure used for safety and operations on OCS platforms have the potential to impact the black-capped petrel. While inexperienced fledglings and juveniles are sensitive to artificial lighting (USFWS 2023a), the closest known nesting area is on the island of Hispaniola in the Caribbean Sea, which is not located within the proposed action area for Bureau-regulated oil- and gas-related activities. Adult black-capped petrels forage and migrate offshore and are known to occur on the OCS, to which lighting could result in disorientation, collisions, and wasting of energy; however, lighted platforms could also provide foraging opportunities with attraction of prey (Van de Lar 2007; Simons et al. 2013; Ronconi et al. 2015; Marangoni et al. 2022). Offshore observations have shown that migrating or foraging adult petrels mostly occur in the eastern region of the Gulf, predominantly outside areas of Bureau-related oil- and gas-related activity (Jodice et al. 2021). Thus, the opportunity for petrels to be impacted by artificial lighting is insignificant.

Low-altitude aircraft overflights could disturb black-capped petrels during foraging and resting periods; however, the Service, Federal Aviation Administration (FAA), National Park Service, and Bureau of Land Management have an Interagency Agreement to reduce low-level flights over natural resource areas for wildlife and sensitive ecosystems. The recommended minimum flight altitude is 2,000 feet above ground level. The FAA (FAA Advisory Circular 91-36C) and corporate helicopter policy also states that helicopters must maintain a minimum altitude of 700 feet while in transit offshore and 500 feet while working between platforms. According to Haney (1987), black-capped petrels fly at altitudes ranging from the surface of the sea to approximately 100m (328ft) above sea level.  Due to low OCS-related activity in the areas used by black-capped petrels and the low altitude of flight for black-capped petrels, impacts from helicopter and vessel traffic should be insignificant.

The Outer Continental Shelf Lands Act (OCSLA; 43 U.S.C. § 1334(a)(8)) requires the Secretary of the Department of the Interior to promulgate and administer regulations that comply with National Air Quality Standards pursuant to the Clean Air Act (CAA; 42 U.S.C. §§ 7401 et seq.), to the extent that authorized activities significantly affect the air quality of any state. The Environmental Protection Agency Administrator has jurisdiction in OCS areas in the Gulf eastward of 87.5 degrees west (°W) longitude. The BOEM implementing regulations in 30 C.F.R. § 550 Subpart C apply to those air emission sources in the Gulf westward of 87.5°W longitude. The Bureaus anticipate minimal effects to air quality associated with OCS oil and gas emissions due to prevailing atmospheric conditions, emission heights and rates, and pollutant concentrations. Emissions from OCS-related activities are not likely to impact ambient air quality offshore; therefore, any potential impacts to the black-capped petrel from decreased air quality is expected to be insignificant.

Produced water is an operational discharge containing hydrocarbons, trace heavy metals, radionuclides, sulfates, treatment chemicals, and produced solids that represents most of the waste discharged from offshore oil extraction production facilities (Veil et al. 2004; Welch and Rychel 2004). Operational discharges or runoff in the offshore environment could affect seabirds that remain and feed in the immediate vicinity of offshore OCS structures and platforms (Wiese et al. 2001; Burke et al. 2005). Routine discharges are restricted and regulated, including under the Clean Water Act through the Environmental Protection Agency's National Pollutant Discharge Elimination System permits and USCG regulations. Impacts of produced waters on the black-capped petrel is expected to be discountable and undetectable due to compliance with these mitigating regulations which are required by law.

037286

Black-capped petrels foraging or resting in the action area could potentially be exposed to hydrocarbon releases during accidental oil spills; however, based on the 2023 OSRA, the probability that an oil spill greater than or equal to 1,000 barrels is less than 0.5 to 4 percent (Ji and Schiff 2023) and probability of direct contact with an individual is unlikely because less than five percent of prime marine habitat for the black-capped petrel overlaps with the oil and gas platforms in the Gulf and due to the rare occurrence of the species within the action area (USFWS 2023a; Michael et al. 2022). Furthermore, accidental spills are considered an illegal release, and the Service does not consult on illegal actions. Should the USCG need to conduct response actions for an illegal release, the USCG would consult with the Service regarding those response actions at that time.

Black-capped petrels forage out in the open ocean and while they are not usually attracted to feeding activities or assemblages of marine mammals, they have been shown to be attracted to chum. Perceiving other waste discarded from ships and fishing vessels to be chum, they may be attracted to the waste when there are times of low or unpredictable natural food abundance (USFWS 2023a; Simons et al. 2013). According to the Bureaus' letter, numerous laws, regulations, and enforcement guidelines prohibit and discourage the disposal of marine trash and debris in Gulf waters. The improved handling of waste and trash by industry, along with annual awareness training required by the marine debris mitigation conditions, is decreasing OCS-related debris in the Gulf and impacts to the black-capped petrel. Based on this information, the Service concurs with your determination that the proposed action is not like to adversely affect the black-capped petrel in the Gulf.

