**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, | |
| *Plaintiff*, | Civil Action No.: 26-CV-00940-RC |
| v. | |
| DOUGLAS BURGUM, | |
| *Defendant*. | |

**DECLARATION OF BRETT HARTL IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER**

I, Brett Hartl, declare as follows:

1.      I am competent to make this declaration. I provide this declaration based upon my personal knowledge. I would testify to the facts in this declaration under oath if called upon to do so.

2.      I am the Government Affairs Director at the Center for Biological Diversity ("Center"), and I work out of both the Center's Washington, D.C., and Arizona offices. I have been with the Center since 2013.

3.      I am also a member of the Center and have been a member of the Center since 2013. As a member, I rely on the Center to represent my interests in conserving native species and their habitats.

4.      I earned a Bachelor's of Arts in Conservation Biology from Prescott College. I earned a J.D. from Lewis and Clark Law School. Prior to attending law school, I spent four years working as a field biologist with endangered species, including marine mammals and seabirds. I

1

also worked previously in the House of Representatives' Natural Resources Committee for the Democratic staff, and I was a senior policy fellow at the Society for Conservation Biology.

5.    The Center is a member organization incorporated under the laws of the State of California. It is recognized as a not-for-profit corporation under section 501(c)(3) of the United States Internal Revenue Code. The Center has 106,970 active members across the country, including more than 5,281 members in Florida, 478 in Alabama, 363 in Louisiana, 162 in Mississippi, and 3,966 in Texas. The Center is based in Tucson, AZ, and works throughout the entire United States. Our other major offices are in Washington, D.C., San Francisco, CA, and Portland, OR.

6.    The Center's mission is to ensure the preservation, protection, and restoration of biodiversity, native species, ecosystems, public lands and water, and public health through science, policy, and environmental law. Based on an understanding that the health and welfare of human societies are closely linked to the condition of the natural environment, the Center works to protect natural resources like air, water, and land and to secure a future for animals and plants hovering on the brink of extinction. We work to protect the ecosystems they need to survive, for the species and for the people that interact with, depend on, and cherish these natural resources.

7.    Protection of endangered and threatened species is the core organizational focus of the Center. Whether large or small, we believe all species have an intrinsic right to live.  The United States and the world at large are currently in the midst of a biodiversity crisis: the diversity of life that sustains ecological systems and human cultures around the world are collapsing. As a result, the Center works tirelessly to protect endangered and threatened species through advocacy, litigation, education campaigns, conservation of critical habitats for species,

and holding federal agencies accountable to their duties to protect threatened and endangered species as directed by Congress.

8.      In my professional capacity as the Government Affairs Director at the Center, I monitor national policy issues that impact endangered species, wildlife, oceans, and environmental protection broadly. This includes agency rulemakings, policy decisions and their consequences throughout the country. I coordinate the Center's national-level responses and engagement, meet with agency officials, and work with outside stakeholders. I oversee and am personally involved with Freedom of Information Act requests, formal commenting, advocacy, lobbying, and litigation.

9.      The Center and its Oceans Program and Endangered Species Program have worked towards better environmental protections and better protections for wildlife in the Gulf of Mexico for over 20 years. For example, in 2003, the Center filed a lawsuit to expand critical habitat for the Perdido Key Beach Mouse, Alabama Beach Mouse, Choctawhatchee Beach Mouse found in Alabama and Florida that are threatened by the risks of oil spills from fossil fuel activities in the Gulf of Mexico, and in 2008 the Center worked to secure critical habitat designation for the smalltooth sawfish found off Florida's southwestern coast. In 2010, the Center brought lawsuits under the Clean Water Act following the Deepwater Horizon catastrophe in the Gulf that spilled nearly 5 million barrels of oil into the Gulf, and challenged the unprecedented use of oil dispersants in the Gulf of Mexico following that disater.

