**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY,<br><br>    Plaintiff,<br><br>    v.<br><br>DOUGLAS BURGUM, Secretary of the Interior,<br><br>    Defendant. | Case No.: 1:26-cv-00940-RC<br><br>**PLAINTIFF'S REPLY MEMORANDUM IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER** |

**TABLE OF CONTENTS**

INTRODUCTION .......................................................................**Error! Bookmark not defined.**

ARGUMENT ........................................................................................................... 2

   I.   THE CENTER'S CLAIMS ARE REVIEWABLE UNDER THE APA............................ 2

   II.   THE CENTER'S CLAIMS ARE PROPERLY IN THIS COURT .................................... 6

   III.   THE CENTER HAS STANDING.................................................................................. 8

   IV.   THE TRO STANDARDS ARE SATISFIED.................................................................. 9

       A. The Center Is Likely to Succeed on the Merits.................................................. 9

       B.  Irreparable Injury, Balance of Equities, and the Public Interest.................................. 14

**INTRODUCTION**

Far from undercutting the rationale for a temporary restraining order ("TRO"), Defendant's opposition and supporting declaration strongly support it. For the first time in the 53-year history of the ESA, the government is taking the astonishing position that the Secretary of Defense (referred to by the government as "Secretary of War") may ***unilaterally and at any time*** eliminate any and all safeguards of the ESA—thus allowing any endangered and threatened species to be driven to extinction via federal agency action—with the mere stroke of a pen. And, according to the government, this can all happen in total secrecy until that (*already made*) determination is announced notwithstanding that Congress was concededly "concerned with providing transparency," ECF 13 at 22, when it created the exemption process Defendant is now using in an unprecedented manner.

Relying entirely on a double (or triple) hearsay declaration (from an affiant who does not even profess personal knowledge of any relevant information) the government alleges that the "Secretary of War notified the Secretary of the Interior that the Secretary of War found it necessary for reasons of national security to exempt from the [ESA's] requirements ***all Gulf of America oil and gas exploration and development activities***" regulated by two federal agencies, ECF No. 13-1 (emphasis added). Yet not a single document relating to this purported "national security" rationale for a sweeping ESA "exemption" has been made available to the public or *even to this Court*. Indeed, had it not been for the filing of this case and Plaintiff Center for Biological Diversity's ("Center") request for a TRO, the public would *still* have no clue as to why the Secretary of the Interior even invoked the Endangered Species Committee for the first time in more than three decades. Defendant's attempt to keep the public entirely in the dark until

1

a novel and vast "exemption" from the ESA is rubber-stamped by the Committee this coming Tuesday makes a mockery of the "transparent" exemption process mandated by Congress.

As discussed briefly below, the government's threshold defenses are groundless, particularly in view of the novel reading of the ESA proffered in their brief. In addition, Plaintiff has satisfied the standards for temporarily enjoining the meeting of the Committee.

## ARGUMENT

### I.    THE CENTER'S CLAIMS ARE REVIEWABLE UNDER THE APA

The government's argument that Defendant's decision to convene a meeting of the Committee does not constitute "final agency action" is baseless. While trivializing the Center's motion as seeking to prevent the Executive Branch from "simply holding a meeting," ECF 13 at 1, the government makes crystal-clear that the *sole* function of the meeting is to adopt the Secretary of Defense's purported "national security" justification for dispensing with the ESA for federally-authorized Gulf oil and gas drilling activities. *Id*. at 2 (invoking section ESA 7(j) for the proposition that the "Committee *shall grant an exemption*" whenever the Secretary of Defense asserts that one is, for whatever reason, "necessary for reasons of national security").

