# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CENTER FOR BIOLOGICAL DIVERSITY,
378 N. Main Avenue
Tucson, AZ 85701;

        Plaintiff,

v.

DOUGLAS BURGUM,
in his official capacity as Secretary of the Interior
1849 C Street, NW
Washington, D.C. 20240,

BROOKE ROLLINS,
in her official capacity as Secretary of the U.S.
Department of Agriculture
1600 Independence Ave., SW
Washington, D.C. 20250,

DANIEL P. DRISCOLL,
in his official capacity as Secretary of the
Department of the Army
101 Army Pentagon
Washington, DC 20310,

PIERRE YARED,
in his official capacity as Acting Chair of the
Council of Economic Advisers
1600 Pennsylvania Ave., NW
Washington, D.C. 20500,

LEE ZELDIN,
in his official capacity as Administrator of the
U.S. Environmental Protection Agency
1200 Pennsylvania Ave., NW, Mail Code: 1101A
Washington, DC 20460,

NEIL JACOBS,
in his official capacity as Administrator of the
National Oceanic and Atmospheric Administration
1401 Constitution Ave., NW, Room 5128
Washington, DC 20230,

Case No. 1:26-cv-00940-RC

PETE HEGSETH,
in his official capacity as Secretary of the
U.S. Department of Defense
1000 Defense Pentagon
Washington, DC 20301,

        Defendants.

## FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1.      On March 16, 2026, the Office of the Secretary for the U.S. Department of the Interior announced that the "Endangered Species Committee," commonly referred to as the "God Squad," would meet on March 31, 2026, at DOI's Washington, D.C. Headquarters "regarding" an Endangered Species Act ["ESA" or "Act"] exemption for "Gulf of America Oil and Gas Activities" authorized by the Bureaus of Ocean Energy Management ["BOEM"] and Safety and Environmental Enforcement ["BSEE"]. 91 Fed. Reg. 12672 (March 16, 2026).

2.      Contrary to the ESA, the March 16 notice did not identify any specific agency action for which an exemption is sought; did not identify who was seeking the exemption; and did not specify how, if at all, any of the ESA's statutory prerequisites for seeking an exemption had been satisfied.

3.      The Committee is a cabinet-level panel vested with the extraordinary authority under the ESA to consider *an application to exempt* a federal action that may cause a species' extinction from the standard safeguards of the ESA. Given the dire consequences of facilitating the demise of an entire species, the ESA provides that the Committee is empowered to consider and decide upon *such applications* only under rare and extremely narrow circumstances as defined by the Act and its implementing regulations. The government now claims that this

2

central statutory requirement, and many other provisions governing the Committee's proceedings and decision-making process, can—indeed, must— be waived by the Defense Secretary's invocation of the words "national security."

4.      Plaintiff Center for Biological Diversity ("the Center") filed its Complaint in this action on March 18, 2026, seeking declaratory as well as emergency and permanent injunctive relief prohibiting the meeting (or any other attempt by the Interior Secretary to unlawfully convene the Committee) from occurring. ECF 1. The Center filed a motion for temporary restraining order on March 19, 2026, ECF 9, and Secretary Burgum filed his opposition to that motion on March 25, 2026. ECF 13.

5.      Secretary Burgum's opposition brief revealed, for the first time, that he was not convening the Committee to consider an exemption application, because no such application exists, but was instead acting in response to a March 13, 2026, "notification" from the Secretary of Defense (referred to as the "Secretary of War" in the government's pleadings) that the Defense Secretary "found it necessary for reasons of national security to exempt from the ESA's requirements all Gulf of America oil and gas exploration and development activities associated with [the Department of the Interior's] Outer Continental Shelf Oil and Gas Program." ECF 13 at 7.

6.      According to an attached declaration from Christopher Danley, a "Senior Counselor to the Secretary of the Interior," appointed to that position three days prior, the Defense Secretary's "notification" requested Secretary Burgum to "convene a Committee meeting as soon as practicable." ECF 13-1 at 1. The Defense Secretary's "notification" was not included in the filings, nor was any basis or other information provided explaining the "national security" finding. The government further asserted, without any statutory, regulatory, or other

3

lawful basis, that "[w]hen the Secretary of War initiates an exemption, there is no application." ECF 13 at 5.

7.     The Center filed a reply brief in support of its motion for temporary restraining order on March 26, 2026, ECF 16, and the Court held a hearing on the Motion on March 27, 2026. At the end of that hearing, the Court issued an oral order denying the motion, ECF Minute Entry, and it subsequently issued a written order later that day. ECF 17.

8.     The Interior Secretary's meeting of the Endangered Species Committee accordingly took place as scheduled today, March 31, 2026. At the culmination of this illegally-convened proceeding, without a lawful exemption application that provides the sole basis for the Committee to meet, and with its carefully defined statutory duties and responsibilities reduced to a *pro forma*, rubber stamping of the Defense Secretary's arbitrary and baseless "national security" determination, the Committee members unanimously voted to ratify the exemption of all BOEM and BSEE Gulf of Mexico oil and gas authorizations from the ESA's section 7(a)(2) requirements.

9.     The Interior Secretary's convening of the Committee, and the Committee's action to approve the sweeping exemption, directly conflicts with the ESA. In 1978 amendments to the Act, Congress expressly created the Committee to function as an administrative tribunal of last resort involving irresolvable conflicts that cannot be addressed through the ESA's standard mechanisms. To that end, the ESA expressly limits the Committee's authority to instances where the expert agencies delegated with administering the law's requirements—National Marine Fisheries Service ("NMFS") for most ocean species and the U.S. Fish and Wildlife Service ("FWS") for terrestrial species, nesting sea turtles, seabirds, and some marine mammals, including manatees—have determined during the section 7 "consultation" process that a

proposed federal action will jeopardize the continued existence of a species listed as threatened or endangered *and* that there are no "reasonable and prudent alternatives" to the proposed action that would avoid such jeopardy. 16 U.S.C. § 1536(g)(1). In these rare circumstances, a Federal agency, Governor of an affected state, or a permit or license applicant may submit *an exemption application* to the Committee. *Id.*; 50 C.F.R. § 451.02(c)(1)-(3).

