**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, <br><br>        Plaintiff, <br><br> v. <br><br> DOUGLAS BURGUM, in his official capacity as Secretary of the Interior and Chair of the Endangered Species Committee, et al., <br><br>        Defendants. | Case No. 1:26-cv-940 (RC) |

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

**ORAL ARGUMENT REQUESTED**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................. iii

INTRODUCTION ........................................................................................................... 1

LEGAL BACKGROUND ............................................................................................... 3

    I.    The Endangered Species Act Section 7 Consultation Process. ........................... 3

    II.    The Endangered Species Committee Section 7 Exemption Process. ................... 5

    III.    The Administrative Procedure Act's Judicial Review Provision. ...................... 9

FACTUAL BACKGROUND ........................................................................................... 9

    I.    Federal Oversight of Oil and Gas Activities in the Gulf Outer Continental Shelf. ............ 9

    II.    The Gulf's Natural Environment and Its Central Importance to Many Endangered and Threatened Species. .................................................................... 10

    III.    No Gulf of Mexico ESA Section 7 Consultations Have Culminated in an Irresolvable Conflict with Oil and Gas Activities. .............................................. 11

    IV.    On March 13, 2026, the Defense Secretary Informs the Interior Secretary that He Is Invoking a Section 7(j) Exemption Despite the Lack of an Exemption Application and in the Absence of an Irresolvable Conflict Between Gulf Oil and Gas Activities and Interior's Compliance with Its ESA Section 7 Duties. ............. 13

    V.    On March 31, 2026, Six Members of the Endangered Species Committee Ratify the Section 7(j) Determination Without Meeting Any of the ESA's Statutory Requirements, Including the Requirements of Section 7(h). ............................... 15

    VI.    The Center's Lawsuit. ......................................................................................... 15

STANDARD OF REVIEW ............................................................................................. 16

ARGUMENT ................................................................................................................... 17

    I.    The Judicial Review Provision of Section 7(n) Does Not Apply to the Committee's Exemption Decision, Which Was Not Made "Under" Section 7(h). ............... 18

        A.    The ESA's Text Demonstrates that Section 7(n) Is Inapplicable to the Committee's Exemption Decision. .......................................................... 20

        B.    The ESA's Statutory Structure and Purpose Demonstrates That Section 7(n) Is Inapplicable to the Committee's Exemption Decision. .................... 23

        C.    Defendants' Circumvention of the ESA's Detailed Special Statutory Review Scheme Undermines the Rationale for Original Appellate Review. ................. 27

i

D.    Defendants' Jurisdictional Statement Is Not Entitled Any Deference. ................ 29

II.    The District Court Has Jurisdiction to Hear the Center's Claim Challenging
Defendants' Violation of the ESA's Information Access Requirements......................... 30

III.    The Center Has Plausibly Pled a Mandamus Claim. ........................................................ 32

IV.    The Secretary of War's Invocation of 7(j) Is Not Encompassed by Section 7(n)'s
Jurisdictional Scope and Is Reviewable............................................................................ 38

CONCLUSION......................................................................................................................... 40

## TABLE OF AUTHORITIES

**Cases**

*Abbott Labs. v. Gardner*,
387 U.S. 136 (1967)................................................................................................ 38

*AHA v. Burwell*,
812 F.3d 183 (D.C. Cir. 2016)...................................................................... 32, 33, 34

*Am. Energy v. Burgum*,
No. 26-60240 (5th Cir.) ........................................................................................... 27

*Am. Foreign Serv. Ass'n v. Trump*,
783 F. Supp. 3d 248 (D.D.C. 2025).......................................................................... 29

\* *Am. Petroleum Inst. v. SEC*,
714 F.3d 1329 (D.C. Cir. 2013)............................................................ 19, 20, 22, 25

*Am. Soybean Ass'n v. Regan*,
77 F.4th 873 (D.C. Cir. 2023).................................................................................. 23

*Arch Coal, Inc. v. Acosta*,
888 F.3d 493 (D.C. Cir. 2018).................................................................................. 28

*Ardestani v. I.N.S.*,
502 U.S. 129 (1991).................................................................................................. 20

*Ass'n of Civil Technicians, Mont. Air Chapter No. 29 v. FLRA*,
22 F.3d 1150 (D.C. Cir. 1994).................................................................................. 32

\* *Axon Enter., Inc. v. FTC*,
598 U.S. 175 (2023)...................................................................................... 19, 20, 27

*Bennett v. Spear*,
520 U.S. 154 (1997) ..................................................................................9, 16, 26, 31

*Block v. Cmty. Nutrition Inst.*,
467 U.S. 340 (1984).................................................................................................. 38

\* *Bombardier, Inc. v. U.S. Dep't of Labor*,
145 F. Supp. 3d 21 (D.D.C. 2015)........................................................ 19, 27, 28, 29

*Cutler v. Hayes*,
818 F.2d 879 (D.C. Cir. 1987).................................................................................. 31

*Dunlop v. Bachowski*,
421 U.S. 560 (1975).................................................................................................. 38

*Elec. Privacy Info. Ctr. v. Nat'l Sec. Comm'n on A.I.*,
466 F. Supp. 3d 100 (D.D.C. 2020).......................................................................... 34

*Elgin v. Dep't of the Treasury*,
567 U.S. 1 (2012)................................................................................................ 23, 28

*Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*,
36 F.4th 850 (9th Cir. 2022) .................................................................................... 29

*FDA v. All. for Hippocratic Med.*,
  602 U.S. 367 (2024)......................................................................................... 34

*Fed. Educ. Ass'n v. Trump*,
  795 F. Supp. 3d 74 (D.D.C. 2025)................................................................. 29

*Holder v. Humanitarian Law Project*,
  561 U.S. 1 (2010)............................................................................................ 39

*Humane Soc'y of the United States v. Vilsack*,
  797 F.3d 4 (D.C. Cir. 2015)............................................................................ 16

*In re Nat. Res. Def. Council*,
  645 F.3d 400 (D.C. Cir. 2011)........................................................................ 25

*Indep. Broker-Dealers Trade Ass'n v. SEC*,
  442 F.2d 132 (D.C. Cir. 1971)................................................................. 29, 30

*Jarkesy v. SEC*,
  803 F.3d 9 (D.C. Cir. 2015)....................................................................... 19, 28

*Johnson v. Penetta*,
  953 F. Supp. 2d 244 (D.D.C. 2013)................................................................ 38

*Judicial Watch, Inc. v. U.S. Dep't of Commerce*,
  736 F. Supp. 2d 24 (D.D.C. 2010)................................................................. 34

*Judulang v. Holder*,
  565 U.S. 42 (2011).......................................................................................... 39

*Jung v. Mundy, Holt & Mance, P.C.*,
  473 F. Supp. 2d 86 (D.D.C. 2007)................................................................. 31

*Kirwa v. U.S. Dep't of Def.*,
  285 F. Supp. 3d 257 (D.D.C. 2018)................................................................ 39

*Kucana v. Holder*,
  558 U.S. 233 (2010)........................................................................................ 23

*Learning Res., Inc. v. Trump*,
  146 S. Ct. 628 (2026)...................................................................................... 39

*Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach*,
  523 U.S. 26 (1998).......................................................................................... 32

*Loan Syndications and Trading Ass'n v. SEC*,
  818 F.3d 716 (D.C. Cir. 2016)........................................................................ 19

*Loper Bright Enters. v. Raimondo*,
  603 U.S. 369 (2024)........................................................................................ 23

*Murphy Expl. & Prod. Co. v. U.S. Dep't of the Interior*,
  252 F.3d 473, (D.C. Cir. 2001), *modified on denial of petition for reh'g*,
  270 F.3d 957 (D.C. Cir. 2001)........................................................................ 30

*Nader v. Volpe*,
  466 F.2d 261 (D.C. Cir. 1972)........................................................................ 31

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
  551 U.S. 644 (2007) .................................................................................. 32, 35

\* *Nat'l Ass'n of Mfrs. v. Dep't of Def.*,
  583 U.S. 109 (2018) .......................................................................... 20, 25, 26

*Nat'l Mining Ass'n v. Dep't of Lab.*,
  292 F.3d 849 (D.C. Cir. 2002) ...................................................................... 28

*Nat'l Treasury Emps. Union v. Trump*,
  780 F. Supp. 3d 237 (D.D.C. 2025) ............................................................. 29

*Neighborhood Assistance Corp. of Am. v. Consumer Fin. Prot. Bureau*,
  907 F. Supp. 2d 112 (D.D.C. 2012) ............................................................. 16

*NetCoalition v. SEC*,
  715 F.3d 342 (D.C. Cir. 2013) ................................................................ 19, 30

*NO Gas Pipeline v. FERC*,
  756 F.3d 764 (D.C. Cir. 2014) ...................................................................... 27

*Oceana, Inc. v. Ross*,
  920 F.3d 855 (D.C. Cir. 2019) ...................................................................... 35

*Olu-Cole v. E.L. Haynes Pub. Charter Sch.*,
  376 F. Supp. 3d 77 (D.D.C. 2019) ............................................................... 16

*Pac. Shores Subdivision Cal. Water Dist. v. U.S. Army Corps of Engr's*,
  448 F. Supp. 2d 1 (D.D.C. 2006) ................................................................. 35

*Pereira v. Sessions*,
  585 U.S. 198 (2018) ...................................................................................... 26

*Pub. Citizen v. U.S. Dep't of Justice*,
  491 U.S. 440 (1989) ...................................................................................... 33

*Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*,
  489 F.3d 1279 (D.C. Cir. 2007) .................................................................... 20

*Shaughnessy v. Pedreiro*,
  349 U.S. 48 (1955) .......................................................................................... 9

*Sierra Club v. EPA*,
  No. 25-1112, 2026 WL 686323 (D.D.C. Mar. 11, 2026) ............................. 33

*Sierra Club v. Thomas*,
  828 F.2d 783 (D.C. Cir. 1987) ...................................................................... 32

*St. Louis Fuel & Supply Co. v. FERC*,
  890 F.2d 446 (D.C. Cir. 1989) ...................................................................... 21

*Telecomms. Rsch. & Action Ctr. v. FCC*,
  750 F.2d 70 (D.C. Cir. 1984) ........................................................................ 31

*Tenn. Valley Auth. v. Hill*,
  437 U.S. 153 (1978) .................................................................................... 3, 5

*Wagner v. FEC*,
    717 F.3d 1007 (D.C. Cir. 2013) ......................................................................... 20

*Watts v. SEC*,
    482 F.3d 501 (D.C. Cir. 2007) ........................................................................... 19

*Xiaomi Corp. v. U.S. Dep't of Def.*,
    No. 21-cv-280, 2021 WL 950144 (D.D.C. Mar. 12, 2021) ...................................... 39

**Statutes**

16 U.S.C. § 1531(a)(1) ............................................................................................ 3

16 U.S.C. § 1531(a)(2) ............................................................................................ 3

16 U.S.C. § 1531(a)(3) ............................................................................................ 3

16 U.S.C. § 1531(c) ................................................................................................ 3

16 U.S.C. § 1536(a)(2) ................................................................................... 3, 4, 11

16 U.S.C. § 1536(b)(3)(A) ....................................................................................... 5

16 U.S.C. § 1536(e)(3) ............................................................................................ 6

16 U.S.C. § 1536(e)(3)(G) ....................................................................................... 7

* 16 U.S.C. § 1536(e)(5)(D) ........................................................................ 32, 33, 34