*Proposed Critical Habitat for the Rufa Red Knot*

Migration and wintering ranges for the rufa red knot include all Gulf states. Critical habitat was proposed for the rufa red knot on July 15, 2021, along the U.S. east and Gulf coasts (USFWS 2021) including along the coasts of Texas, Louisiana, Mississippi, Alabama, and Florida, all of which are within the action area. The physical and biological features of proposed critical habitat for red knot include: 1) beaches and tidal flats used for foraging; 2) upper beach areas used for roosting, preening, resting, or sheltering; 3) ephemeral and/or dynamic coastal features used for foraging or roosting; 4) ocean vegetation deposits or surf-cast wrack used for foraging and roosting; 5) intertidal peat banks used for foraging and roosting; 6) features landward of the beach that support foraging or roosting; and 7) artificial habitat mimicking natural conditions or maintaining the physical or biological features 1 to 6 (USFWS 2021).

Consistent with the 2018 BiOp, necessary onshore facilities to support offshore oil and gas activities are already in place, and no major new facilities are anticipated as a result of the proposed lease sales. No new navigation channels are expected to be dredged and no new onshore infrastructure, except for possibly a few pipeline crossings, is expected to result from the proposed activities. Any proposed pipeline installations would require a Department of the Army permit from the U.S. Army Corps of Engineers (USACE), and the USACE would be required to conduct ESA consultation with the Service for those specific activities.

Aircraft traffic, marine trash and debris, and routine discharges may impact proposed critical habitat, but those activities already exist as part of the environmental baseline and would not increase in volume or intensity to such an extent that it would detrimentally affect proposed

critical habitat. Given the guidelines for aircraft flight height and the expected air traffic from the proposed action, impacts to proposed critical habitat are expected to be discountable. Compliance with the numerous existing laws, regulations, and enforcement guidelines that prohibit and discourage the disposal of marine trash and debris in Gulf waters would result in discountable impacts to proposed critical habitat. Additionally, given required compliance with the Clean Water Act and USCG regulations, routine discharges will have an insignificant impact on proposed critical habitat.

Minimal effects to air quality associated with OCS oil and gas emissions due to prevailing atmospheric conditions, emission heights and rates, and pollutant concentrations are anticipated; thus, emissions from OCS-related activities are not likely to impact ambient air quality and any potential impacts to proposed critical habitat would be insignificant. Emissions from routine activities are transitory, diffuse rapidly, and are of limited extent compared to the entire northern Gulf, making impacts to proposed critical habitat insignificant or discountable. Direct impacts or permanent modification to proposed critical habitat as a result of potential oil spills is not anticipated due to the low probability of an oil spill occurring and contacting this habitat. No direct loss or permanent modification of rufa red knot proposed critical habitat is anticipated because of the proposed action. Furthermore, accidental spills are considered an illegal release, and the Service does not consult on illegal actions. Should the USCG need to conduct response actions for an illegal release, the USCG would consult with the Service regarding those response actions at that time. Based on this information, the Service concurs with the Bureaus' determination that the proposed action is not likely to adversely affect or result in the destruction or adverse modification of proposed critical habitat for the rufa red knot.

*Proposed Critical Habitat for the Green Sea Turtle*

The Service proposed critical habitat for five DPSs of the green sea turtle on July 19, 2023. The proposed critical habitat includes some areas within the action area in coastal Florida for only the North Atlantic DPS green sea turtle (USFWS 2023b) – specifically, on beaches on Florida's Gulf Coast. The Bureaus are not aware of any projects that have impacted essential features of proposed critical habitat for the green sea turtle. Consistent with the 2018 BO, the necessary onshore facilities to support offshore oil and gas activities are already in place and no major new facilities are anticipated as a result of the proposed action. There are no new navigation channels that are expected to be dredged and no new onshore infrastructure except for very few pipeline crossings that are expected to result from the proposed activities in Florida. No new coastal infrastructure is expected in Florida, as the majority of OCS oil and gas activity occurs in the WPA and CPA. Regarding the risk of oil spills on proposed critical habitat for green sea turtles along Florida beaches, the probability of oil from a spill reaching it is projected to be less than 0.5 percent (Ji and Schiff 2023). Furthermore, accidental spills are considered an illegal release, and the Service does not consult on illegal actions. Should the USCG need to conduct response actions for an illegal release, the USCG would consult with the Service regarding those response actions at that time.

Activities associated with the proposed action will not affect the ability of any of the physical or biological features of proposed critical habitat to perform their function, and none of the activities have the potential to affect waterbodies and adjacent nesting sites. Based on this information, the Service agrees that the proposed action is not likely to adversely affect proposed critical habitat for green sea turtles of the North Atlantic DPS.

037288

*New information on Kemp's ridley, loggerhead, and green sea turtles*

The Kemp's ridley sea turtle has a restricted distribution with the majority of nesting occurring on beaches of the western Gulf and 95 percent of worldwide nesting occurring in the state of Tamaulipas, Mexico. On a smaller scale, nesting also occurs in Veracruz, Mexico, and in Texas with occasional nesting being documented in North Carolina, South Carolina, Georgia, Florida, and Alabama (National Marine Fisheries Service (NMFS) 2024a).