10.     The Center has actively advocated against continued oil and gas activities in the Gulf of Mexico ever since. For example, the Center has submitted extensive comments on the 2017–2022 Outer Continental Shelf Oil and Gas Leasing Program; the draft Environmental Impact Statements (EIS) s for Lease Sales 247 and 250 in the Gulf of Mexico; the draft EIS for

Lease Sales 250, 251 and 262 in the Gulf; the 2024–2029 Outer Continental Shelf Oil and Gas Leasing Program, the Draft Proposed Program Outer Continental Shelf Oil and Gas Leasing Program for 2026–2029. In addition, in 2021, the Center filed an administrative petition to require vessel speed restrictions to protect Rice's whales in the Gulf of Mexico from deadly ship strike collision.

11.    The Center has worked to secure Endangered Species Act protections for many marine species found in the Gulf of Mexico including the dwarf seahorse, Gulf of Mexico Bryde's whale (now considered a unique species called Rice's whale), sperm whale, bluefin tuna, goliath grouper, elkhorn coral and staghorn corals, black-capped petrel, eastern black rail and the red knot shorebird. The Center has also worked extensively to protect loggerhead sea turtle, leatherback sea turtle, Kemp's ridley sea turtle, including, for example, a 2021 lawsuit challenging a decision to exempt shrimp trawlers from using turtle excluder devices in the Gulf.

12.    The Center has filed numerous lawsuits against the U.S. Department of the Interior challenging approvals of oil and gas in the Gulf of Mexico for failing to properly comply with the nation's environmental laws, including challenges to oil and gas lease sales from 2018 to 2025. The Center has also filed numerous lawsuits against the U.S. Department of Commerce and its National Marine Fisheries Service challenging failures of that agency to properly assess threats to and properly protect endangered species in its jurisdiction during Section 7 consultations under the Endangered Species Act.

13.    Endangered Species Act consultations under Section 7 provide the Center with critical information on the status of endangered species that cannot be obtained elsewhere. Under the law and the Section 7 regulations, every biological opinion provides a comprehensive snapshot of the threatened and endangered species that might be harmed by a proposed action,

4

including a current assessment of a species' conservation status, the state of the current environmental baseline, and an evaluation of all threats a species currently faces. The Center routinely analyzes biological opinions to determine where and how stronger conservation advocacy efforts should be focused to better protect the environment.

14.     Because of the permanent nature of any exemption granted by the Endangered Species Committee under Section 7, future biological opinions related to that particular type of agency action would no longer occur in the future, meaning that all future take and harm cause by that activity would not be minimized or mitigated by those agency actions. For this reason, Section 7 of the Act sets forth a detailed, complex and multistep process that the Endangered Species Committee must undertake when reviewing a possible exemption under the Act. The core components of each Endangered Species Committee process include: an application seeking an exemption must meet particular criteria at the outset to qualify as a valid exemption; the Secretary of the Interior must prepare a report to the Committee assessing the good faith compliance of the federal agencies and/or private applicants throughout the consultation process at issue for a possible exemption; a formal adjudication conducted by an Administrative Law Judge to assess facts and witnesses; and a final review and assessment by the Committee prior to granting an exemption. Each of these components must occur with the public having full access to all underlying public records and the ability for the public to participate and monitor all meetings in person.

15.     The last time the Endangered Species Committee met was in October 1991 to consider an exemption related to logging and its impacts on the northern spotted owl. Following the application to the Committee, an entire month of evidentiary hearings were conducted in Portland, Oregon in January 1992, during which 97 witnesses provided testimony before an

Administrative Law Judge. This trial-like adversarial proceeding allowing all sides to assess the complex scientific determinations of the Interagency Scientific Committee, which had carefully studied the threats to the northern spotted owl from logging of old growth forests.[1] In addition to the formal adjudicatory process, a full two days of public testimony was provided for by the Committee to allow the public to provide its voice and opinions into this process.[2]

16.     On March 16, 2026, the Secretary of the Interior announced that the Endangered Species Committee would meet on March 31, 2026 to consider an exemption relating to "oil and gas exploration, development, and production activities" in the Gulf of Mexico. This notice failed to provide any further details, including which biological opinion or opinions the exemption would relate to, who the applicant for the exemption was, or even what stage of the process the Endangered Species Committee believed it was initiating. The notice does not even inform the Center or other members of the public which threatened and endangered species — either terrestrial or marine or both, either within the U.S. Fish and Wildlife Service's jurisdiction or the National Marine Fisheries Service's jurisdiction or both — would be potentially permanently exempted under the Endangered Species Act moving forward. The failure to provide any information whatsoever about the scope of a potential exemption seriously harms the Center's ongoing advocacy efforts to prevent the extinction and bring about the recovery of threatened and endangered species in the Gulf.