The government's characterization of the meeting as merely a "preliminary step on the way to final agency action," *id.* at 1, is therefore disingenuous since, on the government's own reading of the statute, the meeting can accomplish nothing more than the entirely ministerial function of "granting" the Secretary of Defense's proffered exemption. *See, e.g.*, ECF 13 at 20 (contending that "the Committee **must grant an exemption based on the Secretary of War's national security finding**") (emphasis added). Simply put, according to the government itself, any substantive "decisionmaking process" has *already* been "consummate[ed]," *Bennett v.*

2

*Spear*, 520 U.S. 154, 177-78 (1997) (citation omitted), and no deliberations of the Committee will (or can) alter that decision.

As this Court has explained, in making the assessment of finality, "[c]ourts are further directed to 'apply the finality requirement in a 'flexible' and 'pragmatic way.''" *Public Employees for Envtl. Resp. v. Nat'l Park Serv.*, Civ. No. 19-3629 (RC), 2021 WL 1198047, at *8 (D.D.C. Mar. 30, 2021) (quoting *Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 435 (D.C. Cir. 1986)); *see also Or. Health & Sci. Univ. v. Engels*, Civ. No. 24-2184 (RC), 2025 WL 1707630, at *5 (D.D.C. June 17, 2025) (in assessing finality, "'courts should take as their NorthStar the unique constellation of statutes and regulations that govern the action at issue'") (quoting *Cal. Cmtys. Against Toxics v. EPA*, 934 F.3d 627, 631 (D.C. Cir. 2019)).

Applying those "pragmatic" principles here, the decision by the Secretary of the Interior—the highest-ranking official in the Interior Department, *see Public Employees*, 2021 WL 1198047, at *8 (in finding final agency action, relying on the fact that the "action emanated from one of the highest-ranking officials" in the agency)—to dispense with the extensive process otherwise required for an exemption, and instead convene the Committee for the single purpose of ratifying the Defense Secretary's "national security" exemption, is a final agency action.

The Interior Secretary's convening of the committee also reflects the consummation of decision making regarding public access to the Committee's deliberations. Contrary to the statutory mandate and in an apparent effort to keep the Committee's proceedings as secret as possible, the Secretary has refused to make any of the Committee's records open to the public (let alone "all" of them as the statute mandates) and has likewise refused to "open" the meeting to the public in the manner the ESA requires. 16 U.S.C. § 1536(e)(5)(D). There is nothing "merely tentative or interlocutory" about those determinations. *Bennett*, 520 U.S. at 178. To the

3

contrary, the government doubles down on them in its brief, asserting—without any explanation as to why—no records whatsoever will be made available before the meeting at which the Secretary of Defense's expansive exemption is ratified.

The Interior Secretary's decision to convene the meeting is also "one by which rights or obligations have been determined or from legal consequences will flow." *Bennett*, 520 U.S. at 178. "This inquiry requires the Court to 'pragmatica[ally]' focus on 'the concrete consequences [the] action has or does not have . . . .'" *Public Employees*, 2021 WL 1198047, at *9 (quoting *Cal. Cmtys. Against Toxics v. EPA*, 934 F.3d 627, 637 (D.C. Cir. 2019)).

The "concrete consequences" here include depriving the public of the explicit right of transparency conferred by Congress. In an analogous context—involving cases brought to address violations of the Federal Advisory Committee Act, 5 U.S.C. App. 2 (FACA)—courts in this Circuit (and elsewhere) have held that agency decisions to convene meetings of advisory committees without complying with FACA's openness requirements constitute final agency action under the APA. *See, e.g.*, *Judicial Watch, Inc. v. U.S. Dep't of Commerce*, 736 F. Supp. 2d 24, 30 (D.D.C. 2010) (explaining that "the agency's decisions not to comply with 'the various procedural requirements of FACA' had the effect of a final action because they 'were not tentative or interlocutory' and 'had [the] legal consequence [of] deny[ing] the public's right of access to that information'") (quoting *Judicial Watch v. Nat'l Energy Policy Dev. Group*, 219 F. Supp. 3d 20, 33-34 (D.D.C. 2002)); *see also EDF v. Regan*, No. 20-762 (LLA), 2024 WL 3887383, at *12 (D.D.C. Aug. 20, 2024) ("Because Section 2604(b)(3) [a provision of TSCA] creates a freestanding right to information, the EPA does determine rights and obligations—and therefore does engage in final agency action—when it provides or fails to provide Plaintiffs with access to requested documents.").  The same result should be reached here.