10.    The 1978 amendments define the Committee's process for considering and ruling on section 7 exemption applications in extraordinary detail. The plain text, statutory structure, and legislative history overwhelmingly demonstrate that the *exemption application process* does not exist as an escape route for any federal project to sidestep the ESA requirements but is instead limited to those extraordinarily unusual cases that cannot be resolved after using all of the processes embodied in the ESA.

11.    In practice, such circumstances are exceedingly rare. In the 48 years since its creation, the Committee has adjudicated only *three* exemption applications, with one exemption denied and the other two exemptions granted. Three additional exemption applications were filed but abandoned.

12.    The Interior Secretary unlawfully convened today's Committee meeting in the absence of *any* exemption application. In fact, a valid application could not have been submitted here because the ESA's fundamental statutory prerequisite for invoking its jurisdiction is absent: a determination by either NMFS or FWS that any "oil and gas exploration, development, and production activities" are jeopardizing the continuing existence of any listed species and that there are no reasonable or prudent alternatives that would avoid such jeopardy. 16 U.S.C. § 1536(g)(1).

13.     As finally revealed in the government's brief in opposition to the Center's motion for temporary restraining order, the Interior Secretary believes all of these requirements are simply swept aside by the Defense Secretary's "national security" determination, which was ostensibly issued pursuant to section 7(j) of the Act. *See* 16 U.S.C. § 1536(j) ("Notwithstanding any other provision of the Act, the Committee shall grant an exemption for any agency action if the Secretary of Defense finds that such exemption is necessary for reasons of national security.").

14.     In signing the 1978 ESA amendments into law, President Carter stated that this provision should be used "only in grave circumstances posing a clear and immediate threat to national security." Section 7(j) has never been previously invoked, let alone in the absence of a valid exemption application.

15.     The Interior Secretary's decision to convene the Committee in the absence of a valid exemption application is having disastrous consequences, beginning with today's unlawful Committee approval of the free-floating exemption unlawfully "initiated" by the Defense Secretary. Many ESA-listed species are adversely affected by Gulf oil and gas operations, including the critically-imperiled Rice's whale (found solely in the Gulf, with only 51 individuals remaining), sperm whale, several species of sea turtle (green, hawksbill, Kemp's ridley, leatherback, and loggerhead sea turtles), Gulf sturgeon, West Indian manatee, numerous bird species, and several species of beach mice with highly limited ranges. The impacts to these species from oil spills as well as the multitude of other oil and gas operational impacts on ESA-listed species—such as harmful noise from geological and geophysical surveys, pollution from offshore fracking, collisions with vessels, and habitat destruction from platform and pipeline

construction—will no longer be subject to the Act's section 7 requirements under today's unlawful vote.

16.     The Center accordingly is filing this First Amended Complaint seeking declaratory and injunctive relief that the Interior Secretary's convening the Committee in the absence of an exemption application to be unlawful, declaring unlawful and vacating the "exemption" ratified  by the Committee at today's March 31, 2026, meeting, and enjoining the Committee from issuing further exemptions and holding future meetings unless and until the legal requirements under the ESA and its implementing regulations for doing so have been satisfied. The Court should also vacate as arbitrary and capricious and without any foundation the Secretary of Defense's determination that the Nation's security somehow compels the unlawful waiver of the ESA rubber-stamped by the Committee.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and can grant declaratory relief pursuant to 28 U.S.C. §§ 2201-2202. The Court has jurisdiction under 28 U.S.C. § 1361 to issue mandamus relief against Defendants.

18.     Venue properly vests in this Court pursuant to 28 U.S.C. § 1391(b) and/or (e), because the violations are occurring in this district, Defendants reside in this district, and a substantial part of the events or omissions giving rise to the claims have occurred in this district due to decisions made by Defendants.

## PARTIES

19.     Plaintiff CENTER FOR BIOLOGICAL DIVERSITY ("the Center") is a national conservation organization that advocates for the protection of threatened and endangered species and their habitats through science, law, and policy. The Center's mission includes protecting air

quality, water quality, and public health. The Center has been actively involved in protecting the Gulf of Mexico's oceanic and terrestrial habitats from oil and gas drilling for decades. The Center has more than 101,000 members and more than 1.8 million supporters globally. The Center brings this action on behalf of itself and its members.

20.    The Center has members who live near and regularly visit the Gulf of Mexico and its coastal communities, beaches, and offshore waters. Center members have demonstrated interests in the conservation of the many oceanic and terrestrial ESA-listed species that depend on the Gulf's waters and shores for their continued existence and ultimate recovery, including whales, sea turtles, manatees, birds, and beach mice. These members use and enjoy specific geographic areas directly and indirectly impacted by oil and gas exploration, development, and production activities in the Gulf. The Center's members have recreational, scientific, educational, aesthetic, and professional interests in the Gulf's ESA-listed species and the broader Gulf environment upon which these species depend.

21.    Offshore oil and gas activities in the Gulf, including oil spills, geological and geophysical surveys, offshore fracking, high-pressure high-temperature projects, vessel and helicopter traffic, and the construction and operation of offshore platforms and pipelines, adversely affect many ESA-listed species and their habitats. These activities result in far-reaching impacts to wildlife aquatic and terrestrial habitat, air quality, and water quality. For example, oil spills have a wide array of lethal and sublethal impacts on wildlife, both immediate and long term. Chronic, constant noise from sources such as vessel traffic and construction impair some ESA-listed species' ability to communicate, navigate, reproduce, or feed, including the critically imperiled Rice's whale. Vessel traffic can also injure and kill ESA-listed species through vessel collisions. And offshore platforms and other infrastructure can injure and kill

ESA-listed seabirds, such as the endangered black-capped petrel, through light pollution and collisions.

22.     The Defense Secretary's arbitrary and capricious national security determination, the Interior Secretary's unlawful convening of the Committee in response, and the Committee's unlawful resulting exemption from ESA section 7(a)(2) requirements as they otherwise pertain to the many ESA-listed species in the Gulf of Mexico that are adversely affected by oil and gas exploration, development, and production activities authorized by BOEM and BSEE, injure the Center's members' recreational, scientific, educational, aesthetic, and professional interests.