16 U.S.C. § 1536(f)(2) ............................................................................................. 6

16 U.S.C. § 1536(g) ............................................................................................... 24

16 U.S.C. § 1536(g)(1) ............................................................................................ 6

16 U.S.C. § 1536(g)(2)(B) .................................................................................. 7, 22

16 U.S.C. § 1536(g)(2)(B)(i) .................................................................................... 7

16 U.S.C. § 1536(g)(2)(B)(ii) ................................................................................... 7

16 U.S.C. § 1536(g)(3) ............................................................................................ 7

* 16 U.S.C. § 1536(g)(3)(B) ............................................................................... 7, 24

16 U.S.C. § 1536(g)(4) ............................................................................................ 7

16 U.S.C. § 1536(g)(5) ........................................................................................ 7, 8

* 16 U.S.C. § 1536(h) ........................................................................................... 24

* 16 U.S.C. § 1536(h)(1) ......................................................................................... 8

* 16 U.S.C. § 1536(h)(1)(A) .............................................................................. 21, 22

* 16 U.S.C. § 1536(h)(1)(A)(i) ........................................................................... 8, 22

* 16 U.S.C. § 1536(h)(1)(A)(ii) .......................................................................... 8, 22

* 16 U.S.C. § 1536(h)(1)(A)(iii) ............................................................................. 22

* 16 U.S.C. § 1536(h)(1)(A)(iv) ............................................................................. 22

16 U.S.C. § 1536(i) ........................................................................................................... 7

16 U.S.C. § 1536(j) ...................................................................................................... 8, 25

* 16 U.S.C. § 1536(n) ......................................................................................... 20, 25, 31

28 U.S.C. § 1331 ............................................................................................................. 19

28 U.S.C. § 1361 ............................................................................................................. 32

43 U.S.C. § 1331 *et seq.* ................................................................................................ 10

5 U.S.C. § 551(13) ............................................................................................................ 9

5 U.S.C. § 552(b) ............................................................................................................ 33

5 U.S.C. § 704 .............................................................................................................. 9, 31

5 U.S.C. § 706(2)(A) ......................................................................................................... 9

5 U.S.C. § 706(2)(D) ......................................................................................................... 9

5 U.S.C. §§ 701-706 .......................................................................................................... 9

## Regulations

30 C.F.R. § 250.101 ........................................................................................................ 10

30 C.F.R. § 550.101 ........................................................................................................ 10

50 C.F.R. § 402.03 ............................................................................................................. 4

50 C.F.R. § 402.13 ............................................................................................................. 4

50 C.F.R. § 402.14(a) ..................................................................................................... 4, 11

50 C.F.R. § 402.14(b)(1) ................................................................................................... 4

50 C.F.R. § 402.14(c) ........................................................................................................ 4

50 C.F.R. § 402.14(d) ........................................................................................................ 4

50 C.F.R. § 402.14(g) ........................................................................................................ 4

50 C.F.R. § 402.14(g)(5) ................................................................................................... 5

50 C.F.R. § 402.14(g)(8) ................................................................................................... 4

50 C.F.R. § 402.14(h) ........................................................................................................ 4

50 C.F.R. § 402.14(h)(2) ................................................................................................... 5

50 C.F.R. § 451.02(c)(1) ................................................................................................... 6

50 C.F.R. § 451.02(c)(2) ................................................................................................... 6

50 C.F.R. § 451.02(c)(3) ................................................................................................... 6

50 C.F.R. § 451.03(b)(1) ................................................................................................... 7

50 C.F.R. § 451.03(b)(2) ................................................................................................... 7

50 C.F.R. § 452.03(a) ........................................................................................................ 7

50 C.F.R. § 452.03(c)............................................................................................................... 7

50 C.F.R. § 452.03(e)............................................................................................................... 7

50 C.F.R. § 452.04(a)........................................................................................................... 7, 8

50 C.F.R. § 452.05 .................................................................................................................. 7

50 C.F.R. § 452.08 .................................................................................................................. 8

* 50 C.F.R. § 453.01 .......................................................................................................... 8, 24

50 C.F.R. § 453.03(a)............................................................................................................... 8

* 50 C.F.R. § 453.03(d) ........................................................................................................... 8

* 50 C.F.R. Part 451............................................................................................................... 24

* 50 C.F.R. Part 452............................................................................................................... 24

* 50 C.F.R. Part 453........................................................................................................... 8, 24

## Regulations

91 Fed. Reg. 12672 (Mar. 16, 2026).................................................................................... 15

91 Fed. Reg. 16966 (Apr. 3, 2026) ................................................................... 14, 15, 22, 29

## Treatises

Pub. L. No. 95-632, § 2(4), 92 Stat. 3751 (1978) .................................................................. 6

S. Rep. No. 418, 97th Cong., 2d Sess. 17 (1982) .................................................................. 5

## Rules

Fed. R. Civ. P. 12(b)(1)......................................................................................................... 16

## Other Authorities

*Black's Law Dictionary* (12th ed. 2024)............................................................................... 21

Congressional Research Service, *Endangered Species Act (ESA): The Exemption Process*
(Jan. 27, 2017) ................................................................................................................... 6

David B. Liner, *Environmental Law – The Endangered Species Act Amendments of 1978:
Congress Responds to Tennessee Valley Authority v. Hill.*, 25 Wayne L. Rev. 1327 (Sept.
1979) ............................................................................................................................. 5, 24

Jacob W. Malcom & Ya-Wei Li, *Data Contradict Common Perceptions About a
Controversial Provision of the U.S. Endangered Species Act*, 112(52) PNAS 15844
(2015)............................................................................................................................... 4, 5

Letter from Pete Hegseth, Sec'y of War, to Doug Burgum, Sec'y of Interior, Request for
ESA Exemption for Gulf of America Oil and Gas Activities (Mar. 13, 2026) ........................ 14

NOAA, *The Gulf of Mexico at a Glance: A Second Glance* (NOAA State of the Coast
    Report Series, June 2011) .................................................................................................... 10

**INTRODUCTION**

In its 1978 amendments to the Endangered Species Act ("ESA" or "the Act"), Congress created the Endangered Species Committee—informally known as the "God Squad"—and gave it the power to decide on applications for exemptions from the Act's stringent protections. But Congress did not want the exemption application process to be a rubber stamp escape route for any federal project to sidestep ESA requirements. Instead, it limited the Committee's authority to projects in irresolvable conflict with the measures needed to ensure against a species' extinction, established rigorous requirements for the exemption applications, and prescribed Committee hearing procedures in extraordinary detail.

For nearly 50 years, the Committee has operated as Congress intended: a rarely convened administrative court of last resort. Reflecting the iterative flexibility of the ESA's section 7 consultation framework, as well as the substantive and procedural demands of navigating the exemption process, the God Squad has received only a handful of exemption applications since its creation, and none since the early 1990s.

For the first time in the ESA's history, earlier this year a subset of Committee members issued a preemptive and sweeping exemption for oil and gas exploration, development, and production activities in the "Gulf of America," even though no exemption application has been submitted and no irresolvable conflict exists. Relying solely on an arbitrary determination by the "Secretary of War" that ongoing litigation challenging section 7 consultations on Gulf oil and gas activities somehow threatens national security, the Committee members ratified the exemption in express disregard of the ESA's detailed informational, procedural, and substantive requirements for the consideration of exemption applications.

1

Defendants the Secretary of the Interior *et al.* now move to dismiss Plaintiff Center for Biological Diversity's ("the Center") suit based on the allegation that challenges to all Committee decisions must be brought in the court of appeals. As detailed in this brief, the ESA's text, structure, and purpose all say otherwise. The Center does not dispute that Congress directed legal challenges to decisions resulting from the Committee's intricate administrative process for considering exemption applications to the courts of appeals. Here, however, there was no such process and no exemption application, because there is no irresolvable conflict between Gulf oil and gas activities and the ESA's ordinary protections under section 7 of the ESA. Instead, the Committee has dispensed with *all* the procedural and substantive requirements that Congress imposed for an exemption application decision under section 7(h) of the statute while simultaneously invoking the very provision it has disregarded as the basis for appellate jurisdiction.

The Committee's ratification of the Defense Secretary's unilateral "national security" determination despite the lack of an exemption application, or the lawful basis for such application, eviscerates the finely wrought requirements Congress deliberately and meticulously prescribed to govern God Squad deliberations. The Committee's action not only needlessly poses a grave risk to the continued existence of the Rice's whale and other imperiled species, but also renders the appellate court jurisdictional provision, section 7(n), immaterial to the Committee's action. By its plain terms, that provision applies *only* when the Committee has made a decision in accordance with section 7(h). Where, as here, the Committee has expressly avoided any compliance with that provision, it cannot avail itself of the limited grant of jurisdiction in the court of appeals.

This Court also has jurisdiction over the Center's separate claim against Secretary Hegseth's arbitrary invocation of national security under section 7(j). Nowhere in the ESA has

2

Congress vested jurisdiction in the court of appeals over a Defense Secretary's national security determination made outside of the exemption application process, nor is there any evidence that Congress intended to prohibit judicial review of such determination. Finally, the Center has valid claims under the ESA and for mandamus jurisdiction in this Court based on the ongoing violation of the Committee's mandatory duty under section 7(e) to make "all" of its records "open to the public."

Because jurisdiction over the Center's claims properly arises in this Court, Defendants' motion to dismiss must accordingly be denied.

## LEGAL BACKGROUND

### I.    The Endangered Species Act Section 7 Consultation Process.

The ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978). Finding that "fish, wildlife, and plants are of esthetic, ecological, educational, historical, recreational, and scientific value to the Nation and its people," Congress directed that all federal agencies shall "seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes" of the Act. 16 U.S.C. § 1531(a)(1)–(3), (c). To that end, the ESA establishes substantive and procedural safeguards for species that are listed as endangered or threatened, as well as for the formally designated "critical habitats" of such species.

Most relevant here, section 7 of the ESA prohibits federal agencies from taking any action that is likely to jeopardize the continued existence of listed species or destroy or adversely modify a species' critical habitat. *Id.* § 1536(a)(2). These prohibitions reflect "a conscious decision by Congress to give endangered species priority over the 'primary missions' of federal agencies." *Tenn. Valley Auth.*, 437 U.S. at 185.

3

To meet this substantive mandate, section 7 requires agencies to consult with either the National Marine Fisheries Service ("NMFS") or the U.S. Fish and Wildlife Service ("FWS"), or both, depending on the species at issue, before engaging in any discretionary action that may affect a listed species or critical habitat. *See* 16 U.S.C. § 1536(a)(2); 50 C.F.R. §§ 402.03, 402.14(a). During the consultation process, both the action agency and the Services must "use the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(d), (g)(8).