The Northwest Atlantic Ocean DPS of loggerhead sea turtle nests primarily along the Atlantic coast of Florida, South Carolina, Georgia, and North Carolina and along the Florida and Alabama coasts of the Gulf. The total estimated nesting in the U.S. is more than 100,000 nests per year (NMFS 2024b).

Green sea turtles occur worldwide and nest in over 80 countries (NMFS 2025). In the U.S., the green sea turtle nests in the Hawaiian Islands, U.S. Pacific Island territories, Puerto Rico, the Virgin Islands, Florida, Georgia, South Carolina, North Carolina, and Texas (NMFS 2025).

New information regarding the turtles' presence on the Chandeleur Islands has come available. Kemp's ridley and loggerhead nests were confirmed on the Chandeleur Islands off the coast of Louisiana in 2022 (Lamont et al. 2023). Since our request to the Bureaus for clarification, green sea turtle nests have also been confirmed on the Chandeleur Islands (Baker et al. 2025); thus, the Service is also addressing that species. While historic records suggest sea turtles have nested on the Chandeleur Islands for decades, nesting had not been documented on the islands since 1977 (Ogren et al. 1989). Lamont et al. (2023) indicates that the Kemp's ridley and loggerhead have expanded their nesting range in the Gulf; however, consistent use of these islands or other areas in Louisiana and Mississippi has yet to be confirmed.

Garrison et al. (2020) found that dive-surface behaviors for Kemp's ridleys in the northern Gulf indicated important seasonal, diurnal, and spatial effects on the time available at the surface. The study also found that loggerheads in the northern Gulf were typically found in shallow water in the late spring-early summer, then migrated into deeper water during fall and/or winter months. A study by Gredzens and Shaver (2020) tracked post-nesting Kemp's ridley sea turtles from beaches in Texas and Mexico. The authors evaluated the proportion of nesting females from each nesting beach and estimated that up to 82 percent of adult female Kemp's ridley sea turtles may use the northern Gulf, particularly waters shoreward of the 100-meter isobath, as their primary foraging area post-nesting.

A study by Hart et al. (2020) identified high-use foraging sites for loggerhead turtles in the northeastern Gulf, specifically the Big Bend region off the northwest Florida coast. This region was found to be an important year-round foraging site for loggerheads from several DPSs. The neritic waters west of Florida and in the Florida Straits were identified as high-use migration corridors for post-nesting female adult loggerhead turtles in the Gulf (Iverson et al. 2020).

The overall nesting range for the green sea turtle North Atlantic DPS is vast, and turtles spend the majority of their lives foraging in fairly shallow coastal waters of both open coastline and protected bays and lagoons (NMFS 2015). The green sea turtle is an herbivorous species that relies on marine algae and seagrass as their primary diet, and their marine habitats are often

037289

highly dynamic areas with annual fluctuations in water and air temperatures (NMFS 2015). While natural oscillations of environmental conditions affect food availability and abundance, a better understanding is needed concerning how environmental variability influences green sea turtle migration and reproduction (NMFS 2015).

The greatest concern regarding nesting sea turtles is the threat of an oil spill reaching nesting habitat during the nesting season. This new information concerning sea turtle nesting on the Chandeleur Islands does not change the existing general information, determinations, and conclusions for these species of sea turtles within the 2018 BiOp, which addressed the threat of spills oiling nesting habitat. Furthermore, accidental spills are considered an illegal release, and the Service does not consult on illegal actions. Should the USCG need to conduct response actions for an illegal release, the USCG would consult with the Service regarding those response actions at that time. Accordingly, the Service's concurrence that the proposed action is not likely to adversely affect nesting sea turtles and their nests remains valid.

*Summary*

Based on our review of the proposed action and new information, the new information does not change the conclusions of the 2018 BiOp. Regarding new listings, critical habitats, and proposed rules, the Service concurs with the Bureaus' determinations that the routine activities associated with the proposed action in the 2018 BiOp are not likely to adversely affect the black-capped petrel and not likely to destroy or adversely modify the proposed critical habitats for the rufa red knot and the green sea turtle. No further ESA consultation with the Service for the proposed action will be necessary, unless required by 50 C.F.R § 402.16.

We appreciate the Bureaus' continued coordination and cooperation in the conservation of threatened and endangered species and their critical habitats. If you require further assistance regarding ESA coordination, or have questions regarding the content of this letter, please contact Ms. Amy Trahan (337-291-3126) of this office.

Sincerely,

Brigette D. Firmin    BRIGETTE FIRMIN  Digitally signed by BRIGETTE FIRMIN
Field Supervisor                           Date: 2025.03.28 11:53:52 -05'00'
Louisiana Ecological Services Office

cc:    Protected Species Coordinator, BSEE, New Orleans, LA
       Energy Coordinator, Ecological Services, FWS, Atlanta, GA (ES/CPA)
       ESA Consultation Coordinator, FWS, Southeast Region, Tallahassee, FL
       Field Supervisor, Ecological Services, FWS, Daphne, AL
       Field Supervisor, Ecological Services, FWS, Jacksonville, FL
       Field Supervisor, Ecological Services, FWS, Panama City, FL
       Field Supervisor, Ecological Services, FWS, Vero Beach, FL

037290