17.     To date, the Endangered Species Committee has not made available to the public any of the records of the Committee pertaining to the subject matter of the March 16th meeting—

---

[1] *See generally*, Marcot, Bruce G.; Thomas, Jack Ward. 1997. *Of spotted owls, old growth, and new policies: a history since the Interagency Scientific Committee* report. U.S. Department of Agriculture, Forest Service, Pacific Northwest Research Station. 34 p. *available at*:
https://www.fs.usda.gov/pnw/pubs/pnw_gtr408.pdf
[2] Fischman, Robert L. 1992. *Clear the Air*. 22 Envtl. L. 1097 available at:
https://www.repository.law.indiana.edu/facpub/597

let alone all such records as required by the ESA. The March 16th notice of the Endangered Species Committee meeting provides no indication that any documents or additional materials at all will be provided to the public between now and March 31st. The federal register notice does not reference a related docket on regulations.gov that provides additional documents or information.

18.    The March 16th notice also states that "the meeting will be open to the public through livestreaming on https://youtube.com/live/iC3xyp4GxRE?feature=share. The meeting will also be recorded and accessible at the DOI.gov/live events page for 60 days after the event." This weblink goes to the main Department of the Interior web stream on YouTube and can be accessed right now. There is no information on the website that indicates if, or how, the public itself can participate in a future live-stream, either by posting comments or asking questions. In either case, based on my extensive experience attending meetings held by government agencies, a live-stream is not remotely equivalent to a public meeting that affords an opportunity to have a much better appreciation for how the meeting participants are interacting, what documents and other materials are being reviewed, who else may be in attendance that may be relevant to the discussion and other matters that cannot be captured fully through only live-streaming of a meeting. Even the most basic aspects of a meeting including review of public documents considered by the Endangered Species Committee would be denied to the public with a live-stream.

19.    It is also my experience that many virtual types of live-streams and other instances where the federal agencies did not provide a public meeting are beset by technical malfunctions. In short, while live-streaming may provide a useful *additional* mode of public access for those who cannot attend in person, it does not provide the same level of access and

accountability as a meeting that is open to those members of the public who can and do wish to attend in person. Such attendance also ensures that the members of the Endangered Species Committee will see with their own eyes that members of the public are deeply interested in the consideration of any exemption that would consign Gulf species to extinction. In my many years of experience attending and observing government meetings, the presence of the public can have a salutary effect on the discussions taking place, helping to ensure that meeting participants appreciate the gravity of their deliberations and potential impacts of their decisions on the affected public.

20.     In light of these significant concerns, immediately after the notice was provided to the public, I sent a letter on behalf of the Center for Biological Diversity to the Secretary of the Interior, Secretary of Commerce, Administrator of the Environmental Protection Agency, Secretary of Agriculture, Acting Chair of the National Economic Advisors, and the Secretary of Defense demanding that the Endangered Species Committee comply with the procedural requirements of the Endangered Species Act. I specifically demanded that the Committee provide the public with the necessary prerequisite public documents that the law requires be made available and I requested that the Endangered Species Committee provide the public access to the meeting. *See* Exhibit A hereto.

21.     On March 17th, the Center received a letter from the Deputy Solicitor for Energy & Mineral Resources requesting additional information and clarifications regarding the Center's position that the Endangered Species Committee must allow for public access to the March 31 meeting and why the Committee must make its records publicly available. *See* Exhibit B hereto.