4

That is alone sufficient to dispense with the final agency action objection. But the Interior Secretary's determination to convene the Committee to grant the Defense Secretary's "exemption"—without any of the threshold requirements or extensive adjudicatory process ordinarily required for such an exemption—is one from which drastic "legal" (as well as dire practical) "consequences will flow." The inevitable result of the decision now before the Court (again, based on the government's own reading of the ESA) is that all of the imperiled species in the Gulf—including but not limited to the highly endangered Rice's whale—will, in the very near future, be stripped of basic safeguards necessary to avoid their extinction. *See* 16 U.S.C. § 1536(a)(2). It is a difficult to conceive of an action more "final" than that.

While the foregoing establishes that there is "final agency" action for purposes of review under 5 U.S.C. § 706(2), the government ignores that the Center has also pled that Defendant's failure to comply with the ESA's transparency requirements constitutes action "unlawfully withheld or unreasonably delayed" in contravention of 5 U.S.C. § 706(1). *See* ECF 1 ¶ 72. Such a claim can proceed "where a plaintiff asserts that an agency fails to take a *discrete* agency action that it is *required to take*." *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004). That is exactly what the Center has done here. The ESA says that "all" documents and meetings of the Committee "shall" be open to the public. 16 U.S.C. § 1536(e)(5)(D). Yet Defendant has made *none* of the Committee's documents open to the public—without giving any reason why— and is refusing to allow public attendance at the *only* meeting the Committee intends to hold. This supports a section 706(1) claim for "unlawful" and "unreasonable" delay.[1]

---

[1] By the same token, the Center has a valid Mandamus Act claim because the ESA provides that the Committee's records "shall" be open to the public. *See, e.g., Judicial Watch*, 736 F. Supp. 2d at 31 (explaining that the "Mandamus Act authorizes district courts to issue mandamus orders compelling federal officials to perform ministerial or non-discretionary duties" and that FACA's

## II.     THE CENTER'S CLAIMS ARE PROPERLY IN THIS COURT

The government argues that review of the Center's claims "may be had only in the court of appeals." ECF 13 at 12. That argument is not only wrong but is also in irreconcilable conflict with the government's own explanation of the "exemption" provision being invoked.

To begin with, "[b]ecause district courts have general federal question jurisdiction under 28 U.S.C. § 1331, the 'normal default rule' is that 'persons seeking review of agency action go first to district court rather than to a court of appeals.'" *Watts v. S.E.C.* 482 F.3d 501, 505 (D.C. Cir. 2007) (citation omitted); *see also Am. Petroleum Institute v. S.E.C.*, 714 F.3d 1329 (D.C. Cir. 2013) ("In this circuit, the normal default rule is that persons seeking review of agency action go first to district court rather than to a court of appeals.").

Here, Defendant has not, and cannot, overcome that "default rule." The government's argument is that "[s]ection 7(n) provides that '[a]ny person . . . may obtain review . . . of any decision of the [Committee] **under subsection (h)**' by filing a petition in the appropriate court of appeals within 90 days of the decision." ECF 13 at 12 (quoting 16 U.S.C. § 1536(n) (emphasis added)). But, according to the government's own reading and implementation of the statute, the Committee is not—and, indeed, *cannot*—be making a decision under "subsection (h)." The plain language of subsection (h) provides for those situations in which the Committee makes a final *discretionary* "determination"—following the submission of a detailed "report" by the Interior (and/or Commerce) Secretary and an "on the record" adjudicatory proceeding to consider "testimony or other evidence" (in which intervenors may participate)—that specific criteria are satisfied. 16 U.S.C. § 1536(h)(1)(A); 50 C.F.R. § 451.02(e). Such criteria include that "there are

---

requirement that advisory committee meetings "shall" be open to public scrutiny "qualif[ies] as relief in the nature of mandamus").

no reasonable and prudent alternatives to the agency action"; that the "benefits of such action clearly outweigh the benefits of alternative courses of action consistent with conserving the species or its critical habitat," and that "the action is of regional or national significance." *Id*.