23.     For example, one Center member enjoys observing whales, and has worked on whale-watching boats off the U.S. East Coast, the Gulf Coast of Florida, and in the Caribbean. He now advocates on behalf of whales and educates the public about the need to protect imperiled whales from various threats, including oil and gas drilling activities. He has taken numerous trips to view large whales in various parts of the world and is planning a trip to look for Rice's whales in the Gulf this spring. Another Center member regularly uses the Gulf of Mexico, including the beaches, bays, and coastal waterways in Louisiana, Mississippi, Alabama, and Florida, to walk on the beach, go kayaking or paddleboarding, take out his boat, and observe and look for sea turtles, manatees, and other wildlife. He goes to the Gulf Island National Seashore at least once a month, where he has seen manatees and sea turtles. And another Center member is an avid bird watcher and has traveled to Texas, Louisiana, and Florida to see coastal and ocean birds, including whooping crane, eastern black rail, and black-capped petrel.

24.     Defendant DOUG BURGUM, Secretary of the Interior, is sued in his official capacity. Secretary Burgum is the chairman of the Endangered Species Committee and is the official who convened the meeting of the Committee at issue in this case.

9

25.     Defendant BROOKE ROLLINS, Secretary of the U.S. Department of Agriculture, is sued in her official capacity as a member of the Endangered Species Committee.

26.     Defendant DANIEL P. DRISCOLL, Secretary of the Department of the Army, is sued in his official capacity as a member of the Endangered Species Committee.

27.     Defendant PIERRE YARED, Acting Chair of the Council of Economic Advisers, is sued in his official capacity as a member of the Endangered Species Committee.

28.     Defendant LEE ZELDIN, Administrator of the U.S. Environmental Protection Agency, is sued in his official capacity as a member of the Endangered Species Committee.

29.      Defendant NEIL JACOBS, Administrator of the National Oceanic and Atmospheric Administration, is sued in his official capacity as a member of the Endangered Species Committee.

30.     Defendant PETE HEGSETH, Secretary of the U.S. Department of Defense, is sued in his official capacity. Secretary Hegseth made the finding at issue in this case that it was necessary to exempt federally-authorized Gulf oil and gas exploration and development activities from the requirements of section 7(a)(2) of the ESA for reasons of national security.

## LEGAL BACKGROUND

### A.     The Endangered Species Act: Overview

31.     The ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978). Finding that "fish, wildlife, and plants are of esthetic, ecological, educational, historical, recreational, and scientific value to the Nation and its people," Congress ordered that all federal agencies shall "seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes" of the Act. 16 U.S.C. § 1531(a)(1)-(3), (b). To that

end, the ESA establishes crucial substantive and procedural safeguards for species that are listed as endangered or threatened, as well as for the formally designated "critical habitats" of such species.

32.    Section 7 of the ESA substantively prohibits federal agencies from taking any action which may jeopardize the continued existence of listed species or that would destroy or adversely modify a species' critical habitat. *Id.* § 1536(a)(2).

33.    To meet this substantive mandate, section 7 places a duty on all agencies to consult with either NMFS or FWS, or both, depending on the species at issue, before engaging in any discretionary action that may affect a listed species or critical habitat. *Id*. The agency taking the action is known as the action agency, and NMFS and FWS are known as the expert consulting agencies or "Services."

34.    During the consultation process, both the action agency and the Services must "use the best scientific and commercial data available." *Id*. § 1536(a)(2); 50 C.F.R. § 402.14(d), (g)(8). The section 7 consultation requirement reflects "a conscious decision by Congress to give endangered species priority over the 'primary missions' of federal agencies." *Tenn. Valley Auth.*, 437 U.S. at 185.

35.    Once an action agency determines that its action "may affect" a listed species or critical habitat, consultation, either formal or informal, is required. If the action agency determines that an action "is not likely to adversely affect any listed species or critical habitat," the process ends informally if the Service issues a written concurrence. 50 C.F.R. §§ 402.13, 402.14(b)(1).

36.    A relatively recent review of approximately 25,000 section 7 consultations conducted from 2000 to 2017 found that nearly 80% were resolved informally. Jacob W.

Malcom & Ya-Wei Li, *Data Contradict Common Perceptions About a Controversial Provision of the U.S. Endangered Species Act*, 112(52) PNAS 15844-15849 (2015).

37. For those relatively infrequent actions where the action agency or the Services instead determine that the action is likely to adversely affect a listed species or destroy or adversely modify a species' critical habitat, "formal consultation" is conducted. Formal consultation culminates in the Services issuing a "biological opinion" advising the action agency as to whether the proposed action, alone or taken together with cumulative effects, "is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat." 50 C.F.R. § 402.14(c), (g), (h)

38. If the Services determine that jeopardy is likely, it must provide the action agency with "reasonable and prudent alternatives" to the proposed action that would avoid that result, if such alternatives exist. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(g)(5), (h)(2).

39. The vast majority of biological opinions conclude that the action is not likely to jeopardize a listed species or adversely modify a species' critical habitat. For example, of the 4,934 formal consultations conducted between 2000 and 2017, only 72 (1.5% of formal and 0.3% of all consultations) resulted in jeopardy findings and only 55 (1.1% of formal and 0.2% of all consultations) resulted in findings of adverse modification of critical habitat. In a subset of FWS consultations conducted between 2008 to 2015, *none* of the 88,290 actions had been "stopped or extensively altered as a result of FWS finding jeopardy or destruction/adverse modification." Malcom & Li at 15846.

40. This "low percentage of jeopardy and adverse modification" determinations "shows that [NMFS and FWS] . . . ha[ve] worked with agencies and applicants to find solutions

the vast majority of the time" and that "conventional wisdom about the ESA stopping projects is unfounded." *Id*.

B.    **The Endangered Species Act: 1978 Amendments Creating the "Endangered Species Committee"**

41.    In response to the Supreme Court's decision in *Tenn. Valley Auth.*—which held that construction of a dam would violate the ESA by causing the extinction of a fish species—Congress amended the ESA. President Carter signed the Endangered Species Act Amendments of 1978 into law on November 10, 1978. Pub. L. No. 95-632, § 1, 92 Stat. 3751 (1978).