Once an action agency determines that its action "may affect" a listed species or critical habitat, consultation, either formal or informal, is required. The process ends informally if the action agency determines an action "is not likely to adversely affect any listed species or critical habitat" and the Service issues a written concurrence. 50 C.F.R. §§ 402.13, 402.14(b)(1). A relatively recent review of approximately 25,000 section 7 consultations conducted from 2000 to 2017 found that nearly 80 percent were resolved informally. Jacob W. Malcom & Ya-Wei Li, *Data Contradict Common Perceptions About a Controversial Provision of the U.S. Endangered Species Act*, 112(52) PNAS 15844-15849 (2015) ("Malcom & Li").

For those relatively infrequent actions where the action agency or Services instead determine that an action is likely to adversely affect a listed species or destroy or adversely modify a species' critical habitat, "formal consultation" is conducted. Formal consultation culminates in the Services issuing a "biological opinion" advising the action agency as to whether the proposed action, alone or taken together with cumulative effects, "is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat." 50 C.F.R. § 402.14(c), (g), (h).

The vast majority of biological opinions conclude that an action is not likely to jeopardize a listed species or adversely modify a species' critical habitat. Of the 4,934 formal consultations

4

conducted between 2000 and 2017, only 72 (constituting 1.5 percent of formal and 0.3 percent of all consultations) resulted in jeopardy findings, and 55 (constituting 1.1 percent of formal and 0.2 percent of all consultations) resulted in findings of adverse modification of critical habitat. Malcom & Li at 15486.

If a Service determines that jeopardy is likely, it must provide the action agency with "reasonable and prudent alternatives" to the proposed action that would avoid that result, if such alternatives exist. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(g)(5), (h)(2). For the miniscule percentage of ESA section 7 consultations that do result in a jeopardy determination, almost all these determinations can be addressed through the development of such prudent alternatives. For example, of FWS consultations conducted between 2008 to 2015, *none* of the 88,290 actions had been "stopped or extensively altered as a result of FWS finding jeopardy or destruction/adverse modification." Malcom & Li at 15846.

## II.    The Endangered Species Committee Section 7 Exemption Process.

The Endangered Species Act amendments of 1978 were enacted in response to the *Tennessee Valley Authority v. Hill* decision, in which the Supreme Court held that the Tennessee Valley Authority's continued construction of the largely completed Tellico Dam project was prohibited by section 7 of the ESA because it would inundate the only known population of an endangered fish on the Little Tennessee River. 437 U.S at 171–73. Although proposed amendments were introduced to dramatically weaken or eliminate section 7 requirements, Congress rejected this approach. It instead created a "comprehensive administrative scheme to promote interagency cooperation and to avoid conflict between the interests of particular projects and the protection of endangered species," and vested the Committee with administering this scheme. David B. Liner, *Environmental Law – The Endangered Species Act Amendments of 1978: Congress Responds to Tennessee Valley Authority v. Hill*, 25 Wayne L. Rev. 1327, 1335

5

(Sept. 1979) ("Liner").

The Committee "is designed to function as an *administrative court of last resort*." S. Rep. No. 418, 97th Cong., 2d Sess. 17 (1982) (emphasis added). To that end, Congress expressly limited the Committee's authority to instances where a Service has determined that a specific action will jeopardize the continued existence of a species and/or destroy or adversely modify the species' critical habitat *and* there remains an irresolvable conflict concerning how to address that determination. Pub. L. No. 95-632, § 2(4), 92 Stat. 3751 (1978); 16 U.S.C. § 1536(g)(1), *id*. § 1536(f)(2) (information submitted in an exemption application must include "a statement describing why such action cannot be altered or modified to conform with the requirements of" of section 7(a)(2)).

Reflecting its specific and limited statutory role as an administrative court of last resort, the Committee has adjudicated only three exemption applications in the 47 years since its creation, with one exemption denied and the other two exemptions granted. Three additional exemption applications were filed but abandoned. *See* Congressional Research Service, *Endangered Species Act (ESA): The Exemption Process* 14-21 (Jan. 27, 2017). The last time the Committee even met to consider an exemption application was in 1992. *Id*. at 19. In these last resort situations, the Committee has the extraordinary responsibility of allowing the likely extinction of an entire species and is thus commonly referred to as the God Squad.

In this rare circumstance, a Federal agency, Governor of an affected state, or a permit or license applicant may submit an exemption application to the Committee. *Id*.; 50 C.F.R. § 451.02(c)(1)–(3). The Committee is chaired by the Secretary of the Interior and composed of five other executive branch officials: the Secretaries of Agriculture and the Army, the Chairman of the Council of Economic Advisers, and the Administrators of the Environmental Protection Agency and the National Oceanic and Atmospheric Administration. 16 U.S.C. § 1536(e)(3).

Upon receipt of an exemption application, the Interior Secretary "shall promptly [] notify the Governor of each affected State, if any," "request the Governors so notified to recommend individuals to be appointed" to the Committee, and "publish notice of receipt of the application in the Federal Register, including a summary of the information contained in the application." 16 U.S.C. § 1536(g)(2)(B)(i)–(ii); 50 C.F.R. § 451.03(b)(1). The President appoints one individual from each affected State to be a member of the Committee in relation to the specific application. 16 U.S.C. § 1536(e)(3)(G), (g)(2)(B); 50 C.F.R. § 451.03(b)(1). If there is no affected State, the President (following advice from the Interior Secretary) appoints an individual "with expertise relevant to the application" to the Committee. 50 C.F.R. § 451.03(b)(2).

Among other duties as Committee Chair, the Interior Secretary must make threshold determinations on an application within 20 days. 16 U.S.C. § 1536(g)(3); 50 C.F.R. § 452.03(a). If the Secretary makes a negative finding on any threshold determination, the Secretary must deny the application and the exemption process is terminated. 16 U.S.C. § 1536(g)(3)(B); 50 C.F.R. § 452.03(c). The ESA provides that "the denial of an application" under section 7(g)(3)(B) is considered final agency action for purposes of judicial review. 16 U.S.C. § 1536(g)(3)(B); 50 C.F.R. § 452.03(c).

In addition, if the Secretary of State certifies within 60 days that granting an exemption would violate an international treaty obligation or other international obligation of the United States, then the Interior Secretary "shall terminate the exemption process immediately," 50 C.F.R. § 452.03(e), and the Committee "shall be prohibited" from considering the application. 16 U.S.C. § 1536(i).

For an application that passes the threshold review, and for which the Secretary of State does not issue a section 7(i) determination, the Interior Secretary must then prepare a report to present to the Committee within 140 days. 16 U.S.C. § 1536(g)(4)–(5). To "develop the record

7

for the report," Congress further directed that the Secretary "shall hold a hearing." *Id*. §

1536(g)(4); 50 C.F.R. §§ 452.04(a), 452.05. The hearing is conducted by an administrative law

judge, who is directed to then close and certify the record and transmit it to the Secretary. The

Secretary then prepares the report for submission to the Committee. 50 C.F.R. § 452.08. Among

other requirements, the report must discuss the availability of alternatives, whether the action is

in the public interest, and any reasonable mitigation measures. 16 U.S.C. § 1536(g)(5); 50 C.F.R.

§ 452.04(a).

Under ESA section 7(h), the Committee "shall make a final determination whether or not

to grant an exemption within 30 days after receiving the report of the Secretary." 16 U.S.C.

§ 1536(h)(1); 50 C.F.R. § 453.03(a). Section 7(h) further prescribes that the Committee "shall

grant an exemption" if, "by a vote of not less than five of its members," it determines "on the

record" and "based on the report of the Secretary" that "there are no reasonable and prudent

alternatives to the agency action" and the "benefits of such action clearly outweigh" alternative

courses of action "consistent with conserving the species or its critical habitat," among other

required findings. 16 U.S.C. § 1536(h)(1)(A)(i)–(ii).

Section 7(j) of the ESA provides that "[n]otwithstanding any other provision" of the

ESA, the Committee "shall grant an exemption for any agency action if the Secretary of Defense

finds that such exemption is necessary for reasons of national security." 16 U.S.C. § 1536(j).

Section 7(j) is further addressed under the regulations for the Committee's exemption process,

which affirm that the Defense Secretary's authority is to be exercised in the context of an

exemption application. The relevant regulations were promulgated under 50 C.F.R. Part 453, the

purpose of which is to "prescribe[] the procedures to be used by the [Committee] *when*

*examining applications for exemption*." 50 C.F.R. § 453.01 (emphasis added). Those regulations

state that "[i]f the Secretary of Defense finds in writing that an exemption for the agency action

8

is necessary for reasons of national security, the Committee shall grant the exemption *notwithstanding any other provision in this part*." *Id*. § 453.03(d) (emphasis added).

## III.    The Administrative Procedure Act's Judicial Review Provision.

The Administrative Procedure Act ("APA") governs judicial review of federal agency actions. 5 U.S.C. §§ 701–706. The Supreme Court has long emphasized that the APA's judicial review provision is "generous" and its "purpose was to remove obstacles to judicial review of agency action under subsequently enacted statutes." *Shaughnessy v. Pedreiro*, 349 U.S. 48, 51 (1955).

As such, the APA "provides a right to judicial review of all 'final agency action for which there is no other adequate remedy in a court.'" *Bennett v. Spear*, 520 U.S. 154, 175 (1997) (quoting 5 U.S.C. § 704). The APA broadly defines agency action to include "the whole or a part of an agency rule, order, license, … or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). In reviewing the substance of an agency action, the APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law." *Id.* § 706(2)(A), (D).

**FACTUAL BACKGROUND**

## I.    Federal Oversight of Oil and Gas Activities in the Gulf Outer Continental Shelf.

The outer continental shelf  is the area of submerged land that generally begins about three nautical miles from shore—the outer boundary of most state waters— and extends 200 nautical miles outward. *See* Am. Compl. ¶ 62, Dkt. No. 18. Oil and gas exploration, development, and production activities in the Gulf Outer Continental Shelf include drilling wells, constructing pipelines, installing subsea production systems, pumping oil and gas, and loading and transporting oil, gas, and cargo on ships. *See id.* ¶ 64. Oil and gas activity has made the Gulf

9

one of the most heavily industrialized offshore areas in the world, with 1,366 active platforms. *Id.*

Pursuant to the Outer Continental Shelf Lands Act, 43 U.S.C. § 1331 *et seq.*, these activities are approved and administered by the Bureau of Ocean Energy Management ("BOEM") and Bureau of Safety and Environmental Enforcement ("BSEE"), agencies within the Department of the Interior. BOEM leases and allows development of oil and gas deposits in the Outer Continental Shelf, while BSEE is responsible for enforcing safety and environmental standards for offshore oil and gas activities and approving some permitting activities. 30 C.F.R. §§ 550.101, 250.101.