22.     On March 18th, I sent a letter to the Deputy Solicitor for Energy & Mineral Resources responding to their letter providing further detail and legal justification as to the clear

requirements within the Endangered Species Act regarding public access to all Committee meetings and why the Committee must provide all records to the public. *See* Exhibit C hereto.

23.     If the meeting of the Endangered Species Committee were made open to the public, I would attend the meeting in person and take full advantage of the open meeting right created by Congress. I believe that other Center staff, Center members and numerous other members of the public would also attend this meeting in person given its importance to the conservation of threatened and endangered species and the overall environmental health of the Gulf of Mexico into the future.

24.     The conservation of both marine and terrestrial wildlife around the Gulf of Mexico is of deep personal importance to me. As a result of both my education and field experiences working in conservation, I have developed a deep passion for observing wildlife, specifically mammals and birds. I travel extensively around the United States and the world to look for wildlife, thus far observing 755 species of mammals and 4,850 species of birds. I have a deep love for marine mammals, I have personally observed 37 of the world's 102 species of cetaceans, and even swum with nine different species of marine mammals. In 2024 I traveled to the island of Dominica to snorkel with sperm whales, one of the deepest diving cetaceans on the planet. Sperm whales remain an endangered species throughout the world, and the populations in the Gulf of Mexico and the Caribbean continue to decline primarily due to ship strikes, ocean noise pollution from industrial activities including oil and gas development, and the ingestion of marine debris. Seeing these magnificent animals in the water and feeling their sonar pulses coarse through one's body is truly one of the most amazing experiences of my life, and I am distressed and injured when these whales are killed by the impacts of the oil and gas industry in

the Gulf of Mexico. Below is a photo of a sperm whale that I took and that hangs on my wall at home:



25.     I have traveled to the Gulf of Mexico and will continue to do so in the future to view and attempt to view wildlife potentially being considered for exemption by the Endangered Species Committee. For example, I have travelled numerous times to view whooping cranes on their wintering grounds in and around Aransas National Wildlife Refuge on the Texas coast as far back as 2003, with my most recent trip to view them in March of 2024. Whooping cranes remain one of the rarest birds in North America and the entire wild migratory population only numbers 700 or so individuals, an oil spill in the Gulf of Mexico could potentially put their entire wintering habitat at severe risk and decimate the blue crab, their primary food source. I have also traveled to parts of Texas, Louisiana and Mississippi as far back as 2011 and as recently as

10

March 2024 to attempt to view the eastern black rail, a small and very endangered wetland species found on Gulf coast that could easily have entire populations wiped out by a catastrophic oil spill.

26.     Another species that could easily be wiped away to extinction from a catastrophic oil spill is the Black-capped Petrel. This rare seabird only nests in the Dominican Republic and Haiti, but importantly, forages in deep waters in the Gulf of Mexico and along the Gulf Stream current in the Atlantic. I have gone on several pelagic seabird trips off the coast of North Carolina, in 2009 and 2013, and will be returning to North Carolina in May 2026 to view and photograph these elusive seabirds. I have also traveled to the Sierra de Bahoruco mountains in the southwest portion of the Dominican Republic to search for Black-capped Petrels on their breeding grounds, where I heard one petrel fly overhead. With a population of fewer than 500 pairs, any major impact to these seabirds in the Gulf of Mexico could easily drive the species extinct everywhere.

27.     Because the Endangered Species Committee has failed to provide the public with any meaningful explanation or details relating to the scope of the exemption they are considering, every threatened and endangered terrestrial and marine species found in or along the Gulf of Mexico is now potentially at grave risk that their conservation will be set back, or that such species could be condemned to extinction. My personal aesthetic, recreational and spiritual interests in the wildlife that I love and repeatedly try to observe would be greatly harmed by an exemption from the Endangered Species Committee that sets back the conservation and recovery of these species. It pains me even more that an exemption might be granted that is done in such a cursory and thoughtless way compared to previous meetings of the Committee that were fully

11

open to the public, and where the voices of scientists and conservationists were meaningfully considered in a thoughtful and deliberative process.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed March 17, 2026, in Prescott, Arizona.

Brett Hartl