But, here, the Committee is concededly following *none* of that detailed process and making no such discretionary determination. Rather, in invoking a separate provision, *section 7(j)*, as the entire justification for the convening of the Committee, the government insists that it may ignore (and therefore has ignored) *all* of the requirements and procedures provided in subsection (h); *see* ECF 13 at 20 (arguing that section 7(j)'s "'notwithstanding provision necessarily dispenses with inapplicable procedural provisions that apply to applications for exemptions, such as the submission itself, the hearing on the application, and the report of the Secretary of the Interior or Commerce on the application"). The government cannot have it both ways. It cannot dispense with all of the procedural and substantive requirements of a determination made under subsection (h) and then rely on that very same provision when it comes to the correct forum for judicial review.

In any case, by limiting immediate appellate review to final discretionary decisions made on an adjudicatory record "under subsection (h)," the ESA cannot be read to displace ordinary district court review in all other situations that may arise under the Act. Had Congress meant 7(n) to cover more decisions, actions, or inactions, it would have said so; the omission was intentional and should be treated as such by this Court. *See Avadel CNS Pharmaceuticals, LLC v. Becerra*, 638 F. Supp. 3d 23, 31 (D.D.C. 2022) (holding that when a judicial review provision

7

applies only to a "discrete agency action[]," it "should be construed narrowly.") (citation omitted).[2]

### III.    THE CENTER HAS STANDING

In objecting to the Center's standing, the government contends that "Plaintiff relies on a future injury to protected species." ECF 13 at 16. That is incorrect. The Center's opening memorandum explained at length why the Center has standing to challenge the Interior Secretary's deprivation of their statutory right to information under the ESA. *See* ECF 9-1 at 23-25. The government ignores that distinct basis for standing, thus conceding it.

But even if the Center's standing did depend on "future injury to protected species," the imminent threat to endangered and threatened species—and hence the concrete interests of Center members in those species—is hardly "speculative," as the government asserts. ECF 13 at 17. Again, the government's unequivocal position is that the Committee "*must grant an exemption based on the Secretary of War's national security finding*." ECF 13 at 20. Hence, there is nothing at all "speculative" that in a matter of days, federally-authorized "oil and gas exploration, development, and production activities in the Gulf" will be exempted from the normal safeguards of section 7(a)(2) of the ESA, 91 Fed. Reg. 12672 (Mar. 16, 2026), to the detriment of the already critically endangered Rice's whale and myriad other imperiled species in which the Center's members have concrete interests.

---

[2] This plain language reading also makes sense. It is one thing to provide for immediate appellate review where an agency has already conducted an extensive adjudicatory proceeding and compiled a full record for judicial review – as provided by ESA subsection (h). Indeed, that is the situation in the cases relied on by the government. *See* ECF 13 at 15-16. It is quite another thing when an agency has compiled no such factual record and none will exist in the absence of district court review—as is the situation here. In this circumstance, application of the "normal default rule" of district court review makes practical as well as legal sense.

Under these circumstances, and especially in view of the government's own legal position, the Interior Secretary's decision to convene the meeting most assuredly does pose imminent, devasting "harm to protected species" and, in turn, Plaintiff's cognizable interests in them. ECF 13 at 18. That is not necessary for the Center's standing—given its uncontested information-based standing—but does reinforce why an emergency injunction is essential here.