42.    Although proposed amendments were introduced to dramatically weaken or eliminate section 7 requirements, Congress rejected this approach. Congress instead created a "comprehensive administrative scheme to promote interagency cooperation and to avoid conflict between the interests of particular projects and the protection of endangered species." David B. Liner, *Environmental Law – The Endangered Species Act Amendments of 1978: Congress Responds to Tennessee Valley Authority v. Hill*, 25 Wayne L. Rev. 1327, 1335 (1979). To address the extraordinary circumstances in which such conflicts cannot otherwise be resolved, Congress created the Committee to oversee and implement the exemption application process.

43.    The Committee "is designed to function as an *administrative court of last resort*." S. Rep. No. 418, 97th Cong., 2d Sess. 17 (1982) (emphasis added). To that end, Congress expressly limited the Committee's authority to consider exemption applications arising from instances where NMFS or FWS has determined that a specific action will jeopardize the continued exist of a species and/or destroy or adversely modify the species' critical habitat and there remains an "irresolvable conflict" concerning how to address that determination.

13

44.     Almost all jeopardy determinations—which, as previously explained, are themselves very rare—can be addressed (and have been addressed) through the development of "reasonable and prudent alternatives." 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h)(2).

45.     The Committee's authority to hear exemption applications is limited to an even smaller subset of these already uncommon circumstances—where the agency action will jeopardize a listed species or impair a species' critical habitat *and* there are no reasonable and prudent alternatives that would avoid this result. 16 U.S.C. § 1536(g)(1).

46.     The 1978 amendments specify the Committee's process for ruling on section 7 exemption applications in extraordinary detail, encompassing 12 new subsections ((e) through o)) within section 7.

47.     Among other elements, the amendments prescribe requirements for: (1) establishment of the Committee; (2) promulgation of regulations to govern the form of applications to the Committee; 3) processes and timelines governing the consideration of exemption applications; (4) discretionary findings required to grant an exemption application; and (5) public access and participation requirements. *Id.* § 1536(e)-(h).

48.     Where an exemption application has been properly submitted, the Committee is led by the Interior Secretary and composed of five other senior officials: the Secretaries of Agriculture and the Army, the Chairman of the Council of Economic Advisers, and the Administrators of the Environmental Protection Agency and the National Oceanic and Atmospheric Administration. Once an exemption application is received, the President appoints one individual from each affected State to be a member of the Committee in relation to the specific application. *Id.* § 1536(e)(3)(G), (g)(2)(B); 50 C.F.R. § 451.03(b).

49.      The amendments establish a rigorous framework of specific procedures and timelines governing the Committee's consideration of an exemption application.

50.      Exemption applications may be submitted by a Federal agency, the Governor of the State in which an agency action will occur, or a permit or license applicant. 16 U.S.C. § 1536(g)(1); 50 C.F.R. § 451.02(c).

51.      An exemption application must be submitted to the Secretary within 90 days following the termination of the consultation process, and must include, *inter alia*, a description of the consultation process and the alternatives considered by the Federal agency, and "a statement describing why such action cannot be altered or modified to conform with the requirements of" section 7(a)(2). 16 U.S.C. § 1536(f)(1)-(2); 50 C.F.R. § 451.02(e)(2)(viii), (e)(3)(ix), (e)(4)(viii).

52.      The Interior Secretary as Committee Chair must make a threshold determination on an exemption application within 20 days, including a determination that "the Federal agency concerned and the exemption applicant" have carried out the consultation duties "in good faith and made a reasonable and responsible effort to develop and fairly consider modifications or reasonable and prudent alternatives to the proposed action which would not violate subsection 7(a)(2)." 16 U.S.C. § 1536(g)(3)(A)(i); 50 C.F.R. § 452.03(a)(3).

53.      If the Interior Secretary determines that the exemption application has not met any of these requirements, the Secretary shall deny the application. 16 U.S.C. § 1536(g)(3)(B); 50 C.F.R. § 452.03(c).

54.      If the Interior Secretary makes a positive finding on each of the threshold determinations, "he shall notify the exemption applicant in writing that the application qualifies for consideration by the Endangered Species Committee." 50 C.F.R. § 452.03(d). The Secretary

must then submit a report to the Committee within 140 days. 16 U.S.C. § 1536(g)(5). In order to "develop the record for the report," the Secretary "shall hold a hearing" and "shall designate an Administrative Law Judge [ALJ] to conduct the hearing." 16 U.S.C. § 1536(g)(4); 50 C.F.R. § 452.04(a). The ALJ is empowered to conduct prehearing conferences, hear motions, objections, rebuttal, and cross-examination, may issue subpoenas, and shall provide an opportunity for intervention in the hearing. 50 C.F.R. § 452.05(d), (g).

55.    When an exemption application is properly submitted, the ESA directs that the Committee "shall make a final determination whether or not to grant an exemption within 30 days after receiving the report of the Secretary." 16 U.S.C. § 1536(h)(1); 50 C.F.R. § 453.03(a).

56.    The Interior Secretary is required to meet public notification and information access requirements throughout all stages of the Committee's process for considering exemption applications. *See* 16 U.S.C. § 1536(g)(2)(B)(ii) (requiring the Secretary to "publish notice of receipt of the application in the Federal Register, including a summary of the information contained in the application and a description of the agency action with respect to which the application for exemption has been filed."); *id*. § 1536(e)(5)(D) ("All meeting and records of the Committee shall be open to the public."); *id*. § 1536(g)(8) ("All meetings and records resulting from activities pursuant to this subsection shall be open to the public."); 50 C.F.R. §§ 451.02(h), 452.05(h), 453.05(e).

57.    Reflecting the ESA's limitation of Committee jurisdiction to hearing exemption applications, ESA implementing regulations only prescribe procedures relating to such exemption applications. See 50 C.F.R. Part 451 (*application procedure*); Part 452 (*consideration of application by the Secretary*); Part 453 (Endangered Species Committee); § 453.01 ("This part

16

prescribes the procedures used by the Endangered Species Committee *when examining applications for exemption* from section 7(a)(2).") (emphasis added).