## II.     The Gulf's Natural Environment and Its Central Importance to Many Endangered and Threatened Species.

The Gulf is the world's largest gulf and ninth-largest body of water, spanning roughly 3,700 miles of coastline and 600,000 square miles (about twice the size of Texas) of water. The United States portion of the Gulf extends from the Florida Keys westward to the southern tip of Texas, following the coastlines of five states (Florida, Alabama, Mississippi, Louisiana, and Texas). These coastal areas contain half of the wetlands in the United States, as well as bays, estuaries, tidal flats, barrier islands, and forests. *See generally* NOAA, *The Gulf of Mexico at a Glance: A Second Glance* (NOAA State of the Coast Report Series, June 2011).[1]

One of the world's largest watersheds, the Gulf collects waters from 33 significant U.S. rivers, which carry sediments and nutrients from as far away as the Rocky Mountains. The Gulf's diverse natural habitats—including deep-sea canyons, seagrass meadows, and coral reefs—provide essential services including storm protection, water purification, and recreational

---

[1] Available at: https://www.fws.gov/doiddata/dwh-ar-documents/1187/DWH-AR0008582.pdf.

opportunities, which are essential to the region's social, economic, and environmental well-being. *Id.*

The diverse natural habitats of the Gulf and its shorelines are also home to many marine, terrestrial, and avian species classified as "threatened" or "endangered" under the ESA, including whales, manatees, sea turtles, birds, fish, and corals. Am. Compl. ¶¶ 65, 72. The Rice's whale is the most critically imperiled of these listed species, with the latest abundance estimates at only 51 animals. *Id.* ¶ 66. The only known baleen species to occur in the Gulf year-round, Rice's whales are concentrated in the northeastern Gulf in the De Soto Canyon area at relatively shallow depths of 100 to 400 meters. *Id.* Recent research has determined that the species is also persistently found in the western and central Gulf at the same depths. *Id.*

### III.    No Gulf of Mexico ESA Section 7 Consultations Have Culminated in an Irresolvable Conflict with Oil and Gas Activities.

Because BOEM and BSEE's authorization of oil and gas activities in the Gulf may adversely affect numerous listed species and their critical habitats (through oil spills, vessel strikes, noise, water pollution and marine debris, underwater explosions, and other impacts), section 7 of the ESA requires that BOEM and BSEE consult with NMFS and FWS to ensure that authorization of these activities are "not likely to jeopardize the continued existence" of these species "or result in the destruction or adverse modification of" their critical habitat. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a).

NMFS finalized the latest ESA section 7 consultation with BOEM and BSEE regarding oil and gas leasing, exploration, development, production, and decommissioning activities in the Gulf under a biological opinion ("BiOp") issued on May 20, 2025.[2] The consultation's scope

---

[2] Available at: https://www.fisheries.noaa.gov/s3//2025-05/BOEM-BSEE-Gulf-of-America-Oil-and-Gas-Program-BiOp-5.20.25.pdf.

includes BOEM and BSEE's management and regulation of Gulf Outer Continental Shelf oil and gas-related activities under the Outer Continental Shelf Lands Act from 2025 through 2029, including projections relating to permitting and plan approval and impacts from all prior active leases. Am. Compl. ¶ 63. As leases sold during the 2025–2029 period have a lifespan of roughly 40 years, the BiOp evaluates "effects" for a total of 45 years. *See id.*

NMFS's 2025 BiOp concluded that oil and gas activities in the Gulf were likely to jeopardize the continued existence of Rice's whale due to the risk of vessel strikes. *Id.* ¶ 68. In an effort to ameliorate this predicted impact, NMFS proposed a reasonable and prudent alternative comprised of the following actions to be implemented in step-wise fashion: immediately begin to use technology to enable Rice's whale vessel strike avoidance and monitoring and presence of Rice's whale; establish an expert working group to support development and implementation of a Rice's whale vessel strike avoidance technology plan; improve understanding of Rice's whale vessel strike risk associated with the proposed action; develop a Rice's whale vessel strike avoidance technology plan; undertake independent peer review; implement a Rice's whale vessel strike technology plan; and monitor Rice's whales to ensure no likelihood of jeopardy during implementation of this reasonable and prudent alternative. *Id.*

NMFS also concluded that other impacts arising from oil and gas activities were likely to adversely affect Rice's and sperm whales, green, hawksbill, Kemp's ridley, leatherback, and loggerhead sea turtles, and Gulf sturgeon, including entanglements, pollution from noise and oil spills, and sounds from chronic, constant sources such as vessel traffic and construction. *Id.* ¶ 67. NMFS prepared an Incidental Take Statement in relation to some of these impacts, including the identification of reasonable and prudent measures to mitigate those impacts. *Id.* ¶¶ 70–71.

FWS finalized its most recent BiOp on Gulf oil and gas activities in 2018.[3] *Id.* ¶ 72. That BiOp concluded that Gulf oil and gas activities would not jeopardize the continued existence of any listed species under FWS's jurisdiction, but found that oil spills resulting from those activities were likely to adversely affect ESA-listed bird species (Cape Sable seaside sparrow, Mississippi sandhill crane, piping plover, roseate tern, rufa red knot, whooping crane, and wood stork); nesting sea turtles (Kemp's ridley, loggerhead, and loggerhead critical habitat); beach mice (Alabama, Choctawhatchee, St. Andrew, and Perdido Key); and West Indian manatees. *Id.*

In 2025, FWS finalized a reinitiation of the 2018 consultation to address the listing of the black-capped petrel as an endangered species, proposed critical habitat rules for the rufa red knot and green sea turtle, and new scientific information regarding nesting loggerhead and Kemp's ridley sea turtles.[4] *Id.* ¶ 73. That 2025 consultation re-affirmed FWS's earlier conclusions in its 2018 BiOp and concluded that the proposed actions may affect, but are not likely to adversely affect, the newly listed black-capped petrel. *Id.*

Neither FWS nor NMFS has issued a biological opinion finding that BOEM and BSEE are in violation of section 7(a)(2), which would arise only under a finding of jeopardy or adverse modification for any species and the inability to identify reasonable and prudent alternatives to avoid this jeopardy.

**IV.    On March 13, 2026, the Defense Secretary Informs the Interior Secretary that He Is Invoking a Section 7(j) Exemption Despite the Lack of an Exemption Application and in the Absence of an Irresolvable Conflict Between Gulf Oil and Gas Activities and Interior's Compliance with Its ESA Section 7 Duties.**

On March 13, 2026, Secretary of Defense Pete Hegseth wrote to Interior Secretary Doug Burgum announcing that Secretary Hegseth had "found it necessary for reasons of national

---

[3] Available at: https://www.boem.gov/regions/gulf-america-ocs-region/2018-gom-fws-biop.
[4] Available at: https://www.boem.gov/oil-gas-energy/fws-march-28-2025-reinitiation-conclusion-letterpdf.

security" to exempt Gulf oil and gas activities from the ESA's requirements, under the purported authority of ESA section 7(j). *See* Endangered Species Committee Notice, 91 Fed. Reg. 16966 (Apr. 3, 2026). According to the letter, "[o]n January 26, 2026, the Department of the Interior notified the Department of War of ongoing Endangered Species Act (ESA) litigation that threatens to halt oil and gas production in the Gulf of America." Letter from Pete Hegseth, Sec'y of War, to Doug Burgum, Sec'y of Interior, Request for ESA Exemption for Gulf of America Oil and Gas Activities 1 (Mar. 13, 2026) ("Hegseth Letter").[5]

Secretary Hegseth invoked 7(j) despite the fact that no exemption application had been submitted to the Committee. Nor was there any lawful basis for such application in the absence of an irresolvable conflict, i.e., a finding of jeopardy without any reasonable and prudent alternatives. *See* Am. Compl. ¶ 74. Instead, Secretary Hegseth referred to "ongoing" ESA litigation as the basis for his decision. Hegseth Letter 1. However, the decision did not point to any way in which any pending litigation, or any judicial relief resulting from such litigation, had in fact interfered in any material way with any federal authorizations of oil and gas activities in the Gulf. Rather, Secretary Hegseth relied on the mere *existence* of litigation brought by the Center and others as the rationale for eliminating the ESA's safeguards.

On the same day he received Secretary Hegseth's letter, Interior Secretary Burgum issued a prepublication "Notice of Meeting," stating that the Endangered Species Committee would meet at Interior's Washington, D.C. headquarters on March 31, 2026, "regarding an exemption under the Endangered Species Act with respect to oil and gas exploration, development, and production activities in the Gulf of America associated with the Bureau of Ocean Energy Management [BOEM] and the Bureau of Safety and Environmental Enforcement

---

[5] Available at: https://www.doi.gov/sites/default/files/documents/2026-03/act-exemption-osd070136-26-res-final.pdf.

[BSEE] Outer Continental Shelf Oil and Gas Program." Am. Compl. ¶ 75. This notice was then formally published in the Federal Register on March 16, 2026. *Id.*; 91 Fed. Reg. 12672 (Mar. 16, 2026).

## V. On March 31, 2026, Six Members of the Endangered Species Committee Ratify the Section 7(j) Determination Without Meeting Any of the ESA's Statutory Requirements, Including the Requirements of Section 7(h).

On March 31, 2026, the Secretaries of the Interior, Agriculture, and the Army; the Administrators of the Environmental Protection Agency and the National Oceanic and Atmospheric Administration; and the Chair of the Council on Economic Advisors convened. *See* 91 Fed. Reg. at 16967. The Defense Secretary also attended the meeting. Am. Compl. ¶ 83. The meeting attendees unanimously voted to grant an exemption based solely on Secretary Hegseth's national security determination. Am. Compl. ¶ 81.

The written decision memorializing that vote asserts that "the application and other related requirements" in the ESA, including section 7(h), "do not apply," and the Committee was required to grant the exemption because the Defense Secretary had invoked section 7(j). 91 Fed. Reg. at 16966. Despite this express acknowledgment that the Committee's decision was not made in conformance with section 7(h), the decision asserts that "any person may obtain judicial review of this decision, which is made under [section 7(h)], 'in the United States Court of Appeals for … any circuit wherein the agency action concerned will be, or is being, carried out,'" citing ESA section 7(n), and that such review should proceed "exclusively in the U.S. Courts of Appeals for the Fifth or Eleventh Circuits." *Id.* at 16967.

## VI. The Center's Lawsuit.

The Center's amended complaint asserts four claims: (1) the Interior Secretary's convening of the Committee, and the Committee's decision, are arbitrary and capricious and not in accordance with law under the APA because the ESA substantively limits the Committee's

authority to the adjudication of exemption applications, and both the Interior Secretary's actions and Committee decision were made in disregard of the ESA's detailed required procedures; (2) the Interior Secretary and the Committee members arbitrarily and capriciously failed to comply with the ESA's informational requirements and/or unlawfully withheld the required information; (3) a writ of mandamus is warranted because the Interior Secretary and the Committee members failed to comply with the ESA's mandatory information disclosure requirements; and (4) the Defense Secretary's national security determination under section 7(j) lacked a rational basis, was unlawfully issued in the absence of an exemption application, and was arbitrary and capricious under the APA. The Center maintains that original jurisdiction belongs in the district court for all claims.

## STANDARD OF REVIEW

Motions to dismiss under Federal Rule of Civil Procedure 12(b)(1) "should be granted sparingly and with caution to make certain that the plaintiff is not improperly denied a right to have his claim adjudicated on the merits." *Neighborhood Assistance Corp. of Am. v. Consumer Fin. Prot. Bureau*, 907 F. Supp. 2d 112, 121 (D.D.C. 2012) (citation omitted).