## IV.    THE TRO STANDARDS ARE SATISFIED

### A. The Center Is Likely to Succeed on the Merits

The Center is likely to prevail on its claim that the Interior Secretary has convened the Committee without meeting the statutory prerequisites for doing so. In response to the Center's motion, the government has set forth a construction of the ESA under which a wholesale exemption from its safeguards for federally-authorized activities can (indeed, must) be granted whenever the Secretary of Defense invokes "national security." Further, according to the government, this can be accomplished (as here) without an "application" for an exemption (and the public transparency requirements that accompany it) demonstrating that even the basic threshold requirements for an exemption have been satisfied, *i.e.*, that the standard consultation process has concluded with a Biological Opinion finding jeopardy or adverse modification of critical habitat *and* that there is no Reasonable and Prudent Alternative. *Contra* 16 U.S.C. § 1536(h)(1)(A)(i). Indeed, the government makes no effort to dispute that there is no such scenario here.

The legal and practical implications of this position are staggering. It means that there is literally nothing to prevent Secretary Hegseth from forcing a convening of the Committee (and subsequent adoption of an exemption) for any federal project affecting any endangered or

9

threatened species at any time regardless of the status or outcome of any section 7 consultation process (or entirely preemptively, before section 7 consultation is even contemplated).

Far from being the "best" reading of the ESA, *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024), the government's position proffers an absurd one. It would turn Secretary Hegseth into an ESA overlord able to run roughshod at will over the ESA's carefully crafted scheme for "affording endangered species the highest of priorities," *TVA v. Hill*, 437 U.S. 153, 194 (1978), except under the narrowest of circumstances.

Contrary to the government's argument, nothing in the plain language of the statute compels this counterintuitive result. Tellingly, the government's assertion that the "Secretary of War may *initiate an exemption*" in the absence of any party even applying for such an exemption, ECF 13 at 5 (emphasis added), is unaccompanied by any citation to the statute. This is because nothing in the ESA says that. Section 7(j), on which the government relies, says that the "Committee shall grant an exemption for any agency action if the Secretary of Defense finds that such exemption is necessary for reasons of national security." 16 U.S.C. § 1536(j). But that is entirely compatible with a threshold requirement that there *be* an application for an exemption sufficient to trigger the Committee process. In a footnote, the government in fact admits as much. *See* ECF 13 at 5 n.2 ("The Secretary of War may also make such finding for an agency action that is the subject of the exemption application.").

Asserting that the Secretary of Defense has a free-floating mandate to trigger the exemption process at any time of his choosing merely by declaring "national security" is not only a deeply counterintuitive reading of the statute but has been rejected by others who have analyzed the legislative intent. For example, the Congressional Research Service has detailed the

10

Secretary of Defense's role as one that must come after, not before or instead of, a properly

submitted and supported exemption application:



11



Cong. Rsch. Serv., Endangered Species Act: The Exemption Process, R4078 (Updated Jan. 17, 2017), at 3-4.

The Center is also likely to prevail on the merits of its argument that the Interior Secretary is in violation of the ESA's transparency requirements. The government does not dispute that there is no document, including the Federal Register Notice of the impending meeting, that provides the public with even the barest details regarding who was even seeking an ESA exemption, let alone the purported justification for it. The Center and other interested members of the public would *still* have no idea that a sweeping "national security" exemption is to be ratified by the Committee in a few days if it were not for this case and the request for a TRO.

12

And even now, the public has been provided no information as to why the Secretary of Defense/War believes that "national security" compels placing endangered and threatened species at further peril from the extensive oil and gas drilling operations already routinely occurring in the Gulf. The government's hearsay declaration says that the "Secretary of War notified the Secretary of the Interior that the Secretary of War found it necessary for reasons of national security to exempt the [ESA]'s requirements all Gulf of America oil and gas exploration and development activities . . . ." ECF 13-1 at 1. But not a single document regarding that purported "notification" has been made available to the public. The declaration asserts that the "Secretary of War requested that the Secretary of the Interior, in his capacity as Chairman of the Committee, convene a Committee meeting as soon as possible." *Id*. Not a single document has been made available regarding that "request" nor regarding any other aspect of the meeting at which the exemption will be ratified.