58.     Section 7(j) of the ESA directs that the Committee "shall grant an exemption for any agency action if the Secretary of Defense finds that such exemption is necessary for reasons of national security." Part 453 of the regulations further provide that "[i]f the Secretary of Defense finds in writing that an exemption for the agency action is necessary for reasons of national security, the Committee shall grant the exemption notwithstanding any other provision *in this part*." 50 C.F.R. § 453.03(d)(emphasis added).

**C.     The Administrative Procedure Act**

59.     The Administrative Procedure Act ("APA") governs judicial review of federal agency actions. 5 U.S.C. §§ 701-706.

60.     The APA specifies that courts "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law." *Id.* § 706(2)(A), (D). The APA also provides a right of action to "compel agency action unlawfully withheld or unreasonably delayed[.]" *Id.* § 706(1).

**FACTUAL ALLEGATIONS**

**A.     2025 NMFS Biological Opinion on "Gulf of America Oil and Gas Program"**

61.     Although the Secretary's March 16 notice does not directly reference it, NMFS finalized the latest ESA section 7 consultation with BOEM and BSEE regarding oil and gas exploration, development, and production activities in the Gulf in a biological opinion issued on May 20, 2025.

17

62.     The 2025 Biological Opinion ("2025 BiOp") is a programmatic document that analyzes effects of oil and gas activities within the federal Outer Continental Shelf ("OCS"), referring to the offshore waters beginning 10 miles offshore of Florida; 3.5 miles offshore of Louisiana, Mississippi, and Alabama; and 10.3 miles offshore of Texas, extending seaward to the limits of United States jurisdiction, the Exclusive Economic Zone ("EEZ"), to a water depth of 10,978 feet. 2025 BiOp at 123. Divided into three main areas—the western planning area, central planning area, and eastern planning area—the total area encompassed by the BiOp is approximately 95 million acres. *Id*.

63.     The consultation's scope includes Interior's management and regulation of OCS oil and gas-related activities under the Outer Continental Shelf Lands Act from 2025 through 2029, including projections of activities relating to permitting and plan approval and impacts from all prior active leases and future lease sales. *Id.* at 16-18. As such, the BiOp covers 45 years of federally authorized oil and gas activities in the Gulf.

64.     These activities include geological and geophysical surveys; airgun surveys (deep seismic, ocean-bottom, high-resolution, non-airgun, sound-producing high-resolution); drilling (including offshore fracking and high pressure high temperature projects) and production (fixed, floating, or subsea); vessel operations (barges and tankers); helicopter operations; offshore infrastructure and construction (including pile driving, casing conductor installation, and structure and facility pile installation); pipelines; decommissioning and structure removal; and severance operations. *Id.* at 35-78. There are currently 1,366 active platforms in the Gulf. *Id.* at 71.

65.     In the 2025 BiOp, NMFS concluded that these activities were likely to adversely affect ESA-listed species including Rice's and sperm whale, green, hawksbill, Kemp's ridley,

leatherback, and loggerhead sea turtles, and Gulf sturgeon, and designated or proposed critical habitat for Rice's whale, green sea turtle, and Gulf sturgeon. *Id.* at 150-151.

66.    ESA-listed species are by definition either in danger of extinction or will become so in the foreseeable future. The status of Rice's whale, however, is a particularly urgent situation. The only known baleen species to occur in the Gulf year-round, Rice's whales are concentrated in the northeastern Gulf in the De Soto Canyon area at relatively shallow depths of 100 to 400 meters. *Id.* at 160. Recent science has determined that the species is also persistently found in the western and central Gulf at the same depths. The species is critically endangered, with the latest abundance estimates at only 51 animals. *Id.* at 165-166.

67.    Adverse effects to Rice's and sperm whales include vessel strikes; entanglements; and pollution from noise and oil spills, including sounds from chronic, constant sources such as vessel traffic and construction that impair the whale's ability to communicate, navigate, reproduce, or feed. *Id.* at 151-152.

68.    In the 2025 BiOp, NMFS concluded that oil and gas activities in the Gulf were likely to jeopardize the continued existence of Rice's whale due to the risk of vessel strikes. *Id.* at 574. In an effort to ameliorate this predicted impact, NMFS proposed a reasonable and prudent alternative comprised of the following actions to be implemented in step-wise fashion: immediately begin to use technology to enable Rice's whale vessel strike avoidance and monitoring and presence of Rice's whale; establish an expert working group to support development and implementation of a Rice's whale vessel strike avoidance technology plan; improve understanding of Rice's whale vessel strike risk associated with the proposed action; develop a Rice's whale vessel strike avoidance technology plan; undertake independent peer

19

review; implement Rice's whale vessel strike technology plan; and monitor Rice's whales to ensure no likelihood of jeopardy during RPA implementation. *Id.* at 577-581.

69.     In an earlier 2020 BiOp, NMFS found that federally authorized Gulf oil and gas activities are likely to jeopardize the Rice's whale because of the "wide-ranging, combined multiple effects to the small and likely declining population" from five "combined stressors": vessel strikes, vessel noise, marine debris, oil spills and dispersants, and sound from seismic survey. NMFS included an RPA to address only two of those threats: vessel strikes and vessel noise. Specifically, the RPA restricted vessel activity in Rice's whale habitat in the eastern Gulf, including a requirement that oil and gas vessels travel at no more than 10 knots through the area year-round and a prohibition on oil and gas vessels traveling through the area at night or at times of low visibility, except in emergencies for the safety of the vessel or crew. NMFS included the 2020 RPA as part of the baseline in its 2025 BiOp.

70.     The 2025 BiOp also contained an Incidental Take Statement ("ITS") for ESA-listed species likely to be adversely affected including whales (Rice's and sperm) and sea turtles (Kemp's ridley, North Atlantic green, Northwest Atlantic loggerhead, leatherback, and hawksbill). 2025 BiOp at 584-598.