To establish a court's jurisdiction to hear a claim in response to a Rule 12(b)(1) motion to dismiss, a plaintiff need only "state a plausible claim" for relief. *Humane Soc'y of the United States v. Vilsack*, 797 F.3d 4, 8 (D.C. Cir. 2015). "Determining a claim's plausibility is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Id.* (citation omitted). In ruling on a 12(b)(1) motion, "the Court 'may consider materials outside the pleadings'" but "'must treat the complaint's factual allegations as true and afford the plaintiff the benefit of all inferences that can be derived from the facts alleged.'" *Olu-Cole v. E.L. Haynes Pub. Charter Sch.*, 376 F. Supp. 3d 77, 81 (D.D.C. 2019) (citations omitted).

16

**ARGUMENT**

There is no basis to dismiss any of the Center's four claims for relief. The Center's first claim alleges the Interior Secretary's convening of the Committee in the absence of an exemption application, and the Committee's subsequent exemption, is arbitrary and capricious, and not in accordance with the ESA or its implementing regulations. While the merits of the case are not yet before the Court, Defendants' insistence that the Defense Secretary's invocation of section 7(j) overrides every other statutory requirement pertaining to the Committee's consideration of exemption applications, including section 7(h), also has direct bearing on threshold jurisdictional issues. The special statutory review provision of section 7(n) is limited to Committee decisions that are made under—not in disregard of—section 7(h) and other requirements of the exemption application process. Accepting Defendants' characterization of section 7(n)'s jurisdictional scope would cast a far broader net than the ESA's text, structure, and purpose permits.

Defendants' argument that the Center's second claim—which challenges the Interior Secretary's and Committee members' violation of the ESA's information access requirements—should be dismissed is also without merit. While the Center filed its case prior to the Committee's unlawful meeting and ratification of the Defense Secretary's section 7(j) determination, the Committee has now issued an exemption, and the Center has amended its Complaint to challenge this final agency action. Even if there had been validity to Defendants' characterization of the Center's second claim as an impermissible "piecemeal" or "intermediate" challenge prior to the exemption decision (there was not), that characterization has been overtaken by subsequent events. Now that the Committee has issued its exemption, all facets of that decision are subject to legal challenge, with the only question being the proper venue. As the

17

Center demonstrates in relation to its first claim, that venue is the district courts, rather than the courts of appeals.

This Court also has jurisdiction over the Center's mandamus claim. The Center's amended complaint more than sufficiently alleges that ESA section 7(e) creates a mandatory duty on the Committee to make "all records" relating to its activities "open to the public," that the Center is entitled to those records, and that there is no alternative remedy available.

Finally, Defendants essentially present no argument in relation to the Center's fourth claim, which challenges the Defense Secretary's determination that ESA litigation poses a national security threat sufficient to invoke his authority under section 7(j). Defendants' offhand characterization of this claim as unreviewable is insufficiently detailed and thus they have forfeited their ability to argue for dismissal of this claim. Regardless, while section 7(j) provides the Defense Secretary with authority to override the results of the exemption application process, it does not vest him with a roving authority to preemptively determine an exemption is needed in the absence of an application. In addition, the mere fact that section 7(j) involves national security does not equate to unreviewability, and there is no indication in the ESA that Congress intended to preclude judicial review of 7(j) determinations.

## I.   The Judicial Review Provision of Section 7(n) Does Not Apply to the Committee's Exemption Decision, Which Was Not Made "Under" Section 7(h).

The pervasive theme of the government's brief is that section 7(n) sweepingly provides a "clear mandate that any and all claims challenging exemptions be heard in the court of appeals, not the district courts." Defs.' Br. 15, Dkt. No. 24-1. That is incorrect. Although Defendants plainly prefer that the Center's claims be resolved in the government's chosen forum, the judicial review provision on which Defendants rely is narrowly drawn and, by its plain terms, does not apply to the decision under review.

18

"Because district courts have general federal question jurisdiction under 28 U.S.C. § 1331, the normal default rule is that persons seeking review of agency action go first to district court rather than to a court of appeals." *Watts v. SEC*, 482 F.3d 501, 505 (D.C. Cir. 2007) (citation modified); *see also Am. Petroleum Inst. v. SEC*, 714 F.3d 1329, 1332 (D.C. Cir. 2013) ("In this circuit, the normal default rule is that persons seeking review of agency action go first to district court rather than to a court of appeals.") (citation omitted). Accordingly, "[p]arties may proceed directly to the court[] of appeals only when authorized by a specific direct-review statute." *Loan Syndications and Trading Ass'n v. SEC*, 818 F.3d 716, 719 (D.C. Cir. 2016).

Even where a statute contains a direct review provision such as section 7(n), however, the jurisdiction under such provision "is strictly limited to the agency action(s) included therein." *Id.* (quoting *NetCoalition v. SEC*, 715 F.3d 342, 348 (D.C. Cir. 2013)); *see also Bombardier, Inc. v. U.S. Dep't of Labor*, 145 F. Supp. 3d 21, 31 (D.D.C. 2015) (Contreras, J.) ("[W]hen a 'special statutory review scheme' exists, 'it is ordinarily supposed that Congress intended that procedure to be the exclusive means of obtaining judicial review *in those cases to which it applies*.'" (emphasis added) (quoting *Jarkesy v. SEC*, 803 F.3d 9, 15 (D.C. Cir. 2015))); *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 209 (2023) (Gorsuch, J., concurrence) ("Because no one doubts that § 1331 vests district courts with jurisdiction to hear these cases, the only question properly before us is whether Congress has *actually* carved out some exception."). Here, the plain language, statutory context, and overriding purpose of the ESA and its 1978 amendments overwhelmingly demonstrate that section 7(n)'s jurisdictional provision does not apply to the Committee's decision.

19

A.      **The ESA's Text Demonstrates that Section 7(n) Is Inapplicable to the Committee's Exemption Decision.**

The dispositive interpretive question before the Court is whether the Committee's

exemption decision was, as the government insists, in fact made "*under* subsection (h)." 16

U.S.C. § 1536(n) (emphasis added). In construing the scope of section 7(n), the Court "begin[s],

as always, with the text of the statute." *Wagner v. FEC*, 717 F.3d 1007, 1010 (D.C. Cir. 2013)

(internal citations omitted); *Am. Petroleum Inst.*, 714 F.3d at 1333 ("Looking only at section 25's

language, we think it is apparent that this court lacks jurisdiction … [B]ecause petitioners

challenge a rule, the operative provision is section 25(b). And because the Commission relied on

none of the sections listed in section 25(b) when it published the resource extraction rule, that

should end the matter.") (citation modified); *see also Axon Enter., Inc.*, 598 U.S. at 209

(Gorsuch, J., concurrence) ("Where the statutory language is clear, our sole function … is to

enforce it according to its terms.") (internal citation omitted); *Pub. Citizen, Inc. v. Nat'l Highway

Traffic Safety Admin.*, 489 F.3d 1279, 1287 (D.C. Cir. 2007) (Kavanaugh, J.) (relying on

"ordinary English" to interpret meaning of "prescribe" in concluding that the "plain terms of the

statute dictate that judicial review … must begin in district courts—not in courts of appeals").

Although the word "'under' has many dictionary definitions and must draw its meaning

from its context," numerous courts have concluded that its "plain and ordinary meaning" and

"most natural reading" means "subject to" or "governed by." *Ardestani v. INS*, 502 U.S. 129, 135

(1991). In an analogous context involving interpretation of the Clean Water Act's special

statutory review provision, for example, the Supreme Court defined "under" "to mean 'pursuant

to' or 'by reason of authority' of." *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 583 U.S. 109, 124

(2018) ("The prepositional phrase—'under section 1311'—is most naturally read to mean that

the effluent limitation or other limitation must be approved or promulgated "pursuant to" or "by

20

reason of the authority of" § 1311."); *see also St. Louis Fuel & Supply Co. v. FERC*, 890 F.2d 446, 450 (D.C. Cir. 1989) (R.B. Ginsberg, J.) ("[N]o creative reading is possible—'under' means 'subject to' or 'by reason of the authority of.'"). This extensive caselaw is in accord with the relevant dictionary definitions. *See Black's Law Dictionary* (12th ed. 2024) (defining "under" as "according to"; "in accordance with"; or "pursuant to").

Any reasonable reading of the ESA's plain text shows that the Committee's March 31, 2026, decision was *not* made "under" subsection (h). Section 7(h)(1)(A) states in full:

> **(h) Grant of exemption**
>
>> **(1)** The Committee shall make a final determination whether or not to grant an exemption within 30 days after receiving the report of the Secretary pursuant to subsection (g)(5). The Committee shall grant an exemption from the requirements of subsection (a)(2) for an agency action if, by a vote of not less than five of its members voting in person—
>>
>>> **(A)** it determines on the record, based on the report of the Secretary, the record of the hearing held under subsection (g)(4) and on such other testimony or evidence as it may receive, that—
>>>
>>>> **(i)** there are no reasonable and prudent alternatives to the agency action;
>>>> **(ii)** the benefits of such action clearly outweigh the benefits of alternative courses of action consistent with conserving the species or its critical habitat, and such action is in the public interest;
>>>> **(iii)** the action is of regional or national significance; and
>>>> **(iv)** neither the Federal agency concerned nor the exemption applicant made any irreversible or irretrievable commitment of resources prohibited by subsection (d).

16 U.S.C. § 1536(h)(1)(A).

Absolutely *none* of this occurred before the Committee's decision. None of the required determinations have been made (nor could they be, since no exemption application exists), because the Committee's decision was made in express and purposeful disregard of provisions of section 7(h), rather than "pursuant to" or "in accordance" with those provisions. Far from

21

"strictly limiting" the scope of section 7(n)'s appellate court jurisdiction by its textual boundaries, the government's sweeping reading would instead "eviscerate Congress's carefully constructed jurisdictional scheme." *Am. Petroleum Inst.*, 714 F.3d at 1334. If the ESA's plain language is followed, as it must be, the Committee's decision was therefore not made "under" section 7(h).

The fundamental disconnect between the Committee's exemption decision and section 7(h)'s language is manifest from the provision's very first sentence. The Committee did not decide whether to grant an exemption within 30 days after receiving the report of the Interior Secretary pursuant to subsection (g)(5). 16 U.S.C. § 1536(h)(1)(A). Nor did the Committee make the required substantive findings of section 7(h)(1)(A)(i)–(iv) "based on the report of the Secretary," the "record of the hearing held under (g)(4)," or "on such other testimony or evidence as it may receive." *Id*. § 1536(h)(1)(A)(i)–(iv).[6]

It was, of course, not possible for the Committee to meet any of the section 7(h) requirements because these requirements only make sense in the context of an exemption application, and the Committee here claims the authority to issue exemptions without such application. The Committee decision *itself* expressly states that the "process for the Committee to consider an application for exemption and standards for the Committee to apply when considering an application" pursuant to 7(h) and other provisions "*do not apply* when the

---

[6] The Interior Secretary's convening of the Committee despite the lack of an exemption application renders essentially all the ESA's statutory scheme relating to the Committee superfluous or nonsensical, including the very composition of the Committee. For example, section 7(g)(2)(B) directs the Interior Secretary to "promptly" notify the Governor of each affected State "upon receipt of an application for exemption" and "request the Governors so notified to recommend individuals to be appointed" to the Committee "for consideration of such application." 16 U.S.C. § 1536(g)(2)(B). Because no application was submitted here, no such notification could occur, and thus only a subset of the Committee's statutory membership actually convened to ratify the Defense Secretary's section 7(j) national security determination.