The unexplained refusal to make *any*, let alone "all," such Committee documents—or any others—"open to the public" violates section 7(e)(5)(D) of the ESA. 16 U.S.C. § 1536(e)(5)(D). The government's response is that the "Secretary is under no legal obligation to make records available to the Plaintiff *before* convening any meeting of the Committee, "and that, "[i]n any event, the Committee will make any Committee records open to the public *the day it meets*." ECF 13 at 27 (emphasis added).

In other words, any records that the government elects to disclose will be provided to the public only *after* a decision has already been made by the Secretary of Defense to invoke an exemption and thus is a fait accompli (according to the government's own reading of the Act). Keeping the entire Committee process secret until an exemption is granted is not the "best reading," *Loper Bright*, 603 U.S. at 400, of what Congress intended when it mandated that "all"

13

"records of the Committee shall be open to the public." 16 U.S.C. § 1536(e)(5)(D); *compare id.* § 1536(g)(8) ("All meetings and records *resulting from* activities pursuant to this subsection shall be open to the public.") (emphasis added); *cf. Alabama-Tombigbee Rivers Coalition v. Department of Interior*, 26 F.3d 1103, 1106 (11th Cir. 1994) ("Because FACA's dictates emphasize the importance of openness and debate, the timing of such observation and comment is crucial to compliance with the statute. Public observation and comment must be contemporaneous to the advisory committee process itself.").

As for Defendant's refusal to make the meeting open to public attendance, the government does not dispute that what Congress *specifically* intended when the pertinent ESA provisions were enacted in 1978 was that interested members of the public could attend in person if they chose to do so. The fact that technology has made it feasible (and desirable) for the meeting to be made accessible in *additional* ways that do not fully replicate the experience of in-person attendance cannot alter Congress's contemporaneous understanding of a meeting that is "open to the public."

## B.      Irreparable Injury, Balance of Equities, and the Public Interest

The remaining TRO standards are also satisfied. First, in view of the government's legal position on the exemption being invoked, the case for irreparable injury is even stronger than at the time Plaintiff's motion was filed. Far from being threatened merely by the "*potential* consequences of future agency action," as the government asserts, ECF 13 at 29 (emphasis added), it is an *inevitability* that an exemption will be ratified in several days. *See* ECF 13 at 20 (arguing that "the Committee *must grant an exemption* based on the Secretary of War's national security finding") (emphasis added). That exemption—applying to all "oil and gas exploration, development, and production activities in the Gulf" regulated by federal agencies—is designed

14

to eliminate standard ESA safeguards that prevent species of concern to the Center and its members from going extinct. That is quintessential irreparable harm.

The Center is also facing irreparable harm from the deprivation of its statutory right to information. *See* ECF 9-1 at 21-22. The government again asserts that the "Committee's records will be open to the public *the day the Committee meets*," and that "disclosure at the meeting is *enough*." ECF 13 at 28 (emphasis added). That may be "enough" to serve Defendant's interests in avoiding public scrutiny until after the exemption is an entirely done deal, but it is woefully insufficient to serve the interests of the Center and other interested members of the public in timely access to the exemption process and the workings of the Committee. *See* ECF 9-1 at 21; *see also Public Citizen v. National Economic Comm*., 703 F. Supp. 113, 128 (D.D.C. 1989) (holding that in the absence of injunctive relief "plaintiffs will be irreparably harmed" by the failure to provide "on-going" access information required to be disclosed by FACA).

The government asserts that the Center has "no right to participate in this meeting, which is not an evidentiary hearing to consider an application for an exemption." ECF 13 at 28. But that underscores, rather than negates, why it is crucial for the Center to obtain timely access to the materials. It is true that the government has now made clear that the meeting itself will be merely a pro forma exercise in putting the Committee's imprimatur on Secretary Hegseth's exemption. But that makes it even more important for the Center to have access to the Committee's records *before* that rubber-stamping occurs so that the Center can engage in other advocacy efforts that may have a bearing on the exemption process.[3]

---

[3] For example, given the government's position that "Secretary of War" is the ultimate decision maker, timely access to *his* rationale for invoking a national security exemption would facilitate the submission of pertinent information bearing on that rationale, the impact of an exemption on listed species, and reasonable and prudent alternatives that would avoid jeopardy while allowing oil and gas operations to proceed.