71.     The ITS includes quantified estimates of incidental take for each sea turtle species resulting from geological and geophysical surveys (impairment from seismic survey sound, harassment from seismic survey sound, lethal entanglement in equipment, and entrapment in moon pools) and vessel strikes. The ITS also includes a quantified estimate from geological and geophysical surveys of annual levels of incidental take of Rice's and sperm whales due to sound, and a quantified level of lethal and non-lethal take of Rice's and sperm whales from vessel strikes. *Id.* at 588-591. It does not quantify the extent of take from oil spills or marine debris

expected to occur from Gulf oil and gas drilling activities, nor does it authorize several types of take of Rice's whales and sperm whales that the BiOp acknowledges will likely occur, or contain measures to ensure such take complies with the ESA and Marine Mammal Protection Act.

### B.   FWS Biological Opinion

72.   FWS issued a Biological Opinion regarding BOEM and BSEE authorized oil and gas exploration, development, and production activities in the Gulf on April 20, 2018, responding to the BOEM and BSEE Biological Assessment determining that ESA-listed bird species (Cape Sable seaside sparrow, Mississippi sandhill crane, piping plover, roseate tern, rufa red knot, whooping crane, and wood stork); nesting sea turtles (Kemp's ridley, loggerhead, and loggerhead critical habitat); beach mice (Alabama, Choctawhatchee, St. Andrew, and Perdido Key); and West Indian manatees were either not affected or not likely to be adversely affected by discharges, aircraft noise and operation, vessel noise and operation, drilling and production noise, marine debris, and brightly lit platforms, but were likely to be adversely affected by oil spills. The 2018 FWS BiOp concluded that none of the species would be taken by Gulf oil and gas drilling activities and that none of the species are jeopardized by such activities.

73.   On March 6, 2024, BOEM and BSEE wrote to FWS requesting reinitiation of consultation due to new information, including the listing of black-capped petrel on January 29, 2024; the proposed rules to designate critical habitat for the rufa red knot and North Atlantic distinct population segment of the green sea turtle (for nesting); and an analysis of new information regarding the recent use of the Chandeleur Islands by nesting loggerhead and Kemp's ridley sea turtles. In March 2025, FWS concluded that the proposed actions may affect, but are not likely to adversely affect these listed species. It also re-affirmed its earlier conclusions in the 2018 Biological Opinion.

21

74.     Neither FWS nor NMFS has issued a biological opinion finding jeopardy or adverse modification for any species *and* that there are no reasonable and prudent alternatives that can avoid jeopardy or adverse modification.

### C.      The Secretary's March 16, 2026, Notice of Meeting

75.     On Friday, March 13, 2026, at 6:15 p.m. EDT, the Office of the Secretary for the U.S. Department of the Interior issued a prepublication "Notice of Meeting," stating that "[t]he Endangered Species Committee will meet regarding an Endangered Species Act exemption for Gulf of America Oil and Gas Activities." According to the Notice, published in the Federal Register on Monday, March 16, 2026, the Committee was scheduled to meet on Tuesday, March 31, 2026, at 9:30 a.m. EDT at Department of the Interior Headquarters. 91 Fed. Reg. at 12672.

76.     The March 16, 2026, notice did not indicate whether an exemption application was filed, identify who the applicant was if such an application was filed, or provide any other required information regarding the application or where the public can view the application materials, as required by the ESA and its implementing regulations. The notice provided no explanation as to the basis for convening the Committee in the absence of a determination by NMFS or FWS that oil and gas activities in the Gulf violate section 7(a)(2). Although the government has now revealed that the Secretary of Defense "initiated" the exemption and Committee meeting despite the fact that no exemption application has been submitted, that information was not included in the Federal Register notice or otherwise announced to the public.

### D.      The Center's March 16, 2026, Letter to the Secretary Seeking Public Notification and Information Access Required by the ESA

77.     On March 16, 2026, the Center wrote to the Interior Secretary, invoking the information access obligations imposed by the ESA, citing the pertinent statutory and regulatory

provisions, and demanding by the close of business on March 17, 2026,  all documents presently in the possession of the Interior Department relating in any manner to the "exemption" to be discussed at the upcoming meeting.

78.     By letter to the Center dated March 17, 2026, the Interior Department's Deputy Solicitor for Energy and Mineral Resources responded to the Center's March 16 demand letter. The response did not commit to providing any of the records or other information sought in the Center's letter, and no records or information have subsequently been provided.

**E.     The Secretary of Defense's March 13, 2026 "National Security" "Notification"**

79.     According to the Declaration of Christopher Danley, "[o]n March 13, 2026, the Secretary of War notified the Secretary of the Interior that the Secretary of War found it necessary for reasons for national security to exempt from the [ESA's] requirements all Gulf of America oil and gas exploration and development activities associated with the Department of the Interior [BOEM and BSEE] Outer Continental Shelf Oil and Gas Program." ECF 13-1 at 1. The Declaration provided no details regarding the Defense Secretary's "notification" or "reasons" for the "national security" exemption but stated that "[t]he Committee will make any Committee records open to the public the day it meets." The records were not provided prior to or during the meeting.

80.     By letter to the Secretaries of Defense and Committee dated March 30, 2026, the Center explained, and provided supporting documentation, that there is no national security justification for waiving the ESA's section 7(a)(2) requirements in the Gulf. Among other matters, the Center pointed out that historically high amounts of oil have been produced in the Gulf in recent years and that there is no evidence that protecting endangered and threatened species meaningfully interferes with the production of oil and gas.

23

**F.      The Committee's March 31, 2026, Exemption of Gulf of Mexico Oil and Gas Authorizations Issued by BOEM and BSEE**

81.      On March 31, 2026, the Committee unlawfully convened and unanimously voted to ratify the exemption Defense Secretary Hegseth invoked under ESA section 7(j). No documents regarding the meeting were made available to the public prior to or during the meeting, including but not limited to documentation of the Defense Secretary's national security justification.

82.      While the Committee meeting began at 9:30 a.m. EDT, the public stream did not begin until 10:00 a.m. EDT, demonstrating that the Committee had an unlawful closed session prior to convening the public meeting. During or prior to that time, the Defense Secretary's "national security findings" and attachments to that finding were circulated to Committee members, but were not publicly provided, and as of the filing of this Amended Complaint, have still not been provided.