Secretary of War finds that an exemption is necessary for reasons of national security." 91 Fed. Reg. at 16966 (emphasis added).

Defendants cannot have it both ways. They cannot claim to absolve themselves of the requirements of section 7(h) while they simultaneously seek to shoehorn the Center's APA claim into a jurisdictional provision specifically limited to decisions made "under"—i.e., "pursuant to," "in accordance with," or "by reason of the authority" of—that same provision. *Am. Soybean Ass'n v. Regan*, 77 F.4th 873, 882 (D.C. Cir. 2023) (Rao, J., concurring) (decrying "atextual and largely discredited approach to statutory interpretation" where direct review provision "imposes a simple, bright-line rule directing parties to proceed in district court unless the agency has held a 'hearing'" under applicable provision).

### B. The ESA's Statutory Structure and Purpose Demonstrates That Section 7(n) Is Inapplicable to the Committee's Exemption Decision.

The ESA's statutory context and purpose confirm the plain language understanding of section 7(n)'s jurisdictional scope as limited to Committee decisions arising from the detailed statutory exemption application process. *Elgin v. Dep't of the Treasury*, 567 U.S. 1, 10 (2012) (courts are to "examine" the relevant statute's "text, structure, and purpose" in order to determine whether Congress intended to preclude district court jurisdiction); *Kucana v. Holder*, 558 U.S. 233, 245 (2010) ("Examining, in statutory context, the provision in which the word 'under' is embedded, we conclude that the parties' position stands on firmer ground."); *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024) ("It therefore makes no sense to speak of a 'permissible' interpretation that is not the one the court, after applying all relevant interpretive tools, concludes is best.").

In arguing that the Center's case should be dismissed for lack of jurisdiction in the district courts, the government consistently and conspicuously omits a pivotal aspect of the

23

ESA's statutory structure governing Committee proceedings. Congress did not, as Defendants allege, simply create an "ESA exemption process" in the 1978 amendments to the Act, but an "ESA exemption *application* process." The exemption application is in fact *the* central element of the process leading to a section 7(h) determination. *See* 16 U.S.C. § 1536(g) ("*Application* for Exemption; Report to the Committee"); 50 C.F.R. Part 451 ("*Application* Procedure"); 50 C.F.R. Part 452 ("Consideration of *Application* by the Secretary"); 50 C.F.R. § 453.01 ("Purpose" of 50 C.F.R. Part 453—"Endangered Species Committee") ("This part prescribes the procedures to used by the Endangered Species Committee *when examining applications* for exemption from section 7(a)(2)") (emphasis added); *see also* Liner at 1336 ("It is *the purpose* of the Committee *to consider applications for exemption*.") (emphasis added).

The plain language *and* entire statutory structure of the 1978 amendments are predicated on the fundamental statutory requirement constraining the Committee's authority to convene in response to an exemption application submitted only after NMFS or FWS has issued a "jeopardy" biological opinion for which it has identified no "reasonable and prudent alternatives." This text and structure, in turn, codified Congress's purpose in enacting the 1978 amendments to provide a limited, last resort "escape valve" for those rare circumstances without diluting the potent substantive protections of the section 7 consultation process.

As part of that statutory structure and purpose, Congress provided two different jurisdictional avenues for review of final Committee determinations, depending on at which point the exemption application process culminates. The first, under section 7(g)(3)(B), provides for judicial review by the district courts of the Interior Secretary's threshold denial of an application—*prior* to the Committee's review pursuant to the intricate and detailed requirements of section 7(h). 16 U.S.C. § 1536(g)(3)(B); *id.* § 1536(h). Section 7(n), in contrast, provides for judicial review of a final Committee decision on an exemption application by an appeals court

24

made *after* the Interior Secretary's threshold review under section 7(g) and *under* the detailed review provisions of section 7(h). *Id.* § 1536(n).

Here, the Committee's decision falls in a third category outside of both 7(g)(3)(B) and 7(n), because Defendants assert (unlawfully, as the Center's first claim alleges) that section 7(j), 16 U.S.C. § 1536(j), vests the Secretary of Defense with *unbounded* authority to direct the Committee to grant an exemption for any project at any time, *even in the absence of a valid exemption application* and thus, by definition, without any of the requirements under section 7(h) being met.

The government's preferred scope of section 7(n)'s jurisdictional provision to cover the waterfront of Committee determinations, even one that bears no relationship to section 7(h) and that is instead made within a context never anticipated or provided for by Congress, is counter to the Act's "carefully constructed jurisdictional scheme." *Am. Petroleum Inst.*, 714 F.3d at 1334. Section 7(n) is not, as characterized by the government, a sweeping special review "statute," Defs.' Br. 19, but, rather, a specific special review *provision that has a precise function* within the ESA. *See In re Nat. Res. Def. Council*, 645 F.3d 400, 404 (D.C. Cir. 2011) (noting that the Food, Drug, and Cosmetic Act "contains no single, overarching provision governing judicial review," but "[i]nstead, discrete agency actions are subject to specialized review provisions.") (internal citation omitted); *Nat'l Ass'n of Mfrs.*, 583 U.S. at 117–18 (analyzing the seven categories of EPA actions that fall within the Clean Water Act's special review jurisdictional provision, while noting that actions falling outside that scope "are typically governed by the APA.").

Defendants' observation that "Congress made no provision for review of a Committee decision in the district courts under the ESA citizen-suit provision (or any other cause of action)," Defs.' Br. 11, fails to move the needle in their direction. As explained by the Supreme

Court, "[n]o one contends (and it would not be maintainable) that the causes of action against the Secretary set forth in the ESA's citizen-suit provision are exclusive, supplanting those provided by the APA." *Bennett*, 520 U.S. at 175; *see also id*. ("Nothing in the ESA's citizen-suit provision expressly precludes review under the APA, nor do we detect anything in the statutory scheme suggesting a purpose to do so."). The Center's first claim, challenging the decision by the Secretary of the Interior and other members of the Committee to exempt Gulf oil and gas activities in the absence of a valid exemption application, and without observance of the ESA's detailed requirements for the adjudication of such applications, does not fall under either section 7(n) or the ESA's citizen suit provisions at section 11(g), 16 U.S.C. § 1540(g), and thus is properly brought in the district court, pursuant to the APA.

Nor can Defendants' argument that direct appellate review would promote "speedy review, finality, and consistency of judicial review in enacting Section 7(n)," Defs.' Br. 17, overcome the plain text, structure, and purpose of the ESA, all of which demonstrate that section 7(n)'s jurisdictional reach does not extend to the Committee's decision challenged here. Defs.' Br. 17. *See Nat'l Ass'n of Mfrs.*, 583 U.S. at 126 ("[T]he Government's 'practical-effects' test ignores Congress's decision to grant appellate courts exclusive jurisdiction only over seven enumerated types of EPA actions."); *Pereira v. Sessions*, 585 U.S. 198, 217 (2018) (Kennedy, J., concurring) ("Unable to find sure footing in the statutory text, the Government … pivot[s] away from the plain language and raise[s] a number of practical concerns. These practical considerations are meritless and do not justify departing from the statute's clear text.").[7]

---

[7] The fact that there are several petitions for review pending in the Fifth Circuit challenging the Committee's exemption, *see* Defs.' Br. 17, says nothing about whether the appeals court in fact has jurisdiction to hear those claims. This court currently has three cases pending before it in which plaintiffs maintain that jurisdiction belongs with the district courts. Although one plaintiff also has submitted a petition for review with the court of appeals, that was expressly filed as a

C.    Defendants' Circumvention of the ESA's Detailed Special Statutory Review Scheme Undermines the Rationale for Original Appellate Review.

Defendants' erroneous insistence that the Committee's decision falls under the scope of section 7(n) is not only flatly counter to the ESA's text, structure, and purpose, it also undermines a common central rationale for Congress's inclusion of special statutory review provisions: the presence of prior, detailed administrative fact-finding and review. *See Bombardier*, 145 F. Supp. 3d at 34 (noting that special statutory review schemes precluding district court jurisdiction have "a familiar structure: agency action, then review before an administrative law judge, then review by a higher agency board or commission, then finally judicial review"); *NO Gas Pipeline v. FERC*, 756 F.3d 764, 769 (D.C. Cir. 2014) ("This prospect further counsels against reading 15 U.S.C. § 717r(b) as granting us jurisdiction over [plaintiff's] claim because, as Congress must surely be aware, this court, unlike the district court, is not well equipped to make factual determinations."); *Axon*, 598 U.S. at 186 ("[T]he point of special review provisions" is "to give the agency a heightened role in the matters it customarily handles, and can apply distinctive knowledge to.").

Here, due to the Committee's failure to abide by any of the ESA's requirements governing a decision under section 7(h), there is a total absence of any prior fact-fact finding, public participation, or actual administrative review. Instead, there was a single tightly choreographed, 17-minute closed-door meeting in which a subset of Committee members dutifully embraced the foregone conclusion that the sweeping and unprecedented exemption invoked by the Secretary of Defense would be granted. Defendants' wholesale circumvention of

protective petition. The Center moved to intervene in one of the Fifth Circuit petitions (filed by an industry group) in order to contest appellate jurisdiction, but its motion was denied without any explanation and without even the opportunity to file a reply brief. *Am. Energy v. Burgum*, No. 26-60240 (5th Cir.), Dkt. Nos. 47, 62.

27

the ESA's "elaborate framework" for the Interior Secretary's and Committee's adjudication of exemption applications, set out by Congress in "painstaking detail" under sections 7(e), 7(g), and 7(h), thus further underscores the inapplicability of section 7(n)'s appellate court jurisdictional provision to the Committee's March 31 decision. *Bombardier*, 145 F. Supp. 3d at 33 (quoting *Elgin*, 567 U.S. at 11).

Without the Committee's adherence to the ESA's "comprehensive administrative scheme," the accusation that the Center is attempting to "effortlessly evade" Circuit Court review, Defs.' Br. 16, falls flat. The cases Defendants rely on in support of this misguided characterization address a different scenario: where the plaintiff—typically a regulated party at odds with its regulator—tries to avoid the prescribed agency process altogether by recharacterizing a regulatory dispute that Congress committed to an agency adjudicator in the first instance as a justiciable civil complaint. *See, e.g.*, *Arch Coal, Inc. v. Acosta*, 888 F.3d 493, 500–01 (D.C. Cir. 2018) ("[T]he plaintiffs … attempted 'to short-circuit the administrative process by challenging a Department enforcement position in a district court.'") (quoting *Nat'l Mining Ass'n v. Dep't of Lab.*, 292 F.3d 849, 858 (D.C. Cir. 2002) (per curiam)); *Bombardier*, 145 F. Supp. 3d at 40 ("Like Bombardier, the *Jarkesy* plaintiffs filed suit before their agency proceedings culminated in a hearing before an administrative law judge.") (citing *Jarkesy*, 803 F.3d at 13).