On the other side of the coin, the government has put forth no meaningful injury, let alone an irreparable one, that it would suffer from postponement of a meeting during a temporary restraining order—time the Court could take to further consider the important issues in this case before an unprecedented ESA exemption is set in stone. Defendant vaguely asserts that the "meeting necessarily implicates national security" and cites for that proposition the hearsay declaration that provides *zero* information about any actual national security concern other than that Secretary Hegseth has (purportedly) said there is one. ECF 13 at 30. That is not a basis for denying relief. *See, e.g.*, *Kirwa v. U.S. Dep't of Def.*, 285 F. Supp. 3d 257, 270 (D.D.C. 2018) ("APA review may be limited, but it involves more than a court rubberstamping action based on bare declarations from the agency amounting to 'trust us, we had good national security reasons for what we did.'"); *Xiaomi Corp. v. Dep't of Def.*, No. CV 21-280, 2021 WL 950144, at *4 (D.D.C. Mar. 12, 2021) (Contreas, J.) (Granting preliminary injunction in case implicating national security because even in such situations, "'courts retain a role, and an important one, in ensuring that agencies have engaged in reasoned decisionmaking.'") (quoting *Judulang v. Holder*, 565 U.S. 42, 53 (2011)); *Xiaomi Corp.*, 2021 WL 950144, at *4 (finding "fundamental problems . . . with the Defendants' proffered explanation," including that the agency's "blanket conclusion . . . skips the most 'critical step' of an agency 'connecting the facts to the conclusion'") *(quoting Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1404 (D.C. Cir. 1995)).

As for the public interest, Congress has declared that endangered and threatened species should be afforded the highest of national priorities except in those exceedingly rare circumstances in which a valid exemption is approved by the Endangered Species Committee. Plaintiff has made strong arguments for why the unbridled authority that the government seeks to assign to Secretary Hegseth is irreconcilable with this carefully crafted statutory scheme. The

16

public interest therefore favors temporary injunctive relief while the Court conducts further proceedings. *Xiaomi Corp.*, 2021 WL 950144, at *12 (granting relief based on a finding "that Defendants have not made the case that the national security interests at stake here are compelling" and that "against this diminished national security interest, the Court must consider the substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations'")(citation omitted).

Respectfully submitted this 26th day of March, 2026.

<div style="margin-left:40%">

*/s/ Eric Robert Glitzenstein*
Eric Robert Glitzenstein (D.C. Bar No. 358287)
Center for Biological Diversity
1411 K Street NW, Suite 1300
Washington, DC 20005
Phone: (202) 849-8401
Email: eglitzenstein@biologicaldiversity.org

/s/ *Brian Segee*
Brian Segee (CA Bar No. 200795)
Admitted *pro hac vice*
Center for Biological Diversity
226 W. Ojai Ave., Ste. 101-442
Ojai, CA 93023-3278
Phone: 805-750-8852
Email: bsegee@biologicaldiversity.org

/s/ *Kristen Monsell*
Kristen Monsell (D.C. Bar No. CA00060)
Center for Biological Diversity
2100 Franklin St., Suite 375
Oakland, CA 94612
Phone: (510) 844-7137
Email: kmonsell@biologicaldiversity.org

/s/ *Lindsay E. Reeves*
Lindsay E. Reeves (La. Bar No. 32703)
Admitted *pro hac vice*
Center for Biological Diversity
3436 Magazine Street, FRNT PMB 539
New Orleans, LA 70115
Phone: (504) 342-4337

</div>

17

Email: lreeves@biologicaldiversity.org

*Attorneys for Plaintiff*

18