83.      As announced at the meeting, the Defense Secretary's national security finding is based on the fact that environmental organizations have brought litigation against the NMFS 2025 BiOp and FWS 2018 BiOp and subsequent ESA section 7(a)(2) consultation. No mention was made of the fact that the State of Louisiana and the oil industry are also litigating against the 2025 NMFS BiOp. Neither the Committee members, nor Secretary Hegseth (who also attended the meeting), identified any actual conflict between the outcome of any consultation process and any national security interest. Nor did they identify any actual conflict posed by any litigation concerning the consultation processes.

84.      During the Committee's discussion, the EPA administrator and other Committee members stated that they had "no discretion" to deny the exemption, given the Defense Secretary's national security finding.

85.    In ratifying the Defense Secretary's exemption, the Committee followed none of the procedures and made none of the discretionary findings provided for under ESA section 7(h). The sole basis on which an exemption was granted was the "exemption" invoked by Secretary Hegseth.

86.    Never before in the history of the ESA has the Committee granted a "national security" exemption, nor has the government previously taken the position that a national security exemption can be granted in the absence of an application for an exemption.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**APA Violation Against Defendants Burgum, Rollins, Driscoll, Yared, Zeldin, Jacobs: Unlawful Convening, and Resulting Unlawful Final Exemption Decision of the Endangered Species Committee, in the Absence of an Exemption Application**

87.    Plaintiff incorporates by reference the allegations in all preceding paragraphs.

88.    The Committee may not convene in the absence of a lawful exemption application submitted by a Federal agency, the Governor of the State in which an action agency will occur, or a permit or license applicant. 16 U.S.C. § 1536(g)(1); 50 C.F.R. § 451.02(c)(1)-(3). An application exemption may only be submitted after NMFS or FWS has determined that a proposed federal action is likely to jeopardize the continued existence of a species listed under the ESA, and that there are no "reasonable and prudent alternatives" that would avoid this jeopardy. 16 U.S.C. § 1536(f)(1)-(2); 50 C.F.R. §§ 451.02(c)(2)-(4), 451.03,  451.02(e)(2)(viii), (e)(3)(ix), (e)(4)(viii).

89.    When an exemption application is received, the Interior Secretary as Committee Chair must make threshold determinations, including that "the Federal agency concerned and the exemption applicant" have carried out the consultation duties "in good faith and made a reasonable and responsible effort to develop and fairly consider modifications or reasonable and

25

prudent alternatives to the proposed action which would not violate subsection 7(a)(2)." 16 U.S.C. § 1536(g)(3)(A)(i); 50 C.F.R. § 452.03(a)(3).

90.    Defendants do not dispute that there has been no exemption application. Defendants also do not dispute that there is no biological opinion from FWS or NMFS finding that there is an irreconcilable conflict with using the ESA's ordinary consultation procedures.

91.    Defendants instead allege that when the Secretary of Defense "initiates" an exemption pursuant to his purported authority under section 7(j), 16 U.S.C. § 1536(j), the Committee *must* meet to consider, and *must* approve, that exemption *in the absence of an application*, without meeting the ESA's procedural or substantive requirements in section 7(h) relating to the Committee's discretionary consideration and approval of exemption applications.

92.    Gulf of Mexico oil and gas operations adversely affect numerous threatened and endangered species, and NMFS has repeatedly determined that some oil and gas operations, including vessel traffic, jeopardize the continued existence of Rice's whales, of which only 51 animals remain on Earth. NMFS, however, has been able to identify reasonable and prudent alternatives in each instance that it believes would mitigate the jeopardy. These operations thus do not fall in in the very rare category of a federal action that would be eligible for an exemption application to the Committee, which is why no application has, in fact, been submitted in this case.

93.    The scope of the government's asserted authority under section 7(j) would extend well beyond the present circumstance, however. Under its extreme interpretation, the Defense Secretary has the power to "initiate" an ESA section 7 exemption—that then must be approved by the Committee—*for any project at any time*, simply by invoking the words "national

security." This authority applies, according to the government, even where there exists no conflict between the proposed federal action and the protection of listed species.

94.    Defendants' position that the Defense Secretary has a free-floating, roving authority to initiate an ESA exemption in the absence of a lawful exemption application is contrary to the text and structure of the Act, and would in fact negate the ESA's overall statutory scheme "affording endangered species the highest of priorities." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 194 (1978).

95.    The Committee is not empowered to meet and grant an exemption in the absence of a lawful exemption application that meets the threshold requirements for such an application in the Act and its implementing regulations. Thus, the Interior Secretary's invocation of the Committee, and the Committee's resulting decisions—based on the position that the Defense Secretary can not only compel the Committee to meet simply by invoking "national security," but that the Committee then has a ministerial duty to approve any exemption demanded by the Defense Secretary untethered from any of the Act's threshold requirements for an exemption—is arbitrary, capricious, an abuse of discretion, and not otherwise in accordance with law. This Court has the authority and responsibility to reject the government's radical and unprecedented rereading of the ESA as contrary to the "best" reading of the Act. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024).

96.    Even if the Interior Secretary and Committee otherwise had the authority and/or duty to grant an exemption at the request of the Defense Secretary, nothing in section 7(j) precludes the Committee from adopting mitigation measures that could protect listed species without in any way interfering with national security. The Committee's failure to do so is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

97.     The Interior Secretary's convening of the Committee, and the Committee's subsequent adoption of an exemption in the absence of a lawful exemption application, is therefore arbitrary, capricious, made without procedure required by law, and otherwise not in accordance with law, in violation of the ESA and its implementing regulations and the APA. 5 U.S.C. § 706(2)(A), (D).

## SECOND CLAIM FOR RELIEF
### APA Violation Against Secretary Burgum, Rollins, Driscoll, Yared, Zeldin, Jacobs: Violation of, and/or Unlawful Withholding of, Information Access Requirements

98.     Plaintiff incorporates by reference the allegations in all preceding paragraphs.

99.     The ESA requires that all Committee meetings and records shall be open to the public. *See* 16 U.S.C. § 1536(e)(5)(D) ("[a]ll meetings and records of the Committee shall be open to the public."); *id*. § 1536(g)(8) ("All meetings and records resulting from activities pursuant to this subsection shall be open to the public.").