In contrast, the Center is not attempting to avoid any agency process here, as no such process was provided. It is *Defendants* who have chosen not to "respect the review process established by Congress," *Bombardier*, 145 F. Supp. 3d at 41, but have instead expressly cast aside every facet of that process—beginning with the need for an exemption application that is required to trigger the process in the first instance. Accordingly, the Center's APA claims cannot be characterized as an "end run" around a process—including review by an Administrative Law

28

Judge, intensive fact-finding, and extensive opportunity for public involvement, including intervention—that Defendants themselves have made unavailable. *See id.* at 40–41; *see also Fed. Educ. Ass'n v. Trump*, 795 F. Supp. 3d 74, 85 (D.D.C. 2025) (district court holding it had "jurisdiction over the [plaintiffs'] claims" where the Executive Order at issue "removed [the agency] from coverage under [the statute]" such that "there is no 'special statutory review scheme' that is actually available to the [plaintiffs] for reviewing their claims"); *Nat'l Treasury Emps. Union v. Trump*, 780 F. Supp. 3d 237, 249 (D.D.C. 2025) (similar); *Am. Foreign Serv. Ass'n v. Trump*, 783 F. Supp. 3d 248, 259 (D.D.C. 2025) (similar).

### D.    Defendants' Jurisdictional Statement Is Not Entitled Any Deference.

Despite their own express acknowledgment that the Committee's decision was *not* made in conformance with any of the procedures or requirements of section 7(h), Defendants rely on the Committee's assertion, in adopting the exemption, that "any person may obtain judicial review of this decision, which is made under [section 7(h)], 'in the United States Court of Appeals for … any circuit wherein the agency action concerned will be, or is being, carried out,'" citing ESA section 7(n), and that such review must proceed "exclusively in the U.S. Courts of Appeals for the Fifth or Eleventh Circuits." 91 Fed. Reg. at 16967. Defendants' own declaration of where and how judicial review should occur has no bearing whatsoever on whether this Court has jurisdiction to resolve the Center's claims.

To begin with, simply because the Committee *asserted* that it was issuing the exemption "under" section 7(h) and that challenges to that decision must be brought in the Fifth or Eleventh Circuits, does not make it so. It is elementary administrative law that "[i]t is 'the effect of the action and not its label that must be considered.'" *Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 868 (9th Cir. 2022) (internal citation omitted); *see also Indep. Broker-Dealers Trade Ass'n v. SEC*, 442 F.2d 132, 139 (D.C. Cir. 1971) ("The question" of whether a

29

particular action constitutes an agency action under the APA "cannot be disposed of by referring to captions or labels."). As such, the Court cannot "predicat[e] reviewability on the use of" particular words by the Committee. *Indep. Broker-Dealers*, 442 F.3d at 139.

In any event, Defendants' own self-serving declaration regarding jurisdiction is entitled to no deference from the Court. *Murphy Expl. & Prod. Co. v. U.S. Dep't of the Interior*, 252 F.3d 473, 479 (D.C. Cir. 2001), *modified on denial of petition for reh'g*, 270 F.3d 957 (D.C. Cir. 2001) ("It goes without saying that the jurisdiction of the federal courts is outside agencies' expertise."); *NetCoalition*, 715 F.3d at 348 ("[W]e accord no deference to the executive branch in construing our jurisdiction.") (citing *Murphy*, 252 F.3d at 478).

Here, as explained, the unavoidable fact is that the Committee did not make a decision "under" section 7(h) and, to the contrary, expressly sidestepped that provision. That reality, rather than Defendants' *ipse dixit*, must govern the Court's jurisdictional analysis.

## II.    The District Court Has Jurisdiction to Hear the Center's Claim Challenging Defendants' Violation of the ESA's Information Access Requirements.

Defendants mischaracterize the Center's third claim, asserting violations of the ESA's information access requirements, as a "piecemeal" challenge to "procedural or intermediate actions." Defs.' Br. 16; *see also id.* at 9 (stating that the Center is "disaggregating" a "single decision into a series of freestanding claims"); *id*. at 15 ("Nor does Plaintiff's focus on preliminary or intermediate steps in the Committee's decision dispense with Section 7(n)'s bar on district court litigation.").

While the Center's initial Complaint alleged violations of the myriad ESA information access requirements prior to the March 31, 2026 meeting, the Committee has now convened and issued an exemption decision. The Center has filed an Amended Complaint challenging the decision, which supersedes its initial Complaint. *Jung v. Mundy, Holt & Mance, P.C.*, 473 F.

30

Supp. 2d 86, 87 (D.D.C. 2007) ("[A] plaintiff's properly amended complaint supersedes prior pleadings and controls [a jurisdictional] determination.") (internal citation omitted).

Defendants do not (and could not) argue that the exemption decision is not a final agency action for purposes of APA review. 5 U.S.C. § 704; *Bennett*, 520 U.S. at 178 (agency action is final when (i) it "mark[s] the 'consummation' of the agency's decisionmaking" as to a particular issue, and (ii) it determines "rights or obligations" or results in "legal consequences") (citation omitted). Notably, in arguing for dismissal of the Center's mandamus claim, Defendants assert that the Center has "an adequate vehicle to raise claims about its access to documents, meetings, and other information of the Committee … alongside its challenge to the Committee's order, in the proper court of appeals, pursuant to the exclusive review provision of Section 7(n)." Defs.' Br. 22; *see also id*. at 16 ("[A] claim challenging procedural or intermediate actions that will culminate in a final action reviewable only in the courts of appeals may only be raised in the courts of appeals.").

As demonstrated *supra*, the jurisdictional scope of section 7(n) is inapplicable to the Committee's decision here, and the Center is instead entitled to bring its APA claims before the district court. Defendants' cases in support of their muddied argument conflate this jurisdictional dispute with finality and are thus all inapposite. *See Telecomms. Rsch. & Action Ctr. v. FCC*, 750 F.2d 70, 75 (D.C. Cir. 1984) ("*TRAC*") ("Here, of course, there is no final order—indeed, the lack of a final order is the very gravamen of the petitioners' complaint.");[8] *Nader v. Volpe*, 466 F.2d 261, 265, 269–70 (D.C. Cir. 1972) (holding plaintiffs could not bring suit in district court

---

[8] In *TRAC*, the D.C. Circuit held that it had original jurisdiction over the agency action at issue, but "essential to [that] holding … were statutory provisions enabling [the appellate court] to review *any* final FCC order." *Cutler v. Hayes*, 818 F.2d 879, 887 n.61 (D.C. Cir. 1987) (emphasis added) (citing *TRAC*, 750 F.2d at 77). Here, unlike the judicial review provision at issue in *TRAC*, the judicial provision on which Defendants rely does not cover *any* Committee order. Rather, it covers only a Committee "decision under subsection (h)." 16 U.S.C. § 1536(n).

"for an injunction mandating augmentation of the administrative record while the administrative proceeding was still in progress"); *Sierra Club v. Thomas*, 828 F.2d 783, 792 (D.C. Cir. 1987) (finding district court did not have jurisdiction to hear APA unreasonable delay claim where appellate court had jurisdiction over final rule).

**III.     The Center Has Plausibly Pled a Mandamus Claim.**

The Center's third claim seeks mandamus relief against Defendants based on the ESA's requirement that "[a]ll meetings and records resulting from activities pursuant to this subsection *shall be open to the public.*" 16 U.S.C. § 1536(e)(5)(D) (emphasis added). The Center's claim alleges that the Committee is in violation of this mandatory duty because "the Committee has yet to make all of its records available to the public." Am. Compl. ¶ 103.

As Defendants concede, "[t]he Mandamus Act grants district courts 'original jurisdiction of any action in the nature of mandamus.'" Defs.' Br. 20 (citing 28 U.S.C. § 1361). However, Defendants contend that "Plaintiff has not plausibly alleged that the Committee had a duty to act or that Plaintiff is entitled to relief." *Id.* at 21. That argument is baseless. Each element of mandamus is present here. *See AHA v. Burwell*, 812 F.3d 183, 189 (D.C. Cir. 2016) (articulating test for obtaining mandamus relief).

First, as for the "duty to act," *id.*, section 7(e)(5)(D) is both mandatory and sweeping. "The word 'shall' generally indicates a command that admits of no discretion on the part of the person instructed to carry out the directive." *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 661 (2007); *see also Lexecon, Inc.* v. *Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998) ("[T]he mandatory 'shall' … normally creates an obligation impervious to judicial discretion."); *Ass'n of Civil Technicians, Mont. Air Chapter No. 29 v. FLRA*, 22 F.3d 1150, 1153 (D.C. Cir. 1994) ("The word 'shall' generally indicates a command that admits of no discretion on the part of the person instructed to carry out the directive.").

The mandatory duty imposed on the Committee is vast in scope; it mandates that "[a]ll …
records" of any kind relating to the Committee's activities be "open to the public." 16 U.S.C. §
1536(e)(5)(D). Reflecting Congress's unequivocal intention that there be maximum public
scrutiny of the Committee's activities, section 7(e)(5)(D) therefore imposes an obligation of
remarkable breadth. By its express terms, it does not allow the Committee to exempt from public
access any records for any reason. *Compare* 5 U.S.C. § 552(b) (setting forth the exemptions in
the Freedom of Information Act).

Accordingly, based on the express terms of the ESA, any records reflecting any
communications between the members of the Committee, or between any of the members and
Secretary Hegseth, or with *any* outside parties (such as the oil and gas industry) must be made
"open to the public" without exception. Hence, this is the paradigmatic situation in which a
mandatory legal duty *is* "plain in the statutory text" and does not "depend[] on statutory
construction or interpretation"—i.e., the very legal test that the government itself says should be
applied. Defs.' Br. 22.

Second, as for whether the Center is "entitled" to the information that the statute
mandates be made accessible, *id*.; *see AHA*, 812 F.3d at 189, the statutory provision at issue is
legally indistinguishable from other open government provisions that confer broad rights of
public access to particular materials. As this Court recently explained, "[i]nformational standing"
arises in "specific statutory contexts where a statutory provision has explicitly created a right to
information.'" *Sierra Club v. EPA*, No. 25-1112, 2026 WL 686323, at *5 (D.D.C. Mar. 11, 2026)
(Contreras, J.) (citation omitted). That is the precise situation here with regard to the statutory
mandate that "[a]ll … records" of the Committee "shall be open to the public." 16 U.S.C. §
1536(e)(5)(D); *see also Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 449 (1989) ("[W]hen
an agency denies requests for information under the Freedom of Information Act, refusal to

permit appellants to scrutinize the [American Bar Association] Committee's activities to the extent [the Federal Advisory Committee Act] allows constitutes a sufficiently distinct injury to provide standing to sue."); *cf. FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395–96 (2024) (finding no informational injury where plaintiffs did not assert that "federal law requires FDA to disseminate such information upon request by members of the public.").