100.     Prior to today's meeting, the Interior Secretary and other Committee members refused to make any documents available to the public, including any documentation of Secretary Hegseth's national security justification. Moreover, while the Committee meeting began at 9:30 a.m. EDT, the public stream did not begin until 10:00 a.m. EDT, demonstrating that the Committee had an unlawful session prior to convening the public meeting, in violation of the ESA's open meeting requirement. During or prior to that time, the Defense Secretary's "national security findings" and attachments to that finding were circulated to Committee members, but were not publicly provided. Although the Committee has now ratified the exemption, on information and belief, and as of the filing of this amended Complaint, the Committee has still not made "all" Committee records available to the public.

101.    The Secretary's decision to call a meeting and the Committee's resulting adoption of an exemption without satisfying the ESA's public notification and information access requirements is arbitrary, capricious, made without procedure required by law, and is otherwise not in accordance with law. 5 U.S.C. § 706(2)(A), (D). The Committee's apparent closing of a portion of the meeting violates the ESA's requirement that "all" meetings of the Committee be open to the public. Because all Committee records still have not been made available to the public, such access is being unreasonably delayed and unlawfully withheld in violation of 5 U.S.C. § 706(1).

### THIRD CLAIM FOR RELIEF
### Mandamus Relief Against Secretary Burgum, Rollins, Driscoll, Yared, Zeldin, Jacobs: Failure to Comply With the ESA's Mandatory Disclosure Obligations

102.    Plaintiff incorporates by reference the allegations in all preceding paragraphs.

103.    The ESA requires that "[a]ll meetings and records resulting from activities pursuant to this subsection shall be open to the public." 16 U.S.C. § 1536(e)(5)(D). On information and belief, the Committee has yet to make all of its records available to the public.

104.    A writ of mandamus is therefore warranted to compel Defendants to provide the Center with the access to information, documents, and meetings that the ESA mandates. 28 U.S.C. § 1361.

### FOURTH CLAIM FOR RELIEF
### APA Violation Against Defendant Hegseth: Unlawful National Security Determination

105.    Plaintiff incorporates by reference the allegations in all preceding paragraphs.

106.    Secretary Hegseth's determination that exempting Gulf oil and gas exploration and development activities authorized by BOEM and BSEE from ESA section 7(a)(2) consultation requirements is needed for reasons of national security lacks a rational basis,

fails to consider relevant factors, and runs counter to the evidence before him. For example, there is no evidence that ESA section 7(a)(2) consultation requirements and/or judicial review of such requirements, are in irresolvable conflict with BOEM and BSEE authorization of Gulf oil and gas operations, as reflected by the absence of an exemption application regarding that authorization. Notwithstanding the ESA's expansive citizen suit provision, reflecting Congressional intent to provide for such judicial review, Secretary Hegseth primarily justifies the exemption on the mere fact that litigation has been brought regarding ESA section 7(a)(2) consultations regarding Gulf oil and gas operations. The presence of litigation is not a rational basis for invoking the national security exemption, and could be applied to any litigation or threat of litigation under any circumstances. Secretary Hegseth's finding is therefore arbitrary, capricious, made without procedure required by law, and otherwise not in accordance with law. 5 U.S.C. § 706(2)(A), (D).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that this Court:

1.    Declare Secretary Burgum's March 31, 2026, convening of the Endangered Species Act Committee, and the Committee's (in addition to Defendant Burgum, Defendant Rollins, Driscoll, Yared, Zeldin, and Jacobs) resulting decision to exempt Gulf of Mexico oil and gas exploration and development activities authorized by BOEM and BSEE from ESA section 7(a)(2) consultation requirements, in the absence of a lawful exemption application, as arbitrary, capricious, in violation of the ESA's requirements, and otherwise not in accordance with law;

2.     Vacate the Committee's exemption of ESA section 7(a)(2) consultation requirements issued on March 31, 2026, and enjoin the Committee from convening or issuing

any further exemptions without full observance of the requirements of the ESA and its implementing regulations;

3. Issue a writ of mandamus compelling Defendants Burgum, Rollins, Driscoll, Yared, Zeldin, and Jacobs to comply with the public access requirements of the ESA;

4. Declare that Secretary Hegseth's finding that exempting Gulf of Mexico oil and gas exploration and development activities authorized by BOEM and BSEE from ESA section 7(a)(2) consultation requirements was necessary for reasons of national security is arbitrary, capricious, and otherwise not in accordance with law;

5. Vacate Secretary Hegseth's national security finding;

6. Retain jurisdiction to ensure compliance with the Court's Orders;

7. Award Plaintiff its reasonable costs of litigation, including reasonable attorneys' fees, expert fees, and costs; and

8. Grant such other and further relief as the Court may deem just and proper.

DATED: March 31, 2026                    Respectfully submitted,

/s/ *Eric R. Glitzenstein*
Eric R. Glitzenstein (D.C. Bar No. 358287)
Center for Biological Diversity
1411 K Street NW, Suite 1300
Washington, DC 20005
Phone: (202) 849-8401
Email: eglitzenstein@biologicaldiversity.org

/s/ *Brian Segee*
Brian Segee (CA Bar No. 200795)
Center for Biological Diversity
226 W. Ojai Ave., Ste. 101-442
Ojai, CA 93023-3278
Phone: 805-750-8852
Email: bsegee@biologicaldiversity.org
*Admitted Pro Hac Vice*

/s/ *Kristen Monsell*

31

Kristen Monsell (D.C. Bar No. CA00060)
Center for Biological Diversity
2100 Franklin St., Suite 375
Oakland, CA 94612
Phone: (510) 844-7137
Email: kmonsell@biologicaldiversity.org

/s/ *Lindsay E. Reeves*
Lindsay E. Reeves (La. Bar No. 32703)
Center for Biological Diversity
3436 Magazine Street, FRNT PMB 539
New Orleans, LA 70115
Phone: (504) 342-4337
Email: lreeves@biologicaldiversity.org
*Admitted Pro Hac Vice*


*Attorneys for Plaintiff*