In functionally identical circumstances, judges in this Circuit have held that a mandamus claim may be pursued to obtain records that Congress has mandated be made available to the public. For example, Judge McFadden held that the requirement in the Federal Advisory Committee Act that advisory committee records "shall be open to the public" is enforceable through a mandamus claim. *Elec. Privacy Info. Ctr. v. Nat'l Sec. Comm'n on A.I.*, 466 F. Supp. 3d 100, 111 (D.D.C. 2020); *see also Judicial Watch*, *Inc. v. U.S. Dep't of Commerce*, 736 F. Supp. 2d 24, 31 (D.D.C. 2010) (explaining that the "Mandamus Act authorizes district courts to issue mandamus orders compelling federal officials to perform ministerial or non-discretionary duties" and that the Federal Advisory Committee Act's requirement that advisory committee proceedings "shall" be open to public scrutiny "qualif[ies] as relief in the nature of mandamus"). The same result should apply here.

Third, there is no other alternative remedy. *See AHA*, 812 F.3d at 189. In arguing otherwise, Defendants claim only that, in seeking enforcement of the ESA's public disclosure requirement, the Center is relegated to the "exclusive review provision of Section 7(n)." Defs.' Br. 22. However, even putting aside the overall inapplicability of that review provision to the Center's claims, it certainly does not constitute an "adequate vehicle" to enforce the public disclosure mandate in 16 U.S.C. § 1536(e)(5)(D).

To begin with, the government is improperly equating the *administrative record* that the government chooses to designate for judicial review of a final Committee decision with the far

34

more sweeping obligation for public disclosure of "all" records of the Committee that is the subject of the mandamus claim. *See* Defs.' Br. 21, n.8 (referring to the "certified list of contents of record" for judicial review). Thus, all Committee materials excluded from the administrative record on deliberative process or other grounds are nevertheless encompassed within the sweeping public disclosure mandate in section 7(e)(5)(D). *See Oceana, Inc. v. Ross*, 920 F.3d 855, 865 (D.C. Cir. 2019) (holding that "predecisional and deliberative documents" are ordinarily "not part of the administrative record") (citation modified); *Pac. Shores Subdivision Cal. Water Dist. v. U.S. Army Corps of Engr's*, 448 F. Supp. 2d 1, 4–5 (D.D.C. 2006) (noting that relevant documents not considered by the agency may be excluded from the administrative record).

If, as the government contends, Congress had simply intended to require production of what the government represents to be the administrative record for judicial review of a final Committee decision, there would have been no need to adopt section 7(e)(5)(D) at all. In mandating public disclosure of "all" records of the Committee, Congress intended to impose an obligation that is both distinct from, and broader than, any administrative record compiled by the government solely for purposes of judicial review of a final exemption decision. Defendants' conflation of the public access requirement with the judicial review provision therefore violates the basic rule of statutory construction that no provision of a statute should be rendered redundant or meaningless. *See, e.g., Nat'l Ass'n of Home Builders*, 551 U.S. at 669 (explaining that the Supreme Court has repeatedly "cautioned against reading a text in a way that makes part of it redundant" and "mere surplusage").

Defendants' reading of the statute also undermines Congress's intent regarding the *timing* of public disclosure. Under Defendants' approach, section 7(e)(5)(D) cannot be judicially enforceable until and unless a final Committee decision is subject to review (by an appellate

35

court)—which may well after a Committee decision is made. That reading runs counter to Congress's patent purpose to provide for meaningful, ongoing public access to "all" of the records and meetings of the Committee.

In arguing that the Center "must raise [its] claims" regarding public access "alongside its challenge to the Committee's order," Defs.' Br. 22, Defendants also erroneously assume that judicial enforcement of the public access provision must be contingent on pursuit of a substantive challenge to a Committee "order" granting an exemption. But there may well be situations in which there is no such substantive challenge, e.g., because the Committee ultimately opts not to grant an exemption or an exemption becomes moot before judicial review can occur. Under Defendants' reading, the public access provision would be rendered effectively unenforceable under such circumstances.

While the foregoing is more than sufficient for the Court to hold that the Center's mandamus claim meets the plausibility standard, it is noteworthy that Defendants do not even suggest that they have fully complied with the public access provision. Rather, Defendants misstate the Center's claim as "appear[ing]" to be that certain specific "documents were not made publicly available *during the meeting*." Defs.' Br. 21 (emphasis added). But the Center's mandamus claim—as set forth in the Amended Complaint filed following the Committee's meeting—is that the Committee is in *ongoing* violation of its duty to make "all" records available to the public. *See* Am. Compl. ¶ 103 (alleging that the "Committee has *yet to make all of its records available to the public*") (emphasis added).

That allegation is not only unrebutted in Defendants' motion, but it cannot reasonably be disputed. According to Defendants' own declarant, a grand total of *four* records have been made available to the public through the Interior Department's website. *See* Rybacki Decl. ¶¶ 3–4, Dkt. No. 24-2. And these are merely described as the few records "received" by the "Web and Digital

36

Media Strategist in the Office of Communications," *id*. ¶ 1, rather than "all" of the Committee's records pertaining to the exemption, as required by the plain terms of the ESA.

It defies credulity that no additional records exist. For example, the Committee has not provided the public with even a single document reflecting any communications between Committee members and any representatives of the oil and gas industry regarding the scope and substance of an unprecedented exemption from the ESA that is expressly designed to benefit that very industry. Nor has the Committee provided the public with any written communication between and among members of the Committee regarding the novel exemption. And not a single communication between Committee members and Secretary Hegseth has been made publicly available, other than Secretary Hegseth's March 13, 2026, ultimate assertion of the need for a national security exemption based on litigation brought by the Center and other organizations. It is inconceivable that no additional communications occurred of any kind before the brief meeting on March 31 at which the exemption was ratified. Illustrating this, in advance of that meeting, the Center (and others) sent Committee members letters explaining how there is no evidence that protecting ESA-listed species meaningfully interferes with the production of oil and gas in the Gulf, demonstrating that additional communications do in fact exist. *See* Am. Compl. ¶ 80. That even those communications with the Committee have not been made "open to the public" leaves little doubt that Defendants are flouting section 7(e)(5)(D).

In any event, the Center has asserted, at the very least, a plausible claim that the Committee is in ongoing violation of its express mandatory duty to make "all" of its records "open to the public." Defendants' motion to dismiss that claim should be denied.

**IV.    The Secretary of War's Invocation of 7(j) Is Not Encompassed by Section 7(n)'s Jurisdictional Scope and Is Reviewable.**

Defendants' motion to dismiss makes only offhand mention of the Center's fourth claim for relief, which alleges that the Defense Secretary's national security determination under section 7(j) is arbitrary and capricious, Am. Compl. ¶¶ 105–06, and thus clearly does not fall within the jurisdictional scope of section 7(n). Like the Center's third claim for relief, Defendants inaccurately describe the claim as "piecemeal," and this argument thus fall short for the same reasons. Defs.' Br. 17.

Defendants also state without elaboration that the Secretary's determination "is not even reviewable." *Id.* This conclusory, unexplained assertion should be deemed waived. *Johnson v. Penetta*, 953 F. Supp. 2d 244, 250 (D.D.C. 2013) ("[P]erfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are deemed waived.") (internal citation omitted). It is also meritless. In general, there exists "a basic presumption of judicial review" in APA cases. *Abbott Labs. v. Gardner*, 387 U.S. 136, 141 (1967) (requiring "clear and convincing evidence" of a preclusive purpose). Defendants "bear[] the heavy burden of overcoming the strong presumption that Congress did not mean to prohibit all judicial review." *Dunlop v. Bachowski*, 421 U.S. 560, 567 (1975); *see also Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345 (1984) ("Whether and to what extent a particular statute precludes judicial review is determined not only from its express language, but also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved."). Defendants have provided no evidence of preclusion here, which is not supported in any manner by the ESA's text or structure.

Nor does the fact that the Defense Secretary made a "national security" determination presumptively insulate the decision from judicial review. *See Holder v. Humanitarian Law*

38

*Project*, 561 U.S. 1, 34 (2010) ("Our precedents, old and new, make clear that concerns of national security and foreign relations do not warrant abdication of the judicial role."); *Kirwa v. U.S. Dep't of Def.*, 285 F. Supp. 3d 257, 270 (D.D.C. 2018) ("APA review may be limited, but it involves more than a court rubberstamping action based on bare declarations from the agency amounting to 'trust us, we had good national security reasons for what we did.'") (citation omitted); *Xiaomi Corp. v. U.S. Dep't of Def.*, No. 21-cv-280, 2021 WL 950144, at * 4 (D.D.C. Mar. 12, 2021) (Contreas, J.) (granting preliminary injunction in case implicating national security because even in such situations, "'courts retain a role, and an important one, in ensuring that agencies have engaged in reasoned decisionmaking.'") (quoting *Judulang v. Holder*, 565 U.S. 42, 53 (2011)). Defendants, again, have presented no evidence, express or implied, that Congress intended such preclusion, let alone the clear evidence required to uphold a finding of unreviewability.

Defendants' passing claim of unreviewability is all the more remarkable given that, if accepted, it would not only vest a Defense Secretary with unbounded authority to exempt any federal agency action, at any time, for any reason, from ESA requirements, but would completely insulate any such decision from judicial review. This radical interpretation would fundamentally undermine the ESA's section 7 protections, accreting absolute power to the executive branch while neutering the constitutional role of Congress in enacting the Nation's laws and the judicial branch in interpreting those laws. *See Learning Res., Inc. v. Trump*, 146 S. Ct. 628, 637 (2026) ("Based on two words separated by 16 others … "regulate" and "importation"—the President asserts the independent power to impose tariffs on imports from any country, of any product, at any rate, for any amount of time. Those words cannot bear such weight.").

**CONCLUSION**

The Center's claims are properly before this Court. As such, the Court should deny

Defendants' motion to dismiss.

Respectfully submitted this 15th day of June, 2026.

/s/ *Brian Segee*
Brian Segee (CA Bar No. 200795)
Admitted *pro hac vice*
Center for Biological Diversity
226 W. Ojai Ave., Ste. 101-442
Ojai, CA 93023-3278
Phone: 805-750-8852
Email: bsegee@biologicaldiversity.org

Kristen Monsell (D.C. Bar No. CA00060)
Center for Biological Diversity
2100 Franklin St., Suite 375
Oakland, CA 94612
Phone: (510) 844-7137
Email: kmonsell@biologicaldiversity.org

Eric Robert Glitzenstein (D.C. Bar No. 358287)
Center for Biological Diversity
1411 K Street NW, Suite 1300
Washington, DC 20005
Phone: (202) 849-8401
Email: eglitzenstein@biologicaldiversity.org

Lindsay E. Reeves (La. Bar No. 32703)
Admitted *pro hac vice*
Center for Biological Diversity
3436 Magazine Street, FRNT PMB 539
New Orleans, LA 70115
Phone: (504) 342-4337
Email: lreeves@biologicaldiversity.org

*Attorneys for Plaintiff*

40